1    District Judge Ronald B. Leighton

2    Magistrate Judge J. Richard Creatura

3

4

5

6

7    UNITED STATES DISTRICT COURT

8    WESTERN DISTRICT OF WASHINGTON

9    AT TACOMA

10   MARCO SANTIAGO                    No.3:18-CV-05825-RBL-JRC

11        Plaintiff,                   Plaintiff's Exhibits in

12   v.                                Support of Summary Judgment

13   BRUCE GAGE, RYAN HARRINGTON,

14   SCOTT LIGHT

15        Defendants,

16

17    The Following Exhibits are presented for the Court's review

18   of Plaintiff's summarry Judgment.

19   A). mental Health update 4-27-17

20   B). S.c.c.c outpatient psychiatry clinic treatment progress note 8-16-17

21   C). Ashley's Declaration

22   D). P.I.R 1-5-18 Scott light

23   E). P.I.R 1-5-18 by Maureen Alyca

24   F). P.I.R 6-14-17 by Scott light

25   G). WPATH Standards of care

26   H). Federal bureau of Prisons Transgender offender manual

Plaintiff's Exhibits in                Marco Santiago #896177
Support of Summary Judgment            191 Constantine Way
                                       Aberdeen Wa, 98520

1 of 238

1   I). consent for hormone treatment for GID and/or transgender identification

2   J). Gender Dysphoria Protocol and GID-CRC

3   K). P.I.R 4-3-18 by Bruce Giage

4   L). Defendant Giage's admissions

5   M). Rachael Seevers emails

6   N). Herrington postponement DOCS/HS kites

7   O). Medical/Mental Health kites regarding Mental Health issues

8   P). Steven Hammond P.I.R

9   Q). kites to Scott light

10  R). Scott light P.I.R where he Authorizes Hormones

11  S). Grievance #18655767 1-3

12  T). Tort claim for damages

13  U). Herrington P.I.R where he removes My Stiches

14  V). letter from Danny Waxwing concerning medical records

15  W. Position Statement from endocrine Society, American medical Assoc./trans
16  Patients, Federal bureau of Prison clinical Guidelines for GID
        Respectfully Submitted,

17

18

19              *Ashley Moon Raelynn*
20              Marco Santiago #896177
                (AKA Ashley Moon Raelynn)
21              191 Constantine Way
                Aberdeen Wa, 98520

22

23

24

25

26

Plaintiff's Exhibits in                    Marco Sanitago #896177
Support of Summary Judgment                191 Constantine Way
                                           Aberdeen Wa, 98520





Department of
**Corrections**
WASHINGTON STATE

**MENTAL HEALTH UPDATE**

| OFFENDER NAME: | |
|---|---|
| **SANTIAGO, MARCO (ASHLEY)** | |
| DOC NUMBER: | DATE OF BIRTH: |
| **896177** | **09/02/1986** |
| FACILITY: | DATE: |
| **SCCC** | **04/27/2017** |

**SECTION 1 – Update**

**Reason for update (check one):**

☐ Annual update  ☐ New to institution  ☐ New to residential treatment  ☒ Other: Criteria for GD

**Source and reason for referral:**

This offender is an S1. A file review will show an MHA done at CBCC/IMU in January 2016. In that MHA, she requested that she be assessed in order to obtain female hormones. At that time, the writer of the MHA gave her a rule out for Gender Dysphoria as the writer did not feel that offender met the criteria for this diagnosis. She was left an S1.

Upon coming to SCCC, she requested to be seen via kite on 11-11-2017 and PER notes reflect that. She was seen on 11-30-2016, 12-29-2016 and today for a MHU.

A note from 12/29/2016 stated in part:

"She was seen on November 30th and at that time told this writer that she is a transgender woman. She asked to be seen to gather information on what to do from this point. She was assessed at CBCC on Jan 04, 2016 and told the writer of that MHA that she wanted female hormones. She reports she has felt this way (that she is a female) since she was "very young". She spoke with her father about this but he has since past away. She only told someone in DOC last year and only spoke to the assessor. She has a long sentence and does not want to wait until she is released to start this process. However, at this point in time, she only wants access to female undergarments and female products from offender store. She has spoken to the PREA coordinator, Ms. Ralkey and they are in the process of getting Ms. Santiago the items she desires. She is also reaching out to resources in the transgender community for support."

When meeting with this offender, the impression given was that she just wanted female under garments and was willing to wait to have the hormone needs met. She has since changed her mind about the hormone therapy and that is why this MHU is being done.

**Presenting problems (problem development):**

Today she reports that she wants to get the process started to get the permission needed to get the female hormones she desires.

She states that since about February of this year, she has been "under a lot of stress" and it has affected her relationships, her sleep, her appetite and her energy level. She is not exercising, she has lost weight and it is hard for her to focus at school or at work. She also reports that this stress is making her "impulsive" and she finds herself "snapping" at people when she normally would not do that.

She states that she has been in trouble with law enforcement since she was 13 or 14 and has spent most of her life in "Juvi, jail or prison". She states that she has never been in the community more than a few weeks before she would get into trouble again. So, there has not been a significant period of time that she has been in the community to seek out assistance with this situation. She has never spoken to a counselor or a doctor about her feelings. She told her father when she was 19 and she states "It did not go well". He started to call her names and she left home. (Before this time, she reports that her father found ladies underwear in her room but never asked her about it. She is not sure if her father thought she was bringing girls home or what.)

Her mother has never been a part of her life. Her father was abusive and she was taken from him by CPS at age 4. From the ages of 4 to 12, she was in a number of foster homes. She reports that when she was 4 years old, while in the care of CPS, she found a pair a girl's underwear in a box of clothes and she put them on. "This was the first time that I felt kinda whole."

She had behavioral issues in foster care and in school. She reports she "couldn't focus, I was impulsive and I ran away a lot. I ran from my father, I ran from foster homes and I ran from school."

She reports that she was always "different". She was bullied and teased as far back as she can remember. The kids in school thought she was Gay and she often got called names and slurs that are used for Gay people. She states she was afraid of the other kids. They made fun of her, bullied her and called her names.

Page 1 of 6

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-476 (09/03/2014)        DOC 630.500                                MENTAL HEALTH



**Department of Corrections**
WASHINGTON STATE

MENTAL HEALTH UPDATE

| OFFENDER NAME: | |
|---|---|
| SANTIAGO, MARCO (ASHLEY) | |
| DOC NUMBER: | DATE OF BIRTH: |
| 896177 | 09/02/1986 |
| FACILITY: | DATE: |
| SCCC | 04/27/2017 |

She played with the toys that CPS and the foster homes had but when she had the chance to play with girls, they would play Barbie's or house and she "loved that". She played Soccer when she was about 8 years old and liked that too.

She reports that after leaving her father's home, she was "homeless" for a little while. She reports she interacted better with females, trans-people and the Gay community. At that time, she did grow out her hair and wear makeup. She also would wear ladies clothing and presented herself as a female. Because she found herself in trouble "a lot" and because she was afraid of the reaction from others, she never went to talk to anyone like a doctor or counselor.

During puberty "I felt shame. Like my body was battling me. I wouldn't look at myself or touch myself. I am still like that today. I will do my best not to touch myself or look at it. It seems so foreign." She went on, "If I could remove my male parts, I would. I tried once to tie them off like they do to cattle but it hurt so bad that I stopped. I have thought about cutting them off but I am afraid of the pain, I'm afraid I would bleed out and I was afraid the DOC would think I was trying to kill myself and I didn't want that."

She has done extensive research on the effect that the hormones will have on her. She seems to be aware of how they will change her.

She is not sure what she will do if she is turned down for the treatment. She doesn't understand why DOC would not allow someone to get this treatment. "Why would anyone put themselves through all this, the ridicule, the shame, the slander if they were not serious about this? Especially in prison?"

## Observations / Mental status

| Affect-Visible | Mood | Orientation | Speech |
|---|---|---|---|
| ☒ Appropriate | ☐ Normal | ☒ Person | ☒ Appropriate |
| ☐ Labile | ☐ Depressed | ☒ Place | ☐ Poverty of content |
| ☐ Inappropriate | ☒ Anxious | ☒ Time | ☐ Flight of ideas |
| ☐ Constricted | ☐ Hypomanic/Manic | ☒ Situation | ☐ Latent |
| ☐ Expansive | ☐ Hopeless | ☐ Other | ☐ Guarded |
| ☐ Angry | ☐ Other | | ☐ Loud |
| ☐ Sad | | | ☐ Soft |
| ☐ Other | | | ☐ Rapid |
| | | | ☐ Pressured |
| | | | ☐ Other |

| Thought Process | Memory Impairment | Hallucinations | Appearance |
|---|---|---|---|
| ☒ Organized | ☒ None | ☒ None | ☒ Groomed |
| ☐ Tangential | ☐ Immediate recall | ☐ Auditory | ☐ Disheveled |
| ☐ Loose associations | ☐ Short-term | ☐ Auditory command | ☐ Poor Hygiene |
| ☐ Poverty of content | ☐ Long-term | ☐ Visual | ☐ Malodorous |
| ☐ Paranoid | | ☐ Olfactory | ☐ Poor Dentition |
| ☐ Illogical | | ☐ Tactile | ☐ Scars/Tattoos |
| ☐ Other | | ☒ Does not seem to be responding to internal stimuli | ☐ Other |
| | | ☐ Other | |

| Thought Content | Attention Impairment | Psychomotor | Interactional Style |
|---|---|---|---|
| ☒ None | ☒ None | ☐ Gait | ☒ Pleasant/Cooperative |
| ☐ Persecutory | ☐ Mild | ☐ Tremor | ☐ Suspicious |
| ☐ Grandiose | ☐ Moderate | ☐ Fidget | ☐ Evasive/Guarded |
| ☐ Somatic | ☐ Severe | ☐ Catatonia | ☐ Hostile/Aggressive |
| ☐ Phobias | ☐ Other | | ☐ Urgency/Aggravated |
| ☐ Themes | | | ☐ Manipulative |
| ☐ Other | | | ☐ Withdrawn |

Page 2 of 8

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-476 (09/03/2014)                    DOC 630.500                    MENTAL HEALTH

**Department of Corrections**
WASHINGTON STATE

**MENTAL HEALTH UPDATE**

| OFFENDER NAME: SANTIAGO, MARCO (ASHLEY) | |
|---|---|
| DOC NUMBER: 896177 | DATE OF BIRTH: 09/02/1986 |
| FACILITY: SCCC | DATE: 04/27/2017 |

**Daily functioning (sleep, appetite, energy):**

Sleep: ☐ Normal ☐ Hypersomnia ☒ Insomnia
Appetite: ☐ Normal ☐ Increased ☒ Decreased
Weight: ☐ Normal ☐ Increased ☒ Decreased
Energy: ☐ Normal ☐ Increased ☒ Decreased
Comments: Please see notes on page one

**Harm to self / others:**

☒ History of suicidal ideation   ☒ History of suicide attempt   ☐ Current assaultive ideation
☐ Current suicidal ideation   ☐ Current suicide attempt   ☐ Current assaultive command
☐ Current suicide plan   ☐ Current suicide command   ☐ Current self-mutilation (describe)

Age 19 she tried to Suffocate herself with a plastic bag.  At age 29 When she received this last sentence, she tried to get the police to kill her.

Current psychotropic medications:   ☒ No   ☐ Yes (list)

Response to psychotropic medications since last appraisal or update:

Other important interim history since last appraisal or update:

Change in Axis I - III Diagnoses:   ☐ No   ☒ Yes (if yes, list below)

| | DSM IV-TR Code | Diagnosis |
|---|---|---|
| Axis I | 302.85 F64.1 | Gender Dysphoria |
| | 296.22 F32.1 | R/O Major Depressive Disorder |

Axis II
Axis III   General Medical Conditions:   ☐ Unknown   ☒ Medical problems denied   ☐ Other (describe):

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-476 (09/03/2014)                DOC 630.500                MENTAL HEALTH

PRU-51454, 2nd installment   000003

5 OF 238



**Department of**
**Corrections**
WASHINGTON STATE

**MENTAL HEALTH UPDATE**

| OFFENDER NAME: | |
|---|---|
| **SANTIAGO, MARCO (ASHLEY)** | |
| DOC NUMBER: **896177** | DATE OF BIRTH: **09/02/1986** |
| FACILITY: **SCCC** | DATE: **04/27/2017** |

**Rationale for diagnostic change:**

The criteria for GD is as follows:

A: A marked incongruence between one's experienced /expressed gender and assigned gender, of at least 6 months' duration and manifested by at least two of the following:

1. A marked incongruence between one's experienced /expressed gender and primary and/or secondary sex characteristics

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be the other gender, (or some alternative gender different from one's assigned gender.)

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender.)

6. A strong conviction that one has the typical feelings and reactions of the other gender, (or some alternative gender different from one's assigned gender.)

B: The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

Based on offender's report, she meets all criteria.

The criteria for MDD is as follows:

Major Depressive Disorder:   (5 or more sx, over two week period)

At least one sx is depressed mood or loss of interest

A: •Depressed mood most of the day, nearly every day, as indicated by self-report or observation by others. For at least two weeks        (Meets this criteria )

•   Diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day, as indicated by self-report or observation by others.    (Meets this criteria: Does not work out or exercise anymore, has lost her appetite)

•   Significant weight loss when not dieting (or) weight gain, (or) decrease or increase in appetite nearly every day.   (Reports weight loss of at least 10 pounds)

•   Insomnia (or) Hypersomnia nearly every day.   (She is not sleeping well)

•   Psychomotor agitation (or) retardation nearly every day, observable by others.   (does not meet)

•   Fatigue or loss of energy nearly every day.   (Reports low energy)

•   Feelings of worthlessness (or) excessive or inappropriate guilt (which can be delusional) nearly every day (Not merely self-reproach or guilt about being sick). (Does not meet)

•   Diminished ability to think or concentrate (or) indecisiveness nearly every day. (Either by self-report or observation by others.)   (Is having trouble at work and at school)

•   Recurrent thoughts of death (not just a fear of dying), recurrent suicide ideation without a specific plan, (or) a suicide attempt (or) a specific plan for committing suicide.   (NOT SUICIDAL AT THIS TIME)

B:    The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

C: The episode is not attributable to the physiological effects of a substance or to another medical condition.

D: Not better explained by another disorder--Could be explained by Gender Dysphoria

E: There has never been a manic episode or hypomanic episode

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-476 (09/03/2014)                DOC 630.500                MENTAL HEALTH

PRU-51454, 2nd installment  000004



6 OF 238

**Department of Corrections**
WASHINGTON STATE

MENTAL HEALTH UPDATE

| OFFENDER NAME: | |
|---|---|
| **SANTIAGO, MARCO (ASHLEY)** | |
| DOC NUMBER: | DATE OF BIRTH: |
| **896177** | **09/02/1986** |
| FACILITY: | DATE: |
| **SCCC** | **04/27/2017** |

Current Axis IV - V (required):

Axis IV    Psychosocial and Environmental Problems (check all that apply):
- ☒ Primary support group
- ☒ Social environment
- ☒ Educational
- ☒ Occupational
- ☒ Housing
- ☐ Economic
- ☒ Access to health care
- ☒ Interaction with legal system

Axis V    Global Assessment of Functioning = 60
- ☐ 100-91 Superior
- ☐ 90-81 Minimal symptoms
- ☐ 80-71 Transient symptoms
- ☐ 70-61 Mild or some difficulty
- ☐ 60-51 Moderate symptoms
- ☐ 50-41 Serious symptoms
- ☐ 40-31 Reality testing impaired/communication/several areas
- ☐ 30-21 Delusions/hallucinations/impaired communication
- ☐ 20-11 Danger of hurting self/minimal hygiene/grossly impaired communication

Highest GAF in past year: N/A        ☐ Other:

**SECTION 2 – Disposition**

Service Needs:
- ☐ **Acute Care and Evaluation** (describe needs)

- ☐ **Crisis Stabilization** (describe needs)

- ☐ **Residential Treatment** (describe needs)

- ☒ **General Population and Outpatient Services** (describe needs)
  Offender can be treated for the depression here at SCCC.  If approved for Hormones, she can be followed by medical services.
- ☐ **Camp-based Services**
  - ☐ Current mental health evaluation reflects a GAF of 60 or more
  - ☐ Patient has not committed any self-destructive acts for over one year
  - ☐ Offender's mental health needs can be met at camp where mental health staff (non-prescribers) is on-site
  - ☐ Mental health issues do not interfere with living under camp circumstances
- ☐ **Work Release (Rap House or Lincoln Park)** (describe needs)

- ☐ **Has current needs but refuses treatment** (describe needs)

- ☐ **No current mental health needs**

Psychiatric prescriber referral:    ☐ No    ☒ Yes (give rationale)
In order to be presented to the GD CRC, she must meet with Psychiatry.

Priority Level: ☐ Urgent/emergent – Contact made with prescriber: _____
              ☐ High priority (unstable or Rx expiring)        ☒ Routine referral

Testing Referral (rationale):

Expedited Medicaid eligibility referral:    ☒ No    ☐ Yes
ORCS referral:                              ☒ No    ☐ Yes

Page 5 of 6

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-476 (09/03/2014)                    DOC 630.500                    MENTAL HEALTH

7 of 738



**Department of**
**Corrections**
WASHINGTON STATE

**MENTAL HEALTH UPDATE**

| OFFENDER NAME: | |
|---|---|
| **SANTIAGO, MARCO (ASHLEY)** | |
| DOC NUMBER: | DATE OF BIRTH: |
| **896177** | **09/02/1986** |
| FACILITY: | DATE: |
| **SCCC** | **04/27/2017** |

Other reason(s) and/or comments:

Classification information: Custody level: ___MI3___     "S" code: _2_     ERD: _07/13/2027_

| DATE | SIGNATURE | TITLE | STAMP/TYPE NAME |
|---|---|---|---|
| 04/28/2017 | *M Alyea* | Psych Assoc | Maureen Alyea, MA |

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-476 (09/03/2014)                DOC 630.500                                MENTAL HEALTH

PRU-51454, 2nd installment   000006

8 OF 2046 238

STAFFORD CREEK CORRECTIONS CENTER
OUTPATIENT PSYCHIATRY CLINIC TREATMENT PROGRESS NOTE

**NAME:** Santiago, Marco "Ashley"
**DOC#:** 896177
**DOB:** 09/02/1986
**DATE:** 08/09/2017

This is a psychiatric/psychological report providing information for DOC classification staff, community corrections officers, DOC Risk Management Specialists, the Indeterminate Sentence Review Board, and care providers within DOC who have a need to know.  Disclosure and dissemination of this report shall be in accordance with RCW 70.02 and DOC Policy 640.020.  It shall not be released to individuals outside DOC without the offender's consent or unless otherwise authorized by law.  The offender was advised of the purpose of the evaluation and departmental policy regarding information practices.

**This health care information is expected to be used by classification and other staff who have a legitimate need to know it to effectively manage the offender within the Department of Corrections.  This report is replicated in the offender's health record.**

**HPI:** Please see prior chart note for treatment review.  Patient requested that his primary therapist attend today's meeting.

Patient had previously reported variable concentration and appetite with decreased energy level and sleep disruption at our last visit 10 weeks ago.  Today, she reports ongoing difficulties with appetite and some weight loss with several hours of initial insomnia.  She denies any difficulties with concentration or significant anhedonia but describes her mood as "sad, depressed, lonely…".

Patient denied other significant substance abuse history beyond the cocaine use previously described and she has had no formal CD treatment history.

Patient acknowledges symptoms consistent with early onset dysthymia during much of her latency and adolescence.  She has experienced suicidal thoughts with 2 prior attempts: spontaneously attempting to strangle herself at age 19 after her father asked her to leave his home and told her that he did not love her; and a similar attempt at age 21 that occurred following harassment during incarceration.  Patient is reporting current depressive symptomatology > 6 months.

Ashley reports no history of symptoms of consistent with diagnoses of psychosis, social phobia, OCD, panic disorder, eating disorder or ADHD.

Patient provides a questionable history of possible hypomania.

Patient alleges physical abuse from her father occurring BIW from ages 4 – 21 whenever she lived with him.  She also reports monthly abuse occurring whenever she was institutionalized and TIW abuse while in juvenile detention from ages 15 – 18.  She recalls a single episode of sexual molestation from a 12-year-old boy when she was younger than age 10.  She is currently experiencing weekly nightmares relating to these events with daily intrusive memories and ongoing avoidance behaviors.

Past psychiatric treatment history includes multiple forensic evaluations at Western State hospital.  She reports no history of sustained psychotherapy and was initially prescribed psychotropic medications at age 15 recalling that she took Geodon for 8 months or so.  She also recalls taking Wellbutrin and Seroquel for several months in 2008 and this is confirmed by CIPS.

Past medical/surgical history is notable for appendectomy in 2012.  She denies any history of head trauma but does report 2 seizures that were related to crack cocaine use at age 19.  She has NKDA.

Family psychiatric history is notable for substance use in her father.

Patient is an only child and does not know how old her parents were when they were together or the duration of their relationship.  She does have a half-sister who is 16 years younger.  Her father worked as a bookbinder and the family relocated annually generally near Lynnwood, Washington.
Patient was removed from her father's care at age 4 subsequently living in various placements until age 9 when she was admitted to the Ryther Child Treatment Center for the next 3 years.

Patient has difficulty recalling her educational experience but was "always" in special education primarily for behavioral issues.  She does not recall having friends or participating in extracurricular activities.  She returned to live with her father from ages 12 – 15 and was not attending school at the time or was truant.

She subsequently was placed in juvenile detention from ages 15 – 18.

She has no significant community employment history and does not report significant intimate emotional relationships as an adult.

Patient recognized her gender dysphoria as a child recalling that she preferred to play with girls and avoided the roughhousing of her male peers.  She was tempted by female clothing and recalls being confused and somewhat disgusted by the physical changes that occurred for her during puberty.  She recalls attempting to simply avoid touching her genitalia.

**MENTAL STATUS EXAM:** is notable for a casually but neatly groomed and attired individual with longer fingernails and mildly effeminate psychomotor behavior.  Speech is soft with an appropriate tone.  Thought processes are digressive but redirectable.  She denies any current perceptual abnormalities, organized paranoia or active suicidal/assaultive ideation.  Mood is constricted and depressed.  Insight and judgment appear fair though limited.

Initial diagnostic impressions are: likely early onset dysthymia; gender dysphoria; cocaine abuse/dependence; grief/reactive depression by history; likely PTSD; personality disorder, NOS; and rule out bipolar disorder type 2.

Supportive psychotherapy and psychoeducation were provided.  It is unclear whether she has had actual hypomanic episodes.  Psychological testing may be helpful for diagnostic clarification and treatment planning.

I would recommend that Ashley consider a trial with an antidepressant medication while closely monitoring for any signs/symptoms of an elevated mood.

I would recommend that she continue with her current psychotherapy.

I will meet with her again in 2 weeks to discuss possible pharmacotherapy options.

Michael Furst, M.D.
Psychiatrist

MF/ks
T: 08/16/2017

OFFENDER NAME: SANTIAGO, MARCO
DOC #: 896177
DATE: 08/09/2017
PAGE 2 of 2

EX. C

District Judge Ronald B. Leighton

Magistrate Judge J. Richard Creatura

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

MARCO SANTIAGO                    No.3:18-CV-05825-RBL-JRC

      Plaintiff,              Plaintiff's Declaration in

v.                                Support Of Summary Judgment

BRUCE GAGE, RYAN HARRINGTON,

SCOTT LIGHT

      Defendants,

    I, Marco Santiago, (AKA Ashley Moon Raelynn), declare

the following facts are of my first hand knowledge and also

true and correct to the best of my knowledge,

1. I. Marco Santiago, (AKA Ashley Moon Raelynn), am the

the plaintiff in the above action, and suffer from Gender

Dysphoria; The facts as detailed by Psych Assoc Maureen Aleya,

within her primary encounter report, dated 4-27-17, regarding

my past history is true and correct, as well, said report

is correct that I do meet the standards to be treated with

Hormone therapy.

Declaration in Support of          Marco Santiago #896177
Summary Judgment                   191 Constantine Way
                                   Aberdeen Wa 98520

2. As an individual inflicted with Gender Dyphoria, "being transgendered", I have done extensive reading to better understand an cope with my condition, which I have presented within my briefing a number of references to that material, to include symptoms, that are known to persist with the condition as well current treatment, all of which I attest are true and correct reflections of those materials.

3. On 1-5-18, as a result of depression over my condition and in doubt if any medical treatment may be forthcoming, I attempted to auto-castrate myself in order to alleviate my pain.

4. I had suffered unremitting emotional pain to include anxiety, depression, suicidal thoughts from Gender Dysphoria, while awaiting treatment. I did my best to bring these concerns of my mental status to the attention of medical staff, which I detailed in kites and verbally through medical visits with mental health to include conversations with Defendant Scott Light, and Defendant Ryan Harrington.

5. I was hospitalized on 6-14-17 as a result of one of many panic episodes I had while awaiting treatment.

Declaration in Support of
Summary Judgment

Marco Santiago #896177
191 Constantine Way
Aberdeen Wa, 98520

6. I have presented a true and correct copy of ("WPATH") Standards of Care; All of my excerpts within my breifing regarding ("WPATH") are accurate. These Standards of care outline appropriate treatment protocols for individuals with Gender Dyphoria. I recieved this proper presented copy from Attorney Danny Waxwing at Washington Disability Rights, "TIP", Trans In Prison Project. As well, Attorney Waxwing provided me a copy of all the following true and correct documents to support my claims before this honorable Court;

a). ("WPATH") Standards Of Care;

b). ("B.O.P") Standards of Care;

c). E-mails between Attorney Rachel Seevers and Defendant Bruce Gage, and well as E-mails between Dr.Karsic and Attorney Rachel Seevers;

d). D.O.C. Gender Dysphoria Protocol;

e). My D.O.C. medical file, which portions of were used to support my claims and found within as Exhibits.

7. I do attest that The D.O.C. Gender Dysphoria Protocol, ("WPATH" Standards Of Care), ("B.O.P" Standards Of Care), are all silent on the need for projective testing, perosnality testing as a requisite for diagnosis or treatment of Gender Dysphoria.

Declaration in Support of
Summary Judgment

Marco Santiago #896177
191 Constantine Way
Aberdeen Wa 98520

8. I have first hand knowledge, through conversations with my provider, Scott Light and other medical staff that the GD-CRC at all times were aware of my prolactin levels, and that those levels were never a factor to the GD-CRC to deny me care.

9. I informed medical staff including my provider, Defendant Scott Light, that I displayed no symptoms whatsoever of possible prolactinoma, through verbal conversation and via the kite system, which is established within the record of kites I have provided at EX Q.

10. At EX W, I have provided a true and accurate copy of the Endrocrine Society Position statement as well as the Federal Bureau Of Prison Clinical Guidance Assessment and Management of the TG individual, a Multidisciplinary Approach, to further help this Court understand how vital hormone treatment is to someone as myself and the requisites needed to give that treatment.

I declare under the penalty of perjury, under the laws of the United States of America, pursuant to 28 U.S.C.S § 1746, that the foregoing is true and correct.

Executed this __4__ day of __June__ . 2019       _Ashley Moon Raelynn_
                                                  Marco Santiago #896177
Declaration in Support of                         Marco Santiago #896177
Summary Judgment                                  191 Constantine Way
                                                  Aberdeen Wa 98520



Department of
**Corrections**
WASHINGTON STATE

PATIENT I.D. DATA:   **SANTIAGO, MARCO**
(Name, DOC#, DOB)   **896177      09/02/1986**

## PRIMARY ENCOUNTER REPORT

| DATE | TIME | FACILITY |
|------|------|----------|
| 01/05/2018 | 14:13 | SCCC |

**Subjective Complaint/Objective Findings/Assessment/Evaluation:**

Subjective:
A medical emergency was called in the housing unit (G) where the patient was found holding the genital area stating that she (transgender male to female) had cut herself. She explained to me in the treatment room that she was frustrated and wanted to perform an orchectomy by herself. She stated that she wanted to cut a small incision in the scrotum then enter the scrotum and cut out the testicles. She made the outer incision with a clean razor blade, but the blood "freaked me out," and she sought medical attention. She states she had no intention to kill herself. She denies testicular pain, or injury to the testicles themselves. She denies any other medical problems.

Objective:
VS- BP 146/96, HR 82, RR 16, T-98.3, SPo2 100%
General- slightly shy and anxious. Otherwise fit / healthy appearing young male patient.
Heent-tearful. Pearl.
Chest-CTA bilaterally
CV- RRR
Abdomen- non-tender
GU- RN Johnson is with me directly observing thoughout. The lower portion of the scrotum (which is shaved) midline exhibits a 1.3 cm incision of I believe the outer skin only. Testicular exam seems otherwise within normal limits without pain or masses noted.

**Diagnosis/Plan/Rx:** (Diagnosis required for medication orders. Allergies required for new medication orders.)

1. Self inflicted scrotal skin laceration. With the patient's informed consent I first cleaned the entire scrotum with betadine soap. Sterile technique was then used and the area of the laceration was cleaned with betadine. I then anesthetized each side of the involved skin with a total of approximately 1.5 ccs. of plain 2% lidocaine with excellent effect. I then used 3 simple inturrupted throws of 4.0 prolene to close the laceration. Subsequent scrotal exam was unchanged. TAO and a bandage were applied. Suture removal of 3 sutures in 10-14 days.

I spoke with mental health and they were considering IPU admission with conditions of confinement due to self harm.

☒ Risks/benefits of recommended intervention explained; patient consents.

| Name and Title of Employee/Contract Staff Performing Encounter: | Signature: |
|---|---|
| S. LIGHT, PA-C | |

Page 1 of 1

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 320.255   DOC 410.430   DOC 420.250   DOC 420.255   DOC 420.312   DOC 490.850
DOC 610.010   DOC 610.025   DOC 610.040   DOC 610.600   DOC 610.650   DOC 670.020

EX. E



**Department of**
**Corrections**
WASHINGTON STATE

OFFENDER I.D. DATA: **SANTIAGO, MARCO**
(Name, DOC#, DOB)   **896177   09/02/1986**

## PRIMARY ENCOUNTER REPORT

| DATE | TIME | FACILITY | UNIT |
|------|------|----------|------|
| 01/05/2018 | 15:15 | SCCC | MH |

**Allergies:** ☐ Allergies verified with patient (Update Problem List and CIPS if needed)
NKDA

**Subjective Complaint/Objective Findings/Assessment/Evaluation:**

Note to reader: This offender is identifying as a transgender woman and would like to be addressed as "she".

S: This writer was contacted by medical that Ms. Santiago had attempted to cut her testes off. When she saw all the blood, she stopped and called a medical emergency.
After she was medically cleared, this writer spoke to her and asked her why she had done this. She reported that after the appointment yesterday "I got mad, not at you but at the situation and I have been waiting so long and I just hate the way my body looks and I just wanted them off. I will never do that again, I know it was stupid."
While she asked to not go to the COA, this writer explained that this was a "time out" for her to get some rest and to think. She was told that when something like this happens that person has to be assessed and we have to be certain that they are stable before we can send them back to the unit.

O: Ms. Santiago was upset. She was teary-eyed and anxious. She was oriented times four. His speech was anxious in rate, tone, and volume. She was polite, compliant, and responded to all questions asked of her. Her eye contact was appropriate. Her thought process was organized and her mood was appropriate for the situation.

A: While this writer doesn't believe that she is suicidal, one cannot be too careful. The COA time will give her time to think and clam down. It will also help medical to watch the wound and stitches. Ms. Santiago needs to be aware of how serious this self harm was and that she cannot take things into her own hands.
An SII and the COC paperwork was done and the Shift Lt was notified.

**Diagnosis/Plan/Rx:** (Diagnosis required for medication orders)
P: Offender Santiago will be seen on Monday Jan 8, 2018

☐ Risks/benefits of recommended intervention explained; patient consents

| Name and Title of Staff Performing Encounter: | Signature |
|---|---|
| Maureen Alyea, MA, Psych Assoc | Alyea |

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 410.430   DOC 420.250   DOC 420.255   DOC 490.850   DOC 610.010
DOC 610.040   DOC 610.025   DOC 610.600   DOC 610.650   DOC 670.020

DOC 13-435FP (10/28/2015)

OUTPATIENT/MENTAL HEALTH

SANTIAGO, MARCO 896177 09-02-86

| DATE (m/d/yy) | TIME (24-hr) | FACILITY | UNIT | ALLERGIES | PLAN / RX (Dx required for medication orders) |
|---|---|---|---|---|---|
| 7-14-17 | 2030 | SCC | W6 | Codeine | |

☐ Risks/benefits of recommended intervention explained; patient consents

Pt declined to complete his
scheduled initial psychiatric
assessment appt w/ me today

M.L. FURST, M.D.

---

SANTIAGO, MARCO 896177 09-02-86

| DATE (m/d/yy) | TIME (24-hr) | FACILITY | UNIT | ALLERGIES |
|---|---|---|---|---|
| 6/14/17 | 0200 | SCC | H6 | Codeine |

☐ Risks/benefits of recommended intervention explained; patient consents

Med emergency called to H6 A pod pt c/o
numbness in hands, feet & face upon arrival
pt laying on side foamy material coming
from mouth pt only responding to pain
open & closes eyes BP 180/90 P 100 O2 99% R
witnesses report pt being "very" depressed not
eating MH hx Resp. 35-40 pt fingers curled
up assisted pt to breath in paper bag enc
pt to slow breathing & results EMS activated
provider notified & orders received. @ 217
20g IV inserted in L upper arm using
aseptic technique IV patent. Non rebreather placed
O2 15 L O2 sats 98% @ 225 pt to ER arrived
on scene #4 Continued to breath @ 35-40 resp.
per min. still verbally not responding began
twitching of leg & hip muscles provider updated
of symptoms & pt condition new orders

PLAN / RX (Dx required for medication orders)

1) transport pt to
CHCC via ambulance
2) Insert IV Saline
lock.
3) Ativan 0.5mg
via IV push x 1 now
per T.O RN

[signed] PA-C H. Wilkena

SCANNED


S. Wilson PA-C

---

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

Department of Corrections

DOC 410.430   DOC 420.250   DOC 420.255   DOC 420.312
DOC 490.850   DOC 610.010   DOC 610.025   DOC 610.040
DOC 610.600   DOC 610.650   DOC 670.020

**PRIMARY ENCOUNTER REPORT**

DOC 13-435 (10/28/2015)

PRU-51454, 1st installment   000387

EX. G



# Standards of Care

## for the Health of Transsexual, Transgender, and Gender-Nonconforming People

The World Professional Association for Transgender Health

www.wpath.org

Version 7



**WPATH** WORLD PROFESSIONAL ASSOCIATION for TRANSGENDER HEALTH

# Standards of Care

## for the Health of Transsexual, Transgender, and Gender-Nonconforming People

Eli Coleman, Walter Bockting, Marsha Botzer, Peggy Cohen-Kettenis, Griet DeCuypere, Jamie Feldman, Lin Fraser, Jamison Green, Gail Knudson, Walter J. Meyer, Stan Monstrey, Richard K. Adler, George R. Brown, Aaron H. Devor, Randall Ehrbar, Randi Ettner, Evan Eyler, Rob Garofalo, Dan H. Karasic, Arlene Istar Lev, Gal Mayer, Heino Meyer-Bahlburg, Blaine Paxton Hall, Friedmann Pfäfflin, Katherine Rachlin, Bean Robinson, Loren S. Schechter, Vin Tangpricha, Mick van Trotsenburg, Anne Vitale, Sam Winter, Stephen Whittle, Kevan R. Wylie & Ken Zucker

© 2012 World Professional Association for Transgender Health (WPATH). All rights reserved.

7th Version[1] | www.wpath.org

ISBN: X-XXX-XXXXX-XX

---

[1] This is the seventh version of the *Standards of Care* since the original 1979 document. Previous revisions were in 1980, 1981, 1990, 1998, and 2001. Version seven was published in the International Journal of Transgenderism, 13(4), 165–232. doi:10.1080/15532739. 2011.700873

# Table of Contents

I.     Purpose and Use of the *Standards of Care* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.    Global Applicability of the *Standards of Care* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

III.   The Difference Between Gender Nonconformity and Gender Dysphoria . . . . . . . . . . . . .4

IV.    Epidemiologic Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

V.     Overview of Therapeutic Approaches for Gender Dysphoria . . . . . . . . . . . . . . . . . . . . .8

VI.    Assessment and Treatment of Children and Adolescents with Gender Dysphoria  . . . . .10

VII.   Mental Health  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

VIII.  Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

IX.    Reproductive Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

X.     Voice and Communication Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

XI.    Surgery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

XII.   Postoperative Care and Follow-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

XIII.  Lifelong Preventive and Primary Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

XIV.   Applicability of the *Standards of Care* to People Living in Institutional Environments . . .67

XV.    Applicability of the *Standards of Care* to People with Disorders of Sex Development . . . .69

## References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72

## Appendices

A.     Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .95

B.     Overview of Medical Risks of Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . .97

C.     Summary of Criteria for Hormone Therapy and Surgeries . . . . . . . . . . . . . . . . . . . . . .104

D.     Evidence for Clinical Outcomes of Therapeutic Approaches . . . . . . . . . . . . . . . . . . . .107

E.     Development Process for the *Standards of Care, Version 7* . . . . . . . . . . . . . . . . . . . . . .109

20 OF 246 238

# Purpose and Use of the *Standards of Care*

The World Professional Association for Transgender Health (WPATH)[I] is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect in transsexual and transgender health. The vision of WPATH is a world wherein transsexual, transgender, and gender-nonconforming people benefit from access to evidence-based health care, social services, justice, and equality.

One of the main functions of WPATH is to promote the highest standards of health care for individuals through the articulation of *Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People*. The *SOC* are based on the best available science and expert professional consensus.[II] Most of the research and experience in this field comes from a North American and Western European perspective; thus, adaptations of the *SOC* to other parts of the world are necessary. Suggestions for ways of thinking about cultural relativity and cultural competence are included in this version of the *SOC*.

The overall goal of the *SOC* is to provide clinical guidance for health professionals to assist transsexual, transgender, and gender-nonconforming people with safe and effective pathways to achieving lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment. This assistance may include primary care, gynecologic and urologic care, reproductive options, voice and communication therapy, mental health services (e.g., assessment, counseling, psychotherapy), and hormonal and surgical treatments. While this is primarily a document for health professionals, the *SOC* may also be used by individuals, their families, and social institutions to understand how they can assist with promoting optimal health for members of this diverse population.

WPATH recognizes that health is dependent upon not only good clinical care but also social and political climates that provide and ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that promote tolerance and equity

---

I   Formerly the Harry Benjamin International Gender Dysphoria Association

II  The *Standards of Care (SOC)*, *Version 7*, represents a significant departure from previous versions. Changes in this version are based upon significant cultural shifts, advances in clinical knowledge, and appreciation of the many health care issues that can arise for transsexual, transgender, and gender-nonconforming people beyond hormone therapy and surgery (Coleman, 2009a, b, c, d).



for gender and sexual diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these changes in public policies and legal reforms.

## The *Standards of Care* Are Flexible Clinical Guidelines

The *SOC* are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender-nonconforming people. While flexible, they offer standards for promoting optimal health care and guiding the treatment of people experiencing gender dysphoria—broadly defined as discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b).

As in all previous versions of the *SOC*, the criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. Clinical departures from the *SOC* may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm-reduction strategies. These departures should be recognized as such, explained to the patient, and documented through informed consent for quality patient care and legal protection. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care—and the *SOC*—to evolve.

The *SOC* articulate standards of care but also acknowledge the role of making informed choices and the value of harm-reduction approaches. In addition, this version of the *SOC* recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments. Some patients who present for care will have made significant self-directed progress towards gender role changes, transition, or other resolutions regarding their gender identity or gender dysphoria. Other patients will require more intensive services. Health professionals can use the *SOC* to help patients consider the full range of health services open to them, in accordance with their clinical needs and goals for gender expression.

# II

# Global Applicability of the *Standards of Care*

While the *SOC* are intended for worldwide use, WPATH acknowledges that much of the recorded clinical experience and knowledge in this area of health care is derived from North American and Western European sources. From place to place, both across and within nations, there are differences in all of the following: social attitudes towards transsexual, transgender, and gender-nonconforming people; constructions of gender roles and identities; language used to describe different gender identities; epidemiology of gender dysphoria; access to and cost of treatment; therapies offered; number and type of professionals who provide care; and legal and policy issues related to this area of health care (Winter, 2009).

It is impossible for the *SOC* to reflect all of these differences. In applying these standards to other cultural contexts, health professionals must be sensitive to these differences and adapt the *SOC* according to local realities. For example, in a number of cultures, gender-nonconforming people are found in such numbers and living in such ways as to make them highly socially visible (Peletz, 2006). In settings such as these, it is common for people to initiate a change in their gender expression and physical characteristics while in their teens or even earlier. Many grow up and live in a social, cultural, and even linguistic context quite unlike that of Western cultures. Yet almost all experience prejudice (Peletz, 2006; Winter, 2009). In many cultures, social stigma towards gender nonconformity is widespread and gender roles are highly prescriptive (Winter et al., 2009). Gender-nonconforming people in these settings are forced to be hidden and, therefore, may lack opportunities for adequate health care (Winter, 2009).

The *SOC* are not intended to limit efforts to provide the best available care to all individuals. Health professionals throughout the world—even in areas with limited resources and training opportunities—can apply the many core principles that undergird the *SOC*. These principles include the following: Exhibit respect for patients with nonconforming gender identities (do not pathologize differences in gender identity or expression); provide care (or refer to knowledgeable colleagues) that affirms patients' gender identities and reduces the distress of gender dysphoria, when present; become knowledgeable about the health care needs of transsexual, transgender, and gender-nonconforming people, including the benefits and risks of treatment options for gender dysphoria; match the treatment approach to the specific needs of patients, particularly their goals for gender expression and need for relief from gender dysphoria; facilitate access to appropriate care; seek patients' informed consent before providing treatment; offer continuity of care; and be prepared to support and advocate for patients within their families and communities (schools, workplaces, and other settings).

23 OF 238

The Standards of Care
VERSION 7

Terminology is culture- and time-dependent and is rapidly evolving. It is important to use respectful language in different places and times, and among different people. As the *SOC* are translated into other languages, great care must be taken to ensure that the meanings of terms are accurately translated. Terminology in English may not be easily translated into other languages, and vice versa. Some languages do not have equivalent words to describe the various terms within this document; hence, translators should be cognizant of the underlying goals of treatment and articulate culturally applicable guidance for reaching those goals.

# III

# The Difference Between Gender Nonconformity and Gender Dysphoria

## Being Transsexual, Transgender, or Gender-Nonconforming Is a Matter of Diversity, Not Pathology

WPATH released a statement in May 2010 urging the de-psychopathologization of gender nonconformity worldwide (WPATH Board of Directors, 2010). This statement noted that "the expression of gender characteristics, including identities, that are not stereotypically associated with one's assigned sex at birth is a common and culturally diverse human phenomenon [that] should not be judged as inherently pathological or negative."

Unfortunately, there is stigma attached to gender nonconformity in many societies around the world. Such stigma can lead to prejudice and discrimination, resulting in "minority stress" (I. H. Meyer, 2003). Minority stress is unique (additive to general stressors experienced by all people), socially based, and chronic, and may make transsexual, transgender, and gender-nonconforming individuals more vulnerable to developing mental health concerns such as anxiety and depression (Institute of Medicine, 2011). In addition to prejudice and discrimination in society at large, stigma can contribute to abuse and neglect in one's relationships with peers and family members, which in turn can lead to psychological distress. However, these symptoms are socially induced and are not inherent to being transsexual, transgender, or gender-nonconforming.



# Gender Nonconformity Is Not the Same as Gender Dysphoria

*Gender nonconformity* refers to the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex (Institute of Medicine, 2011). *Gender dysphoria* refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b). Only *some* gender-nonconforming people experience gender dysphoria at *some* point in their lives.

Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them (Bockting & Goldberg, 2006). Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications. Medical treatment options include, for example, feminization or masculinization of the body through hormone therapy and/or surgery, which are effective in alleviating gender dysphoria and are medically necessary for many people. Gender identities and expressions are diverse, and hormones and surgery are just two of many options available to assist people with achieving comfort with self and identity.

Gender dysphoria can in large part be alleviated through treatment (Murad et al., 2010). Hence, while transsexual, transgender, and gender-nonconforming people may experience gender dysphoria at some points in their lives, many individuals who receive treatment will find a gender role and expression that is comfortable for them, even if these differ from those associated with their sex assigned at birth, or from prevailing gender norms and expectations.

# Diagnoses Related to Gender Dysphoria

Some people experience gender dysphoria at such a level that the distress meets criteria for a formal diagnosis that might be classified as a mental disorder. Such a diagnosis is not a license for stigmatization or for the deprivation of civil and human rights. Existing classification systems such as the *Diagnostic Statistical Manual of Mental Disorders (DSM)* (American Psychiatric Association, 2000) and the *International Classification of Diseases (ICD)* (World Health Organization, 2007) define hundreds of mental disorders that vary in onset, duration, pathogenesis, functional disability, and treatability. All of these systems attempt to classify clusters of symptoms and conditions, not the individuals themselves. A disorder is a description of something with which a person might struggle, not a description of the person or the person's identity.

25 OF 238

The Standards of Care
VERSION 7

Thus, transsexual, transgender, and gender-nonconforming individuals are not inherently disordered. Rather, the distress of gender dysphoria, when present, is the concern that might be diagnosable and for which various treatment options are available. The existence of a diagnosis for such dysphoria often facilitates access to health care and can guide further research into effective treatments.

Research is leading to new diagnostic nomenclatures, and terms are changing in both the *DSM* (Cohen-Kettenis & Pfäfflin, 2010; Knudson, De Cuypere, & Bockting, 2010b; Meyer-Bahlburg, 2010; Zucker, 2010) and the *ICD*. For this reason, familiar terms are employed in the *SOC* and definitions are provided for terms that may be emerging. Health professionals should refer to the most current diagnostic criteria and appropriate codes to apply in their practice areas.



# IV

# Epidemiologic Considerations

Formal epidemiologic studies on the incidence[III] and prevalence[IV] of transsexualism specifically or transgender and gender-nonconforming identities in general have not been conducted, and efforts to achieve realistic estimates are fraught with enormous difficulties (Institute of Medicine, 2011; Zucker & Lawrence, 2009). Even if epidemiologic studies established that a similar proportion of transsexual, transgender, or gender-nonconforming people existed all over the world, it is likely that cultural differences from one country to another would alter both the behavioral expressions of different gender identities and the extent to which gender dysphoria—distinct from one's gender identity—is actually occurring in a population. While in most countries, crossing normative gender boundaries generates moral censure rather than compassion, there are examples in certain cultures of gender-nonconforming behaviors (e.g., in spiritual leaders) that are less stigmatized and even revered (Besnier, 1994; Bolin, 1988; Chiñas, 1995; Coleman, Colgan, & Gooren, 1992; Costa & Matzner, 2007; Jackson & Sullivan, 1999; Nanda, 1998; Taywaditep, Coleman, & Dumronggittigule, 1997).

For various reasons, researchers who have studied incidence and prevalence have tended to focus on the most easily counted subgroup of gender-nonconforming individuals: transsexual individuals who experience gender dysphoria and who present for gender-transition-related care at specialist gender clinics (Zucker & Lawrence, 2009). Most studies have been conducted in European countries such as Sweden (Wålinder, 1968, 1971), the United Kingdom (Hoenig & Kenna, 1974),

---

III  **incidence**—the number of new cases arising in a given period (e.g., a year)
IV  **prevalence**—the number of individuals having a condition, divided by the number of people in the general population

World Professional Association for Transgender Health

26 OF 238

the Netherlands (Bakker, Van Kesteren, Gooren, & Bezemer, 1993; Eklund, Gooren, & Bezemer, 1988; van Kesteren, Gooren, & Megens, 1996), Germany (Weitze & Osburg, 1996), and Belgium (De Cuypere et al., 2007). One was conducted in Singapore (Tsoi, 1988).

De Cuypere and colleagues (2007) reviewed such studies, as well as conducted their own. Together, those studies span 39 years. Leaving aside two outlier findings from Pauly in 1965 and Tsoi in 1988, ten studies involving eight countries remain. The prevalence figures reported in these ten studies range from 1:11,900 to 1:45,000 for male-to-female individuals (MtF) and 1:30,400 to 1:200,000 for female-to-male (FtM) individuals. Some scholars have suggested that the prevalence is much higher, depending on the methodology used in the research (e.g., Olyslager & Conway, 2007).

Direct comparisons across studies are impossible, as each differed in their data collection methods and in their criteria for documenting a person as transsexual (e.g., whether or not a person had undergone genital reconstruction, versus had initiated hormone therapy, versus had come to the clinic seeking medically supervised transition services). The trend appears to be towards higher prevalence rates in the more recent studies, possibly indicating increasing numbers of people seeking clinical care. Support for this interpretation comes from research by Reed and colleagues (2009), who reported a doubling of the numbers of people accessing care at gender clinics in the United Kingdom every five or six years. Similarly, Zucker and colleagues (2008) reported a four- to five-fold increase in child and adolescent referrals to their Toronto, Canada clinic over a 30-year period.

The numbers yielded by studies such as these can be considered minimum estimates at best. The published figures are mostly derived from clinics where patients met criteria for severe gender dysphoria and had access to health care at those clinics. These estimates do not take into account that treatments offered in a particular clinic setting might not be perceived as affordable, useful, or acceptable by all self-identified gender dysphoric individuals in a given area. By counting only those people who present at clinics for a specific type of treatment, an unspecified number of gender dysphoric individuals are overlooked.

Other clinical observations (not yet firmly supported by systematic study) support the likelihood of a higher prevalence of gender dysphoria: (i) Previously unrecognized gender dysphoria is occasionally diagnosed when patients are seen with anxiety, depression, conduct disorder, substance abuse, dissociative identity disorders, borderline personality disorder, sexual disorders, and disorders of sex development (Cole, O'Boyle, Emory, & Meyer III, 1997). (ii) Some crossdressers, drag queens/ kings or female/male impersonators, and gay and lesbian individuals may be experiencing gender dysphoria (Bullough & Bullough, 1993). (iii) The intensity of some people's gender dysphoria fluctuates below and above a clinical threshold (Docter, 1988). (iv) Gender nonconformity among FtM individuals tends to be relatively invisible in many cultures, particularly to Western health

27 of 2006 238

The Standards of Care
VERSION 7

professionals and researchers who have conducted most of the studies on which the current estimates of prevalence and incidence are based (Winter, 2009).

Overall, the existing data should be considered a starting point, and health care would benefit from more rigorous epidemiologic study in different locations worldwide.

# V

# Overview of Therapeutic Approaches for Gender Dysphoria

## Advancements in the Knowledge and Treatment of Gender Dysphoria

In the second half of the 20th century, awareness of the phenomenon of gender dysphoria increased when health professionals began to provide assistance to alleviate gender dysphoria by supporting changes in primary and secondary sex characteristics through hormone therapy and surgery, along with a change in gender role. Although Harry Benjamin already acknowledged a spectrum of gender nonconformity (Benjamin, 1966), the initial clinical approach largely focused on identifying who was an appropriate candidate for sex reassignment to facilitate a physical change from male to female or female to male as completely as possible (e.g., Green & Fleming, 1990; Hastings, 1974). This approach was extensively evaluated and proved to be highly effective. Satisfaction rates across studies ranged from 87% of MtF patients to 97% of FtM patients (Green & Fleming, 1990), and regrets were extremely rare (1–1.5% of MtF patients and <1% of FtM patients; Pfäfflin, 1993). Indeed, hormone therapy and surgery have been found to be medically necessary to alleviate gender dysphoria in many people (American Medical Association, 2008; Anton, 2009; World Professional Association for Transgender Health, 2008).

As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither (Bockting & Goldberg, 2006; Bockting, 2008; Lev, 2004). Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate

8

gender dysphoria. Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones. In other words, treatment for gender dysphoria has become more individualized.

As a generation of transsexual, transgender, and gender-nonconforming individuals has come of age—many of whom have benefitted from different therapeutic approaches—they have become more visible as a community and demonstrated considerable diversity in their gender identities, roles, and expressions. Some individuals describe themselves not as gender-nonconforming but as unambiguously cross-sexed (i.e., as a member of the other sex; Bockting, 2008). Other individuals affirm their unique gender identity and no longer consider themselves to be either male or female (Bornstein, 1994; Kimberly, 1997; Stone, 1991; Warren, 1993). Instead, they may describe their gender identity in specific terms such as transgender, bigender, or genderqueer, affirming their unique experiences that may transcend a male/female binary understanding of gender (Bockting, 2008; Ekins & King, 2006; Nestle, Wilchins, & Howell, 2002). They may not experience their process of identity affirmation as a "transition," because they never fully embraced the gender role they were assigned at birth or because they actualize their gender identity, role, and expression in a way that does not involve a change from one gender role to another. For example, some youth identifying as genderqueer have always experienced their gender identity and role as such (genderqueer). Greater public visibility and awareness of gender diversity (Feinberg, 1996) has further expanded options for people with gender dysphoria to actualize an identity and find a gender role and expression that are comfortable for them.

Health professionals can assist gender dysphoric individuals with affirming their gender identity, exploring different options for expression of that identity, and making decisions about medical treatment options for alleviating gender dysphoria.

## Options for Psychological and Medical Treatment of Gender Dysphoria

For individuals seeking care for gender dysphoria, a variety of therapeutic options can be considered. The number and type of interventions applied and the order in which these take place may differ from person to person (e.g., Bockting, Knudson, & Goldberg, 2006; Bolin, 1994; Rachlin, 1999; Rachlin, Green, & Lombardi, 2008; Rachlin, Hansbury, & Pardo, 2010). Treatment options include the following:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

- Hormone therapy to feminize or masculinize the body;

29 OF 238

The Standards of Care
VERSION 7

- Surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

## Options for Social Support and Changes in Gender Expression

In addition (or as an alternative) to the psychological- and medical-treatment options described above, other options can be considered to help alleviate gender dysphoria, for example:

- In-person and online peer support resources, groups, or community organizations that provide avenues for social support and advocacy;

- In-person and online support resources for families and friends;

- Voice and communication therapy to help individuals develop verbal and non-verbal communication skills that facilitate comfort with their gender identity;

- Hair removal through electrolysis, laser treatment, or waxing;

- Breast binding or padding, genital tucking or penile prostheses, padding of hips or buttocks;

- Changes in name and gender marker on identity documents.

# VI

# Assessment and Treatment of Children and Adolescents With Gender Dysphoria

There are a number of differences in the phenomenology, developmental course, and treatment approaches for gender dysphoria in children, adolescents, and adults. In children and adolescents, a rapid and dramatic developmental process (physical, psychological, and sexual) is involved and

10

there is greater fluidity and variability in outcomes, particularly in prepubertal children. Accordingly, this section of the *SOC* offers specific clinical guidelines for the assessment and treatment of gender dysphoric children and adolescents.

## Differences Between Children and Adolescents with Gender Dysphoria

An important difference between gender dysphoric children and adolescents is in the proportion for whom dysphoria persists into adulthood. Gender dysphoria during childhood does not inevitably continue into adulthood.[v] Rather, in follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6–23% of children (Cohen-Kettenis, 2001; Zucker & Bradley, 1995). Boys in these studies were more likely to identify as gay in adulthood than as transgender (Green, 1987; Money & Russo, 1979; Zucker & Bradley, 1995; Zuger, 1984). Newer studies, also including girls, showed a 12–27% persistence rate of gender dysphoria into adulthood (Drummond, Bradley, Peterson-Badali, & Zucker, 2008; Wallien & Cohen-Kettenis, 2008).

In contrast, the persistence of gender dysphoria into adulthood appears to be much higher for adolescents. No formal prospective studies exist. However, in a follow-up study of 70 adolescents who were diagnosed with gender dysphoria and given puberty-suppressing hormones, all continued with actual sex reassignment, beginning with feminizing/masculinizing hormone therapy (de Vries, Steensma, Doreleijers, & Cohen-Kettenis, 2010).

Another difference between gender dysphoric children and adolescents is in the sex ratios for each age group. In clinically referred, gender dysphoric children under age 12, the male/female ratio ranges from 6:1 to 3:1 (Zucker, 2004). In clinically referred, gender dysphoric adolescents older than age 12, the male/female ratio is close to 1:1 (Cohen-Kettenis & Pfäfflin, 2003).

As discussed in section IV and by Zucker and Lawrence (2009), formal epidemiologic studies on gender dysphoria—in children, adolescents, and adults—are lacking. Additional research is needed to refine estimates of its prevalence and persistence in different populations worldwide.

---

v   Gender-nonconforming behaviors in children may continue into adulthood, but such behaviors are not necessarily indicative of gender dysphoria and a need for treatment. As described in section III, gender dysphoria is not synonymous with diversity in gender expression.

31 OF 238

The Standards of Care
VERSION 7

# Phenomenology in Children

Children as young as age two may show features that could indicate gender dysphoria. They may express a wish to be of the other sex and be unhappy about their physical sex characteristics and functions. In addition, they may prefer clothes, toys, and games that are commonly associated with the other sex and prefer playing with other-sex peers. There appears to be heterogeneity in these features: Some children demonstrate extremely gender-nonconforming behavior and wishes, accompanied by persistent and severe discomfort with their primary sex characteristics. In other children, these characteristics are less intense or only partially present (Cohen-Kettenis et al., 2006; Knudson, De Cuypere, & Bockting, 2010a).

It is relatively common for gender dysphoric children to have coexisting internalizing disorders such as anxiety and depression (Cohen-Kettenis, Owen, Kaijser, Bradley, & Zucker, 2003; Wallien, Swaab, & Cohen-Kettenis, 2007; Zucker, Owen, Bradley, & Ameeriar, 2002). The prevalence of autism spectrum disorders seems to be higher in clinically referred, gender dysphoric children than in the general population (de Vries, Noens, Cohen-Kettenis, van Berckelaer-Onnes, & Doreleijers, 2010).

# Phenomenology in Adolescents

In most children, gender dysphoria will disappear before, or early in, puberty. However, in some children these feelings will intensify and body aversion will develop or increase as they become adolescents and their secondary sex characteristics develop (Cohen-Kettenis, 2001; Cohen-Kettenis & Pfäfflin, 2003; Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008; Zucker & Bradley, 1995). Data from one study suggest that more extreme gender nonconformity in childhood is associated with persistence of gender dysphoria into late adolescence and early adulthood (Wallien & Cohen-Kettenis, 2008). Yet many adolescents and adults presenting with gender dysphoria do not report a history of childhood gender-nonconforming behaviors (Docter, 1988; Landén, Wålinder, & Lundström, 1998). Therefore, it may come as a surprise to others (parents, other family members, friends, and community members) when a youth's gender dysphoria first becomes evident in adolescence.

Adolescents who experience their primary and/or secondary sex characteristics and their sex assigned at birth as inconsistent with their gender identity may be intensely distressed about it. Many, but not all, gender dysphoric adolescents have a strong wish for hormones and surgery. Increasing numbers of adolescents have already started living in their desired gender role upon entering high school (Cohen-Kettenis & Pfäfflin, 2003).

32 OF PAGE 232

Among adolescents who are referred to gender identity clinics, the number considered eligible for early medical treatment—starting with GnRH analogues to suppress puberty in the first Tanner stages—differs among countries and centers. Not all clinics offer puberty suppression. If such treatment is offered, the pubertal stage at which adolescents are allowed to start varies from Tanner stage 2 to stage 4 (Delemarre-van de Waal & Cohen-Kettenis, 2006; Zucker et al., 2012). The percentages of treated adolescents are likely influenced by the organization of health care, insurance aspects, cultural differences, opinions of health professionals, and diagnostic procedures offered in different settings.

Inexperienced clinicians may mistake indications of gender dysphoria for delusions. Phenomenologically, there is a qualitative difference between the presentation of gender dysphoria and the presentation of delusions or other psychotic symptoms. The vast majority of children and adolescents with gender dysphoria are not suffering from underlying severe psychiatric illness such as psychotic disorders (Steensma, Biemond, de Boer, & Cohen-Kettenis, published online ahead of print January 7, 2011).

It is more common for adolescents with gender dysphoria to have coexisting internalizing disorders such as anxiety and depression, and/or externalizing disorders such as oppositional defiant disorder (de Vries et al., 2010). As in children, there seems to be a higher prevalence of autistic spectrum disorders in clinically referred, gender dysphoric adolescents than in the general adolescent population (de Vries et al., 2010).

## Competency of Mental Health Professionals Working with Children or Adolescents with Gender Dysphoria

The following are recommended minimum credentials for mental health professionals who assess, refer, and offer therapy to children and adolescents presenting with gender dysphoria:

1. Meet the competency requirements for mental health professionals working with adults, as outlined in section VII;

2. Trained in childhood and adolescent developmental psychopathology;

3. Competent in diagnosing and treating the ordinary problems of children and adolescents.

33 OF 2006 238

The Standards of Care
VERSION 7

# Roles of Mental Health Professionals Working with Children and Adolescents with Gender Dysphoria

The roles of mental health professionals working with gender dysphoric children and adolescents may include the following:

1. Directly assess gender dysphoria in children and adolescents (see general guidelines for assessment, below).

2. Provide family counseling and supportive psychotherapy to assist children and adolescents with exploring their gender identity, alleviating distress related to their gender dysphoria, and ameliorating any other psychosocial difficulties.

3. Assess and treat any coexisting mental health concerns of children or adolescents (or refer to another mental health professional for treatment). Such concerns should be addressed as part of the overall treatment plan.

4. Refer adolescents for additional physical interventions (such as puberty-suppressing hormones) to alleviate gender dysphoria. The referral should include documentation of an assessment of gender dysphoria and mental health, the adolescent's eligibility for physical interventions (outlined below), the mental health professional's relevant expertise, and any other information pertinent to the youth's health and referral for specific treatments.

5. Educate and advocate on behalf of gender dysphoric children, adolescents, and their families in their community (e.g., day care centers, schools, camps, other organizations). This is particularly important in light of evidence that children and adolescents who do not conform to socially prescribed gender norms may experience harassment in school (Grossman, D'Augelli, & Salter, 2006; Grossman, D'Augelli, Howell, & Hubbard, 2006; Sausa, 2005), putting them at risk for social isolation, depression, and other negative sequelae (Nuttbrock et al., 2010).

6. Provide children, youth, and their families with information and referral for peer support, such as support groups for parents of gender-nonconforming and transgender children (Gold & MacNish, 2011; Pleak, 1999; Rosenberg, 2002).

Assessment and psychosocial interventions for children and adolescents are often provided within a multidisciplinary gender identity specialty service. If such a multidisciplinary service is not available, a mental health professional should provide consultation and liaison arrangements with a pediatric endocrinologist for the purpose of assessment, education, and involvement in any decisions about physical interventions.

World Professional Association for Transgender Health

# Psychological Assessment of Children and Adolescents

When assessing children and adolescents who present with gender dysphoria, mental health professionals should broadly conform to the following guidelines:

1. Mental health professionals should not dismiss or express a negative attitude towards nonconforming gender identities or indications of gender dysphoria. Rather, they should acknowledge the presenting concerns of children, adolescents, and their families; offer a thorough assessment for gender dysphoria and any coexisting mental health concerns; and educate clients and their families about therapeutic options, if needed. Acceptance, and alleviation of secrecy, can bring considerable relief to gender dysphoric children/adolescents and their families.

2. Assessment of gender dysphoria and mental health should explore the nature and characteristics of a child's or adolescent's gender identity. A psychodiagnostic and psychiatric assessment—covering the areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement—should be performed. Assessment should include an evaluation of the strengths and weaknesses of family functioning. Emotional and behavioral problems are relatively common, and unresolved issues in a child's or youth's environment may be present (de Vries, Doreleijers, Steensma, & Cohen-Kettenis, 2011; Di Ceglie & Thümmel, 2006; Wallien et al., 2007).

3. For adolescents, the assessment phase should also be used to inform youth and their families about the possibilities and limitations of different treatments. This is necessary for informed consent, but also important for assessment. The way that adolescents respond to information about the reality of sex reassignment can be diagnostically informative. Correct information may alter a youth's desire for certain treatment, if the desire was based on unrealistic expectations of its possibilities.

# Psychological and Social Interventions
# for Children and Adolescents

When supporting and treating children and adolescents with gender dysphoria, health professionals should broadly conform to the following guidelines:

1. Mental health professionals should help families to have an accepting and nurturing response to the concerns of their gender dysphoric child or adolescent. Families play an important role in the psychological health and well-being of youth (Brill & Pepper, 2008; Lev, 2004). This also applies to peers and mentors from the community, who can be another source of social support.

The Standards of Care
VERSION 7

2. Psychotherapy should focus on reducing a child's or adolescent's distress related to the gender dysphoria and on ameliorating any other psychosocial difficulties. For youth pursuing sex reassignment, psychotherapy may focus on supporting them before, during, and after reassignment. Formal evaluations of different psychotherapeutic approaches for this situation have not been published, but several counseling methods have been described (Cohen-Kettenis, 2006; de Vries, Cohen-Kettenis, & Delemarre-van de Waal, 2006; Di Ceglie & Thümmel, 2006; Hill, Menvielle, Sica, & Johnson, 2010; Malpas, in press; Menvielle & Tuerk, 2002; Rosenberg, 2002; Vanderburgh, 2009; Zucker, 2006).

   Treatment aimed at trying to change a person's gender identity and expression to become more congruent with sex assigned at birth has been attempted in the past without success (Gelder & Marks, 1969; Greenson, 1964), particularly in the long term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

3. Families should be supported in managing uncertainty and anxiety about their child's or adolescent's psychosexual outcomes and in helping youth to develop a positive self-concept.

4. Mental health professionals should not impose a binary view of gender. They should give ample room for clients to explore different options for gender expression. Hormonal or surgical interventions are appropriate for some adolescents, but not for others.

5. Clients and their families should be supported in making difficult decisions regarding the extent to which clients are allowed to express a gender role that is consistent with their gender identity, as well as the timing of changes in gender role and possible social transition. For example, a client might attend school while undergoing social transition only partly (e.g., by wearing clothing and having a hairstyle that reflects gender identity) or completely (e.g., by also using a name and pronouns congruent with gender identity). Difficult issues include whether and when to inform other people of the client's situation, and how others in their lives might respond.

6. Health professionals should support clients and their families as educators and advocates in their interactions with community members and authorities such as teachers, school boards, and courts.

7. Mental health professionals should strive to maintain a therapeutic relationship with gender-nonconforming children/adolescents and their families throughout any subsequent social changes or physical interventions. This ensures that decisions about gender expression and the treatment of gender dysphoria are thoughtfully and recurrently considered. The same reasoning applies if a child or adolescent has already socially changed gender role prior to being seen by a mental health professional.

World Professional Association for Transgender Health

36 OF 238

# Social Transition in Early Childhood

Some children state that they want to make a social transition to a different gender role long before puberty. For some children, this may reflect an expression of their gender identity. For others, this could be motivated by other forces. Families vary in the extent to which they allow their young children to make a social transition to another gender role. Social transitions in early childhood do occur within some families with early success. This is a controversial issue, and divergent views are held by health professionals. The current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood. Outcomes research with children who completed early social transitions would greatly inform future clinical recommendations.

Mental health professionals can help families to make decisions regarding the timing and process of any gender role changes for their young children. They should provide information and help parents to weigh the potential benefits and challenges of particular choices. Relevant in this respect are the previously described relatively low persistence rates of childhood gender dysphoria (Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008). A change back to the original gender role can be highly distressing and even result in postponement of this second social transition on the child's part (Steensma & Cohen-Kettenis, 2011). For reasons such as these, parents may want to present this role change as an exploration of living in another gender role rather than an irreversible situation. Mental health professionals can assist parents in identifying potential in-between solutions or compromises (e.g., only when on vacation). It is also important that parents explicitly let the child know that there is a way back.

Regardless of a family's decisions regarding transition (timing, extent), professionals should counsel and support them as they work through the options and implications. If parents do not allow their young child to make a gender-role transition, they may need counseling to assist them with meeting their child's needs in a sensitive and nurturing way, ensuring that the child has ample possibilities to explore gender feelings and behavior in a safe environment. If parents do allow their young child to make a gender role transition, they may need counseling to facilitate a positive experience for their child. For example, they may need support in using correct pronouns, maintaining a safe and supportive environment for their transitioning child (e.g., in school, peer group settings), and communicating with other people in their child's life. In either case, as a child nears puberty, further assessment may be needed as options for physical interventions become relevant.

The Standards of Care
VERSION 7

# Physical Interventions for Adolescents

Before any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken, as outlined above. The duration of this exploration may vary considerably depending on the complexity of the situation.

Physical interventions should be addressed in the context of adolescent development. Some identity beliefs in adolescents may become firmly held and strongly expressed, giving a false impression of irreversibility. An adolescent's shift towards gender conformity can occur primarily to please the parents and may not persist or reflect a permanent change in gender dysphoria (Hembree et al., 2009; Steensma et al., published online ahead of print January 7, 2011).

Physical interventions for adolescents fall into three categories or stages (Hembree et al., 2009):

1. *Fully reversible interventions.* These involve the use of GnRH analogues to suppress estrogen or testosterone production and consequently delay the physical changes of puberty. Alternative treatment options include progestins (most commonly medroxyprogesterone) or other medications (such as spironolactone) that decrease the effects of androgens secreted by the testicles of adolescents who are not receiving GnRH analogues. Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses.

2. *Partially reversible interventions.* These include hormone therapy to masculinize or feminize the body. Some hormone-induced changes may need reconstructive surgery to reverse the effect (e.g., gynaecomastia caused by estrogens), while other changes are not reversible (e.g., deepening of the voice caused by testosterone).

3. *Irreversible interventions.* These are surgical procedures.

A staged process is recommended to keep options open through the first two stages. Moving from one stage to another should not occur until there has been adequate time for adolescents and their parents to assimilate fully the effects of earlier interventions.

# Fully Reversible Interventions

Adolescents may be eligible for puberty-suppressing hormones as soon as pubertal changes have begun. In order for adolescents and their parents to make an informed decision about pubertal delay, it is recommended that adolescents experience the onset of puberty to at least Tanner Stage 2. Some children may arrive at this stage at very young ages (e.g., 9 years of age). Studies

evaluating this approach have only included children who were at least 12 years of age (Cohen-Kettenis, Schagen, Steensma, de Vries, & Delemarre-van de Waal, 2011; de Vries, Steensma et al., 2010; Delemarre-van de Waal, van Weissenbruch, & Cohen Kettenis, 2004; Delemarre-van de Waal & Cohen-Kettenis, 2006).

Two goals justify intervention with puberty-suppressing hormones: (i) their use gives adolescents more time to explore their gender nonconformity and other developmental issues; and (ii) their use may facilitate transition by preventing the development of sex characteristics that are difficult or impossible to reverse if adolescents continue on to pursue sex reassignment.

Puberty suppression may continue for a few years, at which time a decision is made to either discontinue all hormone therapy or transition to a feminizing/masculinizing hormone regimen. Pubertal suppression does not inevitably lead to social transition or to sex reassignment.

### Criteria for Puberty-Suppressing Hormones

In order for adolescents to receive puberty-suppressing hormones, the following minimum criteria must be met:

1. The adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);

2. Gender dysphoria emerged or worsened with the onset of puberty;

3. Any coexisting psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;

4. The adolescent has given informed consent and, particularly when the adolescent has not reached the age of medical consent, the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process)

### Regimens, Monitoring, and Risks for Puberty Suppression

For puberty suppression, adolescents with male genitalia should be treated with GnRH analogues, which stop luteinizing hormone secretion and therefore testosterone secretion. Alternatively, they may be treated with progestins (such as medroxyprogesterone) or with other medications that block testosterone secretion and/or neutralize testosterone action. Adolescents with female genitalia should be treated with GnRH analogues, which stop the production of estrogens and

39 OF 238 728

The Standards of Care
VERSION 7

progesterone. Alternatively, they may be treated with progestins (such as medroxyprogesterone). Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses. In both groups of adolescents, use of GnRH analogues is the preferred treatment (Hembree et al., 2009), but their high cost is prohibitive for some patients.

During pubertal suppression, an adolescent's physical development should be carefully monitored—preferably by a pediatric endocrinologist—so that any necessary interventions can occur (e.g., to establish an adequate gender appropriate height, to improve iatrogenic low bone mineral density) (Hembree et al., 2009).

Early use of puberty-suppressing hormones may avert negative social and emotional consequences of gender dysphoria more effectively than their later use would. Intervention in early adolescence should be managed with pediatric endocrinological advice, when available. Adolescents with male genitalia who start GnRH analogues early in puberty should be informed that this could result in insufficient penile tissue for penile inversion vaginoplasty techniques (alternative techniques, such as the use of a skin graft or colon tissue, are available).

Neither puberty suppression nor allowing puberty to occur is a neutral act. On the one hand, functioning in later life can be compromised by the development of irreversible secondary sex characteristics during puberty and by years spent experiencing intense gender dysphoria. On the other hand, there are concerns about negative physical side effects of GnRH analogue use (e.g., on bone development and height). Although the very first results of this approach (as assessed for adolescents followed over 10 years) are promising (Cohen-Kettenis et al., 2011; Delemarre-van de Waal & Cohen-Kettenis, 2006), the long-term effects can only be determined when the earliest-treated patients reach the appropriate age.

## Partially Reversible Interventions

Adolescents may be eligible to begin feminizing/masculinizing hormone therapy, preferably with parental consent. In many countries, 16-year-olds are legal adults for medical decision-making and do not require parental consent. Ideally, treatment decisions should be made among the adolescent, the family, and the treatment team.

Regimens for hormone therapy in gender dysphoric adolescents differ substantially from those used in adults (Hembree et al., 2009). The hormone regimens for youth are adapted to account for the somatic, emotional, and mental development that occurs throughout adolescence (Hembree et al., 2009).

World Professional Association for Transgender Health

40 of 238

## Irreversible Interventions

Genital surgery should not be carried out until (i) patients reach the legal age of majority to give consent for medical procedures in a given country, and (ii) patients have lived continuously for at least 12 months in the gender role that is congruent with their gender identity. The age threshold should be seen as a minimum criterion and not an indication in and of itself for active intervention.

Chest surgery in FtM patients could be carried out earlier, preferably after ample time of living in the desired gender role and after one year of testosterone treatment. The intent of this suggested sequence is to give adolescents sufficient opportunity to experience and socially adjust in a more masculine gender role, before undergoing irreversible surgery. However, different approaches may be more suitable, depending on an adolescent's specific clinical situation and goals for gender identity expression.

## Risks of Withholding Medical Treatment for Adolescents

Refusing timely medical interventions for adolescents might prolong gender dysphoria and contribute to an appearance that could provoke abuse and stigmatization. As the level of gender-related abuse is strongly associated with the degree of psychiatric distress during adolescence (Nuttbrock et al., 2010), withholding puberty suppression and subsequent feminizing or masculinizing hormone therapy is not a neutral option for adolescents.

# VII
# Mental Health

Transsexual, transgender, and gender-nonconforming people might seek the assistance of a mental health professional for any number of reasons. Regardless of a person's reason for seeking care, mental health professionals should have familiarity with gender nonconformity, act with appropriate cultural competence, and exhibit sensitivity in providing care.

This section of the *SOC* focuses on the role of mental health professionals in the care of adults seeking help for gender dysphoria and related concerns. Professionals working with gender dysphoric children, adolescents, and their families should consult section VI.

The Standards of Care
VERSION 7

## Competency of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

The training of mental health professionals competent to work with gender dysphoric adults rests upon basic general clinical competence in the assessment, diagnosis, and treatment of mental health concerns. Clinical training may occur within any discipline that prepares mental health professionals for clinical practice, such as psychology, psychiatry, social work, mental health counseling, marriage and family therapy, nursing, or family medicine with specific training in behavioral health and counseling. The following are recommended minimum credentials for mental health professionals who work with adults presenting with gender dysphoria:

1. A master's degree or its equivalent in a clinical behavioral science field. This degree, or a more advanced one, should be granted by an institution accredited by the appropriate national or regional accrediting board. The mental health professional should have documented credentials from a relevant licensing board or equivalent for that country.

2. Competence in using the *Diagnostic Statistical Manual of Mental Disorders* and/or the *International Classification of Diseases* for diagnostic purposes.

3. Ability to recognize and diagnose coexisting mental health concerns and to distinguish these from gender dysphoria.

4. Documented supervised training and competence in psychotherapy or counseling.

5. Knowledgeable about gender-nonconforming identities and expressions, and the assessment and treatment of gender dysphoria.

6. Continuing education in the assessment and treatment of gender dysphoria. This may include attending relevant professional meetings, workshops, or seminars; obtaining supervision from a mental health professional with relevant experience; or participating in research related to gender nonconformity and gender dysphoria.

In addition to the minimum credentials above, it is recommended that mental health professionals develop and maintain cultural competence to facilitate their work with transsexual, transgender, and gender-nonconforming clients. This may involve, for example, becoming knowledgeable about current community, advocacy, and public policy issues relevant to these clients and their families. Additionally, knowledge about sexuality, sexual health concerns, and the assessment and treatment of sexual disorders is preferred.

World Professional Association for Transgender Health

42 OF 2006 228

Mental health professionals who are new to the field (irrespective of their level of training and other experience) should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria.

## Tasks of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

Mental health professionals may serve transsexual, transgender, and gender-nonconforming individuals and their families in many ways, depending on a client's needs. For example, mental health professionals may serve as a psychotherapist, counselor, or family therapist, or as a diagnostician/assessor, advocate, or educator.

Mental health professionals should determine a client's reasons for seeking professional assistance. For example, a client may be presenting for any combination of the following health care services: psychotherapeutic assistance to explore gender identity and expression or to facilitate a coming-out process; assessment and referral for feminizing/masculinizing medical interventions; psychological support for family members (partners, children, extended family); psychotherapy unrelated to gender concerns; or other professional services.

Below are general guidelines for common tasks that mental health professionals may fulfill in working with adults who present with gender dysphoria.

## Tasks Related to Assessment and Referral

### 1. Assess Gender Dysphoria

Mental health professionals assess clients' gender dysphoria in the context of an evaluation of their psychosocial adjustment (Bockting et al., 2006; Lev, 2004, 2009). The evaluation includes, at a minimum, assessment of gender identity and gender dysphoria, history and development of gender dysphoric feelings, the impact of stigma attached to gender nonconformity on mental health, and the availability of support from family, friends, and peers (for example, in-person or online contact with other transsexual, transgender, or gender-nonconforming individuals or groups). The evaluation may result in no diagnosis, in a formal diagnosis related to gender dysphoria, and/or in other diagnoses that describe aspects of the client's health and psychosocial adjustment. The role

The Standards of Care
VERSION 7

of mental health professionals includes making reasonably sure that the gender dysphoria is not secondary to, or better accounted for, by other diagnoses.

Mental health professionals with the competencies described above (hereafter called "a qualified mental health professional") are best prepared to conduct this assessment of gender dysphoria. However, this task may instead be conducted by another type of health professional who has appropriate training in behavioral health and is competent in the assessment of gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy. This professional may be the prescribing hormone therapy provider or a member of that provider's health care team.

### 2. Provide Information Regarding Options for Gender Identity and Expression and Possible Medical Interventions

An important task of mental health professionals is to educate clients regarding the diversity of gender identities and expressions and the various options available to alleviate gender dysphoria. Mental health professionals then may facilitate a process (or refer elsewhere) in which clients explore these various options, with the goals of finding a comfortable gender role and expression and becoming prepared to make a fully informed decision about available medical interventions, if needed. This process may include referral for individual, family, and group therapy and/or to community resources and avenues for peer support. The professional and the client discuss the implications, both short- and long-term, of any changes in gender role and use of medical interventions. These implications can be psychological, social, physical, sexual, occupational, financial, and legal (Bockting et al., 2006; Lev, 2004).

This task is also best conducted by a qualified mental health professional, but may be conducted by another health professional with appropriate training in behavioral health and with sufficient knowledge about gender-nonconforming identities and expressions and about possible medical interventions for gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy.

### 3. Assess, Diagnose, and Discuss Treatment Options for Coexisting Mental Health Concerns

Clients presenting with gender dysphoria may struggle with a range of mental health concerns (Gómez-Gil, Trilla, Salamero, Godás, & Valdés, 2009; Murad et al., 2010) whether related or unrelated to what is often a long history of gender dysphoria and/or chronic minority stress. Possible concerns include anxiety, depression, self-harm, a history of abuse and neglect, compulsivity, substance abuse, sexual concerns, personality disorders, eating disorders, psychotic disorders, and autistic spectrum disorders (Bockting et al., 2006; Nuttbrock et al., 2010; Robinow, 2009). Mental health professionals should screen for these and other mental health concerns and incorporate

44 OF 238

the identified concerns into the overall treatment plan. These concerns can be significant sources of distress and, if left untreated, can complicate the process of gender identity exploration and resolution of gender dysphoria (Bockting et al., 2006; Fraser, 2009a; Lev, 2009). Addressing these concerns can greatly facilitate the resolution of gender dysphoria, possible changes in gender role, the making of informed decisions about medical interventions, and improvements in quality of life.

Some clients may benefit from psychotropic medications to alleviate symptoms or treat coexisting mental health concerns. Mental health professionals are expected to recognize this and either provide pharmacotherapy or refer to a colleague who is qualified to do so. The presence of coexisting mental health concerns does not necessarily preclude possible changes in gender role or access to feminizing/masculinizing hormones or surgery; rather, these concerns need to be optimally managed prior to, or concurrent with, treatment of gender dysphoria. In addition, clients should be assessed for their ability to provide educated and informed consent for medical treatments.

Qualified mental health professionals are specifically trained to assess, diagnose, and treat (or refer to treatment for) these coexisting mental health concerns. Other health professionals with appropriate training in behavioral health, particularly when functioning as part of a multidisciplinary specialty team providing access to feminizing/masculinizing hormone therapy, may also screen for mental health concerns and, if indicated, provide referral for comprehensive assessment and treatment by a qualified mental health professional.

## 4. If Applicable, Assess Eligibility, Prepare, and Refer for Hormone Therapy

The *SOC* provide criteria to guide decisions regarding feminizing/masculinizing hormone therapy (outlined in section VIII and Appendix C). Mental health professionals can help clients who are considering hormone therapy to be both psychologically prepared (e.g., client has made a fully informed decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (e.g., has been evaluated by a physician to rule out or address medical contraindications to hormone use; has considered the psychosocial implications). If clients are of childbearing age, reproductive options (section IX) should be explored before initiating hormone therapy.

It is important for mental health professionals to recognize that decisions about hormones are first and foremost a client's decisions—as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

45 oF 238

The Standards of Care
VERSION 7

Referral for feminizing/masculinizing hormone therapy

People may approach a specialized provider in any discipline to pursue feminizing/masculinizing hormone therapy. However, transgender health care is an interdisciplinary field, and coordination of care and referral among a client's overall care team is recommended.

Hormone therapy can be initiated with a referral from a qualified mental health professional. Alternatively, a health professional who is appropriately trained in behavioral health and competent in the assessment of gender dysphoria may assess eligibility, prepare, and refer the patient for hormone therapy, particularly in the absence of significant coexisting mental health concerns and when working in the context of a multidisciplinary specialty team. The referring health professional should provide documentation—in the chart and/or referral letter—of the patient's personal and treatment history, progress, and eligibility. Health professionals who recommend hormone therapy share the ethical and legal responsibility for that decision with the physician who provides the service.

The recommended content of the referral letter for feminizing/masculinizing hormone therapy is as follows:

1. The client's general identifying characteristics;

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the referring health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for hormone therapy have been met, and a brief description of the clinical rationale for supporting the client's request for hormone therapy;

5. A statement that informed consent has been obtained from the patient;

6. A statement that the referring health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary; rather, the assessment and recommendation can be documented in the patient's chart.

## 5. If Applicable, Assess Eligibility, Prepare, and Refer for Surgery

The SOC also provide criteria to guide decisions regarding breast/chest surgery and genital surgery (outlined in section XI and Appendix C). Mental health professionals can help clients who are

46 OF ~~XXX~~ 238

considering surgery to be both psychologically prepared (e.g., has made a fully informed decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (e.g., has made an informed choice about a surgeon to perform the procedure; has arranged aftercare). If clients are of childbearing age, reproductive options (section IX) should be explored before undergoing genital surgery.

The *SOC* do not state criteria for other surgical procedures, such as feminizing or masculinizing facial surgery; however, mental health professionals can play an important role in helping their clients to make fully informed decisions about the timing and implications of such procedures in the context of the overall coming-out or transition process.

It is important for mental health professionals to recognize that decisions about surgery are first and foremost a client's decisions—as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

Referral for surgery

Surgical treatments for gender dysphoria can be initiated by a referral (one or two, depending on the type of surgery) from a qualified mental health professional. The mental health professional provides documentation—in the chart and/or referral letter—of the patient's personal and treatment history, progress, and eligibility. Mental health professionals who recommend surgery share the ethical and legal responsibility for that decision with the surgeon.

- One referral from a qualified mental health professional is needed for breast/chest surgery (e.g., mastectomy, chest reconstruction, or augmentation mammoplasty).

- Two referrals—from qualified mental health professionals who have independently assessed the patient—are needed for genital surgery (i.e., hysterectomy/salpingo-oophorectomy, orchiectomy, genital reconstructive surgeries). If the first referral is from the patient's psychotherapist, the second referral should be from a person who has only had an evaluative role with the patient. Two separate letters, or one letter signed by both (e.g., if practicing within the same clinic) may be sent. Each referral letter, however, is expected to cover the same topics in the areas outlined below.

47 OF 238

The recommended content of the referral letters for surgery is as follows:

1. The client's general identifying characteristics;

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the mental health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for surgery have been met, and a brief description of the clinical rationale for supporting the patient's request for surgery;

5. A statement about the fact that informed consent has been obtained from the patient;

6. A statement that the mental health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary, rather, the assessment and recommendation can be documented in the patient's chart.

## Relationship of Mental Health Professionals with Hormone-Prescribing Physicians, Surgeons, and Other Health Professionals

It is ideal for mental health professionals to perform their work and periodically discuss progress and obtain peer consultation from other professionals (both in mental health care and other health disciplines) who are competent in the assessment and treatment of gender dysphoria. The relationship among professionals involved in a client's health care should remain collaborative, with coordination and clinical dialogue taking place as needed. Open and consistent communication may be necessary for consultation, referral, and management of postoperative concerns.

## Tasks Related to Psychotherapy

### 1. Psychotherapy Is Not an Absolute Requirement for Hormone Therapy and Surgery

A mental health screening and/or assessment as outlined above is needed for referral to hormonal and surgical treatments for gender dysphoria. In contrast, psychotherapy—although highly recommended—is not a requirement.

48 of 238

The *SOC* do not recommend a minimum number of psychotherapy sessions prior to hormone therapy or surgery. The reasons for this are multifaceted (Lev, 2009). First, a minimum number of sessions tends to be construed as a hurdle, which discourages the genuine opportunity for personal growth. Second, mental health professionals can offer important support to clients throughout all phases of exploration of gender identity, gender expression, and possible transition—not just prior to any possible medical interventions. Third, clients and their psychotherapists differ in their abilities to attain similar goals in a specified time period.

### 2. Goals of Psychotherapy for Adults with Gender Concerns

The general goal of psychotherapy is to find ways to maximize a person's overall psychological well-being, quality of life, and self-fulfillment. Psychotherapy is not intended to alter a person's gender identity; rather, psychotherapy can help an individual to explore gender concerns and find ways to alleviate gender dysphoria, if present (Bockting et al., 2006; Bockting & Coleman, 2007; Fraser, 2009a; Lev, 2004). Typically, the overarching treatment goal is to help transsexual, transgender, and gender-nonconforming individuals achieve long-term comfort in their gender identity expression, with realistic chances for success in their relationships, education, and work. For additional details, see Fraser (Fraser, 2009c).

Therapy may consist of individual, couple, family, or group psychotherapy, the latter being particularly important to foster peer support.

### 3. Psychotherapy for Transsexual, Transgender, and Gender-Nonconforming Clients, Including Counseling and Support for Changes in Gender Role

Finding a comfortable gender role is, first and foremost, a psychosocial process. Psychotherapy can be invaluable in assisting transsexual, transgender, and gender-nonconforming individuals with all of the following: (i) clarifying and exploring gender identity and role, (ii) addressing the impact of stigma and minority stress on one's mental health and human development, and (iii) facilitating a coming-out process (Bockting & Coleman, 2007; Devor, 2004; Lev, 2004), which for some individuals may include changes in gender role expression and the use of feminizing/masculinizing medical interventions.

Mental health professionals can provide support and promote interpersonal skills and resilience in individuals and their families as they navigate a world that often is ill-prepared to accommodate and respect transgender, transsexual, and gender-nonconforming people. Psychotherapy can also aid in alleviating any coexisting mental health concerns (e.g., anxiety, depression) identified during screening and assessment.

49 OF 238

The Standards of Care
VERSION 7

For transsexual, transgender, and gender-nonconforming individuals who plan to change gender roles permanently and make a social gender role transition, mental health professionals can facilitate the development of an individualized plan with specific goals and timelines. While the experience of changing one's gender role differs from person to person, the social aspects of the experience are usually challenging—often more so than the physical aspects. Because changing gender role can have profound personal and social consequences, the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role.

Many transsexual, transgender, and gender-nonconforming people will present for care without ever having been related to, or accepted in, the gender role that is most congruent with their gender identity. Mental health professionals can help these clients to explore and anticipate the implications of changes in gender role, and to pace the process of implementing these changes. Psychotherapy can provide a space for clients to begin to express themselves in ways that are congruent with their gender identity and, for some clients, overcome fears about changes in gender expression. Calculated risks can be taken outside of therapy to gain experience and build confidence in the new role. Assistance with coming out to family and community (friends, school, workplace) can be provided.

Other transsexual, transgender, and gender-nonconforming individuals will present for care already having acquired experience (minimal, moderate, or extensive) living in a gender role that differs from that associated with their birth-assigned sex. Mental health professionals can help these clients to identify and work through potential challenges and foster optimal adjustment as they continue to express changes in their gender role.

### 4. Family Therapy or Support for Family Members

Decisions about changes in gender role and medical interventions for gender dysphoria have implications for, not only clients, but also their families (Emerson & Rosenfeld, 1996; Fraser, 2009a; Lev, 2004). Mental health professionals can assist clients with making thoughtful decisions about communicating with family members and others about their gender identity and treatment decisions. Family therapy may include work with spouses or partners, as well as with children and other members of a client's extended family.

Clients may also request assistance with their relationships and sexual health. For example, they may want to explore their sexuality and intimacy-related concerns.

Family therapy might be offered as part of the client's individual therapy and, if clinically appropriate, by the same provider. Alternatively, referrals can be made to other therapists with relevant expertise

30

for working with family members or to sources of peer support (e.g., in-person or offline support networks of partners or families).

### 5. Follow-Up Care Throughout Life

Mental health professionals may work with clients and their families at many stages of their lives. Psychotherapy may be helpful at different times and for various issues throughout the life cycle.

### 6. E-Therapy, Online Counseling, or Distance Counseling

Online or e-therapy has been shown to be particularly useful for people who have difficulty accessing competent in-person psychotherapeutic treatment and who may experience isolation and stigma (Derrig-Palumbo & Zeine, 2005; Fenichel et al., 2004; Fraser, 2009b). By extrapolation, e-therapy may be a useful modality for psychotherapy with transsexual, transgender, and gender-nonconforming people. E-therapy offers opportunities for potentially enhanced, expanded, creative, and tailored delivery of services; however, as a developing modality it may also carry unexpected risk. Telemedicine guidelines are clear in some disciplines in some parts of the United States (Fraser, 2009b; Maheu, Pulier, Wilhelm, McMenamin, & Brown-Connolly, 2005) but not all; the international situation is even less well-defined (Maheu et al., 2005). Until sufficient evidence-based data on this use of e-therapy is available, caution in its use is advised.

Mental health professionals engaging in e-therapy are advised to stay current with their particular licensing board, professional association, and country's regulations, as well as the most recent literature pertaining to this rapidly evolving medium. A more thorough description of the potential uses, processes, and ethical concerns related to e-therapy has been published (Fraser, 2009b).

## Other Tasks of Mental Health Professionals

### 1. Educate and Advocate on Behalf of Clients Within Their Community (Schools, Workplaces, Other Organizations) and Assist Clients with Making Changes in Identity Documents

Transsexual, transgender, and gender-nonconforming people may face challenges in their professional, educational, and other types of settings as they actualize their gender identity and expression (Lev, 2004, 2009). Mental health professionals can play an important role by educating people in these settings regarding gender nonconformity and by advocating on behalf of their clients (Currah, Juang, & Minter, 2006; Currah & Minter, 2000). This role may involve consultation

51 oF 2000 238

The Standards of Care
VERSION 7

with school counselors, teachers, and administrators, human resources staff, personnel managers and employers, and representatives from other organizations and institutions. In addition, health providers may be called upon to support changes in a client's name and/or gender marker on identity documents such as passports, driver's licenses, birth certificates, and diplomas.

### 2. Provide Information and Referral for Peer Support

For some transsexual, transgender, and gender-nonconforming people, an experience in peer support groups may be more instructive regarding options for gender expression than anything individual psychotherapy could offer (Rachlin, 2002). Both experiences are potentially valuable, and all people exploring gender issues should be encouraged to participate in community activities, if possible. Resources for peer support and information should be made available.

## Culture and Its Ramifications for Assessment and Psychotherapy

Health professionals work in enormously different environments across the world. Forms of distress that cause people to seek professional assistance in any culture are understood and classified by people in terms that are products of their own cultures (Frank & Frank, 1993). Cultural settings also largely determine how such conditions are understood by mental health professionals. Cultural differences related to gender identity and expression can affect patients, mental health professionals, and accepted psychotherapy practice. WPATH recognizes that the *SOC* have grown out of a Western tradition and may need to be adapted depending on the cultural context.

## Ethical Guidelines Related to Mental Health Care

Mental health professionals need to be certified or licensed to practice in a given country according to that country's professional regulations (Fraser, 2009b; Pope & Vasquez, 2011). Professionals must adhere to the ethical codes of their professional licensing or certifying organizations in all of their work with transsexual, transgender, and gender-nonconforming clients.

Treatment aimed at trying to change a person's gender identity and lived gender expression to become more congruent with sex assigned at birth has been attempted in the past (Gelder & Marks, 1969; Greenson, 1964), yet without success, particularly in the long-term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

The Standards of Care
VERSION 7

If mental health professionals are uncomfortable with, or inexperienced in, working with transsexual, transgender, and gender-nonconforming individuals and their families, they should refer clients to a competent provider or, at minimum, consult with an expert peer. If no local practitioners are available, consultation may be done via telehealth methods, assuming local requirements for distance consultation are met.

## Issues of Access to Care

Qualified mental health professionals are not universally available; thus, access to quality care might be limited. WPATH aims to improve access and provides regular continuing education opportunities to train professionals from various disciplines to provide quality, transgender-specific health care. Providing mental health care from a distance through the use of technology may be one way to improve access (Fraser, 2009b).

In many places around the world, access to health care for transsexual, transgender, and gender-nonconforming people is also limited by a lack of health insurance or other means to pay for needed care. WPATH urges health insurance companies and other third-party payers to cover the medically necessary treatments to alleviate gender dysphoria (American Medical Association, 2008; Anton, 2009; The World Professional Association for Transgender Health, 2008).

When faced with a client who is unable to access services, referral to available peer support resources (offline and online) is recommended. Finally, harm-reduction approaches might be indicated to assist clients with making healthy decisions to improve their lives.

# VIII

# Hormone Therapy

## Medical Necessity of Hormone Therapy

Feminizing/masculinizing hormone therapy—the administration of exogenous endocrine agents to induce feminizing or masculinizing changes—is a medically necessary intervention for many transsexual, transgender, and gender-nonconforming individuals with gender dysphoria



The Standards of Care
VERSION 7

(Newfield, Hart, Dibble, & Kohler, 2006; Pfäfflin & Junge, 1998). Some people seek maximum feminization/masculinization, while others experience relief with an androgynous presentation resulting from hormonal minimization of existing secondary sex characteristics (Factor & Rothblum, 2008). Evidence for the psychosocial outcomes of hormone therapy is summarized in Appendix D.

Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Hormone therapy can provide significant comfort to patients who do not wish to make a social gender role transition or undergo surgery, or who are unable to do so (Meyer III, 2009). Hormone therapy is a recommended criterion for some, but not all, surgical treatments for gender dysphoria (see section XI and Appendix C).

## Criteria for Hormone Therapy

Initiation of hormone therapy may be undertaken after a psychosocial assessment has been conducted and informed consent has been obtained by a qualified health professional, as outlined in section VII of the *SOC*. A referral is required from the mental health professional who performed the assessment, unless the assessment was done by a hormone provider who is also qualified in this area.

**The criteria for hormone therapy are as follows:**

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* outlined in section VI);

4. If significant medical or mental health concerns are present, they must be reasonably well-controlled.

As noted in section VII of the *SOC*, the presence of coexisting mental health concerns does not necessarily preclude access to feminizing/masculinizing hormones; rather, these concerns need to be managed prior to, or concurrent with, treatment of gender dysphoria.

In selected circumstances, it can be acceptable practice to provide hormones to patients who have not fulfilled these criteria. Examples include facilitating the provision of monitored therapy using hormones of known quality as an alternative to illicit or unsupervised hormone use or to patients

World Professional Association for Transgender Health



who have already established themselves in their affirmed gender and who have a history of prior hormone use. It is unethical to deny availability or eligibility for hormone therapy solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis B or C.

In rare cases, hormone therapy may be contraindicated due to serious individual health conditions. Health professionals should assist these patients with accessing nonhormonal interventions for gender dysphoria. A qualified mental health professional familiar with the patient is an excellent resource in these circumstances.

## Informed Consent

Feminizing/masculinizing hormone therapy may lead to irreversible physical changes. Thus, hormone therapy should be provided only to those who are legally able to provide informed consent. This includes people who have been declared by a court to be emancipated minors, incarcerated people, and cognitively impaired people who are considered competent to participate in their medical decisions (Bockting et al., 2006). Providers should document in the medical record that comprehensive information has been provided and understood about all relevant aspects of the hormone therapy, including both possible benefits and risks and the impact on reproductive capacity.

## Relationship Between the *Standards of Care* and Informed Consent Model Protocols

A number of community health centers in the United States have developed protocols for providing hormone therapy based on an approach that has become known as the Informed Consent Model (Callen Lorde Community Health Center, 2000, 2011; Fenway Community Health Transgender Health Program, 2007; Tom Waddell Health Center, 2006). These protocols are consistent with the guidelines presented in the WPATH *Standards of Care, Version 7*. The *SOC* are flexible clinical guidelines; they allow for tailoring of interventions to the needs of the individual receiving services and for tailoring of protocols to the approach and setting in which these services are provided (Ehrbar & Gorton, 2010).

Obtaining informed consent for hormone therapy is an important task of providers to ensure that patients understand the psychological and physical benefits and risks of hormone therapy, as well as its psychosocial implications. Providers prescribing the hormones or health professionals recommending the hormones should have the knowledge and experience to assess gender

The Standards of Care
VERSION 7

dysphoria. They should inform individuals of the particular benefits, limitations, and risks of hormones, given the patient's age, previous experience with hormones, and concurrent physical or mental health concerns.

Screening for and addressing acute or current mental health concerns is an important part of the informed consent process. This may be done by a mental health professional or by an appropriately trained prescribing provider (see section VII of the SOC). The same provider or another appropriately trained member of the health care team (e.g., a nurse) can address the psychosocial implications of taking hormones when necessary (e.g., the impact of masculinization/feminization on how one is perceived and its potential impact on relationships with family, friends, and coworkers). If indicated, these providers will make referrals for psychotherapy and for the assessment and treatment of coexisting mental health concerns such as anxiety or depression.

The difference between the Informed Consent Model and SOC, Version 7, is that the SOC puts greater emphasis on the important role that mental health professionals can play in alleviating gender dysphoria and facilitating changes in gender role and psychosocial adjustment. This may include a comprehensive mental health assessment and psychotherapy, when indicated. In the Informed Consent Model, the focus is on obtaining informed consent as the threshold for the initiation of hormone therapy in a multidisciplinary, harm-reduction environment. Less emphasis is placed on the provision of mental health care until the patient requests it, unless significant mental health concerns are identified that would need to be addressed before hormone prescription.

## Physical Effects of Hormone Therapy

Feminizing/masculinizing hormone therapy will induce physical changes that are more congruent with a patient's gender identity.

- In FtM patients, the following physical changes are expected to occur: deepened voice, clitoral enlargement (variable), growth in facial and body hair, cessation of menses, atrophy of breast tissue, and decreased percentage of body fat compared to muscle mass.

- In MtF patients, the following physical changes are expected to occur: breast growth (variable), decreased erectile function, decreased testicular size, and increased percentage of body fat compared to muscle mass.

Most physical changes, whether feminizing or masculinizing, occur over the course of two years. The amount of physical change and the exact timeline of effects can be highly variable. Tables 1a and 1b outline the approximate time course of these physical changes.

The Standards of Care
VERSION 7

TABLE 1B:  EFFECTS AND EXPECTED TIME COURSE OF FEMINIZING HORMONES [A]

| Effect | Expected onset[B] | Expected maximum effect[B] |
|---|---|---|
| Body fat redistribution | 3–6 months | 2–5 years |
| Decreased muscle mass/strength | 3–6 months | 1–2 years[C] |
| Softening of skin/decreased oiliness | 3–6 months | Unknown |
| Decreased libido | 1–3 months | 1–2 years |
| Decreased spontaneous erections | 1–3 months | 3–6 months |
| Male sexual dysfunction | Variable | Variable |
| Breast growth | 3–6 months | 2–3 years |
| Decreased testicular volume | 3–6 months | 2–3 years |
| Decreased sperm production | Variable | Variable |
| Thinning and slowed growth of body and facial hair | 6–12 months | > 3 years[D] |
| Male pattern baldness | No regrowth, loss stops 1–3 months | 1–2 years |

[A]  Adapted with permission from Hembree et al. (2009). Copyright 2009, The Endocrine Society.
[B]  Estimates represent published and unpublished clinical observations.
[C]  Significantly dependent on amount of exercise.
[D]  Complete removal of male facial and body hair requires electrolysis, laser treatment, or both.

The degree and rate of physical effects depends in part on the dose, route of administration, and medications used, which are selected in accordance with a patient's specific medical goals (e.g., changes in gender role expression, plans for sex reassignment) and medical risk profile. There is no current evidence that response to hormone therapy—with the possible exception of voice deepening in FtM persons—can be reliably predicted based on age, body habitus, ethnicity, or family appearance. All other factors being equal, there is no evidence to suggest that any medically approved type or method of administering hormones is more effective than any other in producing the desired physical changes.

57 OF 2016 238

The Standards of Care
VERSION 7

TABLE 1A: EFFECTS AND EXPECTED TIME COURSE OF MASCULINIZING HORMONES [A]

| Effect | Expected onset[B] | Expected maximum effect[B] |
|---|---|---|
| Skin oiliness/acne | 1–6 months | 1–2 years |
| Facial/body hair growth | 3–6 months | 3–5 years |
| Scalp hair loss | >12 months[C] | Variable |
| Increased muscle mass/strength | 6–12 months | 2–5 years[D] |
| Body fat redistribution | 3–6 months | 2–5 years |
| Cessation of menses | 2–6 months | n/a |
| Clitoral enlargement | 3–6 months | 1–2 years |
| Vaginal atrophy | 3–6 months | 1–2 years |
| Deepened voice | 3–12 months | 1–2 years |

[A] Adapted with permission from Hembree et al.(2009). Copyright 2009, The Endocrine Society.
[B] Estimates represent published and unpublished clinical observations.
[C] Highly dependent on age and inheritance; may be minimal.
[D] Significantly dependent on amount of exercise.

58 of 238

## Risks of Hormone Therapy

All medical interventions carry risks. The likelihood of a serious adverse event is dependent on numerous factors: the medication itself, dose, route of administration, and a patient's clinical characteristics (age, comorbidities, family history, health habits). It is thus impossible to predict whether a given adverse effect will happen in an individual patient.

The risks associated with feminizing/masculinizing hormone therapy for the transsexual, transgender, and gender-nonconforming population as a whole are summarized in Table 2. Based on the level of evidence, risks are categorized as follows: (i) likely increased risk with hormone therapy, (ii) possibly increased risk with hormone therapy, or (iii) inconclusive or no increased risk. Items in the last category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Additional detail about these risks can be found in Appendix B, which is based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (Dahl, Feldman, Goldberg, & Jaberi, 2006; Ettner, Monstrey, & Eyler, 2007).

59 OF 2006 738

The Standards of Care
VERSION 7

TABLE 2:  RISKS ASSOCIATED WITH HORMONE THERAPY. BOLDED ITEMS ARE CLINICALLY SIGNIFICANT

| Risk Level | Feminizing hormones | Masculinizing hormones |
|---|---|---|
| Likely increased risk | Venous thromboembolic disease[a]<br><br>Gallstones<br><br>Elevated liver enzymes<br><br>Weight gain<br><br>**Hypertriglyceridemia** | Polycythemia<br><br>Weight gain<br><br>Acne<br><br>Androgenic alopecia (balding)<br><br>Sleep apnea |
| Likely increased risk with presence of additional risk factors[b] | **Cardiovascular disease** | |
| Possible increased risk | **Hypertension**<br><br>Hyperprolactinemia or prolactinoma | Elevated liver enzymes<br><br>Hyperlipidemia |
| Possible increased risk with presence of additional risk factors[b] | **Type 2 diabetes[a]** | Destabilization of certain psychiatric disorders[c]<br><br>**Cardiovascular disease**<br><br>Hypertension<br><br>**Type 2 diabetes** |
| No increased risk or inconclusive | Breast cancer | Loss of bone density<br><br>Breast cancer<br><br>Cervical cancer<br><br>Ovarian cancer<br><br>Uterine cancer |

[o]  Note: Risk is greater with oral estrogen administration than with transdermal estrogen administration.
[a]  Risk is greater with oral estrogen administration than with transdermal estrogen administration.
[b]  Additional risk factors include age.
[c]  Includes bipolar, schizoaffective, and other disorders that may include manic or psychotic symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

World Professional Association for Transgender Health

60 OF ~~2006~~ 238

# Competency of Hormone-Prescribing Physicians, Relationship with Other Health Professionals

Feminizing/masculinizing hormone therapy is best undertaken in the context of a complete approach to health care that includes comprehensive primary care and a coordinated approach to psychosocial issues (Feldman & Safer, 2009). While psychotherapy or ongoing counseling is not required for the initiation of hormone therapy, if a therapist is involved, then regular communication among health professionals is advised (with the patient's consent) to ensure that the transition process is going well, both physically and psychosocially.

With appropriate training, feminizing/masculinizing hormone therapy can be managed by a variety of providers, including nurse practitioners, physician assistants, and primary care physicians (Dahl et al., 2006). Medical visits relating to hormone maintenance provide an opportunity to deliver broader care to a population that is often medically underserved (Clements, Wilkinson, Kitano, & Marx, 1999; Feldman, 2007; Xavier, 2000). Many of the screening tasks and management of comorbidities associated with long-term hormone use, such as cardiovascular risk factors and cancer screening, fall more uniformly within the scope of primary care rather than specialist care (American Academy of Family Physicians, 2005; Eyler, 2007; World Health Organization, 2008), particularly in locations where dedicated gender teams or specialized physicians are not available.

Given the multidisciplinary needs of transsexual, transgender, and gender-nonconforming people seeking hormone therapy, as well as the difficulties associated with fragmentation of care in general (World Health Organization, 2008), WPATH strongly encourages the increased training and involvement of primary care providers in the area of feminizing/masculinizing hormone therapy. If hormones are prescribed by a specialist, there should be close communication with the patient's primary care provider. Conversely, an experienced hormone provider or endocrinologist should be involved if the primary care physician has no experience with this type of hormone therapy, or if the patient has a pre-existing metabolic or endocrine disorder that could be affected by endocrine therapy.

While formal training programs in transgender medicine do not yet exist, hormone providers have a responsibility to obtain appropriate knowledge and experience in this field. Clinicians can increase their experience and comfort in providing feminizing/masculinizing hormone therapy by co-managing care or consulting with a more experienced provider, or by providing more limited types of hormone therapy before progressing to initiation of hormone therapy. Because this field of medicine is evolving, clinicians should become familiar and keep current with the medical literature, and discuss emerging issues with colleagues. Such discussions might occur through networks established by WPATH and other national/local organizations.

61 of 238

The Standards of Care
VERSION 7

# Responsibilities of Hormone-Prescribing Physicians

In general, clinicians who prescribe hormone therapy should engage in the following tasks:

1. Perform an initial evaluation that includes discussion of a patient's physical transition goals, health history, physical examination, risk assessment, and relevant laboratory tests.

2. Discuss with patients the expected effects of feminizing/masculinizing medications and the possible adverse health effects. These effects can include a reduction in fertility (Feldman & Safer, 2009; Hembree et al., 2009). Therefore, reproductive options should be discussed with patients before starting hormone therapy (see section IX).

3. Confirm that patients have the capacity to understand the risks and benefits of treatment and are capable of making an informed decision about medical care.

4. Provide ongoing medical monitoring, including regular physical and laboratory examination to monitor hormone effectiveness and side effects.

5. Communicate as needed with a patient's primary care provider, mental health professional, and surgeon.

6. If needed, provide patients with a brief written statement indicating that they are under medical supervision and care that includes feminizing/masculinizing hormone therapy. Particularly during the early phases of hormone treatment, a patient may wish to carry this statement at all times to help prevent difficulties with the police and other authorities.

Depending on the clinical situation for providing hormones (see below), some of these responsibilities are less relevant. Thus, the degree of counseling, physical examinations, and laboratory evaluations should be individualized to a patient's needs.


# Clinical Situations for Hormone Therapy

There are circumstances in which clinicians may be called upon to provide hormones without necessarily initiating or maintaining long-term feminizing/masculinizing hormone therapy. By acknowledging these different clinical situations (see below, from least to highest level of complexity), it may be possible to involve clinicians in feminizing/masculinizing hormone therapy who might not otherwise feel able to offer this treatment.

World Professional Association for Transgender Health

### 1. Bridging

Whether prescribed by another clinician or obtained through other means (e.g., purchased over the Internet), patients may present for care already on hormone therapy. Clinicians can provide a limited (1–6 month) prescription for hormones while helping patients find a provider who can prescribe long-term hormone therapy. Providers should assess a patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated (Dahl et al., 2006; Feldman & Safer, 2009). If hormones were previously prescribed, medical records should be requested (with the patient's permission) to obtain the results of baseline examinations and laboratory tests and any adverse events. Hormone providers should also communicate with any mental health professional who is currently involved in a patient's care. If a patient has never had a psychosocial assessment as recommended by the *SOC* (see section VII), clinicians should refer the patient to a qualified mental health professional if appropriate and feasible (Feldman & Safer, 2009). Providers who prescribe bridging hormones need to work with patients to establish limits as to the duration of bridging therapy.

### 2. Hormone Therapy Following Gonad Removal

Hormone replacement with estrogen or testosterone is usually continued lifelong after an oophorectomy or orchiectomy, unless medical contraindications arise. Because hormone doses are often decreased after these surgeries (Basson, 2001; Levy, Crown, & Reid, 2003; Moore, Wisniewski, & Dobs, 2003) and only adjusted for age and comorbid health concerns, hormone management in this situation is quite similar to hormone replacement in any hypogonadal patient.

### 3. Hormone Maintenance Prior to Gonad Removal

Once patients have achieved maximal feminizing/masculinizing benefits from hormones (typically two or more years), they remain on a maintenance dose. The maintenance dose is then adjusted for changes in health conditions, aging, or other considerations such as lifestyle changes (Dahl et al., 2006). When a patient on maintenance hormones presents for care, the provider should assess the patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated. The patient should continue to be monitored by physical examinations and laboratory testing on a regular basis, as outlined in the literature (Feldman & Safer, 2009; Hembree et al., 2009). The dose and form of hormones should be revisited regularly with any changes in the patient's health status and available evidence on the potential long-term risks of hormones (See *Hormone Regimens,* below).

63 OF 238

The Standards of Care
VERSION 7

## 4.  Initiating Hormonal Feminization/Masculinization

This clinical situation requires the greatest commitment in terms of provider time and expertise. Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Although a wide variety of hormone regimens have been published (Dahl et al., 2006; Hembree et al., 2009; Moore et al., 2003), there are no published reports of randomized clinical trials comparing safety and efficacy. Despite this variation, a reasonable framework for initial risk assessment and ongoing monitoring of hormone therapy can be constructed, based on the efficacy and safety evidence presented above.

# Risk Assessment and Modification for Initiating Hormone Therapy

The initial evaluation for hormone therapy assesses a patient's clinical goals and risk factors for hormone-related adverse events. During the risk assessment, the patient and clinician should develop a plan for reducing risks wherever possible, either prior to initiating therapy or as part of ongoing harm reduction.

All assessments should include a thorough physical exam, including weight, height, and blood pressure. The need for breast, genital, and rectal exams, which are sensitive issues for most transsexual, transgender, and gender-nonconforming patients, should be based on individual risks and preventive health care needs (Feldman & Goldberg, 2006; Feldman, 2007).

### Preventive Care

Hormone providers should address preventive health care with patients, particularly if a patient does not have a primary care provider. Depending on a patient's age and risk profile, there may be appropriate screening tests or exams for conditions affected by hormone therapy. Ideally, these screening tests should be carried out prior to the start of hormone therapy.

### Risk Assessment and Modification for Feminizing Hormone Therapy (MtF)

There are no absolute contraindications to feminizing therapy per se, but absolute contraindications exist for the different feminizing agents, particularly estrogen. These include previous venous thrombotic events related to an underlying hypercoagulable condition, history of estrogen-sensitive neoplasm, and end-stage chronic liver disease (Gharib et al., 2005).

44

Other medical conditions, as noted in Table 2 and Appendix B, can be exacerbated by estrogen or androgen blockade, and therefore should be evaluated and reasonably well controlled prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Clinicians should particularly attend to tobacco use, as it is associated with increased risk of venous thrombosis, which is further increased with estrogen use. Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of feminizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

**Risk Assessment and Modification for Masculinizing Hormone Therapy (FtM)**

Absolute contraindications to testosterone therapy include pregnancy, unstable coronary artery disease, and untreated polycythemia with a hematocrit of 55% or higher (Carnegie, 2004). Because the aromatization of testosterone to estrogen may increase risk in patients with a history of breast or other estrogen dependent cancers (Moore et al., 2003), consultation with an oncologist may be indicated prior to hormone use. Comorbid conditions likely to be exacerbated by testosterone use should be evaluated and treated, ideally prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease. (Dhejne et al., 2011).

An increased prevalence of polycystic ovarian syndrome (PCOS) has been noted among FtM patients even in the absence of testosterone use (Baba et al., 2007; Balen, Schachter, Montgomery, Reid, & Jacobs, 1993; Bosinski et al., 1997). While there is no evidence that PCOS is related to the development of a transsexual, transgender, or gender-nonconforming identity, PCOS is associated with increased risk of diabetes, cardiac disease, high blood pressure, and ovarian and endometrial cancers (Cattrall & Healy, 2004). Signs and symptoms of PCOS should be evaluated prior to initiating testosterone therapy, as testosterone may affect many of these conditions. Testosterone can affect the developing fetus (*Physicians' Desk Reference*, 2010), and patients at risk of becoming pregnant require highly effective birth control.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of masculinizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

65 OF 📝 & 2.28

The Standards of Care
VERSION 7

# Clinical Monitoring During Hormone Therapy for Efficacy and Adverse Events

The purpose of clinical monitoring during hormone use is to assess the degree of feminization/ masculinization and the possible presence of adverse effects of medication. However, as with the monitoring of any long-term medication, monitoring should take place in the context of comprehensive health care. Suggested clinical monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009). Patients with comorbid medical conditions may need to be monitored more frequently. Healthy patients in geographically remote or resource-poor areas may be able to use alternative strategies, such as telehealth, or cooperation with local providers such as nurses and physician assistants. In the absence of other indications, health professionals may prioritize monitoring for those risks that are either likely to be increased by hormone therapy or possibly increased by hormone therapy but clinically serious in nature.

## Efficacy and Risk Monitoring During Feminizing Hormone Therapy (MtF)

The best assessment of hormone efficacy is clinical response: Is a patient developing a feminized body while minimizing masculine characteristics, consistent with that patient's gender goals? In order to more rapidly predict the hormone dosages that will achieve clinical response, one can measure testosterone levels for suppression below the upper limit of the normal female range and estradiol levels within a premenopausal female range but well below supraphysiologic levels (Feldman & Safer, 2009; Hembree et al., 2009).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs of cardiovascular impairment and venous thromboembolism (VTE) through measurement of blood pressure, weight, and pulse; heart and lung exams; and examination of the extremities for peripheral edema, localized swelling, or pain (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual comorbidities and risk factors, and the specific hormone regimen itself. Specific lab-monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

## Efficacy and Risk Monitoring During Masculinizing Hormone Therapy (FtM)

The best assessment of hormone efficacy is clinical response: Is a patient developing a masculinized body while minimizing feminine characteristics, consistent with that patient's gender goals? Clinicians can achieve a good clinical response with the least likelihood of adverse events by maintaining testosterone levels within the normal male range while avoiding supraphysiological

World Professional Association for Transgender Health

66 OF 238

levels (Dahl et al., 2006; Hembree et al., 2009). For patients using intramuscular (IM) testosterone cypionate or enanthate, some clinicians check trough levels while others prefer midcycle levels (Dahl et al., 2006; Hembree et al., 2009; Tangpricha, Turner, Malabanan, & Holick, 2001; Tangpricha, Ducharme, Barber, & Chipkin, 2003).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs and symptoms of excessive weight gain, acne, uterine break-through bleeding, and cardiovascular impairment, as well as psychiatric symptoms in at-risk patients. Physical examinations should include measurement of blood pressure, weight, and pulse; and heart, lung, and skin exams (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual comorbidities and risk factors, and the specific hormone regimen itself. Specific lab monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

## Hormone Regimens

To date, no controlled clinical trials of any feminizing/masculinizing hormone regimen have been conducted to evaluate safety or efficacy in producing physical transition. As a result, wide variation in doses and types of hormones have been published in the medical literature (Moore et al., 2003; Tangpricha et al., 2003; van Kesteren, Asscheman, Megens, & Gooren, 1997). In addition, access to particular medications may be limited by a patient's geographical location and/or social or economonic situations. For these reasons, WPATH does not describe or endorse a particular feminizing/masculinizing hormone regimen. Rather, the medication classes and routes of administration used in most published regimens are broadly reviewed.

As outlined above, there are demonstrated safety differences in individual elements of various regimens. The Endocrine Society Guidelines (Hembree et al., 2009) and Feldman and Safer (2009) provide specific guidance regarding the types of hormones and suggested dosing to maintain levels within physiologic ranges for a patient's desired gender expression (based on goals of full feminization/masculinization). It is strongly recommend that hormone providers regularly review the literature for new information and use those medications that safely meet individual patient needs with available local resources.

67 OF 238

The Standards of Care
VERSION 7

**Regimens for Feminizing Hormone Therapy (MtF)**

Estrogen

Use of oral estrogen, and specifically ethinyl estradiol, appears to increase the risk of VTE. Because of this safety concern, ethinyl estradiol is not recommended for feminizing hormone therapy. Transdermal estrogen is recommended for those patients with risks factors for VTE. The risk of adverse events increases with higher doses, particular doses resulting in supraphysiologic levels (Hembree et al., 2009). Patients with co-morbid conditions that can be affected by estrogen should avoid oral estrogen if possible and be started at lower levels. Some patients may not be able to safely use the levels of estrogen needed to get the desired results. This possibility needs to be discussed with patients well in advance of starting hormone therapy.

Androgen-reducing medications ("anti-androgens")

A combination of estrogen and "anti-androgens" is the most commonly studied regimen for feminization. Androgen-reducing medications, from a variety of classes of drugs, have the effect of reducing either endogenous testosterone levels or testosterone activity, and thus diminishing masculine characteristics such as body hair. They minimize the dosage of estrogen needed to suppress testosterone, thereby reducing the risks associated with high-dose exogenous estrogen (Prior, Vigna, Watson, Diewold, & Robinow, 1986; Prior, Vigna, & Watson, 1989).

Common anti-androgens include the following:

- Spironolactone, an antihypertensive agent, directly inhibits testosterone secretion and androgen binding to the androgen receptor. Blood pressure and electrolytes need to be monitored because of the potential for hyperkalemia.

- Cyproterone acetate is a progestational compound with anti-androgenic properties. This medication is not approved in the United States because of concerns over potential hepatotoxicity, but it is widely used elsewhere (De Cuypere et al., 2005).

- GnRH agonists (e.g., goserelin, buserelin, triptorelin) are neurohormones that block the gonadtropin-releasing hormone receptor, thus blocking the release of follicle stimulating hormone and luteinizing hormone. This leads to highly effective gonadal blockade. However, these medications are expensive and only available as injectables or implants.

- 5-alpha reductase inhibitors (finasteride and dutasteride) block the conversion of testosterone to the more active agent, 5-alpha-dihydrotestosterone. These medications have beneficial effects on scalp hair loss, body hair growth, sebaceous glands, and skin consistency.

48                                    World Professional Association for Transgender Health

68 OF WPATH 238

Cyproterone and spironolactone are the most commonly used anti-androgens and are likely the most cost-effective.

Progestins

With the exception of cyproterone, the inclusion of progestins in feminizing hormone therapy is controversial (Oriel, 2000). Because progestins play a role in mammary development on a cellular level, some clinicians believe that these agents are necessary for full breast development (Basson & Prior, 1998; Oriel, 2000). However, a clinical comparison of feminization regimens with and without progestins found that the addition of progestins neither enhanced breast growth nor lowered serum levels of free testosterone (Meyer et al., 1986). There are concerns regarding potential adverse effects of progestins, including depression, weight gain, and lipid changes (Meyer et al., 1986; Tangpricha et al., 2003). Progestins (especially medroxyprogesterone) are also suspected to increase breast cancer risk and cardiovascular risk in women (Rossouw et al., 2002). Micronized progesterone may be better tolerated and have a more favorable impact on the lipid profile than medroxyprogesterone does (de Lignières, 1999; Fitzpatrick, Pace, & Wiita, 2000).

**Regimens for Masculinizing Hormone Therapy (FtM)**

Testosterone

Testosterone generally can be given orally, transdermally, or parenterally (IM), although buccal and implantable preparations are also available. Oral testosterone undecanoate, available outside the United States, results in lower serum testosterone levels than nonoral preparations and has limited efficacy in suppressing menses (Feldman, 2005, April; Moore et al., 2003). Because intramuscular testosterone cypionate or enanthate are often administered every 2–4 weeks, some patients may notice cyclic variation in effects (e.g., fatigue and irritability at the end of the injection cycle, aggression or expansive mood at the beginning of the injection cycle), as well as more time outside the normal physiologic levels (Jockenhövel, 2004). This may be mitigated by using a lower but more frequent dosage schedule or by using a daily transdermal preparation (Dobs et al., 1999; Jockenhövel, 2004; Nieschlag et al., 2004). Intramuscular testosterone undecanoate (not currently available in the United States) maintains stable, physiologic testosterone levels over approximately 12 weeks and has been effective in both the setting of hypogonadism and in FtM individuals (Mueller, Kiesewetter, Binder, Beckmann, & Dittrich, 2007; Zitzmann, Saad, & Nieschlag, 2006). There is evidence that transdermal and intramuscular testosterone achieve similar masculinizing results, although the timeframe may be somewhat slower with transdermal preparations (Feldman, 2005, April). Especially as patients age, the goal is to use the lowest dose needed to maintain the desired clinical result, with appropriate precautions being made to maintain bone density.

The Standards of Care
VERSION 7

Other agents

Progestins, most commonly medroxyprogesterone, can be used for a short period of time to assist with menstrual cessation early in hormone therapy. GnRH agonists can be used similarly, as well as for refractory uterine bleeding in patients without an underlying gynecological abnormality.

**Bioidentical and Compounded Hormones**

As discussion surrounding the use of bioidentical hormones in postmenopausal hormone replacement has heightened, interest has also increased in the use of similar compounds in feminizing/masculinizing hormone therapy. There is no evidence that custom compounded bioidentical hormones are safer or more effective than government agency-approved bioidentical hormones (Sood, Shuster, Smith, Vincent, & Jatoi, 2011). Therefore, it has been advised by the North American Menopause Society (2010) and others to assume that, whether the hormone is from a compounding pharmacy or not, if the active ingredients are similar, it should have a similar side-effect profile. WPATH concurs with this assessment.



# Reproductive Health

Many transgender, transsexual, and gender-nonconforming people will want to have children. Because feminizing/masculinizing hormone therapy limits fertility (Darney, 2008; Zhang, Gu, Wang, Cui, & Bremner, 1999), it is desirable for patients to make decisions concerning fertility before starting hormone therapy or undergoing surgery to remove/alter their reproductive organs. Cases are known of people who received hormone therapy and genital surgery and later regretted their inability to parent genetically related children (De Sutter, Kira, Verschoor, & Hotimsky, 2002).

Health care professionals—including mental health professionals recommending hormone therapy or surgery, hormone-prescribing physicians, and surgeons—should discuss reproductive options with patients prior to initiation of these medical treatments for gender dysphoria. These discussions should occur even if patients are not interested in these issues at the time of treatment, which may be more common for younger patients (De Sutter, 2009). Early discussions are desirable, but not always possible. If an individual has not had complete sex reassignment surgery, it may be possible to stop hormones long enough for natal hormones to recover, allowing

The Standards of Care
VERSION 7

the production of mature gametes (Payer, Meyer, & Walker, 1979; Van den Broecke, Van der Elst, Liu, Hovatta, & Dhont, 2001).

Besides debate and opinion papers, very few research papers have been published on the reproductive health issues of individuals receiving different medical treatments for gender dysphoria. Another group who faces the need to preserve reproductive function in light of loss or damage to their gonads are people with malignancies that require removal of reproductive organs or use of damaging radiation or chemotherapy. Lessons learned from that group can be applied to people treated for gender dysphoria.

MtF patients, especially those who have not already reproduced, should be informed about sperm-preservation options and encouraged to consider banking their sperm prior to hormone therapy. In a study examining testes that were exposed to high-dose estrogen (Payer et al., 1979), findings suggest that stopping estrogen may allow the testes to recover. In an article reporting on the opinions of MtF individuals towards sperm freezing (De Sutter et al., 2002), the vast majority of 121 survey respondents felt that the availability of freezing sperm should be discussed and offered by the medical world. Sperm should be collected before hormone therapy or after stopping the therapy until the sperm count rises again. Cryopreservation should be discussed even if there is poor semen quality. In adults with azoospermia, a testicular biopsy with subsequent cryopreservation of biopsied material for sperm is possible, but may not be successful.

Reproductive options for FtM patients might include oocyte (egg) or embryo freezing. The frozen gametes and embryo could later be used with a surrogate woman to carry to pregnancy. Studies of women with polycystic ovarian disease suggest that the ovary can recover in part from the effects of high testosterone levels (Hunter & Sterrett, 2000). Stopping the testosterone briefly might allow for ovaries to recover enough to release eggs; success likely depends on the patient's age and duration of testosterone treatment. While not systematically studied, some FtM individuals are doing exactly that, and some have been able to become pregnant and deliver children (More, 1998).

Patients should be advised that these techniques are not available everywhere and can be very costly. Transsexual, transgender, and gender-nonconforming people should not be refused reproductive options for any reason.

A special group of individuals are prepubertal or pubertal adolescents who will never develop reproductive function in their natal sex due to blockers or cross-gender hormones. At this time there is no technique for preserving function from the gonads of these individuals.

71 OF 238

The Standards of Care
VERSION 7



# Voice and Communication Therapy

Communication, both verbal and nonverbal, is an important aspect of human behavior and gender expression. Transsexual, transgender, and gender-nonconforming people might seek the assistance of a voice and communication specialist to develop vocal characteristics (e.g., pitch, intonation, resonance, speech rate, phrasing patterns) and non-verbal communication patterns (e.g., gestures, posture/movement, facial expressions) that facilitate comfort with their gender identity. Voice and communication therapy may help to alleviate gender dysphoria and be a positive and motivating step towards achieving one's goals for gender role expression.

## Competency of Voice and Communication Specialists Working with Transsexual, Transgender, and Gender-Nonconforming Clients

Specialists may include speech-language pathologists, speech therapists, and speech-voice clinicians. In most countries the professional association for speech-language pathologists requires specific qualifications and credentials for membership. In some countries the government regulates practice through licensing, certification, or registration processes (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

The following are recommended minimum credentials for voice and communication specialists working with transsexual, transgender, and gender-nonconforming clients:

1. Specialized training and competence in the assessment and development of communication skills in transsexual, transgender, and gender-nonconforming clients.

2. A basic understanding of transgender health, including hormonal and surgical treatments for feminization/masculinization and trans-specific psychosocial issues as outlined in the *SOC*; and familiarity with basic sensitivity protocols such as the use of preferred gender pronoun and name (Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

World Professional Association for Transgender Health

72 OF 238

3.  Continuing education in the assessment and development of communication skills in transsexual, transgender, and gender-nonconforming clients. This may include attendance at professional meetings, workshops, or seminars; participation in research related to gender identity issues; independent study; or mentoring from an experienced, certified clinician.

Other professionals such as vocal coaches, theatre professionals, singing teachers, and movement experts may play a valuable adjunct role. Such professionals will ideally have experience working with, or be actively collaborating with, speech-language pathologists.

## Assessment and Treatment Considerations

The overall purpose of voice and communication therapy is to help clients adapt their voice and communication in a way that is both safe and authentic, resulting in communication patterns that clients feel are congruent with their gender identity and that reflect their sense of self (Adler, Hirsch, & Mordaunt, 2006). It is essential that voice and communication specialists be sensitive to individual communication preferences. Communication—style, voice, choice of language, etc.—is personal. Individuals should not be counseled to adopt behaviors with which they are not comfortable or which do not feel authentic. Specialists can best serve their clients by taking the time to understand a person's gender concerns and goals for gender-role expression (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

Individuals may choose the communication behaviors that they wish to acquire in accordance with their gender identity. These decisions are also informed and supported by the knowledge of the voice and communication specialist and by the assessment data for a specific client (Hancock, Krissinger, & Owen, 2010). Assessment includes a client's self-evaluation and a specialist's evaluation of voice, resonance, articulation, spoken language, and non-verbal communication (Adler et al., 2006; Hancock et al., 2010).

Voice-and-communication treatment plans are developed by considering the available research evidence, the clinical knowledge and experience of the specialist, and the client's own goals and values (American Speéch-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia). Targets of treatment typically include pitch, intonation, loudness and stress patterns, voice quality, resonance, articulation, speech rate and phrasing,`language, and nonverbal communication (Adler et al., 2006; Davies & Goldberg, 2006; de Bruin, Coerts, & Greven, 2000; Gelfer, 1999; McNeill, 2006; Oates & Dacakis, 1983). Treatment may involve individual and/or group sessions. The frequency and duration of treatment will vary according to a client's needs. Existing protocols for voice-and-communication treatment can be considered in

The Standards of Care
VERSION 7

developing an individualized therapy plan (Carew, Dacakis, & Oates, 2007; Dacakis, 2000; Davies & Goldberg, 2006; Gelfer, 1999; McNeill, Wilson, Clark, & Deakin, 2008; Mount & Salmon, 1988).

Feminizing or masculinizing the voice involves non-habitual use of the voice production mechanism. Prevention measures are necessary to avoid the possibility of vocal misuse and long-term vocal damage. All voice and communication therapy services should therefore include a vocal health component (Adler et al., 2006).

## Vocal Health Considerations After Voice Feminization Surgery

As noted in section XI, some transsexual, transgender, and gender-nonconforming people will undergo voice feminization surgery. (Voice deepening can be achieved through masculinizing hormone therapy, but feminizing hormones do not have an impact on the adult MtF voice.) There are varying degrees of satisfaction, safety, and long-term improvement in patients who have had such surgery. It is recommended that individuals undergoing voice feminization surgery also consult a voice and communication specialist to maximize the surgical outcome, help protect vocal health, and learn nonpitch related aspects of communication. Voice surgery procedures should include follow-up sessions with a voice and communication specialist who is licensed and/or credentialed by the board responsible for speech therapists/speech-language pathologists in that country (Kanagalingam et al., 2005; Neumann & Welzel, 2004).

# XI

# Surgery

## Sex Reassignment Surgery Is Effective and Medically Necessary

Surgery – particularly genital surgery – is often the last and the most considered step in the treatment process for gender dysphoria. While many transsexual, transgender, and gender-nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria (Hage & Karim, 2000). For the latter group, relief from gender dysphoria cannot be achieved

World Professional Association for Transgender Health

74 OF 238 7.38

without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity. Moreover, surgery can help patients feel more at ease in the presence of sex partners or in venues such as physicians' offices, swimming pools, or health clubs. In some settings, surgery might reduce risk of harm in the event of arrest or search by police or other authorities.

Follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well-being, cosmesis, and sexual function (De Cuypere et al., 2005; Gijs & Brewaeys, 2007; Klein & Gorzalka, 2009; Pfäfflin & Junge, 1998). Additional information on the outcomes of surgical treatments are summarized in Appendix D.

## Ethical Questions Regarding Sex Reassignment Surgery

In ordinary surgical practice, pathological tissues are removed to restore disturbed functions, or alterations are made to body features to improve a patient's self image. Some people, including some health professionals, object on ethical grounds to surgery as a treatment for gender dysphoria, because these conditions are thought not to apply.

It is important that health professionals caring for patients with gender dysphoria feel comfortable about altering anatomically normal structures. In order to understand how surgery can alleviate the psychological discomfort and distress of individuals with gender dysphoria, professionals need to listen to these patients discuss their symptoms, dilemmas, and life histories. The resistance against performing surgery on the ethical basis of "above all do no harm" should be respected, discussed, and met with the opportunity to learn from patients themselves about the psychological distress of having gender dysphoria and the potential for harm caused by denying access to appropriate treatments.

Genital and breast/chest surgical treatments for gender dysphoria are not merely another set of elective procedures. Typical elective procedures involve only a private mutually consenting contract between a patient and a surgeon. Genital and breast/chest surgeries as medically necessary treatments for gender dysphoria are to be undertaken only after assessment of the patient by qualified mental health professionals, as outlined in section VII of the SOC. These surgeries may be performed once there is written documentation that this assessment has occurred and that the person has met the criteria for a specific surgical treatment. By following this procedure, mental health professionals, surgeons, and patients share responsibility for the decision to make irreversible changes to the body.

It is unethical to deny availability or eligibility for sex reassignment surgeries solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis C or B.

The Standards of Care
VERSION 7

## Relationship of Surgeons with Mental Health Professionals, Hormone-Prescribing Physicians (if Applicable), and Patients (Informed Consent)

The role of a surgeon in the treatment of gender dysphoria is not that of a mere technician. Rather, conscientious surgeons will have insight into each patient's history and the rationale that led to the referral for surgery. To that end, surgeons must talk at length with their patients and have close working relationships with other health professionals who have been actively involved in their clinical care.

Consultation is readily accomplished when a surgeon practices as part of an interdisciplinary health care team. In the absence of this, a surgeon must be confident that the referring mental health professional(s), and if applicable the physician who prescribes hormones, is/are competent in the assessment and treatment of gender dysphoria, because the surgeon is relying heavily on his/her/their expertise.

Once a surgeon is satisfied that the criteria for specific surgeries have been met (as outlined below), surgical treatment should be considered and a preoperative surgical consultation should take place. During this consultation, the procedure and postoperative course should be extensively discussed with the patient. Surgeons are responsible for discussing all of the following with patients seeking surgical treatments for gender dysphoria:

- The different surgical techniques available (with referral to colleagues who provide alternative options);

- The advantages and disadvantages of each technique;

- The limitations of a procedure to achieve "ideal" results; surgeons should provide a full range of before-and-after photographs of their own patients, including both successful and unsuccessful outcomes;

- The inherent risks and possible complications of the various techniques; surgeons should inform patients of their own complication rates with each procedure.

These discussions are the core of the informed consent process, which is both an ethical and legal requirement for any surgical procedure. Ensuring that patients have a realistic expectation of outcomes is important in achieving a result that will alleviate their gender dysphoria.

All of this information should be provided to patients in writing, in a language in which they are fluent, and in graphic illustrations. Patients should receive the information in advance (possibly

56

76 of 2006 7.38

The Standards of Care
VERSION 7

via the Internet) and be given ample time to review it carefully. The elements of informed consent should always be discussed face-to-face prior to the surgical intervention. Questions can then be answered and written informed consent can be provided by the patient. Because these surgeries are irreversibile, care should be taken to ensure that patients have sufficient time to absorb information fully before they are asked to provide informed consent. A minimum of 24 hours is suggested.

Surgeons should provide immediate aftercare and consultation with other physicians serving the patient in the future. Patients should work with their surgeon to develop an adequate aftercare plan for the surgery.

## Overview of Surgical Procedures for the Treatment of Patients with Gender Dysphoria

**For the Male-to-Female (MtF) Patient, Surgical Procedures May Include the Following:**

1. Breast/chest surgery: augmentation mammoplasty (implants/lipofilling);

2. Genital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty;

3. Nongenital, nonbreast surgical interventions: facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and various aesthetic procedures.

**For the Female-to-Male (FtM) Patient, Surgical Procedures May Include the Following:**

1. Breast/chest surgery: subcutaneous mastectomy, creation of a male chest;

2. Genital surgery: hysterectomy/salpingo-oophorectomy, reconstruction of the fixed part of the urethra, which can be combined with a metoidioplasty or with a phalloplasty (employing a pedicled or free vascularized flap), vaginectomy, scrotoplasty, and implantation of erection and/or testicular prostheses;

3. Nongenital, nonbreast surgical interventions: voice surgery (rare), liposuction, lipofilling, pectoral implants, and various aesthetic procedures.

77 of 238

The Standards of Care
VERSION 7

## Reconstructive Versus Aesthetic Surgery

The question of whether sex reassignment surgery should be considered "aesthetic" surgery or "reconstructive" surgery is pertinent not only from a philosophical point of view, but also from a financial point of view. Aesthetic or cosmetic surgery is mostly regarded as not medically necessary and therefore is typically paid for entirely by the patient. In contrast, reconstructive procedures are considered medically necessary—with unquestionable therapeutic results—and thus paid for partially or entirely by national health systems or insurance companies.

Unfortunately, in the field of plastic and reconstructive surgery (both in general and specifically for gender-related surgeries), there is no clear distinction between what is purely reconstructive and what is purely cosmetic. Most plastic surgery procedures actually are a mixture of both reconstructive and cosmetic components.

While most professionals agree that genital surgery and mastectomy cannot be considered purely cosmetic, opinions diverge as to what degree other surgical procedures (e.g., breast augmentation, facial feminization surgery) can be considered purely reconstructive. Although it may be much easier to see a phalloplasty or a vaginoplasty as an intervention to end lifelong suffering, for certain patients an intervention like a reduction rhinoplasty can have a radical and permanent effect on their quality of life, and therefore is much more medically necessary than for somebody without gender dysphoria.

## Criteria for Surgeries

As for all of the SOC, the criteria for initiation of surgical treatments for gender dysphoria were developed to promote optimal patient care. While the SOC allow for an individualized approach to best meet a patient's health care needs, a criterion for all breast/chest and genital surgeries is documentation of persistent gender dysphoria by a qualified mental health professional. For some surgeries, additional criteria include preparation and treatment consisting of feminizing/masculinizing hormone therapy and one year of continuous living in a gender role that is congruent with one's gender identity.

These criteria are outlined below. Based on the available evidence and expert clinical consensus, different recommendations are made for different surgeries.

The SOC do not specify an order in which different surgeries should occur. The number and sequence of surgical procedures may vary from patient to patient, according to their clinical needs.

58                                    World Professional Association for Transgender Health



The Standards of Care
VERSION 7

**Criteria for Breast/Chest Surgery (One Referral)**

Criteria for mastectomy and creation of a male chest in FtM patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Hormone therapy is not a prerequisite.

Criteria for breast augmentation (implants/lipofilling) in MtF patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Although not an explicit criterion, it is recommended that MtF patients undergo feminizing hormone therapy (minimum 12 months) prior to breast augmentation surgery. The purpose is to maximize breast growth in order to obtain better surgical (aesthetic) results.

**Criteria for Genital Surgery (Two Referrals)**

The criteria for genital surgery are specific to the type of surgery being requested.

Criteria for hysterectomy and salpingo-oophorectomy in FtM patients and for orchiectomy in MtF patients:

1. Persistent, well-documented gender dysphoria;

79 OF 238

The Standards of Care
VERSION 7

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled.

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual).

The aim of hormone therapy prior to gonadectomy is primarily to introduce a period of reversible estrogen or testosterone suppression, before the patient undergoes irreversible surgical intervention.

These criteria do not apply to patients who are having these procedures for medical indications other than gender dysphoria.

Criteria for metoidioplasty or phalloplasty in FtM patients and for vaginoplasty in MtF patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual).

6. 12 continuous months of living in a gender role that is congruent with their gender identity.

Although not an explicit criterion, it is recommended that these patients also have regular visits with a mental health or other medical professional.

Rationale for a preoperative, 12-month experience of living in an identity-congruent gender role:

The criterion noted above for some types of genital surgeries—i.e., that patients engage in 12 continuous months of living in a gender role that is congruent with their gender identity—is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery. As noted in section VII, the social aspects of changing one's gender role are usually challenging—

60                                             World Professional Association for Transgender Health

often more so than the physical aspects. Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role. Support from a qualified mental health professional and from peers can be invaluable in ensuring a successful gender role adaptation (Bockting, 2008).

The duration of 12 months allows for a range of different life experiences and events that may occur throughout the year (e.g., family events, holidays, vacations, season-specific work or school experiences). During this time, patients should present consistently, on a day-to-day basis and across all settings of life, in their desired gender role. This includes coming out to partners, family, friends, and community members (e.g., at school, work, other settings).

Health professionals should clearly document a patient's experience in the gender role in the medical chart, including the start date of living full time for those who are preparing for genital surgery. In some situations, if needed, health professionals may request verification that this criterion has been fulfilled: They may communicate with individuals who have related to the patient in an identity-congruent gender role, or request documentation of a legal name and/or gender marker change, if applicable.

## Surgery for People with Psychotic Conditions and Other Serious Mental Illnesses

When patients with gender dysphoria are also diagnosed with severe psychiatric disorders and impaired reality testing (e.g., psychotic episodes, bipolar disorder, dissociative identity disorder, borderline personality disorder), an effort must be made to improve these conditions with psychotropic medications and/or psychotherapy before surgery is contemplated. (Dhejne et al., 2011). Reevaluation by a mental health professional qualified to assess and manage psychotic conditions should be conducted prior to surgery, describing the patient's mental status and readiness for surgery. It is preferable that this mental health professional be familiar with the patient. No surgery should be performed while a patient is actively psychotic (De Cuypere & Vercruysse, 2009).

## Competency of Surgeons Performing Breast/Chest or Genital Surgery

Physicians who perform surgical treatments for gender dsyphoria should be urologists, gynecologists, plastic surgeons, or general surgeons, and board-certified as such by the relevant national

81 OF ~~238~~ 238

The Standards of Care
VERSION 7

and/or regional association. Surgeons should have specialized competence in genital reconstructive techniques as indicated by documented supervised training with a more experienced surgeon. Even experienced surgeons must be willing to have their surgical skills reviewed by their peers. An official audit of surgical outcomes and publication of these results would be greatly reassuring to both referring health professionals and patients. Surgeons should regularly attend professional meetings where new techniques are presented. The internet is often effectively used by patients to share information on their experience with surgeons and their teams.

Ideally, surgeons should be knowledgeable about more than one surgical technique for genital reconstruction so that they, in consultation with patients, can choose the ideal technique for each individual. Alternatively, if a surgeon is skilled in a single technique and this procedure is either not suitable for or desired by a patient, the surgeon should inform the patient about other procedures and offer referral to another appropriately skilled surgeon.

## Breast/Chest Surgery Techniques and Complications

Although breast/chest appearance is an important secondary sex characteristic, breast presence or size is not involved in the legal definitions of sex and gender and is not necessary for reproduction. The performance of breast/chest operations for treatment of gender dysphoria should be considered with the same care as beginning hormone therapy, as both produce relatively irreversible changes to the body.

For the MtF patient, a breast augmentation (sometimes called "chest reconstruction") is not different from the procedure in a natal female patient. It is usually performed through implantation of breast prostheses and occasionally with the lipofilling technique. Infections and capsular fibrosis are rare complications of augmentation mammoplasty in MtF patients (Kanhai, Hage, Karim, & Mulder, 1999).

For the FtM patient, a mastectomy or "male chest contouring" procedure is available. For many FtM patients, this is the only surgery undertaken. When the amount of breast tissue removed requires skin removal, a scar will result and the patient should be so informed. Complications of subcutaneous mastectomy can include nipple necrosis, contour irregularities, and unsightly scarring (Monstrey et al., 2008).

## Genital Surgery Techniques and Complications

Genital surgical procedures for the MtF patient may include orchiectomy, penectomy, vaginoplasty, clitoroplasty, and labiaplasty. Techniques include penile skin inversion, pedicled colosigmoid

World Professional Association for Transgender Health

82 of 128

transplant, and free skin grafts to line the neovagina. Sexual sensation is an important objective in vaginoplasty, along with creation of a functional vagina and acceptable cosmesis.

Surgical complications of MtF genital surgery may include complete or partial necrosis of the vagina and labia, fistulas from the bladder or bowel into the vagina, stenosis of the urethra, and vaginas that are either too short or too small for coitus. While the surgical techniques for creating a neovagina are functionally and aesthetically excellent, anorgasmia following the procedure has been reported, and a second stage labiaplasty may be needed for cosmesis (Klein & Gorzalka, 2009; Lawrence, 2006).

Genital surgical procedures for FtM patients may include hysterectomy, salpingo-oophorectomy, vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, and phalloplasty. For patients without former abdominal surgery, the laparoscopic technique for hysterectomy and salpingo-oophorectomy is recommended to avoid a lower-abdominal scar. Vaginal access may be difficult as most patients are nulliparous and have often not experienced penetrative intercourse. Current operative techniques for phalloplasty are varied. The choice of techniques may be restricted by anatomical or surgical considerations and by a client's financial considerations. If the objectives of phalloplasty are a neophallus of good appearance, standing micturition, sexual sensation, and/or coital ability, patients should be clearly informed that there are several separate stages of surgery and frequent technical difficulties, which may require additional operations. Even metoidioplasty, which in theory is a one-stage procedure for construction of a microphallus, often requires more than one operation. The objective of standing micturition with this technique can not always be ensured (Monstrey et al., 2009).

Complications of phalloplasty in FtMs may include frequent urinary tract stenoses and fistulas, and occasionally necrosis of the neophallus. Metoidioplasty results in a micropenis, without the capacity for standing urination. Phalloplasty, using a pedicled or a free vascularized flap, is a lengthy, multi-stage procedure with significant morbidity that includes frequent urinary complications and unavoidable donor site scarring. For this reason, many FtM patients never undergo genital surgery other than hysterectomy and salpingo-oophorectomy (Hage & De Graaf, 1993).

Even patients who develop severe surgical complications seldom regret having undergone surgery. The importance of surgery can be appreciated by the repeated finding that quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2006).


## Other Surgeries

Other surgeries for assisting in body feminization include reduction thyroid chondroplasty (reduction of the Adam's apple), voice modification surgery, suction-assisted lipoplasty (contour

83 OF 238

The Standards of Care
VERSION 7

modeling) of the waist, rhinoplasty (nose correction), facial bone reduction, face-lift, and blepharoplasty (rejuvenation of the eyelid). Other surgeries for assisting in body masculinization include liposuction, lipofilling, and pectoral implants. Voice surgery to obtain a deeper voice is rare but may be recommended in some cases, such as when hormone therapy has been ineffective.

Although these surgeries do not require referral by mental health professionals, such professionals can play an important role in assisting clients in making a fully informed decision about the timing and implications of such procedures in the context of the social transition.

Although most of these procedures are generally labeled "purely aesthetic," these same operations in an individual with severe gender dysphoria can be considered medically necessary, depending on the unique clinical situation of a given patient's condition and life situation. This ambiguity reflects reality in clinical situations, and allows for individual decisions as to the need and desirability of these procedures.



# XII

# Postoperative Care and Follow-Up

Long-term postoperative care and follow-up after surgical treatments for gender dysphoria are associated with good surgical and psychosocial outcomes (Monstrey et al., 2009). Follow-up is important to a patient's subsequent physical and mental health and to a surgeon's knowledge about the benefits and limitations of surgery. Surgeons who operate on patients coming from long distances should include personal follow-up in their care plan and attempt to ensure affordable local long-term aftercare in their patients' geographic region.

Postoperative patients may sometimes exclude themselves from follow-up by specialty providers, including the hormone-prescribing physician (for patients receiving hormones), not recognizing that these providers are often best able to prevent, diagnose, and treat medical conditions that are unique to hormonally and surgically treated patients. The need for follow-up equally extends to mental health professionals, who may have spent a longer period of time with the patient than any other professional and therefore are in an excellent position to assist in any postoperative adjustment difficulties. Health professionals should stress the importance of postoperative follow-up care with their patients and offer continuity of care.

Postoperative patients should undergo regular medical screening according to recommended guidelines for their age. This is discussed more in the next section.

World Professional Association for Transgender Health

# XIII

# Lifelong Preventive and Primary Care

Transsexual, transgender, and gender-nonconforming people need health care throughout their lives. For example, to avoid the negative secondary effects of having a gonadectomy at a relatively young age and/or receiving long-term, high-dose hormone therapy, patients need thorough medical care by providers experienced in primary care and transgender health. If one provider is not able to provide all services, ongoing communication among providers is essential.

Primary care and health maintenance issues should be addressed before, during, and after any possible changes in gender role and medical interventions to alleviate gender dysphoria. While hormone providers and surgeons play important roles in preventive care, every transsexual, transgender, and gender-nonconforming person should partner with a primary care provider for overall health care needs (Feldman, 2007).

## General Preventive Health Care

Screening guidelines developed for the general population are appropriate for organ systems that are unlikely to be affected by feminizing/masculinizing hormone therapy. However, in areas such as cardiovascular risk factors, osteoporosis, and some cancers (breast, cervical, ovarian, uterine, and prostate), such general guidelines may either over- or underestimate the cost-effectiveness of screening individuals who are receiving hormone therapy.

Several resources provide detailed protocols for the primary care of patients undergoing feminizing/masculinizing hormone therapy, including therapy that is provided after sex reassignment surgeries (Center of Excellence for Transgender Health, UCSF, 2011; Feldman & Goldberg, 2006; Feldman, 2007; Gorton, Buth, & Spade, 2005). Clinicians should consult their national evidence-based guidelines and discuss screening with their patients in light of the effects of hormone therapy on their baseline risk.

85 of 238

The Standards of Care
VERSION 7

# Cancer Screening

Cancer screening of organ systems that are associated with sex can present particular medical and psychosocial challenges for transsexual, transgender, and gender-nonconforming patients and their health care providers. In the absence of large-scale prospective studies, providers are unlikely to have enough evidence to determine the appropriate type and frequency of cancer screenings for this population. Over-screening results in higher health care costs, high false positive rates, and often unnecessary exposure to radiation and/or diagnostic interventions such as biopsies. Under-screening results in diagnostic delay for potentially treatable cancers. Patients may find cancer screening gender affirming (such as mammograms for MtF patients) or both physically and emotionally painful (such as Pap smears offer continuity of care for FtM patients).

# Urogenital Care

Gynecologic care may be necessary for transsexual, transgender, and gender-nonconforming people of both sexes. For FtM patients, such care is needed predominantly for individuals who have not had genital surgery. For MtF patients, such care is needed after genital surgery. While many surgeons counsel patients regarding postoperative urogenital care, primary care clinicians and gynecologists should also be familiar with the special genital concerns of this population.

All MtF patients should receive counseling regarding genital hygiene, sexuality, and prevention of sexually transmitted infections; those who have had genital surgery should also be counseled on the need for regular vaginal dilation or penetrative intercourse in order to maintain vaginal depth and width (van Trotsenburg, 2009). Due to the anatomy of the male pelvis, the axis and the dimensions of the neovagina differ substantially from those of a biologic vagina. This anatomic difference can affect intercourse if not understood by MtF patients and their partners (van Trotsenburg, 2009).

Lower urinary tract infections occur frequently in MtF patients who have had surgery because of the reconstructive requirements of the shortened urethra. In addition, these patients may suffer from functional disorders of the lower urinary tract; such disorders may be caused by damage of the autonomous nerve supply of the bladder floor during dissection between the rectum and the bladder, and by a change of the position of the bladder itself. A dysfunctional bladder (e.g., overactive bladder, stress or urge urinary incontinence) may occur after sex reassignment surgery (Hoebeke et al., 2005; Kuhn, Hiltebrand, & Birkhauser, 2007).

Most FtM patients do not undergo vaginectomy (colpectomy). For patients who take masculinizing hormones, despite considerable conversion of testosterone to estrogens, atrophic changes of the vaginal lining can be observed regularly and may lead to pruritus or burning. Examination can be

World Professional Association for Transgender Health

The Standards of Care
VERSION 7

both physically and emotionally painful, but lack of treatment can seriously aggravate the situation. Gynecologists treating the genital complaints of FtM patients should be aware of the sensitivity that patients with a male gender identity and masculine gender expression might have around having genitals typically associated with the female sex.

# XIV

## Applicability of the *Standards of Care* to People Living in Institutional Environments

The *SOC* in their entirety apply to all transsexual, transgender, and gender-nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long-/intermediate-term health care facilities (Brown, 2009). Health care for transsexual, transgender, and gender-nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

All elements of assessment and treatment as described in the *SOC* can be provided to people living in institutions (Brown, 2009). Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.

People with gender dysphoria in institutions may also have coexisting mental health conditions (Cole et al., 1997). These conditions should be evaluated and treated appropriately.

People who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies and monitored according to the *SOC*. A "freeze frame" approach is not considered appropriate care in most situations *(Kosilek v. Massachusetts Department of Corrections/Maloney,* C.A. No. 92–12820-MLW, 2002). People with gender dysphoria who are deemed appropriate for hormone therapy (following the *SOC*) should be started on such therapy. The consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality (Brown, 2010).

The Standards of Care
VERSION 7

Reasonable accommodations to the institutional environment can be made in the delivery of care consistent with the *SOC*, if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria. An example of a reasonable accommodation is the use of injectable hormones, if not medically contraindicated, in an environment where diversion of oral preparations is highly likely (Brown, 2009). Denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the *SOC* (Brown, 2010).

Housing and shower/bathroom facilities for transsexual, transgender, and gender-nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization (Brown, 2009).

Institutions where transsexual, transgender, and gender-nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents.

# XV

# Applicability of the *Standards of Care* to People With Disorders of Sex Development

## Terminology

The term *disorder of sex development* (DSD) refers to a somatic condition of atypical development of the reproductive tract (Hughes, Houk, Ahmed, Lee, & LWPES/ESPE Consensus Group, 2006). DSDs include the condition that used to be called *intersexuality*. Although the terminology was changed to DSD during an international consensus conference in 2005 (Hughes et al., 2006), disagreement about language use remains. Some people object strongly to the "disorder" label, preferring instead to view these congenital conditions as a matter of diversity (Diamond, 2009) and to continue using the terms *intersex* or *intersexuality*. In the *SOC*, WPATH uses the term DSD in an objective and value-free manner, with the goal of ensuring that health professionals recognize this medical term and use it to access relevant literature as the field progresses. WPATH remains

68

open to new terminology that will further illuminate the experience of members of this diverse population and lead to improvements in health care access and delivery.


## Rationale for Addition to the *SOC*

Previously, individuals with a DSD who also met the *DSM-IV-TR's* behavioral criteria for Gender Identity Disorder (American Psychiatric Association, 2000) were excluded from that general diagnosis. Instead, they were categorized as having a "Gender Identity Disorder - Not Otherwise Specified." They were also excluded from the WPATH *Standards of Care*.

The current proposal for *DSM-5* (www.dsm5.org) is to replace the term *gender identity disorder* with *gender dysphoria*. Moreover, the proposed changes to the *DSM* consider gender dysphoric people with a DSD to have a subtype of gender dysphoria. This proposed categorization—which explicitly differentiates between gender dysphoric individuals with and without a DSD—is justified: In people with a DSD, gender dysphoria differs in its phenomenological presentation, epidemiology, life trajectories, and etiology (Meyer-Bahlburg, 2009).

Adults with a DSD and gender dysphoria have increasingly come to the attention of health professionals. Accordingly, a brief discussion of their care is included in this version of the *SOC*.


## Health History Considerations

Health professionals assisting patients with both a DSD and gender dysphoria need to be aware that the medical context in which such patients have grown up is typically very different from that of people without a DSD.

Some people are recognized as having a DSD through the observation of gender-atypical genitals at birth. (Increasingly this observation is made during the prenatal period by way of imaging procedures such as ultrasound.) These infants then undergo extensive medical diagnostic procedures. After consultation among the family and health professionals—during which the specific diagnosis, physical and hormonal findings, and feedback from long-term outcome studies (Cohen-Kettenis, 2005; Dessens, Slijper, & Drop, 2005; Jurgensen, Hiort, Holterhus, & Thyen, 2007; Mazur, 2005; Meyer-Bahlburg, 2005; Stikkelbroeck et al., 2003; Wisniewski, Migeon, Malouf, & Gearhart, 2004) are considered—the newborn is assigned a sex, either male or female.

89 OF 238

The Standards of Care
VERSION 7

Other individuals with a DSD come to the attention of health professionals around the age of puberty through the observation of atypical development of secondary sex characteristics. This observation also leads to a specific medical evaluation.

The type of DSD and severity of the condition has significant implications for decisions about a patient's initial sex assignment, subsequent genital surgery, and other medical and psychosocial care (Meyer-Bahlburg, 2009). For instance, the degree of prenatal androgen exposure in individuals with a DSD has been correlated with the degree of masculinization of gender-related *behavior* (that is, *gender role and expression*); however, the correlation is only moderate, and considerable behavioral variability remains unaccounted for by prenatal androgen exposure (Jurgensen et al., 2007; Meyer-Bahlburg, Dolezal, Baker, Ehrhardt, & New, 2006). Notably, a similar correlation of prenatal hormone exposure with gender *identity* has not been demonstrated (e.g., Meyer-Bahlburg et al., 2004). This is underlined by the fact that people with the same (core) gender identity can vary widely in the degree of masculinization of their gender-related behavior.

## Assessment and Treatment of Gender Dysphoria in People with Disorders of Sex Development

Very rarely are individuals with a DSD identified as having gender dysphoria *before* a DSD diagnosis has been made. Even so, a DSD diagnosis is typically apparent with an appropriate history and basic physical exam—both of which are part of a medical evaluation for the appropriateness of hormone therapy or surgical interventions for gender dysphoria. Mental health professionals should ask their clients presenting with gender dysphoria to have a physical exam, particularly if they are not currently seeing a primary care (or other health care) provider.

Most people with a DSD who are born with genital ambiguity do not develop gender dysphoria (e.g., Meyer-Bahlburg, Dolezal, et al., 2004; Wisniewski et al., 2004). However, some people with a DSD will develop chronic gender dysphoria and even undergo a change in their birth-assigned sex and/or their gender role (Meyer-Bahlburg, 2005; Wilson, 1999; Zucker, 1999). If there are persistent and strong indications that gender dysphoria is present, a comprehensive evaluation by clinicians skilled in the assessment and treatment of gender dysphoria is essential, irrespective of the patient's age. Detailed recommendations have been published for conducting such an assessment and for making treatment decisions to address gender dysphoria in the context of a DSD (Meyer-Bahlburg, 2011). Only after thorough assessment should steps be taken in the direction of changing a patient's birth-assigned sex or gender role.

Clinicians assisting these patients with treatment options to alleviate gender dysphoria may profit from the insights gained from providing care to patients without a DSD (Cohen-Kettenis, 2010).

However, certain criteria for treatment (e.g., age, duration of experience with living in the desired gender role) are usually not routinely applied to people with a DSD; rather, the criteria are interpreted in light of a patient's specific situation (Meyer-Bahlburg, 2011). In the context of a DSD, changes in birth-assigned sex and gender role have been made at any age between early elementary-school age and middle adulthood. Even genital surgery may be performed much earlier in these patients than in gender dysphoric individuals without a DSD if the surgery is well justified by the diagnosis, by the evidence-based gender-identity prognosis for the given syndrome and syndrome severity, and by the patient's wishes.

One reason for these treatment differences is that genital surgery in individuals with a DSD is quite common in infancy and adolescence. Infertility may already be present due to either early gonadal failure or to gonadectomy because of a malignancy risk. Even so, it is advisable for patients with a DSD to undergo a full social transition to another gender role only if there is a long-standing history of gender-atypical behavior, and if gender dysphoria and/or the desire to change one's gender role has been strong and persistent for a considerable period of time. Six months is the time period of full symptom expression required for the application of the gender dysphoria diagnosis proposed for *DSM-5* (Meyer-Bahlburg, 2011).


## Additional Resources

The gender-relevant medical histories of people with a DSD are often complex. Their histories may include a great variety of inborn genetic, endocrine, and somatic atypicalities, as well as various hormonal, surgical, and other medical treatments. For this reason, many additional issues need to be considered in the psychosocial and medical care of such patients, regardless of the presence of gender dysphoria. Consideration of these issues is beyond what can be covered in the *SOC*. The interested reader is referred to existing publications (e.g., Cohen-Kettenis & Pfäfflin, 2003; Meyer-Bahlburg, 2002, 2008). Some families and patients also find it useful to consult or work with community support groups.

There is a very substantial medical literature on the medical management of patients with a DSD. Much of this literature has been produced by high-level specialists in pediatric endocrinology and urology, with input from specialized mental health professionals, especially in the area of gender. Recent international consensus conferences have addressed evidence-based care guidelines (including issues of gender and of genital surgery) for DSD in general (Hughes et al., 2006) and specifically for Congenital Adrenal Hyperplasia (Joint LWPES/ESPE CAH Working Group et al., 2002; Speiser et al., 2010). Others have addressed the research needs for DSD in general (Meyer-Bahlburg & Blizzard, 2004) and for selected syndromes such as 46,XXY (Simpson et al., 2003).



# References

Abramowitz, S. I. (1986). Psychosocial outcomes of sex reassignment surgery. *Journal of Consulting and Clinical Psychology, 54*(2), 183–189. doi:10.1037/0022–006X.54.2.183

ACOG Committee of Gynecologic Practice. (2005). Committee opinion #322: Compounded bioidentical hormones. *Obstetrics & Gynecology, 106*(5), 139–140.

Adler, R. K., Hirsch, S., & Mordaunt, M. (2006). *Voice and communication therapy for the transgender/transsexual client: A comprehensive clinical guide.* San Diego, CA: Plural Pub.

American Academy of Family Physicians. (2005). *Definition of family medicine.* Retrieved from http://www.aafp.org/online/en/home/policy/policies/f/fammeddef.html

American Medical Association. (2008). *Resolution 122 (A-08).* Retrieved from http://www.ama-assn.org/ama1/pub/upload/mm/471/122.doc

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders DSM-IV-TR* (4th ed., text rev.). Washington, DC: Author.

American Speech-Language-Hearing Association. (2011). *Scope of practice.* Retrieved from www.asha.org

Anton, B. S. (2009). Proceedings of the American Psychological Association for the legislative year 2008: Minutes of the annual meeting of the council of representatives, February 22–24, 2008, Washington, DC, and August 13 and 17, 2008, Boston, MA, and minutes of the February, June, August, and December 2008 meetings of the board of directors. *American Psychologist, 64,* 372–453. doi:10.1037/a0015932

Asscheman, H., Giltay, E. J., Megens, J. A. J., de Ronde, W., van Trotsenburg, M. A. A., & Gooren, L. J. G. (2011). A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *European Journal of Endocrinology, 164*(4), 635–642. doi:10.1530/EJE-10–1038

Baba, T., Endo, T., Honnma, H., Kitajima, Y., Hayashi, T., Ikeda, H., . . . Saito, T. (2007). Association between polycystic ovary syndrome and female-to-male transsexuality. *Human Reproduction, 22*(4), 1011–1016. doi:10.1093/humrep/del474

92 OF 202 238

The Standards of Care
VERSION 7

Bakker, A., Van Kesteren, P. J., Gooren, L. J., & Bezemer, P. D. (1993). The prevalence of transsexualism in the Netherlands. *Acta Psychiatrica Scandinavica, 87*(4), 237–238. doi:10.1111/j.1600–0447.1993.tb03364.x

Balen, A. H., Schachter, M. E., Montgomery, D., Reid, R. W., & Jacobs, H. S. (1993). Polycystic ovaries are a common finding in untreated female to male transsexuals. *Clinical Endocrinology, 38*(3), 325–329. doi:10.1111/j.1365–2265.1993.tb01013.x

Basson, R. (2001). Towards optimal hormonal treatment of male to female gender identity disorder. *Journal of Sexual and Reproductive Medicine, 1*(1), 45–51.

Basson, R., & Prior, J. C. (1998). Hormonal therapy of gender dysphoria: The male-to-female transsexual. In D. Denny (Ed.), *Current concepts in transgender identity* (pp. 277–296). New York, NY: Garland.

Benjamin, H. (1966). *The transsexual phenomenon.* New York, NY: Julian Press.

Besnier, N. (1994). Polynesian gender liminality through time and space. In G. Herdt (Ed.), *Third sex, third gender: Beyond sexual dimorphism in culture and history* (pp. 285–328). New York: Zone Books.

Bockting, W. O. (1999). From construction to context: Gender through the eyes of the transgendered. *Siecus Report, 28*(1), 3–7.

Bockting, W. O. (2008). Psychotherapy and the real-life experience: From gender dichotomy to gender diversity. *Sexologies, 17*(4), 211–224. doi:10.1016/j.sexol.2008.08.001

Bockting, W. O., & Coleman, E. (2007). Developmental stages of the transgender coming out process: Toward an integrated identity. In R. Ettner, S. Monstrey & A. Eyler (Eds.), *Principles of transgender medicine and surgery* (pp. 185–208). New York, NY: The Haworth Press.

Bockting, W. O., & Goldberg, J. M. (2006). Guidelines for transgender care (Special issue). *International Journal of Transgenderism, 9*(3/4).

Bockting, W. O., Knudson, G., & Goldberg, J. M. (2006). Counseling and mental health care for transgender adults and loved ones. *International Journal of Transgenderism, 9*(3/4), 35–82. doi:10.1300/J485v09n03_03

Bolin, A. (1988). *In search of Eve* (pp. 189–192). New York, NY: Bergin & Garvey.

Bolin, A. (1994). Transcending and transgendering: Male-to-female transsexuals, dichotomy and diversity. In G. Herdt (Ed.), *Third sex, third gender: Beyond sexual dimorphism in culture and history* (pp. 447–486). New York, NY: Zone Books.

Bornstein, K. (1994). *Gender outlaw: On men, women, and the rest of us.* New York, NY: Routledge.

93 OF [[crossed out]] 238

The Standards of Care
VERSION 7

Bosinski, H. A. G., Peter, M., Bonatz, G., Arndt, R., Heidenreich, M., Sippell, W. G., & Wille, R. (1997). A higher rate of hyperandrogenic disorders in female-to-male transsexuals. *Psychoneuroendocrinology, 22*(5), 361–380. doi:10.1016/S0306–4530(97)00033–4

Brill, S. A., & Pepper, R. (2008). *The transgender child: A handbook for families and professionals.* Berkeley, CA: Cleis Press.

Brown, G. R. (2009). Recommended revisions to The World Professional Association for Transgender Health's *Standards of Care* section on medical care for incarcerated persons with gender identity disorder. *International Journal of Transgenderism, 11*(2), 133–139. doi:10.1080/15532730903008073

Brown, G. R. (2010). Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder. *International Journal of Transgenderism, 12*(1), 31–39. doi:10.1080/15532731003688970

Bullough, V. L., & Bullough, B. (1993). *Cross dressing, sex, and gender.* Philadelphia, PA: University of Pennsylvania Press.

Callen Lorde Community Health Center. (2000). *Transgender health program protocols.* Retrieved from http://www.callen-lorde.org/documents/TG_Protocol_Request_Form2.pdf

Callen Lorde Community Health Center. (2011). *Transgender health program protocols.* Retrieved from http://www.callen-lorde.org/documents/TG_Protocol_Request_Form2.pdf

Canadian Association of Speech-Language Pathologists and Audiologists. (n.d.). CASLPA *clinical certification program.* Retrieved from http://www.caslpa.ca/

Carew, L., Dacakis, G., & Oates, J. (2007). The effectiveness of oral resonance therapy on the perception of femininity of voice in male-to-female transsexuals. *Journal of Voice, 21*(5), 591–603. doi:10.1016/j.jvoice.2006.05.005

Carnegie, C. (2004). Diagnosis of hypogonadism: Clinical assessments and laboratory tests. *Reviews in Urology, 6*(Suppl 6), S3–8.

Cattrall, F. R., & Healy, D. L. (2004). Long-term metabolic, cardiovascular and neoplastic risks with polycystic ovary syndrome. *Best Practice & Research Clinical Obstetrics & Gynaecology, 18*(5), 803–812. doi:10.1016/j.bpobgyn.2004.05.005

Center of Excellence for Transgender Health, UCSF. (2011). *Primary care protocol for transgender health care.* Retrieved from http://transhealth.ucsf.edu/trans?page=protocol-00–00

Chiñas, B. (1995). Isthmus Zapotec attitudes toward sex and gender anomalies. In S. O. Murray (Ed.), *Latin American male homosexualities* (pp. 293–302). Albuquerque, NM: University of New Mexico Press.

94 OF 238

Clements, K., Wilkinson, W., Kitano, K., & Marx, R. (1999). HIV prevention and health service needs of the transgender community in San Francisco. *International Journal of Transgenderism, 3*(1), 2–17.

Cohen-Kettenis, P. T. (2001). Gender identity disorder in DSM? *Journal of the American Academy of Child & Adolescent Psychiatry, 40*(4), 391–391. doi:10.1097/00004583-200104000-00006

Cohen-Kettenis, P. T. (2005). Gender change in 46,XY persons with 5α-reductase-2 deficiency and 17β-hydroxysteroid dehydrogenase-3 deficiency. *Archives of Sexual Behavior, 34*(4), 399–410. doi:10.1007/s10508-005-4339-4

Cohen-Kettenis, P. T. (2006). Gender identity disorders. In C. Gillberg, R. Harrington & H. C. Steinhausen (Eds.), *A clinician's handbook of child and adolescent psychiatry* (pp. 695–725). New York, NY: Cambridge University Press.

Cohen-Kettenis, P. T. (2010). Psychosocial and psychosexual aspects of disorders of sex development. *Best Practice & Research Clinical Endocrinology & Metabolism, 24*(2), 325–334. doi:10.1016/j.beem.2009.11.005

Cohen-Kettenis, P. T., & Kuiper, A. J. (1984). Transseksualiteit en psychothérapie. *Tijdschrift Voor Psychotherapie, 10*, 153–166.

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. *Journal of Abnormal Child Psychology, 31*(1), 41–53. doi:10.1023/A:1021769215342

Cohen-Kettenis, P. T., & Pfäfflin, F. (2003). *Transgenderism and intersexuality in childhood and adolescence: Making choices.* Thousand Oaks, CA: Sage.

Cohen-Kettenis, P. T., & Pfäfflin, F. (2010). The DSM diagnostic criteria for gender identity disorder in adolescents and adults. *Archives of Sexual Behavior, 39*(2), 499–513. doi:10.1007/s10508-009-9562-y

Cohen-Kettenis, P. T., Schagen, S. E. E., Steensma, T. D., de Vries, A. L. C., & Delemarre-van de Waal, H. A. (2011). Puberty suppression in a gender-dysphoric adolescent: A 22-year follow-up. *Archives of Sexual Behavior, 40*(4), 843–847. doi:0.1007/s10508-011-9758-9

Cohen-Kettenis, P. T., Wallien, M., Johnson, L. L., Owen-Anderson, A. F. H., Bradley, S. J., & Zucker, K. J. (2006). A parent-report gender identity questionnaire for children: A cross-national, cross-clinic comparative analysis. *Clinical Child Psychology and Psychiatry, 11*(3), 397–405. doi:10.1177/1359104506059135

95 OF *ttttt* 238

Cole, C. M., O'Boyle, M., Emory, L. E., & Meyer III, W. J. (1997). Comorbidity of gender dysphoria and other major psychiatric diagnoses. *Archives of Sexual Behavior, 26*(1), 13–26.

Coleman, E. (2009a). Toward version 7 of the World Professional Association for Transgender Health's *Standards of Care. International Journal of Transgenderism, 11*(1), 1–7. doi: 10.1080/15532730902799912

Coleman, E. (2009b). Toward version 7 of the World Professional Association for Transgender Health's *Standards of Care*: Psychological assessment and approaches to treatment. *International Journal of Transgenderism, 11*(2), 69–73. doi: 10.1080/15532730903008008

Coleman, E. (2009c). Toward version 7 of the World Professional Association for Transgender Health's *Standards of Care*: Hormonal and surgical approaches to treatment. *International Journal of Transgenderism, 11*(3), 141–145. doi: 10.1080/15532730903383740

Coleman, E. (2009d). Toward version 7 of the World Professional Association for Transgender Health's *Standards of Care*: Medical and therapeutic approaches to treatment. *International Journal of Transgenderism, 11*(4), 215–219. doi: 10.1080/15532730903439450

Coleman, E., Colgan, P., & Gooren, L. (1992). Male cross-gender behavior in Myanmar (Burma): A description of the acault. *Archives of Sexual Behavior, 21*(3), 313–321.

Costa, L. M., & Matzner, A. (2007). *Male bodies, women's souls: Personal narratives of Thailand's transgendered youth.* Binghamton, NY: Haworth Press.

Currah, P., Juang, R. M., & Minter, S. (2006). *Transgender rights.* Minneapolis, MN: University of Minnesota Press.

Currah, P., & Minter, S. (2000). Unprincipled exclusions: The struggle to achieve judicial and legislative equality for transgender people. *William and Mary Journal of Women and Law, 7*, 37–60.

Dacakis, G. (2000). Long-term maintenance of fundamental frequency increases in male-to-female transsexuals. *Journal of Voice, 14*(4), 549–556. doi:10.1016/S0892–1997(00)80010–7

Dahl, M., Feldman, J. L., Goldberg, J. M., & Jaberi, A. (2006). Physical aspects of transgender endocrine therapy. *International Journal of Transgenderism, 9*(3), 111–134. doi:10.1300/J485v09n03_06

Darney, P. D. (2008). Hormonal contraception. In H. M. Kronenberg, S. Melmer, K. S. Polonsky & P. R. Larsen (Eds.), *Williams textbook of endocrinology* (11th ed., pp. 615–644). Philadelphia: Saunders.

Davies, S., & Goldberg, J. M. (2006). Clinical aspects of transgender speech feminization and masculinization. *International Journal of Transgenderism, 9*(3–4), 167–196. doi:10.1300/J485v09n03_08

96 OF 2446 238

de Bruin, M. D., Coerts, M. J., & Greven, A. J. (2000). Speech therapy in the management of male-to-female transsexuals. *Folia Phoniatrica Et Logopaedica, 52*(5), 220–227.

De Cuypere, G., T'Sjoen, G., Beerten, R., Selvaggi, G., De Sutter, P., Hoebeke, P., . . . Rubens, R. (2005). Sexual and physical health after sex reassignment surgery. *Archives of Sexual Behavior, 34*(6), 679–690. doi:10.1007/s10508–005–7926–5

De Cuypere, G., Van Hemelrijck, M., Michel, A., Carael, B., Heylens, G., Rubens, R., . . . Monstrey, S. (2007). Prevalence and demography of transsexualism in Belgium. *European Psychiatry, 22*(3), 137–141. doi:10.1016/j.eurpsy.2006.10.002

De Cuypere, G., & Vercruysse, H. (2009). Eligibility and readiness criteria for sex reassignment surgery: Recommendations for revision of the WPATH *standards of care. International Journal of Transgenderism, 11*(3), 194–205. doi:10.1080/15532730903383781

Delemarre-van de Waal, H. A., & Cohen-Kettenis, P.T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology, 155*(Suppl 1), S131–S137. doi:10.1530/eje.1.02231

Delemarre-van de Waal, H. A., van Weissenbruch, M. M., & Cohen Kettenis, P. T. (2004). Management of puberty in transsexual boys and girls. *Hormone Research in Paediatrics, 62*(Suppl 2), 75–75. doi:10.1159/000081145

de Lignières, B. (1999). Oral micronized progesterone. *Clinical Therapeutics, 21*(1), 41–60. doi:10.1016/S0149–2918(00)88267–3

Derrig-Palumbo, K., & Zeine, F. (2005). *Online therapy: A therapist's guide to expanding your practice.* New York, NY: W.W. Norton.

Dessens, A. B., Slijper, F. M. E., & Drop, S. L. S. (2005). Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. *Archives of Sexual Behavior, 34*(4), 389–397. doi:10.1007/s10508-005-4338-5

De Sutter, P. (2009). Reproductive options for transpeople: Recommendations for revision of the WPATH's *standards of care. International Journal of Transgenderism, 11*(3), 183–185. doi:10.1080/15532730903383765

De Sutter, P., Kira, K., Verschoor, A., & Hotimsky, A. (2002). The desire to have children and the preservation of fertility in transsexual women: A survey. *International Journal of Transgenderism, 6*(3), retrieved from http://www.wpath.org/journal/www.iiav.nl/ezines/web/IJT/97–03/numbers/symposion/ijtvo06no03_02.htm

Devor, A. H. (2004). Witnessing and mirroring: A fourteen stage model. *Journal of Gay and Lesbian Psychotherapy, 8*(1/2), 41–67.

de Vries, A. L. C., Cohen-Kettenis, P. T., & Delemarre-van de Waal, H. A. (2006). Clinical management of gender dysphoria in adolescents. *International Journal of Transgenderism, 9*(3–4), 83–94. doi:10.1300/J485v09n03_04

97 OF 238

The Standards of Care
VERSION 7

de Vries, A. L. C., Doreleijers, T. A. H., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry*. Advance online publication. doi:10.1111/j.1469–7610.2011.02426.x

de Vries, A. L. C., Noens, I. L. J., Cohen-Kettenis, P. T., van Berckelaer-Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders, 40*(8), 930–936. doi:10.1007/s10803–010–0935–9

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2010). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine*. Advance online publication. doi:10.1111/j.1743–6109.2010.01943.x

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Langstrom, N., & Landen, M. (2011). Longterm follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PloS ONE*, 6(2), 1–8. doi:10.1371/journal.pone.0016885

Diamond, M. (2009). Human intersexuality: Difference or disorder? *Archives of Sexual Behavior, 38*(2), 172–172. doi:10.1007/s10508–008–9438–6

Di Ceglie, D., & Thümmel, E. C. (2006). An experience of group work with parents of children and adolescents with gender identity disorder. *Clinical Child Psychology and Psychiatry, 11*(3), 387–396. doi:10.1177/1359104506064983

Dobs, A. S., Meikle, A. W., Arver, S., Sanders, S. W., Caramelli, K. E., & Mazer, N. A. (1999). Pharmacokinetics, efficacy, and safety of a permeation-enhanced testosterone transdermal system in comparison with bi-weekly injections of testosterone enanthate for the treatment of hypogonadal men. *Journal of Clinical Endocrinology & Metabolism, 84*(10), 3469–3478. doi:10.1210/jc.84.10.3469

Docter, R. F. (1988). *Transvestites and transsexuals: Toward a theory of cross-gender behavior.* New York, NY: Plenum Press.

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology, 44*(1), 34–45. doi:10.1037/0012–1649.44.1.34

Ehrbar, R. D., & Gorton, R. N. (2010). Exploring provider treatment models in interpreting the *standards of care*. *International Journal of Transgenderism, 12*(4), 198–2010. doi:10.1080/15532739.2010.544235

Ekins, R., & King, D. (2006). *The transgender phenomenon.* Thousand Oaks, CA: Sage.

The Standards of Care
VERSION 7

Eklund, P. L., Gooren, L. J., & Bezemer, P. D. (1988). Prevalence of transsexualism in the Netherlands. *British Journal of Psychiatry, 152*(5), 638–640.

Eldh, J., Berg, A., & Gustafsson, M. (1997). Long-term follow up after sex reassignment surgery. *Scandinavian Journal of Plastic and Reconstructive Surgery and Hand Surgery, 31*(1), 39–45.

Emerson, S., & Rosenfeld, C. (1996). Stages of adjustment in family members of transgender individuals. *Journal of Family Psychotherapy, 7*(3), 1–12. doi:10.1300/J085V07N03_01

Emory, L. E., Cole, C. M., Avery, E., Meyer, O., & Meyer III, W. J. (2003). *Client's view of gender identity: Life, treatment status and outcome.* Paper presented at 18th Biennial Harry Benjamin Symposium, Gent, Belgium.

Ettner, R., Monstrey, S., & Eyler, A. (Eds.) (2007). *Principles of transgender medicine and surgery.* Binghamton, NY: Haworth Press.

Eyler, A. E. (2007). Primary medical care of the gender-variant patient. In R. Ettner, S. Monstrey & E. Eyler (Eds.), *Principles of transgender medicine and surgery* (pp. 15–32). Binghamton, NY: Haworth Press.

Factor, R. J., & Rothblum, E. (2008). Exploring gender identity and community among three groups of transgender individuals in the United States: MtFs, FtMs, and genderqueers. *Health Sociology Review, 17*(3), 235–253.

Feinberg, L. (1996). *Transgender warriors: Making history from Joan of Arc to Dennis Rodman.* Boston, MA: Beacon Press.

Feldman, J. (2005, April). *Masculinizing hormone therapy with testosterone 1% topical gel.* Paper presented at the 19th Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, Bologna, Italy.

Feldman, J. (2007). Preventive care of the transgendered patient. In R. Ettner, S. Monstrey & E. Eyler (Eds.), *Principles of transgender surgery and medicine* (pp. 33–72). Binghamton, NY: Haworth Press.

Feldman, J., & Goldberg, J. (2006). Transgender primary medical care. *International Journal of Transgenderism, 9*(3), 3–34. doi:10.1300/J485v09n03_02

Feldman, J., & Safer, J. (2009). Hormone therapy in adults: Suggested revisions to the sixth version of the *standards of care. International Journal of Transgenderism, 11*(3), 146–182. doi:10.1080/15532730903383757

Fenichel, M., Suler, J., Barak, A., Zelvin, E., Jones, G., Munro, K., . . . Walker-Schmucker, W. (2004). *Myths and realities of online clinical work, observations on the phenomena of online behavior, experience, and therapeutic relationships. A 3rd-year report from ISMHO's clinical case study group.* Retrieved from https://www.ismho.org/myths_n_realities.asp

99 OF 238

The Standards of Care
VERSION 7

Fenway Community Health Transgender Health Program. (2007). *Protocol for hormone therapy*. Retrieved from http://www.fenwayhealth.org/site/DocServer/Fenway_Protocols.pdf?docID=2181

Fisk, N. M. (1974). Editorial: Gender dysphoria syndrome—the conceptualization that liberalizes indications for total gender reorientation and implies a broadly based multi-dimensional rehabilitative regimen. *Western Journal of Medicine, 120*(5), 386–391.

Fitzpatrick, L. A., Pace, C., & Wiita, B. (2000). Comparison of regimens containing oral micronized progesterone or medroxyprogesterone acetate on quality of life in postmenopausal women: A cross-sectional survey. *Journal of Women's Health & Gender-Based Medicine, 9*(4), 381–387.

Frank, J. D., & Frank, J. B. (1993). *Persuasion and healing: A comparative study of psychotherapy* (3rd ed.). Baltimore, MD: Johns Hopkins University Press.

Fraser, L. (2009a). Depth psychotherapy with transgender people. *Sexual and Relationship Therapy, 24*(2), 126–142. doi:10.1080/14681990903003878

Fraser, L. (2009b). E-therapy: Ethical and clinical considerations for version 7 of The World Professional Association for Transgender Health's *Standards of Care*. *International Journal of Transgenderism, 11*(4), 247–263. doi:10.1080/15532730903439492

Fraser, L. (2009c). Psychotherapy in The World Professional Association for Transgender Health's *Standards of Care*: Background and recommendations. *International Journal of Transgenderism, 11*(2), 110–126. doi:10.1080/15532730903008057

Garaffa, G., Christopher, N. A., & Ralph, D. J. (2010). Total phallic reconstruction in female-to-male transsexuals. *European Urology, 57*(4), 715–722. doi:10.1016/j.eururo.2009.05.018

Gelder, M. G., & Marks, I. M. (1969). Aversion treatment in transvestism and transsexualism. In R. Green, & J. Money (Eds.), *Transsexualism and sex reassignment* (pp. 383–413). Baltimore, MD: Johns Hopkins University Press.

Gelfer, M. P. (1999). Voice treatment for the male-to-female transgendered client. *American Journal of Speech-Language Pathology, 8*(3), 201–208.

Gharib, S., Bigby, J., Chapin, M., Ginsburg, E., Johnson, P., Manson, J., & Solomon, C. (2005). *Menopause: A guide to management*. Boston, MA: Brigham and Women's Hospital.

Gijs, L., & Brewaeys, A. (2007). Surgical treatment of gender dysphoria in adults and adolescents: Recent developments, effectiveness, and challenges. *Annual Review of Sex Research, 18*, 178–224.

100 nF 238 128

The Standards of Care
VERSION 7

Gold, M., & MacNish, M. (2011). *Adjustment and resiliency following disclosure of transgender identity in families of adolescents and young adults: Themes and clinical implications.* Washington, DC: American Family Therapy Academy.

Gómez-Gil, E., Trilla, A., Salamero, M., Godás, T., & Valdés, M. (2009). Sociodemographic, clinical, and psychiatric characteristics of transsexuals from Spain. *Archives of Sexual Behavior, 38*(3), 378–392. doi:10.1007/s10508–007–9307–8

Gooren, L. (2005). Hormone treatment of the adult transsexual patient. *Hormone Research in Paediatrics, 64*(Suppl 2), 31–36. doi:10.1159/000087751

Gorton, R. N., Buth, J., & Spade, D. (2005). *Medical therapy and health maintenance for transgender men: A guide for health care providers.* San Francisco, CA: Lyon-Martin Women's Health Services.

Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press.

Green, R., & Fleming, D. (1990). Transsexual surgery follow-up: Status in the 1990s. *Annual Review of Sex Research, 1*(1), 163–174.

Greenson, R. R. (1964). On homosexuality and gender identity. *International Journal of Psycho-Analysis, 45,* 217–219.

Grossman, A. H., D'Augelli, A. R., Howell, T. J., & Hubbard, S. (2006). Parent's reactions to transgender youth's gender-nonconforming expression and identity. *Journal of Gay & Lesbian Social Services, 18*(1), 3–16. doi:10.1300/J041v18n01_02

Grossman, A. H., D'Augelli, A. R., & Salter, N. P. (2006). Male-to-female transgender youth: Gender expression milestones, gender atypicality, victimization, and parents' responses. *Journal of GLBT Family Studies, 2*(1), 71–92.

Grumbach, M. M., Hughes, I. A., & Conte, F. A. (2003). Disorders of sex differentiation. In P. R. Larsen, H. M. Kronenberg, S. Melmed & K. S. Polonsky (Eds.), *Williams textbook of endocrinology* (10th ed., pp. 842–1002). Philadelphia, PA: Saunders.

Hage, J. J., & De Graaf, F. H. (1993). Addressing the ideal requirements by free flap phalloplasty: Some reflections on refinements of technique. *Microsurgery, 14*(9), 592–598. doi:10.1002/micr.1920140910

Hage, J. J., & Karim, R. B. (2000). Ought GIDNOS get nought? Treatment options for nontranssexual gender dysphoria. *Plastic and Reconstructive Surgery, 105*(3), 1222–1227.

Hancock, A. B., Krissinger, J., & Owen, K. (2010). Voice perceptions and quality of life of transgender people. *Journal of Voice.* Advance online publication. doi:10.1016/j.jvoice.2010.07.013

*101 of 2016 238*

The Standards of Care
VERSION 7

Hastings, D. W. (1974). Postsurgical adjustment of male transsexual patients. *Clinics in Plastic Surgery, 1*(2), 335–344.

Hembree, W. C., Cohen-Kettenis, P., Delemarre-van de Waal, H. A., Gooren, L. J., Meyer III, W. J., Spack, N. P., . . . Montori, V. M. (2009). Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 94*(9), 3132–3154. doi:10.1210/jc.2009-0345

Hill, D. B., Menvielle, E., Sica, K. M., & Johnson, A. (2010). An affirmative intervention for families with gender-variant children: Parental ratings of child mental health and gender. *Journal of Sex and Marital Therapy, 36*(1), 6–23. doi:10.1080/00926230903375560

Hoebeke, P., Selvaggi, G., Ceulemans, P., De Cuypere, G. D., T'Sjoen, G., Weyers, S., . . . Monstrey, S. (2005). Impact of sex reassignment surgery on lower urinary tract function. *European Urology, 47*(3), 398–402. doi:10.1016/j.eururo.2004.10.008

Hoenig, J., & Kenna, J. C. (1974). The prevalence of transsexualism in England and Wales. *British Journal of Psychiatry, 124*(579), 181–190. doi:10.1192/bjp.124.2.181

Hughes, I. A., Houk, C. P., Ahmed, S. F., Lee, P. A., & LWPES1/ESPE Consensus Group. (2006). Consensus statement on management of intersex disorders. *Archives of Disease in Childhood, 91*(7), 554–563. doi:10.1136/adc.2006.098319

Hunter, M. H., & Sterrett, J. J. (2000). Polycystic ovary syndrome: It's not just infertility. *American Family Physician, 62*(5), 1079–1095.

Institute of Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding.* Washington, DC: The National Academies Press.

Jackson, P. A., & Sullivan, G. (Eds.). (1999). *Lady boys, tom boys, rent boys: Male and female homosexualities in contemporary Thailand.* Binghamton, NY: Haworth Press.

Jockenhövel, F. (2004). Testosterone therapy-what, when and to whom? *The Aging Male, 7*(4), 319–324. doi:10.1080/13685530400016557

Johansson, A., Sundbom, E., Höjerback, T., & Bodlund, O. (2010). A five-year follow-up study of Swedish adults with gender identity disorder. *Archives of Sexual Behavior, 39*(6), 1429–1437. doi:10.1007/s10508-009-9551-1

Joint LWPES/ESPE CAH Working Group, Clayton, P. E., Miller, W. L., Oberfield, S. E., Ritzen, E. M., Sippell, W. G., & Speiser, P. W. (2002). Consensus statement on 21-hydroxylase deficiency from the Lawson Wilkins Pediatric Endocrine Society and the European Society for Pediatric Endocrinology. *Journal of Clinical Endocrinology & Metabolism, 87*(9), 4048–4053. doi:10.1210/jc.2002-020611

World Professional Association for Transgender Health

107 of ~~blah~~ 128

Jurgensen, M., Hiort, O., Holterhus, P. M., & Thyen, U. (2007). Gender role behavior in children with XY karyotype and disorders of sex development. *Hormones and Behavior, 51*(3), 443–453. doi:0.1016/j.yhbeh.2007.01.001

Kanagalingam, J., Georgalas, C., Wood, G. R., Ahluwalia, S., Sandhu, G., & Cheesman, A. D. (2005). Cricothyroid approximation and subluxation in 21 male-to-female transsexuals. *The Laryngoscope, 115*(4), 611–618. doi:10.1097/01.mlg.0000161357.12826.33

Kanhai, R. C. J., Hage, J. J., Karim, R. B., & Mulder, J. W. (1999). Exceptional presenting conditions and outcome of augmentation mammaplasty in male-to-female transsexuals. *Annals of Plastic Surgery, 43*(5), 476–483.

Kimberly, S. (1997). I am transsexual - hear me roar. *Minnesota Law & Politics, June*, 21–49.

Klein, C., & Gorzalka, B. B. (2009). Sexual functioning in transsexuals following hormone therapy and genital surgery: A review (CME). *The Journal of Sexual Medicine, 6*(11), 2922–2939. doi:10.1111/j.1743–6109.2009.01370.x

Knudson, G., De Cuypere, G., & Bockting, W. (2010a). Process toward consensus on recommendations for revision of the DSM diagnoses of gender identity disorders by The World Professional Association for Transgender Health. *International Journal of Transgenderism, 12*(2), 54–59. doi:10.1080/15532739.2010.509213

Knudson, G., De Cuypere, G., & Bockting, W. (2010b). Recommendations for revision of the *DSM* diagnoses of gender identity disorders: Consensus statement of The World Professional Association for Transgender Health. *International Journal of Transgenderism, 12*(2), 115–118. doi:10.1080/15532739.2010.509215

Kosilek v. Massachusetts Department of Corrections/Maloney, C.A. No. 92–12820-MLW (U.S. Federal District Court, Boston, MA, 2002).

Krege, S., Bex, A., Lümmen, G., & Rübben, H. (2001). Male-to-female transsexualism: A technique, results and long-term follow-up in 66 patients. *British Journal of Urology, 88*(4), 396–402. doi:10.1046/j.1464–410X.2001.02323.x

Kuhn, A., Bodmer, C., Stadlmayr, W., Kuhn, P., Mueller, M. D., & Birkhäuser, M. (2009). Quality of life 15 years after sex reassignment surgery for transsexualism. *Fertility and Sterility, 92*(5), 1685–1689. doi:10.1016/j.fertnstert.2008.08.126

Kuhn, A., Hiltebrand, R., & Birkhauser, M. (2007). Do transsexuals have micturition disorders? *European Journal of Obstetrics & Gynecology and Reproductive Biology, 131*(2), 226–230. doi:10.1016/j.ejogrb.2006.03.019

Landén, M., Wålinder, J., & Lundström, B. (1998). Clinical characteristics of a total cohort of female and male applicants for sex reassignment: A descriptive study. *Acta Psychiatrica Scandinavica, 97*(3), 189–194. doi:10.1111/j.1600–0447.1998.tb09986.x

103 OF ~~206~~ 238

The Standards of Care
VERSION 7

Lawrence, A. A. (2003). Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Archives of Sexual Behavior, 32*(4), 299–315. doi:10.1023/A:1024086814364

Lawrence, A. A. (2006). Patient-reported complications and functional outcomes of male-to-female sex reassignment surgery. *Archives of Sexual Behavior, 35*(6), 717–727. doi:10.1007/s10508–006–9104–9

Lev, A. I. (2004). *Transgender emergence: Therapeutic guidelines for working with gender-variant people and their families.* Binghamton, NY: Haworth Clinical Practice Press.

Lev, A. I. (2009). The ten tasks of the mental health provider: Recommendations for revision of The World Professional Association for Transgender Health's *standards of care. International Journal of Transgenderism, 11*(2), 74–99. doi:10.1080/15532730903008032

Levy, A., Crown, A., & Reid, R. (2003). Endocrine intervention for transsexuals. *Clinical Endocrinology, 59*(4), 409–418. doi:10.1046/j.1365–2265.2003.01821.x

MacLaughlin, D. T., & Donahoe, P. K. (2004). Sex determination and differentiation. *New England Journal of Medicine, 350*(4), 367–378.

Maheu, M. M., Pulier, M. L., Wilhelm, F. H., McMenamin, J. P., & Brown-Connolly, N. E. (2005). *The mental health professional and the new technologies: A handbook for practice today.* Mahwah, NJ: Lawrence Erlbaum.

Malpas, J. (2011). Between pink and blue: A multi-dimensional family approach to gender nonconforming children and their families. *Family Process, 50*(4), 453–470 doi:10.1111/j.1545–5300.2011.01371.x

Mazur, T. (2005). Gender dysphoria and gender change in androgen insensitivity or micropenis. *Archives of Sexual Behavior, 34*(4), 411–421. doi:10.1007/s10508–005–4341-x

McNeill, E. J. M. (2006). Management of the transgender voice. *The Journal of Laryngology & Otology, 120*(07), 521–523. doi:10.1017/S0022215106001174

McNeill, E. J. M., Wilson, J. A., Clark, S., & Deakin, J. (2008). Perception of voice in the transgender client. *Journal of Voice, 22*(6), 727–733. doi:10.1016/j.jvoice.2006.12.010

Menvielle, E. J., & Tuerk, C. (2002). A support group for parents of gender-nonconforming boys. *Journal of the American Academy of Child & Adolescent Psychiatry, 41*(8), 1010–1013. doi:10.1097/00004583–200208000–00021

Meyer, I. H. (2003). Prejudice as stress: Conceptual and measurement problems. *American Journal of Public Health, 93*(2), 262–265.

*104 OF 206 238*

Meyer, J. K., & Reter, D. J. (1979). Sex reassignment: Follow-up. *Archives of General Psychiatry, 36*(9), 1010–1015.

Meyer, W. J. III. (2009). World Professional Association for Transgender Health's *standards of care* requirements of hormone therapy for adults with gender identity disorder. *International Journal of Transgenderism, 11*(2), 127–132. doi:10.1080/15532730903008065

Meyer, W. J. III. Webb, A., Stuart, C. A., Finkelstein, J. W., Lawrence, B., & Walker, P. A. (1986). Physical and hormonal evaluation of transsexual patients: A longitudinal study. *Archives of Sexual Behavior, 15*(2), 121–138. doi:10.1007/BF01542220

Meyer-Bahlburg, H. F. L. (2002). Gender assignment and reassignment in intersexuality: Controversies, data, and guidelines for research. *Advances in Experimental Medicine and Biology, 511*, 199–223. doi:10.1007/978–1-4615–0621–8_12

Meyer-Bahlburg, H. F. L. (2005). Gender identity outcome in female-raised 46,XY persons with penile agenesis, cloacal exstrophy of the bladder, or penile ablation. *Archives of Sexual Behavior, 34*(4), 423–438. doi:10.1007/s10508–005–4342–9

Meyer-Bahlburg, H. F. L. (2008). Treatment guidelines for children with disorders of sex development. *Neuropsychiatrie De l'Enfance Et De l'Adolescence, 56*(6), 345–349. doi:10.1016/j.neurenf.2008.06.002

Meyer-Bahlburg, H. F. L. (2009). Variants of gender differentiation in somatic disorders of sex development. *International Journal of Transgenderism, 11*(4), 226–237. doi:10.1080/15532730903439476

Meyer-Bahlburg, H. F. L. (2010). From mental disorder to iatrogenic hypogonadism: Dilemmas in conceptualizing gender identity variants as psychiatric conditions. *Archives of Sexual Behavior, 39*(2), 461–476. doi:10.1007/s10508–009–9532–4

Meyer-Bahlburg, H. F. L. (2011). Gender monitoring and gender reassignment of children and adolescents with a somatic disorder of sex development. *Child & Adolescent Psychiatric Clinics of North America. 20*(4), 639–649. doi: 10.1016/j.ch.2011.07.002.

Meyer-Bahlburg, H. F. L., & Blizzard, R. M. (2004). Conference proceedings: Research on intersex: Summary of a planning workshop. *The Endocrinologist, 14*(2), 59–69. doi:10.1097/01.ten.0000123701.61007.4e

Meyer-Bahlburg, H. F. L., Dolezal, C., Baker, S. W., Carlson, A. D., Obeid, J. S., & New, M. I. (2004). Prenatal androgenization affects gender-related behavior but not gender identity in 5–12-year-old girls with congenital adrenal hyperplasia. *Archives of Sexual Behavior, 33*(2), 97–104. doi:10.1023/B:ASEB.0000014324.25718.51

105 OF 228

The Standards of Care
VERSION 7

Meyer-Bahlburg, H. F. L., Dolezal, C., Baker, S. W., Ehrhardt, A. A., & New, M. I. (2006). Gender development in women with congenital adrenal hyperplasia as a function of disorder severity. *Archives of Sexual Behavior, 35*(6), 667–684. doi:10.1007/s10508–006–9068–9

Meyer-Bahlburg, H. F. L., Migeon, C. J., Berkovitz, G. D., Gearhart, J. P., Dolezal, C., & Wisniewski, A. B. (2004). Attitudes of adult 46,XY intersex persons to clinical management policies. *The Journal of Urology, 171*(4), 1615–1619. doi:10.1097/01.ju.0000117761.94734.b7

Money, J., & Ehrhardt, A. A. (1972). *Man and woman, boy and girl.* Baltimore, MD: Johns Hopkins University Press.

Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role in childhood: Longitudinal follow-up. *Journal of Pediatric Psychology, 4*(1), 29–41. doi:10.1093/jpepsy/4.1.29

Monstrey, S., Hoebeke, P., Selvaggi, G., Ceulemans, P., Van Landuyt, K., Blondeel, P., . . . De Cuypere, G. (2009). Penile reconstruction: Is the radial forearm flap really the standard technique? *Plastic and Reconstructive Surgery, 124*(2), 510–518.

Monstrey, S., Selvaggi, G., Ceulemans, P., Van Landuyt, K., Bowman, C., Blondeel, P., . . . De Cuypere, G. (2008). Chest-wall contouring surgery in female-to-male transsexuals: A new algorithm. *Plastic and Reconstructive Surgery, 121*(3), 849–859. doi:10.1097/01.prs.0000299921.15447.b2

Moore, E., Wisniewski, A., & Dobs, A. (2003). Endocrine treatment of transsexual people: A review of treatment regimens, outcomes, and adverse effects. *Journal of Clinical Endocrinology & Metabolism, 88*(8), 3467–3473. doi:10.1210/jc.2002–021967

More, S. D. (1998). The pregnant man – an oxymoron? *Journal of Gender Studies, 7*(3), 319–328. doi:10.1080/09589236.1998.9960725

Mount, K. H., & Salmon, S. J. (1988). Changing the vocal characteristics of a postoperative transsexual patient: A longitudinal study. *Journal of Communication Disorders, 21*(3), 229–238. doi:10.1016/0021–9924(88)90031–7

Mueller, A., Kiesewetter, F., Binder, H., Beckmann, M. W., & Dittrich, R. (2007). Long-term administration of testosterone undecanoate every 3 months for testosterone supplementation in female-to-male transsexuals. *Journal of Clinical Endocrinology & Metabolism, 92*(9), 3470–3475. doi:10.1210/jc.2007–0746

Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J., & Montori, V. M. (2010). Hormonal therapy and sex reassignment: A systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology, 72*(2), 214–231. doi:10.1111/j.1365–2265.2009.03625.x

Nanda, S. (1998). *Neither man nor woman: The hijras of India.* Belmont, CA: Wadsworth.

World Professional Association for Transgender Health

*106 OF 2226 238*

Nestle, J., Wilchins, R. A., & Howell, C. (2002). *Genderqueer: Voices from beyond the sexual binary*. Los Angeles, CA: Alyson Publications.

Neumann, K., & Welzel, C. (2004). The importance of voice in male-to-female transsexualism. *Journal of Voice, 18*(1), 153–167.

Newfield, E., Hart, S., Dibble, S., & Kohler, L. (2006). Female-to-male transgender quality of life. *Quality of Life Research, 15*(9), 1447–1457. doi:10.1007/s11136–006–0002–3

Nieschlag, E., Behre, H. M., Bouchard, P., Corrales, J. J., Jones, T. H., Stalla, G. K., . . . Wu, F. C. W. (2004). Testosterone replacement therapy: Current trends and future directions. *Human Reproduction Update, 10*(5), 409–419. doi:10.1093/humupd/dmh035

North American Menopause Society. (2010). Estrogen and progestogen use in postmenopausal women: 2010 position statement. *Menopause, 17*(2), 242–255. doi:10.1097/gme.0b013e3181d0f6b9

Nuttbrock, L., Hwahng, S., Bockting, W., Rosenblum, A., Mason, M., Macri, M., & Becker, J. (2010). Psychiatric impact of gender-related abuse across the life course of male-to-female transgender persons. *Journal of Sex Research, 47*(1), 12–23. doi:10.1080/00224490903062258

Oates, J. M., & Dacakis, G. (1983). Speech pathology considerations in the management of transsexualism—a review. *International Journal of Language & Communication Disorders, 18*(3), 139–151. doi:10.3109/13682828309012237

Olyslager, F., & Conway, L. (2007). *On the calculation of the prevalence of transsexualism*. Paper presented at the World Professional Association for Transgender Health 20th International Symposium, Chicago, Illinois. Retrieved from http://www.changelingaspects.com/PDF/2007–09–06-Prevalence_of_Transsexualism.pdf

Oriel, K. A. (2000). Clinical update: Medical care of transsexual patients. *Journal of the Gay and Lesbian Medical Association, 4*(4), 185–194. doi:1090–7173/00/1200–0185$18.00/1

Pauly, I. B. (1965). Male psychosexual inversion: Transsexualism: A review of 100 cases. *Archives of General Psychiatry, 13*(2), 172–181.

Pauly, I. B. (1981). Outcome of sex reassignment surgery for transsexuals. *Australian and New Zealand Journal of Psychiatry, 15*(1), 45–51. doi:10.3109/00048678109159409

Payer, A. F., Meyer, W. J. III. & Walker, P. A. (1979). The ultrastructural response of human leydig cells to exogenous estrogens. *Andrologia, 11*(6), 423–436. doi:10.1111/j.1439–0272.1979.tb02232.x

107 of 238 238

The Standards of Care
VERSION 7

Peletz, M. G. (2006). Transgenderism and gender pluralism in southeast Asia since early modern times. *Current Anthropology, 47*(2), 309–340. doi:10.1086/498947

Pfäfflin, F. (1993). Regrets after sex reassignment surgery. *Journal of Psychology & Human Sexuality, 5*(4), 69–85.

Pfäfflin, F., & Junge, A. (1998). Sex reassignment. Thirty years of international follow-up studies after sex reassignment surgery: A comprehensive review, 1961–1991. *International Journal of Transgenderism*. Retrieved from http://web.archive.org/web/20070503090247/http://www.symposion.com/ijt/pfaefflin/1000.htm

*Physicians' desk reference*. (61st ed.). (2007). Montvale, NJ: PDR.

*Physicians' desk reference*. (65th ed.). (2010). Montvale, NJ: PDR.

Pleak, R. R. (1999). Ethical issues in diagnosing and treating gender-dysphoric children and adolescents. In M. Rottnek (Ed.), *Sissies and tomboys: Gender noncomformity and homosexual childhood* (pp. 34–51). New York: New York University Press.

Pope, K. S., & Vasquez, M. J. (2011). *Ethics in psychotherapy and counseling: A practical guide* (4ᵀᴴ ed.). Hoboken, NJ: John Wiley.

Prior, J. C., Vigna, Y. M., & Watson, D. (1989). Spironolactone with physiological female steroids for presurgical therapy of male-to-female transsexualism. *Archives of Sexual Behavior, 18*(1), 49–57. doi:10.1007/BF01579291

Prior, J. C., Vigna, Y. M., Watson, D., Diewold, P., & Robinow, O. (1986). Spironolactone in the presurgical therapy of male to female transsexuals: Philosophy and experience of the Vancouver Gender Dysphoria Clinic. *Journal of Sex Information & Education Council of Canada, 1*, 1–7.

Rachlin, K. (1999). Factors which influence individual's decisions when considering female-to-male genital reconstructive surgery. *International Journal of Transgenderism, 3*(3). Retrieved from http://www.WPATH.org

Rachlin, K. (2002). Transgendered individuals' experiences of psychotherapy. *International Journal of Transgenderism, 6*(1). Retrieved from http://www.wpath.org/journal/www.iiav.nl/ezines/web/IJT/97–03/numbers/symposion/ijtvo06no01_03.htm.

Rachlin, K., Green, J., & Lombardi, E. (2008). Utilization of health care among female-to-male transgender individuals in the United States. *Journal of Homosexuality, 54*(3), 243–258. doi:10.1080/00918360801982124

108 OF 238

Rachlin, K., Hansbury, G., & Pardo, S. T. (2010). Hysterectomy and oophorectomy experiences of female-to-male transgender individuals. *International Journal of Transgenderism, 12*(3), 155–166. doi:10.1080/15532739.2010.514220

Reed, B., Rhodes, S., Schofield, P. & Wylie, K. (2009). *Gender variance in the UK: Prevalence, incidence, growth and geographic distribution*. Retrieved June 8, 2011, from http://www.gires.org.uk/assets/Medpro-Assets/GenderVarianceUK-report.pdf

Rehman, J., Lazer, S., Benet, A. E., Schaefer, L. C., & Melman, A. (1999). The reported sex and surgery satisfactions of 28 postoperative male-to-female transsexual patients. *Archives of Sexual Behavior, 28*(1), 71–89. doi:10.1023/A:1018745706354

Robinow, O. (2009). Paraphilia and transgenderism: A connection with Asperger's disorder? *Sexual and Relationship Therapy, 24*(2), 143–151. doi:10.1080/14681990902951358

Rosenberg, M. (2002). Children with gender identity issues and their parents in individual and group treatment. *Journal of the American Academy of Child and Adolescent Psychiatry, 41*(5), 619–621. doi:10.1097/00004583–200205000–00020

Rossouw, J. E., Anderson, G. L., Prentice, R. L., LaCroix, A. Z., Kooperberg, C., Stefanick, M. L., . . . Johnson, K. C. (2002). Risks and benefits of estrogen plus progestin in healthy postmenopausal women: Principal results from the women's health initiative randomized controlled trial. *JAMA: The Journal of the American Medical Association, 288*(3), 321–333.

Royal College of Speech Therapists, United Kingdom. http://www.rcslt.org/

Ruble, D. N., Martin, C. L., & Berenbaum, S. A. (2006). Gender development. In N. Eisenberg, W. Damon & R. M. Lerner (Eds.), *Handbook of child psychology* (6th ed., pp. 858–932). Hoboken, NJ: John Wiley.

Sausa, L. A. (2005). Translating research into practice: Trans youth recommendations for improving school systems. *Journal of Gay & Lesbian Issues in Education, 3*(1), 15–28. doi:10.1300/J367v03n01_04

Simpson, J. L., de la Cruz, F., Swerdloff, R. S., Samango-Sprouse, C., Skakkebaek, N. E., Graham, J. M. J., . . . Willard, H. F. (2003). Klinefelter syndrome: Expanding the phenotype and identifying new research directions. *Genetics in Medicine, 5*(6), 460–468. doi:10.1097/01.GIM.0000095626.54201.D0

109 of 238

The Standards of Care
VERSION 7

Smith, Y. L. S., Van Goozen, S. H. M., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine, 35*(1), 89–99. doi:10.1017/S0033291704002776

Sood, R., Shuster, L., Smith, R., Vincent, A., & Jatoi, A. (2011). Counseling postmenopausal women about bioidentical hormones: Ten discussion points for practicing physicians. *Journal of the American Board of Family Practice, 24*(2), 202–210. doi:10.3122/jabfm.2011.02.100194

Speech Pathology Australia. http://www.speechpathologyaustralia.org.au/

Speiser, P. W., Azziz, R., Baskin, L. S., Ghizzoni, L., Hensle, T. W., Merke, D. P., . . . Oberfield, S. E. (2010). Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An endocrine society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 95*(9), 4133–4160. doi:10.1210/jc.2009-2631

Steensma, T. D., Biemond, R., de Boer, F., & Cohen-Kettenis, P. T. (2011). Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. *Clinical Child Psychology and Psychiatry*. Advance online publication. doi:10.1177/1359104510378303

Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Gender transitioning before puberty? *Archives of Sexual Behavior, 40*(4), 649–650. doi:10.1007/s10508-011-9752-2

Stikkelbroeck, N. M. M. L., Beerendonk, C., Willemsen, W. N. P., Schreuders-Bais, C. A., Feitz, W. F. J., Rieu, P. N. M. A., . . . Otten, B. J. (2003). The long term outcome of feminizing genital surgery for congenital adrenal hyperplasia: Anatomical, functional and cosmetic outcomes, psychosexual development, and satisfaction in adult female patients. *Journal of Pediatric and Adolescent Gynecology, 16*(5), 289–296. doi:10.1016/S1083-3188(03)00155-4

Stoller, R. J. (1964). A contribution to the study of gender identity. *International Journal of Psychoanalysis, 45*, 220–226.

Stone, S. (1991). The empire strikes back: A posttransexual manifesto. In J. Epstein, & K. Straub (Eds.), *Body guards: The cultural politics of gender ambiguity* (pp. 280–304). London: Routledge.

Tangpricha, V., Ducharme, S. H., Barber, T. W., & Chipkin, S. R. (2003). Endocrinologic treatment of gender identity disorders. *Endocrine Practice, 9*(1), 12–21.

Tangpricha, V., Turner, A., Malabanan, A., & Holick, M. (2001). Effects of testosterone therapy on bone mineral density in the FtM patient. *International Journal of Transgenderism, 5*(4).

Taywaditep, K. J., Coleman, E., & Dumronggittigule, P. (1997). Thailand (Muang Thai). In R. Francoeur (Ed.), *International encyclopedia of sexuality*. New York, NY: Continuum.

World Professional Association for Transgender Health

110 OF 238

Thole, Z., Manso, G., Salgueiro, E., Revuelta, P., & Hidalgo, A. (2004). Hepatotoxicity induced by antiandrogens: A review of the literature. *Urologia Internationalis, 73*(4), 289–295. doi:10.1159/000081585

Tom Waddell Health Center. (2006). *Protocols for hormonal reassignment of gender.* Retrieved from http://www.sfdph.org/dph/comupg/oservices/medSvs/hlthCtrs/TransGendprotocols122006.pdf

Tsoi, W. F. (1988). The prevalence of transsexualism in Singapore. *Acta Psychiatrica Scandinavica, 78*(4), 501–504. doi:10.1111/j.1600–0447.1988.tb06373.x

Van den Broecke, R., Van der Elst, J., Liu, J., Hovatta, O., & Dhont, M. (2001). The female-to-male transsexual patient: A source of human ovarian cortical tissue for experimental use. *Human Reproduction, 16*(1), 145–147. doi:10.1093/humrep/16.1.145

Vanderburgh, R. (2009). Appropriate therapeutic care for families with pre-pubescent transgender/gender-dissonant children. *Child and Adolescent Social Work Journal, 26*(2), 135–154. doi:10.1007/s10560–008–0158–5

van Kesteren, P. J. M., Asscheman, H., Megens, J. A. J., & Gooren, L. J. G. (1997). Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clinical Endocrinology, 47*(3), 337–343. doi:10.1046/j.1365–2265.1997.2601068.x

van Kesteren, P. J. M., Gooren, L. J., & Megens, J. A. (1996). An epidemiological and demographic study of transsexuals in the Netherlands. *Archives of Sexual Behavior, 25*(6), 589–600. doi:10.1007/BF02437841

van Trotsenburg, M. A. A. (2009). Gynecological aspects of transgender healthcare. *International Journal of Transgenderism, 11*(4), 238–246. doi:10.1080/15532730903439484

Vilain, E. (2000). Genetics of sexual development. *Annual Review of Sex Research, 11*, 1–25.

Wålinder, J. (1968). Transsexualism: Definition, prevalence and sex distribution. *Acta Psychiatrica Scandinavica, 43*(S203), 255–257.

Wålinder, J. (1971). Incidence and sex ratio of transsexualism in Sweden. *The British Journal of Psychiatry, 119*(549), 195–196.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47*(12), 1413–1423. doi:10.1097/CHI.0b013e31818956b9

Wallien, M. S. C., Swaab, H., & Cohen-Kettenis, P. T. (2007). Psychiatric comorbidity among children with gender identity disorder. *Journal of the American Academy of Child & Adolescent Psychiatry, 46*(10), 1307–1314. doi:10.1097/chi.0b013e3181373848

III of 2016 1.3.2

The Standards of Care
VERSION 7

Warren, B. E. (1993). Transsexuality, identity and empowerment. A view from the frontlines. *SIECUS Report, February/March*, 14–16.

Weitze, C., & Osburg, S. (1996). Transsexualism in Germany: Empirical data on epidemiology and application of the German Transsexuals' Act during its first ten years. *Archives of Sexual Behavior, 25*(4), 409–425.

Wilson, J. D. (1999). The role of androgens in male gender role behavior. *Endocrine Reviews, 20*(5), 726–737. doi:10.1210/er.20.5.726

Winter, S. (2009). Cultural considerations for The World Professional Association for Transgender Health's *standards of care*: The Asian perspective. *International Journal of Transgenderism, 11*(1), 19–41. doi:10.1080/15532730902799938

Winter, S., Chalungsooth, P., Teh, Y. K., Rojanalert, N., Maneerat, K., Wong, Y. W., . . . Macapagal, R. A. (2009). Transpeople, transprejudice and pathologization: A seven-country factor analytic study. *International Journal of Sexual Health, 21*(2), 96–118. doi:10.1080/19317610902922537

Wisniewski, A. B., Migeon, C. J., Malouf, M. A., & Gearhart, J. P. (2004). Psychosexual outcome in women affected by congenital adrenal hyperplasia due to 21-hydroxylase deficiency. *The Journal of Urology, 171*(6, Part 1), 2497–2501. doi:10.1097/01.ju.0000125269.91938.f7

World Health Organization. (2007). *International classification of diseases and related health problems-10th revision*. Geneva, Switzerland: World Health Organization.

World Health Organization. (2008). *The world health report 2008: Primary health care—now more than ever*. Geneva, Switzerland: World Health Organization.

World Professional Association for Transgender Health, Inc. (2008). *WPATH clarification on medical necessity of treatment, sex reassignment, and insurance coverage in the U.S.A.* Retrieved from http://www.wpath.org/documents/Med%20Nec%20on%202008%20Letterhead.pdf

WPATH Board of Directors. (2010). *De-psychopathologisation statement released May 26, 2010*. Retrieved from http://wpath.org/announcements_detail.cfm?pk_announcement=17

Xavier, J. M. (2000). *The Washington, D.C. transgender needs assessment survey: Final report for phase two*. Washington, DC: Administration for HIV/AIDS of District of Columbia Government.

Zhang, G., Gu, Y., Wang, X., Cui, Y., & Bremner, W. J. (1999). A clinical trial of injectable testosterone undecanoate as a potential male contraceptive in normal Chinese men. *Journal of Clinical Endocrinology & Metabolism, 84*(10), 3642–3647. doi:10.1210/jc.84.10.3642

112 OF ~~238~~ 7.38

Zitzmann, M., Saad, F., & Nieschlag, E. (2006, April). *Long term experience of more than 8 years with a novel formulation of testosterone undecanoate (nebido) in substitution therapy of hypogonadal men.* Paper presented at European Congress of Endocrinology, Glasgow, UK.

Zucker, K. J. (1999). Intersexuality and gender identity differentiation. *Annual Review of Sex Research, 10*(1), 1–69.

Zucker, K. J. (2004). Gender identity development and issues. *Child and Adolescent Psychiatric Clinics of North America, 13*(3), 551–568. doi:10.1016/j.chc.2004.02.006

Zucker, K. J. (2006). "I'm half-boy, half-girl": Play psychotherapy and parent counseling for gender identity disorder. In R. L. Spitzer, M. B. First, J. B. W. Williams & M. Gibbons (Eds.), *DSM-IV-TR casebook, volume 2* (pp. 321–334). Arlington, VA: American Psychiatric Publishing, Inc.

Zucker, K. J. (2010). The DSM diagnostic criteria for gender identity disorder in children. *Archives of Sexual Behavior, 39*(2), 477–498. doi:10.1007/s10508–009–9540–4

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York, NY: Guilford Press.

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., & Cantor, J. M. (2008). Is gender identity disorder in adolescents coming out of the closet? *Journal of Sex & Marital Therapy, 34*(4), 287–290. doi:10.1080/00926230802096192

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., Wood, H., Singh, D., & Choi, K. (in press). Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. *Journal of Sex & Marital Therapy, 38*(2), 151–189.

Zucker, K. J., & Lawrence, A. A. (2009). Epidemiology of gender identity disorder: Recommendations for the *standards of care* of The World Professional Association for Transgender Health. *International Journal of Transgenderism, 11*(1), 8–18. doi:10.1080/15532730902799946

Zucker, K. J., Owen, A., Bradley, S. J., & Ameeriar, L. (2002). Gender-dysphoric children and adolescents: A comparative analysis of demographic characteristics and behavioral problems. *Clinical Child Psychology and Psychiatry, 7*(3), 398–411.

Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172*(2), 90–97.

# APPENDIX A
## GLOSSARY

Terminology in the area of health care for transsexual, transgender, and gender-nonconforming people is rapidly evolving; new terms are being introduced, and the definitions of existing terms are changing. Thus, there is often misunderstanding, debate, or disagreement about language in this field. Terms that may be unfamiliar or that have specific meanings in the *SOC* are defined below for the purpose of this document only. Others may adopt these definitions, but WPATH acknowledges that these terms may be defined differently in different cultures, communities, and contexts.

WPATH also acknowledges that many terms used in relation to this population are not ideal. For example, the terms *transsexual* and *transvestite*—and, some would argue, the more recent term *transgender*—have been applied to people in an objectifying fashion. Yet such terms have been more or less adopted by many people who are making their best effort to make themselves understood. By continuing to use these terms, WPATH intends only to ensure that concepts and processes are comprehensible, in order to facilitate the delivery of quality health care to transsexual, transgender, and gender-nonconforming people. WPATH remains open to new terminology that will further illuminate the experience of members of this diverse population and lead to improvements in health care access and delivery.

**Bioidentical hormones:**  Hormones that are *structurally* identical to those found in the human body (ACOG Committee of Gynecologic Practice, 2005). The hormones used in bioidentical hormone therapy (BHT) are generally derived from plant sources and are structurally similar to endogenous human hormones, but they need to be commercially processed to become bioidentical.

**Bioidentical compounded hormone therapy (BCHT):**  Use of hormones that are prepared, mixed, assembled, packaged, or labeled as a drug by a pharmacist and custom-made for a patient according to a physician's specifications. Government drug agency approval is not possible for each compounded product made for an individual consumer.

**Cross-dressing (transvestism):** Wearing clothing and adopting a gender role presentation that, in a given culture, is more typical of the other sex.

**Disorders of sex development (DSD):** Congenital conditions in which the development of chromosomal, gonadal, or anatomic sex is atypical. Some people strongly object to the "disorder" label and instead view these conditions as a matter of diversity (Diamond, 2009), preferring the terms *intersex* and *intersexuality*.

The Standards of Care
7TH VERSION

**Female-to-Male (FtM):** Adjective to describe individuals assigned female at birth who are changing or who have changed their body and/or gender role from birth-assigned female to a more masculine body or role.

**Gender dysphoria:** Distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b).

**Gender identity:** A person's intrinsic sense of being male (a boy or a man), female (a girl or woman), or an alternative gender (e.g., boygirl, girlboy, transgender, genderqueer, eunuch) (Bockting, 1999; Stoller, 1964).

**Gender identity disorder:** Formal diagnosis set forth by the *Diagnostic Statistical Manual of Mental Disorders, 4th Edition, Text Rev (DSM IV-TR)* (American Psychiatric Association, 2000). Gender identity disorder is characterized by a strong and persistent cross-gender identification and a persistent discomfort with one's sex or sense of inappropriateness in the gender role of that sex, causing clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**Gender-nonconforming:** Adjective to describe individuals whose gender identity, role, or expression differs from what is normative for their assigned sex in a given culture and historical period.

**Gender role or expression:** Characteristics in personality, appearance, and behavior that in a given culture and historical period are designated as masculine or feminine (that is, more typical of the male or female social role) (Ruble, Martin, & Berenbaum, 2006). While most individuals present socially in clearly masculine or feminine gender roles, some people present in an alternative gender role such as genderqueer or specifically transgender. All people tend to incorporate both masculine and feminine characteristics in their gender expression in varying ways and to varying degrees (Bockting, 2008).

**Genderqueer:** Identity label that may be used by individuals whose gender identity and/or role does not conform to a binary understanding of gender as limited to the categories of man or woman, male or female (Bockting, 2008).

**Internalized transphobia:** Discomfort with one's own transgender feelings or identity as a result of internalizing society's normative gender expectations.

**Male-to-Female (MtF):** Adjective to describe individuals assigned male at birth who are changing or who have changed their body and/or gender role from birth-assigned male to a more feminine body or role.

**Natural hormones:** Hormones that are derived from natural *sources* such as plants or animals. Natural hormones may or may not be bioidentical.

/15 OF 238 238

**Sex:** Sex is assigned at birth as male or female, usually based on the appearance of the external genitalia. When the external genitalia are ambiguous, other components of sex (internal genitalia, chromosomal and hormonal sex) are considered in order to assign sex (Grumbach, Hughes, & Conte, 2003; MacLaughlin & Donahoe, 2004; Money & Ehrhardt, 1972; Vilain, 2000). For most people, gender identity and expression are consistent with their sex assigned at birth; for transsexual, transgender, and gender-nonconforming individuals, gender identity or expression differ from their sex assigned at birth.

**Sex reassignment surgery (gender affirmation surgery):** Surgery to change primary and/or secondary sex characteristics to affirm a person's gender identity. Sex reassignment surgery can be an important part of medically necessary treatment to alleviate gender dysphoria.

**Transgender:** Adjective to describe a diverse group of individuals who cross or transcend culturally defined categories of gender. The gender identity of transgender people differs to varying degrees from the sex they were assigned at birth (Bockting, 1999).

**Transition:** Period of time when individuals change from the gender role associated with their sex assigned at birth to a different gender role. For many people, this involves learning how to live socially in another gender role; for others this means finding a gender role and expression that are most comfortable for them. Transition may or may not include feminization or masculinization of the body through hormones or other medical procedures. The nature and duration of transition are variable and individualized.

**Transsexual:** Adjective (often applied by the medical profession) to describe individuals who seek to change or who have changed their primary and/or secondary sex characteristics through femininizing or masculinizing medical interventions (hormones and/or surgery), typically accompanied by a permanent change in gender role.

# APPENDIX B
## OVERVIEW OF MEDICAL RISKS OF HORMONE THERAPY

The risks outlined below are based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (e.g., Dahl et al., 2006; Ettner et al., 2007).

The Standards of Care
7TH VERSION

# Risks of Feminizing Hormone Therapy (MtF)

**Likely Increased Risk:**

Venous thromboembolic disease

- Estrogen use increases the risk of venous thromboembolic events (VTE), particularly in patients who are over age 40, smokers, highly sedentary, obese, and who have underlying thrombophilic disorders.

- This risk is increased with the additional use of third generation progestins.

- This risk is decreased with use of the transdermal (versus oral) route of estradiol administration, which is recommended for patients at higher risk of VTE.

Cardiovascular, cerebrovascular disease

- Estrogen use increases the risk of cardiovascular events in patients over age 50 with underlying cardiovascular risk factors. Additional progestin use may increase this risk.

Lipids

- Oral estrogen use may markedly increase triglycerides in patients, increasing the risk of pancreatitis and cardiovascular events.

- Different routes of administration will have different metabolic effects on levels of HDL cholesterol, LDL cholesterol and lipoprotein (a).

- In general, clinical evidence suggests that MtF patients with pre-existing lipid disorders may benefit from the use of transdermal rather than oral estrogen.

Liver/gallbladder

- Estrogen and cyproterone acetate use may be associated with transient liver enzyme elevations and, rarely, clinical hepatotoxicity.

- Estrogen use increases the risk of cholelithiasis (gall stones) and subsequent cholecystectomy.

98

**Possible Increased Risk:**

Type 2 diabetes mellitus

- Feminizing hormone therapy, particularly estrogen, may increase the risk of type 2 diabetes, particularly among patients with a family history of diabetes or other risk factors for this disease.

Hypertension

- Estrogen use may increase blood pressure, but the effect on incidence of overt hypertension is unknown.

- Spironolactone reduces blood pressure and is recommended for at-risk or hypertensive patients desiring feminization.

Prolactinoma

- Estrogen use increases the risk of hyperprolactinemia among MtF patients in the first year of treatment, but this risk is unlikely thereafter.

- High-dose estrogen use may promote the clinical appearance of preexisting but clinically unapparent prolactinoma.

**Inconclusive or No Increased Risk:**

Items in this category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Breast cancer

- MtF persons who have taken feminizing hormones do experience breast cancer, but it is unknown how their degree of risk compares to that of persons born with female genitalia.

- Longer duration of feminizing hormone exposure (i.e., number of years taking estrogen preparations), family history of breast cancer, obesity (BMI >35), and the use of progestins likely influence the level of risk.

The Standards of Care
7TH VERSION

**Other Side Effects of Feminizing Therapy:**

The following effects may be considered minor or even desired, depending on the patient, but are clearly associated with feminizing hormone therapy.

Fertility and sexual function

- Feminizing hormone therapy may impair fertility.

- Feminizing hormone therapy may decrease libido.

- Feminizing hormone therapy reduces nocturnal erections, with variable impact on sexually stimulated erections.

**Risks of Anti-Androgen Medications:**

Feminizing hormone regimens often include a variety of agents that affect testosterone production or action. These include GnRH agonists, progestins (including cyproterone acetate), spironolactone, and 5-alpha reductase inhibitors. An extensive discussion of the specific risks of these agents is beyond the scope of the *SOC*. However, both spironolactone and cyproterone acetate are widely used and deserve some comment.

Cyproterone acetate is a progestational compound with anti-androgenic properties (Gooren, 2005; Levy et al., 2003). Although widely used in Europe, it is not approved for use in the United States because of concerns about hepatotoxicity (Thole, Manso, Salgueiro, Revuelta, & Hidalgo, 2004). Spironolactone is commonly used as an anti-androgen in feminizing hormone therapy, particularly in regions where cyproterone is not approved for use (Dahl et al., 2006; Moore et al., 2003; Tangpricha et al., 2003). Spironolactone has a long history of use in treating hypertension and congestive heart failure. Its common side effects include hyperkalemia, dizziness, and gastrointestinal symptoms (*Physicians' Desk Reference*, 2007).

119 OF 238

# Risks of Masculinizing Hormone Therapy (FtM)

**Likely Increased Risk:**

## Polycythemia

- Masculinizing hormone therapy involving testosterone or other androgenic steroids increases the risk of polycythemia (hematocrit > 50%), particularly in patients with other risk factors.

- Transdermal administration and adaptation of dosage may reduce this risk.

## Weight gain/visceral fat

- Masculinizing hormone therapy can result in modest weight gain, with an increase in visceral fat.

**Possible Increased Risk:**

## Lipids

- Testosterone therapy decreases HDL, but variably affects LDL and triglycerides.

- Supraphysiologic (beyond normal male range) serum levels of testosterone, often found with extended intramuscular dosing, may worsen lipid profiles, whereas transdermal administration appears to be more lipid neutral.

- Patients with underlying polycystic ovarian syndrome or dyslipidemia may be at increased risk of worsening dyslipidemia with testosterone therapy.

## Liver

- Transient elevations in liver enzymes may occur with testosterone therapy.

- Hepatic dysfunction and malignancies have been noted with oral methyltestosterone. However, methyltestosterone is no longer available in most countries and should no longer be used.

120 OF 238

The Standards of Care
7TH VERSION

## Psychiatric

Masculinizing therapy involving testosterone or other androgenic steroids may increase the risk of hypomanic, manic, or psychotic symptoms in patients with underlying psychiatric disorders that include such symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

**Inconclusive or No Increased Risk:**

Items in this category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

## Osteoporosis

- Testosterone therapy maintains or increases bone mineral density among FtM patients prior to oophorectomy, at least in the first three years of treatment.

- There is an increased risk of bone density loss after oophorectomy, particularly if testosterone therapy is interrupted or insufficient. This includes patients utilizing solely oral testosterone.

## Cardiovascular

- Masculinizing hormone therapy at normal physiologic doses does not appear to increase the risk of cardiovascular events among healthy patients.

- Masculinizing hormone therapy may increase the risk of cardiovascular disease in patients with underlying risks factors.

## Hypertension

- Masculinizing hormone therapy at normal physiologic doses may increase blood pressure but does not appear to increase the risk of hypertension.

- Patients with risk factors for hypertension, such as weight gain, family history, or polycystic ovarian syndrome, may be at increased risk.

Type 2 diabetes mellitus

- Testosterone therapy does not appear to increase the risk of type 2 diabetes among FtM patients overall, unless other risk factors are present.

- Testosterone therapy may further increase the risk of type 2 diabetes in patients with other risk factors, such as significant weight gain, family history, and polycystic ovarian syndrome. There are no data that suggest or show an increase in risk in those with risk factors for dyslipidemia.

Breast cancer

- Testosterone therapy in FtM patients does not increase the risk of breast cancer.

Cervical cancer

- Testosterone therapy in FtM patients does not increase the risk of cervical cancer, although it may increase the risk of minimally abnormal Pap smears due to atrophic changes.

Ovarian cancer

- Analogous to persons born with female genitalia with elevated androgen levels, testosterone therapy in FtM patients may increase the risk of ovarian cancer, although evidence is limited.

Endometrial (uterine) cancer

- Testosterone therapy in FtM patients may increase the risk of endometrial cancer, although evidence is limited.

**Other Side Effects of Masculinizing Therapy:**

The following effects may be considered minor or even desired, depending on the patient, but are clearly associated with masculinization.

Fertility and sexual function

- Testosterone therapy in FtM patients reduces fertility, although the degree and reversibility are unknown.

122 OF 2046 238

The Standards of Care
7TH VERSION

- Testosterone therapy can induce permanent anatomic changes in the developing embryo or fetus.

- Testosterone therapy induces clitoral enlargement and increases libido.

Acne, androgenic alopecia

Acne and varying degrees of male pattern hair loss (androgenic alopecia) are common side effects of masculinizing hormone therapy.

# APPENDIX C
## SUMMARY OF CRITERIA FOR HORMONE THERAPY AND SURGERIES

As for all previous versions of the *SOC*, the criteria put forth in the *SOC* for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. Clinical departures from the *SOC* may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm-reduction strategies. These departures should be recognized as such, explained to the patient, and documented through informed consent for quality patient care and legal protection. This documentation is also valuable to accumulate new data, which can be retrospectively examined to allow for health care—and the *SOC*—to evolve.

## Criteria for Feminizing/Masculinizing Hormone Therapy (One Referral or Chart Documentation of Psychosocial Assessment)

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to give consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental concerns are present, they must be reasonably well controlled.

World Professional Association for Transgender Health

123 OF 238

The Standards of Care
7TH VERSION

# Criteria for Breast/Chest Surgery (One Referral)

Mastectomy and Creation of a Male Chest in FtM Patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to give consent for treatment;

3. Age of majority in a given country (if younger, follow the SOC for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Hormone therapy is not a prerequisite.

Breast Augmentation (Implants/Lipofilling) in MtF Patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to give consent for treatment;

3. Age of majority in a given country (if younger, follow the SOC for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Although not an explicit criterion, it is recommended that MtF patients undergo feminizing hormone therapy (minimum 12 months) prior to breast augmentation surgery. The purpose is to maximize breast growth in order to obtain better surgical (aesthetic) results.

# Criteria for Genital Surgery (Two Referrals)

Hysterectomy and Salpingo-Oophorectomy in FtM Patients and Orchiectomy in MtF Patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to give consent for treatment;

124 OF 246 238

The Standards of Care
7TH VERSION

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual).

The aim of hormone therapy prior to gonadectomy is primarily to introduce a period of reversible estrogen or testosterone suppression, before a patient undergoes irreversible surgical intervention.

These criteria do not apply to patients who are having these surgical procedures for medical indications other than gender dysphoria.

Metoidioplasty or Phalloplasty in FtM Patients and Vaginoplasty in MtF Patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to give consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless hormones are not clinically indicated for the individual);

6. 12 continuous months of living in a gender role that is congruent with their gender identity.

Although not an explicit criterion, it is recommended that these patients also have regular visits with a mental health or other medical professional.

The criterion noted above for some types of genital surgeries—that is, that patients engage in 12 continuous months of living in a gender role that is congruent with their gender identity—is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery.

106

125 OF 238

# APPENDIX D
## EVIDENCE FOR CLINICAL OUTCOMES
## OF THERAPEUTIC APPROACHES

One of the real supports for any new therapy is an outcome analysis. Because of the controversial nature of sex reassignment surgery, this type of analysis has been very important. Almost all of the outcome studies in this area have been retrospective.

One of the first studies to examine the post-treatment psychosocial outcomes of transsexual patients was done in 1979 at Johns Hopkins University School of Medicine and Hospital (USA) (J. K. Meyer & Reter, 1979). This study focused on patients' occupational, educational, marital, and domiciliary stability. The results revealed several significant changes with treatment. These changes were not seen as positive; rather, they showed that many individuals who had entered the treatment program were no better off or were worse off in many measures after participation in the program. These findings resulted in closure of the treatment program at that hospital/medical school (Abramowitz, 1986).

Subsequently, a significant number of health professionals called for a standard for eligibility for sex reassignment surgery. This led to the formulation of the original *Standards of Care* of the Harry Benjamin International Gender Dysphoria Association (now WPATH) in 1979.

In 1981, Pauly published results from a large retrospective study of people who had undergone sex reassignment surgery. Participants in that study had much better outcomes: Among 83 FtM patients, 80.7% had a satisfactory outcome (i.e., patient self report of "improved social and emotional adjustment"), 6.0% unsatisfactory. Among 283 MtF patients, 71.4% had a satisfactory outcome, 8.1% unsatisfactory. This study included patients who were treated before the publication and use of the *Standards of Care*.

Since the *Standards of Care* have been in place, there has been a steady increase in patient satisfaction and decrease in dissatisfaction with the outcome of sex reassignment surgery. Studies conducted after 1996 focused on patients who were treated according to the *Standards of Care*. The findings of Rehman and colleagues (1999) and Krege and colleagues (2001) are typical of this body of work; none of the patients in these studies regretted having had surgery, and most reported being satisfied with the cosmetic and functional results of the surgery. Even patients who develop severe surgical complications seldom regret having undergone surgery. Quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2003). The vast majority of follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well being, cosmesis, and sexual function (De Cuypere et al., 2005; Garaffa, Christopher, & Ralph, 2010; Klein & Gorzalka, 2009), although the specific magnitude of benefit is uncertain from

The Standards of Care
7TH VERSION

the currently available evidence. One study (Emory, Cole, Avery, Meyer, & Meyer, 2003) even showed improvement in patient income.

One troubling report (Newfield et al., 2006) documented lower scores on quality of life (measured with the SF-36) for FtM patients than for the general population. A weakness of that study is that it recruited its 384 participants by a general email rather than a systematic approach, and the degree and type of treatment were not recorded. Study participants who were taking testosterone had typically being doing so for less than 5 years. Reported quality of life was higher for patients who had undergone breast/chest surgery than for those who had not (p<.001). (A similar analysis was not done for genital surgery.) In other work, Kuhn and colleagues (2009) used the King's Health Questionnaire to assess the quality of life of 55 transsexual patients at 15 years after surgery. Scores were compared to those of 20 healthy female control patients who had undergone abdominal/pelvic surgery in the past. Quality of life scores for transsexual patients were the same or better than those of control patients for some subscales (emotions, sleep, incontinence, symptom severity, and role limitation), but worse in other domains (general health, physical limitation, and personal limitation).

Two long-term observational studies, both retrospective, compared the mortality and psychiatric morbidity of transsexual adults to those of general population samples (Asscheman et al., 2011; Dhejne et al., 2011). An analysis of data from the Swedish National Board of Health and Welfare information registry found that individuals who had received sex reassignment surgery (191 MtF and 133 FtM) had significantly higher rates of mortality, suicide, suicidal behavior, and psychiatric morbidity than those for a nontranssexual control group matched on age, immigrant status, prior psychiatric morbidity, and birth sex (Dhejne et al., 2011). Similarly, a study in the Netherlands reported a higher total mortality rate, including incidence of suicide, in both pre- and post-surgery transsexual patients (966 MtF and 365 MtF) than in the general population of that country (Asscheman et al., 2011). Neither of these studies questioned the efficacy of sex reassignment; indeed, both lacked an adequate comparison group of transsexuals who either did not receive treatment or who received treatment other than genital surgery. Moreover, transsexual people in these studies were treated as far back as the 1970s. However, these findings do emphasize the need to have good long-term psychological and psychiatric care available for this population. More studies are needed that focus on the outcomes of current assessment and treatment approaches for gender dysphoria.

It is difficult to determine the effectiveness of hormones alone in the relief of gender dysphoria. Most studies evaluating the effectiveness of masculinizing/feminizing hormone therapy on gender dysphoria have been conducted with patients who have also undergone sex reassignment surgery. Favorable effects of therapies that included both hormones and surgery were reported in a comprehensive review of over 3000 patients in 79 studies (mostly observational) conducted between 1961 and 1991 (Eldh, Berg, & Gustafsson, 1997; Gijs & Brewaeys, 2007; Murad et al., 2010; Pfäfflin & Junge, 1998). Patients operated on after 1986 did better than those before 1986; this reflects significant improvement in surgical complications (Eldh et al., 1997). Most patients have reported improved psychosocial outcomes, ranging between 87% for MtF patients and 97% for FtM patients (Green & Fleming, 1990).

Similar improvements were found in a Swedish study in which "almost all patients were satisfied with sex reassignment at 5 years, and 86% were assessed by clinicians at follow-up as stable or improved in global functioning" (Johansson, Sundbom, Höjerback, & Bodlund, 2010). Weaknesses of these earlier studies are their retrospective design and use of different criteria to evaluate outcomes.

A prospective study conducted in the Netherlands evaluated 325 consecutive adult and adolescent subjects seeking sex reassignment (Smith, Van Goozen, Kuiper, & Cohen-Kettenis, 2005). Patients who underwent sex reassignment therapy (both hormonal and surgical intervention) showed improvements in their mean gender dysphoria scores, measured by the Utrecht Gender Dysphoria Scale. Scores for body dissatisfaction and psychological function also improved in most categories. Fewer than 2% of patients expressed regret after therapy. This is the largest prospective study to affirm the results from retrospective studies that a combination of hormone therapy and surgery improves gender dysphoria and other areas of psychosocial functioning. There is a need for further research on the effects of hormone therapy without surgery, and without the goal of maximum physical feminization or masculinization.

Overall, studies have been reporting a steady improvement in outcomes as the field becomes more advanced. Outcome research has mainly focused on the outcome of sex reassignment surgery. In current practice there is a range of identity, role, and physical adaptations that could use additional follow-up or outcome research (Institute of Medicine, 2011).

# APPENDIX E
## DEVELOPMENT PROCESS FOR THE
## *STANDARDS OF CARE*, VERSION 7

The process of developing *Standards of Care, Version 7* began when an initial *SOC* "work group" was established in 2006. Members were invited to examine specific sections of *SOC, Version 6*. For each section, they were asked to review the relevant literature, identify where research was lacking and needed, and recommend potential revisions to the *SOC* as warranted by new evidence. Invited papers were submitted by the following authors: Aaron Devor, Walter Bockting, George Brown, Michael Brownstein, Peggy Cohen-Kettenis, Griet DeCuypere, Petra DeSutter, Jamie Feldman, Lin Fraser, Arlene Istar Lev, Stephen Levine, Walter Meyer, Heino Meyer-Bahlburg, Stan Monstrey, Loren Schechter, Mick van Trotsenburg, Sam Winter, and Ken Zucker. Some of these authors chose to add co-authors to assist them in their task.

Initial drafts of these papers were due June 1, 2007. Most were completed by September 2007, with the rest completed by the end of 2007. These manuscripts were then submitted to the *International*

128 OF 238

The Standards of Care
7TH VERSION

*Journal of Transgenderism (IJT)*. Each underwent the regular *IJT* peer review process. The final papers were published in Volume 11 (1–4) in 2009, making them available for discussion and debate.

After these articles were published, an *SOC* Revision Committee was established by the WPATH Board of Directors in 2010. The Revision Committee was first charged with debating and discussing the *IJT* background papers through a Google website. A subgroup of the Revision Committee was appointed by the Board of Directors to serve as the Writing Group. This group was charged with preparing the first draft of *SOC, Version 7* and continuing to work on revisions for consideration by the broader Revision Committee. The Board also appointed an International Advisory Group of transsexual, transgender, and gender-nonconforming individuals to give input on the revision.

A technical writer was hired to (1) review all of the recommendations for revision—both the original recommendations as outlined in the *IJT* articles and additional recommendations that emanated from the online discussion—and (2) create a survey to solicit further input on these potential revisions. From the survey results, the Writing Group was able to discern where these experts stood in terms of areas of agreement and areas in need of more discussion and debate. The technical writer then (3) created a very rough first draft of *SOC, Version 7* for the Writing Group to consider and build on.

The Writing Group met on March 4 and 5, 2011 in a face-to-face expert consultation meeting. They reviewed all recommended changes and debated and came to consensus on various controversial areas. Decisions were made based on the best available science and expert consensus. These decisions were incorporated into the draft, and additional sections were written by the Writing Group with the assistance of the technical writer.

The draft that emerged from the consultation meeting was then circulated among the Writing Group and finalized with the help of the technical writer. Once this initial draft was finalized, it was circulated among the broader *SOC* Revision Committee and the International Advisory Group. Discussion was opened up on the Google website and a conference call was held to resolve issues. Feedback from these groups was considered by the Writing Group, who then made further revisions. Two additional drafts were created and posted on the Google website for consideration by the broader *SOC* Revision Committee and the International Advisory Group. Upon completion of these three iterations of review and revision, the final document was presented to the WPATH Board of Directors for approval. The Board of Directors approved this version on September 14, 2011.

# Funding

The *Standards of Care* revision process was made possible through a generous grant from the Tawani Foundation and a gift from an anonymous donor. These funds supported the following:

1. Costs of a professional technical writer;

2. Process of soliciting international input on proposed changes from gender identity professionals and the transgender community;

3. Working meeting of the Writing Group;

4. Process of gathering additional feedback and arriving at final expert consensus from the professional and transgender communities, the *Standards of Care, Version 7*, Revision Committee, and WPATH Board of Directors;

5. Costs of printing and distributing *Standards of Care, Version 7*, and posting a free downloadable copy on the WPATH website;

6. Plenary session to launch the *Standards of Care, Version 7*, at the 2011 WPATH Biennial Symposium in Atlanta, Georgia, USA.

## Members of the *Standards of Care* Revision Committee[†]

Eli Coleman, PhD (USA)* - Committee chair
Richard Adler, PhD (USA)
Walter Bockting, PhD (USA)*
Marsha Botzer, MA (USA)*
George Brown, MD (USA)
Peggy Cohen-Kettenis, PhD (Netherlands)*
Griet DeCuypere, MD (Belgium)*
Aaron Devor, PhD (Canada)
Randall Ehrbar, PsyD (USA)
Randi Ettner, PhD (USA)
Evan Eyler, MD (USA)
Jamie Feldman, MD, PhD (USA)*
Lin Fraser, EdD (USA)*
Rob Garofalo, MD, MPH (USA)
Jamison Green, PhD, MFA (USA)*
Dan Karasic, MD (USA)
Gail Knudson, MD (Canada)*

Arlene Istar Lev, LCSW-R (USA)
Gal Mayer, MD (USA)
Walter Meyer, MD (USA)*
Heino Meyer-Bahlburg, Dr. rer.nat. (USA)
Stan Monstrey, MD, PhD (Belgium)*
Blaine Paxton Hall, MHS-CL, PA-C (USA)
Friedmann Pfäfflin, MD, PhD (Germany)
Katherine Rachlin, PhD (USA)
Bean Robinson, PhD (USA)
Loren Schechter, MD (USA)
Vin Tangpricha, MD, PhD (USA)
Mick van Trotsenburg, MD (Netherlands)
Anne Vitale, PhD (USA)
Sam Winter, PhD (Hong Kong)
Stephen Whittle, OBE (UK)
Kevan Wylie, MB, MD (UK)
Ken Zucker, PhD (Canada)

---

* Writing Group member.
† All members of the *Standards of Care, Version 7 Revision Committee* donated their time to work on this revision.

130 of 246 238

The Standards of Care
7TH VERSION

## International Advisory Group Selection Committee

Walter Bockting, PhD (USA)
Marsha Botzer, MA (USA)
Aaron Devor, PhD (Canada)
Randall Ehrbar, PsyD (USA)

Evan Eyler, MD (USA)
Jamison Green, PhD, MFA (USA)
Blaine Paxton Hall, MHS-CL, PA-C (USA)

## International Advisory Group

Tamara Adrian, LGBT Rights Venezuela (Venezuela)
Craig Andrews, FtM Australia (Australia)
Christine Burns, MBE, Plain Sense Ltd (UK)
Naomi Fontanos, Society for Transsexual Women's Rights in the Phillipines (Phillipines)
Tone Marie Hansen, Harry Benjamin Resource Center (Norway)
Rupert Raj, Sherbourne Health Center (Canada)
Masae Torai, FtM Japan (Japan)
Kelley Winters, GID Reform Advocates (USA)

## Technical Writer

Anne Marie Weber-Main, PhD (USA)

## Editorial Assistance

Heidi Fall (USA)

World Professional Association for Transgender Health

131 OF 238

ZSQUAREDESIGN LLC | MPLS, MN



ISBN XXX-X-XXX-XXXXX-X

FPO    FPO

X   XXXXXX    XXXXXX



**WPATH** WORLD PROFESSIONAL ASSOCIATION for TRANSGENDER HEALTH

**21 December 2016**

**Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.**

The World Professional Association for Transgender Health (WPATH) is an international, interdisciplinary, professional association devoted to the understanding and treatment of individuals with Gender Dysphoria (GD). Founded in 1979, and currently with over 1500 medical, mental health, social scientist, and legal professional members, all of whom are engaged in clinical practice and/or research that affects the lives of transgender and transsexual people, WPATH is the oldest professional association in the world that continuously has been concerned with this clinical specialty.

Gender Dysphoria (GD), often associated with transsexualism, is a condition recognized in the Diagnostic and Statistical Manual of Mental Disorders, (DSM-5, 2013), published by the American Psychiatric Association. Previous nomenclature for gender dysphoria includes transsexualism and gender identity disorder (GID), conditions which are also recognized in the International Statistical Classification of Diseases and Related Health Problems, Tenth Revision, published by the World Health Organization, of which the United States is a member. Nomenclature is subject to changes, and new terminology and classifications may be arrived at by various medical organizations or administrative bodies, but these events shall not in themselves change the meaning or intent of this WPATH statement.

The criteria currently listed for GD are descriptive of many people who experience dissonance between their sex as assigned at birth and their gender identity. Gender identity is common to all human beings, is developed in early childhood, and is thought to be firmly established in most people—transgender or not—by age 4,[1] though for some transgender individuals, gender identity may remain somewhat fluid for many years,[2] while for others, conditions specific to individual lives may constrain a person from acknowledging or even recognizing any gender dysphoria they may experience until they

---

[1] American Academy of Pediatrics, 1999.

[2] Fraser L and De Cuypere G, 2016.

are well into adulthood. The various The DSM-5 descriptive criteria for gender dysphoria
were developed to aid in diagnosis and treatment to alleviate the clinically significant
distress and impairment that is frequently, though not universally, associated with
transsexual and transgender conditions.

The WPATH Standards of Care for the Health of Transsexual, Transgender, and Gender-
Nonconforming People (SOC) were first issued in 1979, and articulate the "professional
consensus about the psychiatric, psychological, medical and surgical management of
GD." Periodically revised to reflect evolution in evidence-based clinical practice and
scientific research, the Standards also unequivocally reflect this Association's conclusion
that treatment is medically necessary. The most recent version of the SOC (Version 7)
was published in 2012.[3] WPATH recommends that medical and mental health providers
and administrators check www.wpath.org regularly to ensure they are working with the
most up-to-date revision of the SOC.

**MEDICAL NECESSITY** is a term common to health care coverage and insurance
policies in the United States. A common definition of medical necessity as used by
insurers is:

> "[H]ealth care services that a Physician, exercising prudent clinical judgment,
> would provide to a patient for the purpose of preventing, evaluating, diagnosing
> or treating an illness, injury, disease or its symptoms, and that are: (a) in
> accordance with generally accepted standards of medical practice; (b) clinically
> appropriate, in terms of type, frequency, extent, site and duration, and considered
> effective for the patient's illness, injury, or disease; and (c) not primarily for the
> convenience of the patient, physician, or other health care provider, and not more
> costly than an alternative service or sequence of services at least as likely to
> produce equivalent therapeutic or diagnostic results as to the diagnosis or
> treatment of that patient's illness, injury or disease.

> "Generally accepted standards of medical practice means standards that are based
> on credible scientific evidence published in peer-reviewed medical literature
> generally recognized by the relevant medical community, Physician Specialty
> Society recommendations and the views of Physicians practicing in relevant
> clinical areas and any other relevant factors."[4]

The current Board of Directors of the WPATH herewith expresses its considered opinion
based on clinical and peer reviewed evidence that gender affirming/confirming treatments
and surgical procedures, properly indicated and performed as provided by the Standards
of Care, have proven to be beneficial and effective in the treatment of individuals with
transsexualism or gender dysphoria. Gender affirming/confirming surgery, also known as
sex reassignment surgery, plays an undisputed role in contributing toward favorable
outcomes. Treatment includes legal name and sex or gender change on identity

---

[3] Coleman E, Bockting W, Botzer M, et al. 2012.

[4] Definition from Blue Cross Blue Shield Settlement (Section 7.16(a)) available at
www.hmosettlements.com

documents, as well as medically necessary hormone treatment, counseling, psychotherapy, and other medical procedures required to effectively treat an individual's gender dysphoria. Neither genital appearance nor reconstruction is required for social gender recognition, and so no surgery should be a prerequisite for identity document or record changes; changes to documentation so that identity documents reflect the individual's current lived expression and experience are crucial aids to social functioning, and can be a necessary component of the social transition and/or pre-surgical process. Delay of document changes may have a deleterious impact on a patient's social integration and personal safety.

In addition to hormonal balancing, medically necessary gender affirming/confirming surgical procedures are described in section XI of the SOC. These procedures include complete hysterectomy, bilateral mastectomy, chest reconstruction or augmentation as appropriate to each patient, including nipple resizing or placement of breast prostheses, as necessary; genital reconstruction by various techniques which must be appropriate to each patient, including, for example, skin flap hair removal, scrotoplasty, and penile and testicular prostheses, as necessary; facial hair removal, certain facial plastic reconstruction, voice therapy and/or surgery, and gender affirming counseling or psychotherapeutic treatment, as appropriate to the patient.

> "Non-genital surgical procedures are routinely performed… notably, subcutaneous mastectomy in female-to-male transsexuals, and facial feminization surgery, and/or breast augmentation in male-to-female transsexuals. These surgical interventions are often of greater practical significance in the patient's daily life than reconstruction of the genitals."[5]

It is important to understand that every patient will not have a medical need for identical procedures. Clinically appropriate treatments must be determined on an individualized and contextual basis, in consultation with the patient's medical providers.

The medical procedures attendant to gender affirming/confirming surgeries are not "cosmetic" or "elective" or "for the mere convenience of the patient." These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition.[6] In some cases, such surgery is the **only** effective treatment for the condition, and for some people genital surgery is essential and life-saving.

These medical procedures and treatment protocols are not experimental: Decades of both clinical experience and medical research show they are essential to achieving well-being for the transsexual patient. For example, a recent study of female-to-male transsexuals

---

[5] Monstrey S, De Cuypere G, Ettner R (eds). (2007).

[6] Victoria L. Davidson v. Aetna Insurance. (1979). Judicial finding that "…the treatment and surgery…is of a medical nature and is feasible and required for the health and well-being of the patient."

found significantly improved quality of life following cross-gender hormonal therapy.[7] Moreover, those who had also undergone chest reconstruction had significantly higher scores for general health, social functioning, as well as mental health.[8]

> "[Hormone therapy and surgical] SRS [sex reassignment surgery] is an effective treatment for transsexualism and the only treatment that has been evaluated empirically with large clinical case series."[9]

Available routinely in the United States and in many other countries, these treatments are cost effective rather than cost prohibitive. In the United States, numerous large employers (e.g., City and County of San Francisco, University of California, Emory University, University of Michigan, IBM, Johnson & Johnson, Bank of America, Apple, and hundreds more[10]) have negotiated contracts with their insurance carriers to enable medically necessary treatment for transsexualism and/or GD to be provided to covered individuals. As more carriers realize the validity and effectiveness of treatment (Aetna, Cigna, United Healthcare, and many others now have medical guidelines for transgender care), coverage is being offered, often at very low or no additional premium cost.[11] More than 15 states currently have regulations in place prohibiting insurance carriers from offering policies that contain exclusions restricting transgender people from accessing needed healthcare.[12] Further, in a decision rendered 30 May 2014, the US Department of Health and Human Services Departmental Appeals Board found that "transsexual surgery" should not be considered experimental or dangerous as it has been proven to be an effective treatment for gender dysphoria when properly diagnosed and administered, lifting a longstanding Medicare program ban on this treatment.[13] More recently, in June, 2016, the Department of Defense lifted its ban on transgender military service, and will offer medically necessary hormone and surgical therapies for transgender active duty and reserve servicemen and women.[14]

---

[7] Keo-Meier C L, et al. (2014).

[8] Newfield E, et al. (2006).

[9] Gijs L & Brewaeys A. (2007).

[10] See the latest Corporate Equality Index, maintained by the Human Rights Campaign Workplace Project at www.hrc.org for the list of companies that have scored 100% in current and past years (since 2002).

[11] Herman JL. (2013).

[12] See http://www.transequality.org/blog/pennsylvania-makes-17-states-dc-banning-trans-health-exclusions-hawaii-likely-next-0 for further information.

[13] www.hhs.gov/dab/decisions/dabdecisions/dab2576.pdf; last accessed 11-03-2016.

[14] Department of Defense Instruction (DoDI) 1300.28, "In-Service Transition for Transgender Service Members," June 30, 2016, and Directive-Type Memorandum (DTM) 16-005, "Military Service of Transgender Service Members," June 30, 2016.

"Professionals who provide services to patients with gender conditions understand the necessity of SRS, and concur that it is reconstructive, and as such should be reimbursed, as would any other medically necessary treatment."[15]

Professional associations that have issued statements in support of the WPATH Standards of Care include the American Medical Association, the Endocrine Society, the American Psychiatric Association, the American Psychological Association, the American Academy of Family Physicians, the National Commission of Correctional Health Care, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, the American Society of Plastic Surgeons, and the World Health Organization.

The WPATH Board of Directors urges health insurance carriers and healthcare providers in the United States to eliminate transgender or transsexual exclusions from their policy documents and medical guidelines, and to provide coverage for transgender patients; also to include in their policy documents and medical guidelines the medically prescribed sex reassignment or gender affirming/confirming services necessary for subscribers' treatment and well-being; and to ensure that ongoing healthcare, both routine and specialized, is readily accessible and affordable to all their subscribers on an equal basis.

---

[15] Monstrey S, De Cuypere G, Ettner R (eds). (2007).

137 *WPATH AF 738*

This position statement constitutes the professional and clinical opinions of the signers below, comprising all members of the WPATH Board of Directors and Executive Officers as of this date, 21 December 2016.

Gail Knudson, M.D. (Canada) President
Vin Tangpricha, M.D., Ph.D. (USA) President Elect
Jamison Green, Ph.D., M.F.A. (USA) Past President
Walter Pierre Bouman, M.D. (UK) Treasurer
Randi Ettner, Ph.D. (USA) Secretary
Tamara Adrian, J.D. (Venezuela)
Luke Allen M.A. (USA) Student Representative
Griet DeCuypere, M.D., Ph.D. (Belgium) EPATH Representative
Tone Maria Hansen (Norway)
Dan Karasic, M.D. (USA)
Baudewijntje Kreukels, Ph.D. (Netherlands)
Katherine Rachlin, Ph.D. (USA)
Loren Schechter, M.D. (USA)
Sam Winter, Ph.D. (Australia)

**References:**

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders (DSM-5).* Washington, DC:author.

Coleman E, Bockting W, Botzer M, Cohen-Kettenis, P, et al. (2012). Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, 7th Version. *International Journal of Transgenderism*, 11(1), 1-7.

Ettner R. and Guillamon A. (2016). Theories of the Etiology of Transgender Identity. In Ettner R et al. (eds.) *Principles of Transgender Medicine and Surgery: Second Edition.* New York: Haworth Press; pp3-15.

Ettner R, Monstrey S, Eyler A (eds.). (2007). *Principles of Transgender Medicine and Surgery.* New York: Haworth Press.

Ettner R, Monstrey S, Coleman E (eds.). (2016). *Principles of Transgender Medicine and Surgery: Second Edition.* New York: Haworth Press.

Fraser L and De Cuypere G. (2016). Psychotherapy with Transgender People. In Ettner R et al (eds.) *Principles of Transgender Medicine and Surgery.* New York: Haworth Press; pp120-136.

Gijs L and Brewaeys A. (2007). Surgical Treatment of Gender Dysphoria in Adults and Adolescence: Recent Developments, Effectiveness, and Challenges, Annual Review of Sex Research, 18:1, 178-224. doi:10.1037/a0037599

Herman JL. (2013). Costs and Benefits of Providing Transition-related Health Care Coverage in Employee Health B3enefit Plans: Findings from a Survey of Employers. The Williams Institute, UCLA School of Law. Available at http://williamsinstitute.law.ucla.edu/category/research/transgender-issues/page/2/; last accessed 11-03-2016.

Keo-Meier C L, et al. (2014). Testosterone Treatment and MMPI-2 Improvement in Transgender Men: A Prospective Controlled Study. Journal of Consulting and Clinical Psychology 2015, Vol. 83, No. 1, 143-156.

Monstrey S, De Cuypere G, Ettner R. (2007). Surgery: General Principles. In Ettner R et al (eds.) *Principles of Transgender Medicine and Surgery.* New York: Haworth Press; pp89-104.

Newfield E, Hart, S, Dibble S, Kohler L. (2006). Female-to-male transgender quality of life. *Quality of Life Research,* 15(9): 1447-57; November, 2006.

Schor, EL (ed.). (1999). *Caring for your school age child: Ages 5-12.* [American Academy of Pediatrics] New York: Bantam Books.

Victoria L. Davidson v. Aetna Life & Casualty Insurance Co. 101 Misc.2d 1, 420 N.Y.S. 2d 450 (Sup. Ct., 1979).

EX. H



**U.S. Department of Justice**
Federal Bureau of Prisons

CHANGE NOTICE
OPI:        RSD/WSP
NUMBER:   5200.04 CN-1
DATE:       May 11, 2018

# Transgender Offender Manual

*Approved*: Mark S. Inch
Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following change to Program Statement 5200.04, **Transgender Offender Manual**, dated January 18, 2017.  The purpose of the Change Notice is to ensure that the Transgender Executive Council (TEC) considers issues related to prison management and security in determining appropriate housing of transgender inmates, including risks posed to staff, other inmates, and members of the public.  The clarifications to policy will establish appropriate expectations for the inmate population concerning designations.

The changes are marked with a highlight and inserted into the policy.  Deleted text is struck through.  In addition, the branch name has been changed from Female Offender Branch to Women and Special Populations Branch.

## 1.  PURPOSE AND SCOPE

To ensure the Bureau of Prisons (Bureau) properly identifies, tracks, and provides services to the transgender population, consistent with maintaining security and good order in Federal prisons.

## 4.  STAFF TRAINING

The **Women and Special Populations Branch** will be responsible for developing training materials and current information on the management of transgender inmates.  Training will include information concerning best practices for maintaining the safety of transgender inmates, while also ensuring security and good order in Federal prisons and the safety of staff, inmates, and the public. This information will be made available to staff on the Women and Special Populations Branch Sallyport page.

## 5. INITIAL DESIGNATIONS

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing patterns, and physical layouts (e.g., types of showers available). ~~The TEC will recommend housing by gender identity when appropriate.~~

In deciding the facility assignment for a transgender or intersex inmate, the TEC should make the following assessments on a case-by-case basis:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.;
- The TEC will consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 7. HOUSING AND PROGRAMMING ASSIGNMENTS

In order for an inmate to be considered for transfer to another institution of the same sex as the inmate's current facility ~~location, including a facility housing individuals of the inmate's identified gender~~, the Warden should consult with the TEC prior to submitting a designation request to the DSCC, but this is not required.

In addition, the Warden may make a recommendation to the TEC to transfer a transgender or intersex inmate based on an inmate's identified gender.

In considering such recommendations, the TEC will apply all criteria of Section 5, above, and make the following assessments concerning the recommendation:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, re-designation to another facility of the same sex, etc.;
- The TEC will also consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, program participation, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 9. HORMONE AND NECESSARY MEDICAL TREATMENT

Hormone or other necessary medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff. Medical staff should request consultation from Psychology Services regarding the mental health benefits of hormone or other necessary medical treatment. If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement **Patient Care** and relevant clinical guidance. Questions concerning hormone treatment may be referred to the TCCT.



**U.S. Department of Justice**
Federal Bureau of Prisons

PROGRAM STATEMENT
OPI:        RSD/FOB
NUMBER:  5200.04
DATE:      January 18, 2017

# Transgender Offender Manual

/s/
*Approved*: Thomas R. Kane
Acting Director, Federal Bureau of Prisons

## 1. PURPOSE AND SCOPE

To ensure the Bureau of Prisons (Bureau) properly identifies, tracks, and provides services to the transgender population, consistent with maintaining security and good order in Federal prisons.

a. **Program Objectives**.  Expected results of this program are:

- This policy is meant to provide guidance to staff in dealing with the unique issues that arise when working with transgender inmates.
- Institutions ensure transgender inmates can access programs and services that meet their needs as appropriate, and prepare them to return to the community.
- Sufficient resources will be allocated to deliver appropriate services to transgender inmates.
- Staff will be offered training, enabling them to work effectively with transgender inmates.
- To support staff's understanding of the increased risk of suicide, mental health issues and victimization of transgender inmates.

b. **Institution Supplement**.  None required.  Should local facilities make any changes outside changes required in national policy or establish any additional local procedures to implement national policy, the local Union may invoke to negotiate procedures or appropriate arrangements.

## 2. DEFINITIONS

*Gender* – a construct used to classify a person as male, female, both, or neither.  Gender encompasses aspects of social identity, psychological identity, and human behavior.

*Gender identity* – a person's sense of their own gender, which is communicated to others by their gender expression.

*Gender expression* – includes mannerisms, clothing, hair style, and choice of activities.

*Gender nonconforming* – a person whose appearance or manner does not conform to traditional societal gender expectations.

*Transgender* – the state of one's gender identity not matching one's biological sex. For the purposes of this policy, a transgender inmate is one who has met with a Bureau of Prisons psychologist and signed the form indicating consent to be identified within the agency as transgender. This step allows for accommodations to be considered.

*Cisgender* – the state of one's gender identity matching one's biological sex.

*Sexual orientation* – the direction of one's sexual interest towards members of the same, opposite, or both genders (e.g., heterosexual, homosexual, bisexual, asexual). Sexual orientation and gender identity are not related.

*Gender Dysphoria* (GD) – a mental health diagnosis currently defined by DSM-5 as, "A strong and persistent cross-gender identification. It is manifested by a stated desire to be the opposite sex and persistent discomfort with his or her biologically assigned sex." Not all transgender inmates will have a diagnosis of GD, and a diagnosis of GD is not required for an individual to be provided services.

*Intersex* – a person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical biological definitions of male or female. Not all intersex people identify as transgender; unless otherwise specified, this policy does not apply to intersex people who do not identify as transgender.

*Transition* – measures that change one's gender expression or body to better reflect a person's gender identity.

## 3. STAFF RESPONSIBILITIES

The following Bureau components are responsible for ensuring consistent establishment of the programs, services, and resource allocations necessary for transgender offenders.

145 ~~DAY~~ 0F 238

a. **Central Office**

(1) The **Women and Special Populations Branch** is the agency's primary source and point of contact on classification, management, and intervention programs and practices for transgender inmates in Bureau custody. The Branch is responsible for the following functions as they relate to transgender inmates:

- Engaging stakeholders, including serving as the primary point of contact on issues affecting transgender inmates with judges, political figures, and advocacy groups.
- Ensuring the Bureau offers appropriate services to transgender inmates.
- Preparing budgetary requests to deliver national and pilot programs or services affecting transgender inmates.
- Providing guidance and direction to Regional staff and institution leadership on transgender issues.
- Developing and implementing staff training on transgender issues.
- Building a research-based foundation for the Bureau's work with transgender inmates.
- Presenting at internal and external conferences/events regarding the agency's transgender inmates' practices.
- Developing and monitoring monthly reports on the transgender population and institutional programs.
- Issuing an annual report on the state of transgender offenders in the Bureau that will be made available to all staff and stakeholders.
- Advising agency leadership on transgender inmate needs.
- Conducting an annual survey of transgender inmates in the Bureau and sharing results with internal and external stakeholders.
- Providing national oversight of pilot programs and initiatives serving transgender offenders.

(2) The **Health Services Division** oversees all medical and psychiatric activity as it applies to transgender inmates. Guidance on the most current research-driven clinical medical and psychiatric care of transgender inmates will be provided by the Medical Director.

The Health Services Division also has oversight of a Transgender Clinical Care Team (TCCT). This team will be comprised of Physicians, Pharmacists, and Psychiatrists. Social Workers, Psychologists, and other clinical providers can also be included when appropriate. The TCCT will offer advice and guidance to health services staff on the medical treatment of transgender inmates and/or inmates with GD. Medical staff can raise issues to the TCCT through the Health Services Division.

(3) The **Psychology Services Branch** oversees all psychological mental health programs and services as they apply to transgender inmates, to include providing advice and guidance on

identification and evaluation of transgender inmates, and making recommendations for treatment needs of transgender inmates and/or inmates with GD.

(4) **Central Office Branches/Divisions** of Correctional Services, Psychology Services, Education, Correctional Programs, Reentry Affairs, Residential Reentry Management, Health Services, Health Programs, Social Work, Office of General Counsel, and Trust Fund meet annually with the Women and Special Populations Branch to discuss transgender population needs and evaluate current gender-responsive services. The National Union and the Central Office LGBT Special Emphasis Program Manager will be invited to attend these meetings.

(5) The **Transgender Executive Council (TEC)** will consist of staff members from the Health Services Division, the Women and Special Populations Branch, Psychology Services, the Correctional Programs Division, the Designation and Sentence Computation Center (DSCC), and the Office of General Counsel. The TEC will meet a minimum of quarterly to offer advice and guidance on unique measures related to treatment and management needs of transgender inmates and/or inmates with GD, including designation issues. Institution staff and DSCC staff may raise issues on specific inmates to the TEC through the Women and Special Populations Branch. The National PREA Coordinator is consulted as needed.

b. **Regional Offices**

- Provide oversight to institutions regarding services and other relevant trends managing transgender inmates.
- Assign transgender responsibilities to the Regional Female Offender/Transgender Coordinator Collateral Duty Assignment. This individual meets quarterly with the Women and Special Populations Branch to discuss staffing and programming needs.

c. **Institutions**

The institution CEO will establish a multi-disciplinary approach to the management of transgender inmates; specifically:
- Ensure transgender inmates have access to services.
- Enter tracking information for self-identified transgender inmates by updating SENTRY and other databases (e.g., PDS), as appropriate.
- Provide appropriate reentry resources that may be specific to the population.
- Advise the Local Union of transgender inmate management issues, as appropriate.

147 *of* 738

## 4.  STAFF TRAINING

Staff will be provided specialized training in working with unique issues when managing transgender inmates, with refresher training at annual training.  Institutions housing known transgender inmates should provide additional training, if needed.

The Women and Special Populations Branch will be responsible for developing training materials and current information on the management of transgender inmates.  Training will include information concerning best practices for maintaining the safety of transgender inmates, while also ensuring security and good order in Federal prisons and the safety of staff, inmates, and the public.  This information will be made available to staff on the Women and Special Populations Branch Sallyport page.

In addition, the Prison Rape Elimination Act (PREA) regulations incorporated into the BOP Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** have training requirements concerning pat searches and communication skills for transgender inmates. See 28 C.F.R. § 115.15(f) and 115.31 (a) (9).  Please refer to this Program Statement regarding implementation of those training requirements.

Staff will be provided adequate time to complete these trainings during duty hours.

## 5.  INITIAL DESIGNATIONS

The PREA regulations, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program**, state in section 28 C.F.R. § 115.42 (c):

> **"In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates...the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety, and whether the placement would present management or security problems."**

Upon receipt of information from a Pre-Sentence Report, court order, U.S. Attorney's Office, defense counsel, the offender, or other source that an individual entering BOP custody is transgender, designations staff will refer the matter to the TEC for advice and guidance on designation.

Institution staff managing pretrial or holdover offenders may also refer cases to the TEC for review.  Any TEC recommendations concerning pretrial inmates will be coordinated with the appropriate United States Marshal's Office.

144 [illegible] AF 228

The TEC will consider factors including, but not limited to, an inmate's security level, criminal and disciplinary history, current gender expression, medical and mental health needs/information, vulnerability to sexual victimization, and likelihood of perpetrating abuse. The TEC may also consider facility-specific factors, including inmate populations, staffing patterns, and physical layouts (e.g., types of showers available). ~~The TEC will recommend housing by gender identity when appropriate.~~

In deciding the facility assignment for a transgender or intersex inmate, the TEC should make the following assessments on a case-by-case basis:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, etc.;
- The TEC will consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress towards transition as demonstrated by medical and mental health history.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 6. INTAKE SCREENING

The PREA regulations in 28 C.F.R. part 115, Subpart A, incorporated into the Program Statement **Sexually Abusive Behavior Prevention and Intervention Program** and the Program Statement **Intake Screening**, address intake screening. Screening of transgender inmates will be conducted in accordance with these policies and all other applicable policies and procedures.

## 7. HOUSING AND PROGRAMMING ASSIGNMENTS

During Initial classification and Program Reviews, Unit Management staff will twice-yearly review the inmate(s) current housing unit status and programming available for transgender inmates; this review will be documented by Unit Management.

The reviews will consider on a case-by-case basis that the inmate placement does not jeopardize the inmate's health and safety and does not present management or security concerns.

In making housing unit and programming assignments, a transgender or intersex inmate's own views with respect to his/her own safety must be given serious consideration.

Transgender inmates shall be given the opportunity to shower separate from other inmates.

The agency shall not place transgender or intersex inmates in dedicated facilities, units, or wings solely on the basis of such identification or status, unless such placement is in a dedicated facility, unit, or wing established in connection with a consent decree , legal settlement, or legal judgment for the purpose of protecting such inmates.

In order for an inmate to be considered for transfer to another institution of the same sex as the inmate's current facility location, including a facility housing individuals of the inmate's identified gender, the Warden should consult with the TEC prior to submitting a designation request to the DSCC, but this is not required.

In addition, the Warden may make a recommendation to the TEC to transfer a transgender or intersex inmate based on an inmate's identified gender.

In considering such recommendations, the TEC will apply all criteria of Section 5, above, and make the following assessments concerning the recommendation:

- The TEC will use biological sex as the initial determination for designation;
- The TEC will consider the health and safety of the transgender inmate, exploring appropriate options available to assist with mitigating risk to the transgender offender, to include but not limited to cell and/or unit assignments, application of management variables, programming missions of the facility, re-designation to another facility of the same sex, etc.;
- The TEC will also consider factors specific to the transgender inmate, such as behavioral history, overall demeanor, program participation, and likely interactions with other inmates; and
- The TEC will consider whether placement would threaten the management and security of the institution and/or pose a risk to other inmates in the institution (e.g., considering inmates with histories of trauma, privacy concerns, etc.).

The designation to a facility of the inmate's identified gender would be appropriate only in rare cases after consideration of all of the above factors and where there has been significant progress

150 ~~109~~ oF 238

towards transition as demonstrated by medical and mental health history, as well as positive institution adjustments.

It will be noted in SENTRY designation notes that the TEC reviewed the inmate for appropriate institution designation.

## 8. DOCUMENTATION AND SENTRY ASSIGNMENTS

a. **Medical and Mental Health Information**. Medical and mental health information for transgender inmates will be maintained in the current electronic recordkeeping system in accordance with the Program Statement **Health Information Management**. Medical and mental health information is considered confidential, and may only be released in accordance with appropriate laws, rules, and regulations.

b. **Initial Screening**. For initial designations, designations staff will assign Case Management Activity (CMA) SENTRY assignments if information in the PSR or other documentation indicates a likely transgender identity. The screening codes will be:

> SCRN M2F – inmate should be screened for male to female.
> SCRN F2M – inmate should be screened for female to male.

Any inmate arriving at the designated institution with a screening code is to be referred to the Chief Psychologist or designee for review within 14 days. If the code was assigned in error, the screening code will be removed by the psychologist. If the inmate identifies as transgender, the psychologist will replace the screening code with an identifying code, as indicated below. Holdover facilities will be exempt from this initial screening requirement, as limited available records and brevity of stay do not allow for a comprehensive screening.

Any inmate who arrives without a screening code but identifies as transgender during intake, or at any time during the incarceration period, is referred to the Chief Psychologist or designee and interviewed within 14 days of the inmate notification. Inmates in pretrial status at Bureau facilities may also receive a SENTRY code.

c. **Notification to Staff and Tracking**. After consultation with Psychology Services, and if the inmate affirms his/her transgender identity, the screening code will be updated to a permanent assignment by a psychologist:

> TRN M2F – inmate is male to female transgender (transgender female).
> TRN F2M – inmate is a female to male transgender (transgender male).


151   <del>illeg</del> OF 238

The inmate must request to Psychology Services staff that the CMA assignment be entered, and the inmate consents that all staff will therefore be notified that the individual is transgender. The inmate's request will be documented on BP-A1110, Case Management Activity (CMA) SENTRY Assignment Consent Form for Transgender Inmates (included as Attachment A to this policy). Psychology Services will maintain the form in the electronic mental health record and forward a copy of the form to the Unit Team. The Unit Team will maintain the form in the FOI Exempt section of the Central File.

Staff should consult the CMA assignment when interacting with the inmate; e.g., use of pronouns, searches, commissary items, etc., as indicated below.

If there are questions about the need to continue a CMA assignment, the Warden should contact the Women and Special Populations Branch. Should the CMA assignment change, staff members will not be disciplined for the continued provision of accommodations or use of pronouns.

## 9. HORMONE AND NECESSARY MEDICAL TREATMENT

Hormone or other necessary medical treatment may be provided after an individualized assessment of the requested inmate by institution medical staff. Medical staff should request consultation from Psychology Services regarding the mental health benefits of hormone or other necessary medical treatment. If appropriate for the inmate, hormone treatment will be provided in accordance with the Program Statement **Patient Care** and relevant clinical guidance. Questions concerning hormone treatment may be referred to the TCCT.

In the event this treatment changes the inmate's appearance to the extent a new identification card is needed, the inmate will not be charged for the identification card.

## 10. INSTITUTION PSYCHOLOGY SERVICES

Bureau psychologists are available to provide assessment and treatment services for transgender inmates, if appropriate. Guidance on assessment procedures will be provided by the Psychology Services Branch.

If an inmate identifies as transgender, the psychologist will provide the inmate with information regarding the range of treatment options available in the Bureau and their implications. In addition, based upon the psychologist's preliminary assessment and the inmate's expressed interest, a referral to the Clinical Director and/or Chief Psychiatrist may be generated. While the initial interview must be scheduled within 14 days, an assessment may take longer in some instances.

P5200.04  1/18/2017



In addition to a referral to medical services, a transgender inmate may be offered individual psychotherapy. Individual psychotherapy goals might include: (1) helping the inmate to live more comfortably within a gender identity and deal effectively with non-gender issues; (2) emphasizing the need to set realistic life goals related to daily living, work, and relationships, including family of origin; (3) seeking to define and address issues that may have undermined a stable lifestyle, such as substance abuse and/or criminality; and (4) addressing any co-occurring mental health issues. Mood disorders, anxiety disorders, substance use disorders, and personality disorders, etc., may also be present; any effective treatment plan will fully address these symptoms.

If an institution has multiple transgender inmates, a support group facilitated by a mental health provider may also be a component of the treatment plan. Common concerns of transgender inmates, which may be addressed effectively in a group setting, include self-esteem issues and relationship issues.

Psychologists who provide mental health treatment for transgender inmates address all mental health needs, including suicide risk, if present.

Psychologists working with transgender inmates are encouraged to consult the Reentry Services Division in Central Office for additional resources.

## 11. PRONOUNS AND NAMES

Staff interacting with inmates who have a CMA assignment of transgender can use the authorized gender-neutral communication with inmates (e.g., by the legal last name or "Inmate" last name). Transgender inmates often prefer to be called by pronouns of their identified gender identity. Staff may choose to use these gender-specific pronouns or salutations per the inmate's request, and will not be disciplined for doing so.

An official committed name change while in BOP custody must be done consistent with the Program Statement **Correctional Systems Manual**, Chapter 4. The name entered on the inmate's Judgement and Commitment Order will remain the official committed name for all Bureau records (incident reports, progress reviews, sentence calculations, etc.). However, any additional names or aliases can be entered into SENTRY as appropriate.



## 12. PAT SEARCHES

Pat searches of transgender inmates will be conducted in accordance with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**. The policy language, included here as a reference, states:

"Transgender Inmates – For purposes of pat searching, inmates will be pat-searched in accordance with the gender of the institution, or housing assignment, in which they are assigned. Transgender inmates may request an exception. The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services. Exceptions must be specifically described (e.g., "pat search only by female staff"), clearly communicated to relevant staff through a memorandum, and reflected in SENTRY (or other Bureau database; e.g., posted picture file). Inmates should be provided a personal identifier (e.g., notation on commissary card, etc.) that indicates their individual exception, to be carried at all times and presented to staff prior to pat searches."

It is recommended the inmate request the exception by submitting an Inmate Request to Staff (BP-A0148) to the Warden. The Warden will consult with the departments listed above, and the memo approving or denying the request will be generated by the Warden's Office.

Inmates who are granted this exception under policy may have it reversed by the Warden if found to have violated institution rules concerning contraband.

In exigent circumstances, any staff member may conduct a pat search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

## 13. VISUAL SEARCHES

For purposes of a visual search, inmates will be searched in accordance with the gender of the institution, or housing assignment, to which they are assigned. The visual search shall be made in a manner designed to ensure as much privacy to the inmate as practicable. Staff should consider the physical layout of the institution, and the characteristics of an inmate with a transgender CMA assignment, to adjust conditions of the visual search as needed for the inmate's privacy.

Transgender inmates may also request an exception to be visually searched by a staff member of the inmate's identified gender. The exception must be pre-authorized by the Warden, after consultation with staff from Health Services, Psychology Services, Unit Management, and Correctional Services. Exceptions must be specifically described (e.g., "visual search only by female staff"), clearly communicated to relevant staff through a memorandum, and reflected in SENTRY (or other Bureau database; e.g., posted picture file). Inmates should be provided a



personal identifier (e.g., notation on commissary card, etc.) that indicates their individual exception, to be carried at all times and presented to staff prior to visual searches.

It is recommended the inmate request the exception by submitting an Inmate Request to Staff (BP-A0148) to the Warden. The Warden will consult with the departments listed above, and the memo approving or denying the request will be generated by the Warden's Office.

Inmates who are granted this exception under policy may have it reversed by the Warden if found to have violated institution rules concerning contraband.

Transgender inmates placed at an institution or in a housing unit that does not correspond with their identified gender, and who are granted an exemption as indicated above, will be searched by: bargaining unit staff of the inmate's identified gender who consent to participate in the search; management staff of the inmate's identified gender who consent to participate in the search; or available Health Services clinical staff.

Transgender inmates placed at an institution or in a housing unit of their identified gender will be searched by bargaining unit staff of the inmate's identified gender who consent to participate in the search; management staff of the inmate's identified gender; or available medical staff.

Institutions should consider using available body scanning technology in lieu of visual searches of transgender inmates.

In exigent circumstances, any staff member may conduct a visual search of any inmate consistent with the Program Statement **Searches of Housing Units, Inmates, and Inmate Work Areas**.

## 14. CLOTHING AND COMMISSARY ITEMS

Consistent with safety and security concerns, inmates with the CMA assignment of transgender will have the opportunity to have undergarments of their identified gender even if they are not housed with inmates of the identified gender. Institutional laundry will have available institutional undergarments that fulfill the needs of transgender inmates. Undergarments will not have metal components.

Standardized lists of Commissary items for transgender inmates are available in accordance with the Program Statement **Trust Fund/Deposit Manual**.

Additional items based on an individualized assessment of the transgender inmate may be approved by the Warden. Additional items may be provided by the institution or purchased by the inmate, as appropriate.

155 PLH of 238

Inmates who purchase and/or are provided items under this section will be subject to disciplinary sanctions, including the removal of these items, if they are found to have violated institution rules relating to the possession of these items.

## 15.  REENTRY NEEDS

In accordance with the Program Statement **Release Preparation Program**, institution staff should assist transgender inmates in addressing these issues prior to release or placement in a Residential Reentry Center/Home Confinement.

During initial classifications and Program Reviews, Unit Management will formulate a pre-release plan that will assist transgender inmates in obtaining appropriate identification, finding housing and employment, and providing community resources to reintegrate into the community.

The Reentry Affairs Coordinator may assist staff with identifying these resources.  Institution and/or Regional Social Workers should be contacted concerning the continuity of medical care.

The Women and Special Populations Branch and/or Social Workers can be contacted to provide guidance and resources for reentry needs of transgender inmates.

## 16.  ADMINISTRATIVE REMEDIES

Inmates may use the procedures of the Program Statement **Administrative Remedy Program** concerning any issues relating to this policy.

## REFERENCES

*Program Statements*
| | |
|---|---|
| P1330.18 | Administrative Remedy Program (1/6/14) |
| P4500.11 | Trust Fund/Deposit Fund Manual (4/9/15) |
| P5100.08 | Security Designation and Custody Classification Manual (9/12/06) |
| P5290.15 | Intake Screening (3/30/09) |
| P5310.12 | Psychology Services Manual (03/07/95) |
| P5310.16 | Treatment and Care of Inmates with Mental Illness (5/1/14) |
| P5322.13 | Inmate Classification and Program Review (5/16/14) |
| P5324.08 | Suicide Prevention (4/5/07) |
| P5324.12 | Sexually Abusive Behavior Prevention and Intervention Program (6/4/15) |
| P5325.07 | Release Preparation Program (12/31/07) |
| P5521.06 | Searches of Housing Units, Inmates, and Inmate Work Areas (6/4/15) |
| P5800.15 | Correctional Systems Manual (9/23/16) |

P6031.04      Patient Care (6/3/14)
P6090.04      Health Information Management (3/2/15)

*Federal Regulations*
28 CFR part 115

*Additional Resources For Clinicians*
Diagnostic and Statistical Manual of Mental Disorders (DSM), most current version.
World Professional Association for Transgender Health (WPATH) standards.

*BOP Forms*
BP-A0148      Inmate Request to Staff
BP-A1110      Case Management Activity (CMA) SENTRY Assignment Consent Form for
              Transgender Inmates

*ACA Standards (see Program Statement, **Directives Management Manual**, sections 2.5 and 10.3)*

- American Correctional Association Standards for Adult Correctional Institutions, 4th Edition: 4-4056M, 4-4084M, 4-4084.1M, 4-4133M, 4-4180M, 4-4194M, 4-4278M, 4-4281.1M, 4-4281.2M, 4-4281.3M, 4-4281.4M, 4-4281.5M, 4-4281.6M, 4-4281.7M, 4-4281.8M, 4-4362M, 4-4371M, 4-4406M.
- American Correctional Association Performance Based Standards for Adult Local Detention Facilities, 4th Edition:  4-ALDF-2A-29, 4-ALDF-2A-32, 4-ALDF-2A-34, 4-ALDF-6B-03, 4-ALDF-2C-03, 4-ALDF-4C-22M, 4-ALDF-4C-30M, 4-ALDF-4D-22, 4-ALDF-4D-22-1, 4-ALDF-4D-22-2, 4-ALDF-4D-22-3, 4-ALDF-4D-22-4, 4-ALDF-4D-22-5, 4-ALDF-4D-22-6M, 4-ALDF-4D-22-7, 4-ALDF-4D-22-8, 4-ALDF-7B-08, 4-ALDF-7B-10, 4-ALDF-7B-10-1.
- American Correctional Association Standards for Administration of Correctional Agencies, 2nd Edition:  None.
- American Correctional Association Standards for Correctional Training Academies:  None.

*Records Retention*
Requirements and retention guidance for records and information applicable to this program are available in the Records and Information Disposition Schedule (RIDS) on Sallyport.

157 Page of 238

**Attachment A.    Case Management Activity (CMA) SENTRY Assignment
Consent Form for Transgender Inmates (BP-A1110)**

I agree that Bureau of Prisons staff may enter a CMA assignment on SENTRY concerning my gender identity.

I understand that this CMA assignment will identify me as transgender to all staff members.

I understand that the purpose of the CMA assignment is to assist staff members in providing programs and taking measures as described in the Program Statement **Transgender Offender Manual**.

I understand that specific medical and mental health information will not be disclosed to all staff using the CMA assignment; specific medical and mental health information is maintained separately.

Inmate Name:

Register Number:

Signature:

Date:



**Department of Corrections**
WASHINGTON STATE

PATIENT I.D. DATA: SANTIAGO, DATO
(Name, DOC#, DOB)

## Consent for Hormone Treatment for Gender Dysphoria and/or Transgender Identification

| DATE | FACILITY |
|---|---|
| 10/12/18 | SCCC |

<u>Please initial that you understand and agree to each line item.</u>

1. *a.R* I have participated in this process along with my mental health and medical providers.

2. *a.R* I agree that my questions and concerns have been adequately addressed and I understand the information provided.

3. *a.R* I have been given the opportunity to discuss the effects, risks, and possible adverse reactions of the use of hormones.

4. *a.R* I understand that individual patients respond differently to hormone treatment and it is not possible to predict exactly what effects treatment will have.

5. *a.R* I understand that effects of hormone treatment will occur gradually over months and years.

6. *a.R* I understand that some effects of hormonal treatment may not be completely reversible even if the hormonal treatment is discontinued.

7. *a.R* I understand that I can reduce risk of harmful effects of hormone treatment by not smoking, avoiding alcohol and illegal drug use, maintaining a healthy weight, and getting regular exercise.

8. *a.R* I understand that I can reduce the risk of harmful effects of hormonal treatment by working with my healthcare providers to manage my medical and mental health conditions and engage in evidence-based preventive health practices.

9. *a.R* I understand that I may choose to stop taking hormonal treatment at any time but that this should be done in consultation with my healthcare providers. I also understand that my prescribing provider can discontinue treatment for medical reasons.

10. *a.R* I agree to take hormonal treatment under the monitoring and guidance of a licensed DOC prescriber in accord with the DOC Evaluation and Management of Hormonal Treatment of Gender Dysphoria/Transgender Identification Protocol.

**For Male to Female Treatment:**

1. *a.R* I understand that these effects of hormonal treatment might occur:
   a. Breast enlargement
   b. Redistribution of body fat in a more typically female pattern
   c. Decreased upper body strength
   d. Softening of skin, decreased body hair, slowing of loss of hair from scalp
   e. Decreased testicular size
   f. Decreased libido and erections

2. *a.R* I understand that estrogen treatment increases risk of harmful blood clots and may increase risk of heart disease or stroke.

3. *a.R* I understand that after several years of estrogen treatment risk of breast cancer will be closer to that of genetic women and preventive measures recommended for women will be recommended for me.

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

P-2755 000074

159 of 238



PATIENT I.D. DATA:     SANTIAGO, HASCO

(Name, DOC#, DOB)     895177  09-02-00

## Consent for Hormone Treatment for Gender Dysphoria and/or Transgender Identification

| DATE | FACILITY |
|------|----------|
| 10/12/18 | SCCC |

4. _a. R_   I understand that estrogen treatment can aggravate migraine headache.

5. _a. R_   I understand that estrogen treatment may increase risk of liver disease, diabetes or depression.

6. _a. R_   I understand that estrogen treatment may have other harmful effects that are not possible to predict in individual cases.

**For Female to Male Treatment:**

1. _____   I understand that these effects of hormonal treatment might occur:
   a. Deepening of the voice
   b. Increased oiliness of the skin and acne
   c. Clitoral enlargement
   d. Shrinkage of the breasts
   e. Increased facial and body hair
   f. Male pattern balding
   g. Increased upper body strength
   h. Decreased hip fat
   i. Increased libido

2. _____   I understand that fertility might be diminished, possibly irreversibly; however fertility might also be maintained.

3. _____   I understand that testosterone treatment may increase risk of harmful blood clots and may increase risk of high blood pressure, heart disease, or stroke.

4. _____   I understand that testosterone treatment may cause worsening of breast or uterine cancer.

5. _____   I understand that testosterone treatment may increase risk of liver disease or diabetes.

6. _____   I understand that testosterone treatment may increase risk of depression or hostility and aggressive behavior.

7. _____   I understand that testosterone treatment may have other harmful effects that are not possible to predict in individual cases.

_Ashlee M_____ Raelynn_
PATIENT SIGNATURE

_____     S. LIGHT, PA-C
NAME STAMP AND SIGNATURE OF PRACTITIONER RECEIVING CONSENT

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-581 BACK (00/05/2017)                                    LEGAL

P-2755  000075

160 _of_ 238

Interpath I-Web Batch Report

Page 11 of 13



*STILL < 30 ng/dL
WRN MONITOR
AS ESTROGEN IS
STARTED. PER
ENDOCRINE REC.*

**INTERPATH LABORATORY**

(800) 700-6891
BEND (541) 385-1837
BOISE (208) 375-2350
PENDLETON (541) 278-4730
SEATTLE (206) 623-3814

**S. LIGHT, PA-C**
10-24-18

| Patient Name: **SANTIAGO, MARCO** | Accession: 10-47901 | Client: STAFFORD CREEK CORRECTIONS |
|---|---|---|
| DOB: Sep 2, 1986  32y  M | Request: AAT0827 | Collected: Oct 17, 2018 N/G |
| Dr: LIGHT | ID: 896177 | Accessioned: Oct 17, 2018 15:25 PST |
| Mail stop: I-WEB | SSN: | Completed: Oct 18, 2018 05:35 PST |
| | | Hrs Fast: N/G |

**THIS IS A COMPLETED REPORT**

---COMPREHENSIVE METABOLIC PANEL---

SANTIAGO, MARCO  10-47901

| TEST | VALUE | REF. RANGE | UNITS | LC | TEST | VALUE | REF. RANGE | UNITS | LC |
|---|---|---|---|---|---|---|---|---|---|
| SODIUM | 140 | 132-143 | meq/L | AA | CARBON DIOXIDE | 26 | 19-31 | meq/L | AA |
| POTASSIUM | 4.4 | 3.6-5.1 | meq/L | AA | ANION GAP | 13.4 | 7-21 | | AA |
| CHLORIDE | 105 | 95-112 | meq/L | AA | | | | | |
| GLUCOSE | 81 | 70-100 | mg/dL | AA | GFR ESTIMATION | 76 | | ml/min | AA |
| UREA NITROGEN | 12 | 6-23 | mg/dL | AA | BUN/CREAT.RATIO | 10.7 | 6.0-28.6 | | AA |
| CREATININE, SERUM | 1.12 | 0.60-1.35 | mg/dL | AA | CALCIUM | 9.8 | 8.5-10.3 | mg/dL | AA |
| AST(SGOT) | 35 | 13-39 | U/L | AA | PROTEIN | 6.9 | 6.0-8.3 | g/dL | AA |
| ALT(SGPT) | 30 | 7-52 | U/L | AA | ALBUMIN | 4.3 | 3.5-5.0 | g/dl | AA |
| ALKALINE PHOS | 51 | 31-120 | U/L | AA | GLOBULIN | 2.6 | 1.8-3.5 | g/dl | AA |
| BILIRUBIN, TOTAL | 1.1 | 0.0-1.2 | mg/dL | AA | A/G RATIO | 1.7 | 1.1-2.4 | | AA |

ESTIMATED GFR Reference Range:
GFR = Less than 60: Chronic Kidney Disease, if found over a 3 month period.
GFR = Less than 15: Kidney Failure.
For African Americans, multiply the calculated GFR by 1.21.
GFR calculation is not valid for patients under age 18 years.
For patients over age 70 please interpret results with caution as results have not been
validated for this calculation method

Please Note:Total Protein Reference range change as of 5/21/2018.
Please Note: Calcium reference range change as of 7/19/2018.

---PROLACTIN---

SANTIAGO, MARCO  10-47901

| TEST | VALUE | REF. RANGE | UNITS | LC | TEST | VALUE | REF. RANGE | UNITS | LC |
|---|---|---|---|---|---|---|---|---|---|
| PROLACTIN | 26.87 H | 4.04-15.2 | ng/mL | AA | | | | | |

Biotin in specimens taken from patients on high-dose biotin therapy or supplements may
intefere with this test and cause inaccurate test results. It is recommended that for
patients receiving therapy with high biotin doses (> 5 mg/day), no laboratory test
specimen should be collected until at least 8 hours after the last biotin administration.

---TESTOSTERONE---

SANTIAGO, MARCO  10-47901

| TEST | VALUE | REF. RANGE | UNITS | LC | TEST | VALUE | REF. RANGE | UNITS | LC |
|---|---|---|---|---|---|---|---|---|---|
| TESTOSTERONE | 808.0 | 249-836 | ng/dl | AA | | | | | |

Biotin in specimens taken from patients on high-dose biotin therapy or supplements may
intefere with this test and cause inaccurate test results. It is recommended that for
patients receiving therapy with high biotin doses (> 5 mg/day), no laboratory test
specimen should be collected until at least 8 hours after the last biotin administration.

---ESTRADIOL---

SANTIAGO, MARCO  10-47901

| TEST | VALUE | REF. RANGE | UNITS | LC | TEST | VALUE | REF. RANGE | UNITS | LC |
|---|---|---|---|---|---|---|---|---|---|
| ESTRADIOL | 27.83 | 27.1-52.2 | pg/ml | AA | | | | | |

FEMALE REFERENCE RANGES
26.7-156        Follicular phase
48.1-314        Ovulation phase
33.1-298        Luteal phase
<25-49.9        Postmenopause
154-3065        1st trimester pregnancy
1561-18950      2nd trimester pregnancy
10030->30000    3rd trimester pregnancy

Please note Reference Range updated as of 03/06/2017.

Biotin in specimens taken from patients on high-dose biotin therapy or supplements may
intefere with this test and cause inaccurate test results. It is recommended that for
patients receiving therapy with high biotin doses (> 5 mg/day), no laboratory test
specimen should be collected until at least 8 hours after the last biotin administration.



# Gender Dysphoria Protocol and GD-CRC

## INFORMATION

The DOC has elected to authorize treatment of patients having verified Gender Dysphoria (GD) and/or Transgender (TG) identification with hormones and spironolactone, when clinically indicated. Other treatment is provided when medically necessary. This protocol describes the process to manage GD diagnosis assignment and/or confirmation of TG identification, the steps for obtaining authorization to treat these conditions, and the function of GD Care Review Committee (CRC).

## PROCEDURE
### Requests for CRC review

GD CRC review may be requested by any current DOC provider assigned to the case. The case shall be presented to GD CRC by, at a minimum, the treating psychiatrist, primary therapist and medical provider.

**All GD and TG cases require CRC review to initiate or authorize on-going hormone treatment:**

- Prescribers may continue outside source verified hormone therapy and, if relevant, spironolactone treatment for up to 60 days without CRC review.
    - o The Chief of Psychiatry and the Facility Medical Director shall be notified by the prescriber of the continuation of outside treatment, essential case details, and the proposed treatment plan within 30 days of continuation hormone treatment in the DOC.
    - o GD CRC will be convened within 60 days from start of treatment to review the case.
        - At the discretion of the Chief Medical Officer or Chief of Psychiatry, continuation of the hormone treatment may be approved for an additional 90 days if more time is needed to prepare the case for GD CRC presentation.
- GD CRC will determine whether continuing, resuming, or initiating hormonal therapy is clinically indicated based upon the following:
    - o Treatment is a component of an established sexual reassignment regimen under the supervision of a medical doctor **OR**
    - o Treatment is recommended by the DOC treating psychiatrist or primary therapist
    - o **AND** the majority of voting members of the GD CRC agree that such treatment is clinically indicated
    - o **AND** the offender voluntarily completes  DOC 13-035 Authorization for Disclosure of Health Information to permit review of records documenting treatment outside of DOC
    - o **AND** there are no contraindications to treatment
    - o **AND** the patient is ready for and understands the likely effects of treatment
    - o **AND** the patient consents to treatment.

**Other forms of treatment**

- Other GD-specific treatments require GD CRC approval using the OHP medical necessity criteria.  These include:
  - Individual or group therapy with DOC clinicians to explore and manage issues related to sexual identity, establishing treatment readiness, or coping with the effects of treatment
  - Gender confirmation surgery
    - Patients must have at least 2 years remaining in the sentence (based on ERD or PRD).
    - Patients must have been on clinician-ordered hormone therapy for at least one year.
    - If GD-CRC recommends consideration for gender confirmation surgery, review by an outside expert consultant is required before authorizing surgery.
      - Once the consultation is complete, GD-CRC will reconvene to make a decision based on all the information available, including the consultant's report and evaluation of readiness for gender confirmation surgery.

**Gender Dysphoria CRC**

Decisions of the GD CRC are made by majority vote.

**Voting Members**
- Chief of Psychiatry/designee
- Mental Health Director/designee
- Chief Medical Officer/designee

**Non-voting Members**
- Treating correctional providers and/or clinical consultants
- Consulting community endocrinologist, psychiatrist or other specialist (as necessary)

**Function**
- Review the patient's case to determine whether a GD diagnosis or finding that the patient is TG is warranted.
- Authorize any clinically indicated hormonal or other pharmacological treatment for GD or TG (see the Evaluation and Management of Hormonal Treatment of Gender Dysphoria Protocol)
- Authorize any other medically necessary treatment for GD
- Function as a forum for discussion of questions regarding GD diagnosis, TG verification, or treatment concerns

**Diagnosis of GD**
- Shall be based on DSM-5 criteria
- Must be assigned and/or approved by GD CRC

2

163 of 238

**Finding of TG**
- Shall be based on recognized and published standards or approaches, which may include reference to DSM-5 criteria for Gender Dysphoria absent criterion B (dysphoria)
- Must be assigned and/or approved by GD CRC

**Treatment authorizations are based on:**
- Presentations of the treating psychiatrist, primary therapist, and primary care provider addressing the following:
  - Mental health history and diagnoses, including of gender identity
  - Treatment expectations
  - Current treatment readiness
  - Complete medical evaluation (history and physical) to include evaluation of any absolute or relative contraindications to proposed hormonal or other pharmacological treatment for GD or TG
- Review of relevant mental health and medical diagnostic or treatment records
- Likely effects of the recommended treatment
- The findings of an outside consultant (when applicable)

**Treatment interventions other than gender confirmation surgery shall:**
- Address medical, mental health, and personal adjustment needs
- Be the responsibility of facility clinical staff who shall develop a treatment plan that is in accordance with the treatment interventions authorized by GD CRC

**Gender confirmation surgery:**
- Will be done at outside facilities qualified to perform the surgery
- Will be coordinated by DOC health services

**All offenders with GD and TG identification are eligible for:**
- Routine programming for which they qualify
- Psychiatric and mental health services according to the OHP
- Other DOC programming, such as the Sex Offender Treatment Program, when program criteria are met. As appropriate, gender identity issues will be addressed in the context of their sex offending behavior.

**Placement:**
Housing assignments will be in accordance with prison policies.



PATIENT I.D. DATA: **SANTIAGO, MARCO**
(Name, DOC#, DOB)  **896177     09/02/1986**

### Department of
## Corrections
WASHINGTON STATE

**PRIMARY ENCOUNTER REPORT**

| DATE | TIME | FACILITY |
|------|------|----------|
| 04/03/2018 | 14:45 | SCCC |

**Subjective Complaint/Objective Findings/Assessment/Evaluation:**

GD (Gender Dysphoria) CRC was held 3/26/18. GD-CRC members: Bruce Gage, MD; Bart Abplanalp, PhD; Sara Kariko, MD.
Presenters: Maureen Alyea, Psych Assoc; Beth Zeiger, PhD; Michael Furst, MD; Ryan Herrington, MD

Santiago had a chaotic childhood. Mother was not in the picture and father was abusive. Santiago was in foster care from 4-12 years of age. Santiago also has a history of problem behavior dating to an early age, was placed in a juvenile facility at 13, and has been incarcerated for most of adulthood. Santiago also reported being in Rhyther from 9-12 (a group home for mental illness and substance abuse).

Santiago reported feeling like a girl from a young age, though it is not clear when or how this manifested as Santiago tended to be vague and to provide limited information and varying reports. Santiago did report dressing in female underwear while in foster care. Santiago reported being considered "gay" in juvenile detention and being bullied and after coming out to father at 19, was reportedly expelled from the home, though at other times reported leaving by choice. Santiago reported limited dressing as a female in the community and pursuing no treatment, in part due to limited time living in the community. Jail records do not demonstrate any gender-related issues.

Santiago has also given varied reports about schooling, sometime reporting being in special education. Reports regarding history of self-harm have also been conflicting. Santiago did make a superficial cut to the scrotum, reportedly considering autocastration and requiring three sutures, in January of this year.

Santiago also has two recent infractions for strong-arming/intimidating and a history of fighting with custody. Santiago does not present as overtly feminine.

In addition to the preceding, Santiago demonstrates other evidence of Cluster B personality, including general issues with identity, volatility (other offenders report being concerned about Santiago's anger problems), significant substance abuse, vague complaints of auditory hallucinations (unlikely to be true hallucinations), and excessive frustration about processes, including the process of evaluation for TG/GD treatment. This has confused the clinical picture and made assessment of both of TG/GD and readiness for treatment challenging. Santiago has reportedly benefitted from treatment with mirtazapine and escitalopram (which continue) and there is no known history of diversion.

There are no medical contraindications to hormone therapy.

**Diagnosis/Plan/Rx:** (Diagnosis required for medication orders. Allergies required for new medication orders.)
GD-CRC thinks it is possible that Santiago meets criteria for GD, but it is not possible to confirm this at this time. Were this confirmed, there remain questions regarding readiness, including marginal participation with providers, identity concerns generally, and emotional instability. The GD-CRC recommends personality testing (consider PAI or MMPI and projective testing to help clarify the diagnosis and determine readiness).

☐ Risks/benefits of recommended intervention explained; patient consents.

| Name and Title of Employee/Contract Staff Performing Encounter: Bruce Gage, MD for GD-CRC | Signature: |
|---|---|

Page 1 of 1

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 320.255   DOC 410.430   DOC 420.250   DOC 420.255   DOC 420.312   DOC 490.850
DOC 610.010   DOC 610.025   DOC 610.040   DOC 610.600   DOC 610.650   DOC 670.020

DOC 13-435FP (01/23/2017)                    OUTPATIENT/MENTAL HEALTH:Progress Notes

Ex. L

1
2

DISTRICT JUDGE RONALD B. LEIGHTON
MAGISTRATE JUDGE J. RICHARD CREATURA

3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

9

MARCO SANTIAGO,

NO. 3:18-CV-05825-RBL-JRC

10

Plaintiff,

11

v.

12

WASHINGTON DOC, et al.,

13

Defendants.

14

PLAINTIFF'S FIRST SET OF
REQUEST FOR ADMISSIONS TO
BRUCE GAGE PURSUANT TO CR
36

AND DEFENDANT GAGE'S
ANSWERS AND OBJECTIONS
THERETO

15
16

**GENERAL OBJECTIONS**

17

The Defendant neither agrees nor stipulates to the Plaintiff's definitions or procedure.

18

The request for admission will be answered and supplemented in accordance with Civil Rules

19

26 and 36.  Without waiving such objections, answers are provided as set forth below.

20

1.)      Bruce Gage, do you <u>admit</u> that at the time of the Plaintiff's presentation to the

21

Gender Dysphoria Care review commitee in April of 2018, that niether the Offender Health

22

Plan or the DOC Gender Dysphoria protocol recommended personality or projective testing or

23

varification via family contacts as necessary in the diagnoses of Gender Dysphoria or in the

24

approval of hormone treatment?

25
26

PLAINTIFF'S FIRST SET OF REQUEST FOR
ADMISSIONS TO BRUCE GAGE PURSUANT
TO CR 36 AND DEFENDANT GAGE'S
ANSWERS AND OBJECTIONS THERETO
NO. 3:18-CV-05825-RBL-JRC

1

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

1    **OBJECTION:** This request is beyond the scope of discovery under Fed. R. Civ. P.

2    126(b)(1) as it seeks information that is not relevant to any party's claim or defense. These

3    sources do not set the constitutional standard for treatment.

4    **ANSWER:** Without waiving the above objection: Admit Qualified. Defendant Gage

5    admits that the OHP and the document entitled "Gender Dysphoria Protocol and GD-CRC"

6    were both silent on personality and projective testing with regard to Gender Dysphoria. These

7    tools are commonly used to clarify diagnoses generally. These sources do not set the

8    constitutional standard for treatment.

9    2.) Bruce Gage, do you admit that at the time of the plaintiff's presentation to the

10    Gender Dysphoria care review commitee in April of 2018 that niether WPATH Standards of

11    care, Federal Bureau of Prison Guidelines and UCSF Guidelines suggest or recommend

12    personality or projective testing or varification via family contacts as a required or necessary

13    part of a Gender Dysphoria Diagnoses or for the approval of hormone treatment?

14    **OBJECTION:** This request is beyond the scope of discovery under Fed. R. Civ. P.

15    126(b)(1) as it seeks information that is not relevant to any party's claim or defense. These

16    sources do not set the constitutional standard for treatment.

17    **ANSWER:** Without waiving the above objection, Admit Qualified. Defendant Gage

18    admits that the GD-CRC uses the WA DOC document "Gender Dysphoria Protocol and GD-

19    CRC" along with DOC policies. At that time, the Offender Health Plan made decisions

20    regarding authorization of care.

21    3.) Bruce Gage, do you <u>admit</u> that you were aware of the plaintiff's attempt to

22    castrate herself on Jan. 5, 2018 when you postponed your decision to approve her for medical

23    treatment of Gender Sysphoria?

24    **OBJECTION:** This request assumes facts which Defendant Gage does not concede.

25

26

PLAINTIFF'S FIRST SET OF REQUEST FOR
ADMISSIONS TO BRUCE GAGE PURSUANT
TO CR 36 AND DEFENDANT GAGE'S
ANSWERS AND OBJECTIONS THERETO
NO. 3:18-CV-05825-RBL-JRC

2

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

167 (167) OF 238

1   **ANSWER:** Without waiving the above objection, Deny Qualified. Dr. Gage did not

2   postpone any decision to approve plaintiff's treatment. The GD-CRC determined in April

3   2018 that more information was needed before authorizing hormone treatment.

4   4.) Bruce Gage, do you <u>admit</u> that Rachael Seevers, Attorney with Disability

5   Rights Washington, notified you on Monday, April, 02, 2018 at 3:43 pm via email that the

6   plaintiff had kited mental health and medical repeatedly, explaining the anxiety that the Gender

7   Dysphoria care review commitee's delay was causing to the plaintiff?

8   **OBJECTION:** This request is compound as it seeks multiple admissions to multiple

9   factual statements.

10   **ANSWER:** Without waiving the above objection, Admit Qualified. Dr. Gage admits

11   that Ms. Seevers sent an email after the GD-CRC review and decision that Dr. Gage

12   memorialized on 4/3/18, which was the same day Dr. Gage received the email from Ms.

13   Seevers.

14   5.) Bruce Gage, do you admit that between Jan. 1. 2018 and Jan. 1. 2019 you were

15   not aware of any documentation or medical doctrine that suggested personality or projective

16   testing or varification via family contacts in the diagnoses of Gender Dysphoria or in the

17   approval of hormone treatment?

18   **OBJECTION:** This request is compound as it seeks multiple admissions to multiple

19   factual statements. Further this request is ambiguous as the terms "documentation" and

20   "medical doctrine" are not defined and could have many meanings.

21   **ANSWER:** Without waiving the above objection, Deny Qualified. Psychological

22   testing and family history may be relevant and useful in the diagnosis and differential diagnosis

23   of any mental health condition.

24   6.) Bruce Gage, do you <u>admit</u> that on or prior to the Plaintiff's presentation to the

25   Gender Dysphoria care review commitee in April of 2018 that you were aware that the plaintiff

26   had recieved a diagnoses of Gender Dysphoria by Michael Furst?

PLAINTIFF'S FIRST SET OF REQUEST FOR
ADMISSIONS TO BRUCE GAGE PURSUANT
TO CR 36 AND DEFENDANT GAGE'S
ANSWERS AND OBJECTIONS THERETO
NO. 3:18-CV-05825-RBL-JRC      3      ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

166 of 238

1    **OBJECTION:**  This request is ambiguous as the terms "diagnosis" is not defined and

2    could have a different meaning for Defendant than it has for Plaintiff.

3    **ANSWER:** Without waiving the above objection, Admit Qualified.  Dr. Gage admits

4    that he was aware that Gender Dysphoria was included as an "Initial diagnostic impression"

5    on 8/9/17.

6    7.)    Bruce Gage, do you <u>admit</u> that at no time did you have any knowledge that the

7    plaintiff's primary mental health providers stated that the plaintiff was showing minimal

8    participation in her care?

9    **OBJECTION:**  This request is ambiguous as the phrase "minimal participation" is not

10   defined and could have many different meanings.

11   **ANSWER:** Without waiving the above objection, Deny Qualified. Plaintiff was noted

12   to have walked out of a session with a psychiatrist and to have given varying reports and was

13   considered an unreliable historian and the record showed evidence of past malingering for

14   secondary gain.

15   8.)    Bruce Gage, do you <u>admit</u> that you were aware of the plaintiff's excessive risk

16   of self harm at the time of her presentation to the Gender Dysphoria Care Review Commitee

17   in April of 2018?

18   **OBJECTION:**  This request is ambiguous as the phrases "excessive risk" and "self

19   harm" are not defined and could have many different meanings.

20   **ANSWER:** Without waiving the above objection, Deny Qualified. Information from

21   providers did not include that plaintiff was at excessive risk of self-harm but did include

22   plaintiff's statement that plaintiff would never try auto-castration again.

23   9.)    Bruce Gage, do you <u>admit</u> that on or before the plaintiff's presentation to the

24   Gender Dysphoria care review commitee in April of 2018 that you had little or no formal

25   training working with transgender inmates or civilians?

26

PLAINTIFF'S FIRST SET OF REQUEST FOR
ADMISSIONS TO BRUCE GAGE PURSUANT
TO CR 36 AND DEFENDANT GAGE'S
ANSWERS AND OBJECTIONS THERETO
NO. 3:18-CV-05825-RBL-JRC

4

ATTORNEY GENERAL OF WASHINGTON
Corrections Division
PO Box 40116
Olympia, WA 98504-0116
(360) 586-1445

169 ~~238~~ OF 238

1      **OBJECTION:**  This request is compound in that it uses the phrase "little or no" so it

2  asks for two separate admissions. This request is ambiguous as the phrases ""little or no" and

3  "formal are not defined and could have many different meanings.

4      **ANSWER:**  Without waiving the above objection, Deny Qualified. Dr. Gage has

5  attended several conference presentations on Gender Dysphoria that included the diagnosis of

6  and management of Gender Dysphoria He has read numerous articles on the diagnosis and

7  management of Gender Dysphoria, and he has treated patients with Gender Dysphoria.

8      10.)    Bruce Gage, do you <u>admit</u> that on or prior to the plaintiff's presentation to the

9  Gender Dysphoria care review commitee you were aware that the plaintiff was hospitalized

10  for a panic attack caused by anxiety over not being able to receive help for her Gender

11  Dysphoria?

12      **ANSWER:** Deny.

13      11.)    Bruce Gage, do you <u>admit</u> that on or prior to the Plaintiff's presentation to the

14  Gender Dysphoria care review committee, that the plaintiff suffered from a serious medical

15  need which presents an objectively substantial risk of harm?

16      **OBJECTION:**  This request calls for a legal conclusion as the phrase "serious medical

17  need" is a legal term of art.  This request is also ambiguous in that the phrase "serious medical

18  need which presents an objectively substantial risk of harm" is not defined and could have

19  many meanings.

20      12.)    Bruce Gage, do you <u>admit</u> that you did either recklessly or intentionally ignore

21  the Plaintiff's serious medical need by postponing to approve medical treatment in her case in

22  lieu of information you knew was not necessary to your decision?

23      **OBJECTION:**  This request calls for a legal conclusion as the phrases "recklessly"

24  and "intentionally" are legal terms of art. This request is also ambiguous as it is unclear that

25  Plaintiff means by "in lieu of" in this context.

26

PLAINTIFF'S FIRST SET OF REQUEST FOR        5        ATTORNEY GENERAL OF WASHINGTON
ADMISSIONS TO BRUCE GAGE PURSUANT                   Corrections Division
TO CR 36 AND DEFENDANT GAGE'S                     PO Box 40116
ANSWERS AND OBJECTIONS THERETO                  Olympia, WA 98504-0116
NO. 3:18-CV-05825-RBL-JRC                          (360) 586-1445

170 ~~PAGE~~ OF 238

1        13.)   Bruce Gage, do you <u>admit</u> that you are aware that Gender Dysphoria is

2 considered a serious medical need to treat?

3        **OBJECTION:** This request calls for a legal conclusion as the phrase "serious medical

4 need" is a legal term of art.

5

6    RESPECTFULLY SUBMITTED this 30^th^ day of April, 2019.

7                  ROBERT W. FERGUSON

8                  Attorney General

9

10                 AARON M. WILLIAMS, WSBA #46044

10                 Assistant Attorney General

11                 Corrections Division

11                 PO Box 40116

12                 Olympia WA  98504-0116

12                 360-586-1445

13                 AaronW@atg.wa.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S FIRST SET OF REQUEST FOR       6       ATTORNEY GENERAL OF WASHINGTON
ADMISSIONS TO BRUCE GAGE PURSUANT              Corrections Division
TO CR 36 AND DEFENDANT GAGE'S                  PO Box 40116
ANSWERS AND OBJECTIONS THERETO             Olympia, WA 98504-0116
NO. 3:18-CV-05825-RBL-JRC                      (360) 586-1445

171 180 OF 238

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on the date below, I served a copy of PLAINTIFF'S FIRST SET OF

3

REQUEST FOR ADMISSIONS TO BRUCE GAGE PURSUANT TO CR 36 AND

4

DEFENDANT GAGE'S ANSWERS AND OBJECTIONS THERETO on all parties or their

5

counsel of record as follows:

6

7    X       U.S. Mail, Postage Prepaid
             Hand Delivered by:  _____

8

9    MARCO SANTIAGO  DOC #896177
     STAFFORD CREEK CORRECTIONS CENTER
     191 CONSTANTINE WAY

10   ABERDEEN WA  98520

11

12       I declare under penalty of perjury under the laws of the United States of America that the

13   foregoing is true and correct.

14       EXECUTED this 30th day of April, 2019, at Olympia, Washington.

15

16                                  KELLI J. MCKINNEY
                                    Paralegal 2

17                                  Corrections Division
                                    1116 West Riverside Avenue, Suite 100

18                                  Spokane, WA 99201-1106
                                    (509) 456-3123

19                                  kellim@atg.wa.gov

20

21

22

23

24

25

26

PLAINTIFF'S FIRST SET OF REQUEST FOR          7          ATTORNEY GENERAL OF WASHINGTON
ADMISSIONS TO BRUCE GAGE PURSUANT                              Corrections Division
TO CR 36 AND DEFENDANT GAGE'S                                     PO Box 40116
ANSWERS AND OBJECTIONS THERETO                             Olympia, WA 98504-0116
NO. 3:18-CV-05825-RBL-JRC                                       (360) 586-1445

172 (seal) OF 238

EX. M

## Danny Waxwing

| | |
|---|---|
| **From:** | Rachael Seevers |
| **Sent:** | Wednesday, November 21, 2018 11:40 AM |
| **To:** | Danny Waxwing |
| **Subject:** | FW: Inmate awaiting GD CRC review |

Email for Ashley

**From:** Rachael Seevers
**Sent:** Thursday, May 10, 2018 4:20 PM
**To:** 'Danny Waxwing' <danny.waxwing@gmail.com>; Heather McKimmie <heatherm@dr-wa.org>
**Subject:** FW: Inmate awaiting GD CRC review

**From:** Gage, Bruce C. (DOC) [mailto:bcgage@DOC1.WA.GOV]
**Sent:** Thursday, May 10, 2018 4:19 PM
**To:** Rachael Seevers <Rachaels@dr-wa.org>
**Subject:** RE: Inmate awaiting GD CRC review

As with all CRC's, we are obligated to look at the case from a clinical perspective.  This includes assuring that treatment is both indicated and likely to do more good than harm which, for instance, necessitates ruling out other disorders, such as those mentioned in DSM-5.

I would not have said that the standards of care in this arena are well-developed overall.  When hormone therapy is to be provided, the medical guidelines for monitoring are fairly well developed.  We consider WPATH as one source of information to consider but must also look at cases from biological and developmental perspectives as well.

The CRC concluded that we did not have a complete enough picture to conclude that treatment was both indicated and likely to do more good than harm.

Bruce C. Gage, M.D.
Chief of Psychiatry
Washington State Department of Corrections

Confidentiality Note: This e-mail and its attachments are intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail and its attachments or the information therein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail and its attachments in error, please advise the sender at (360) 725-8693 or by e-mail at bcgage@doc1.wa.gov and destroy the original message and all copies.



**From:** Rachael Seevers [mailto:Rachaels@dr-wa.org]
**Sent:** Friday, April 27, 2018 11:13 AM

172 DOC AE 738

**To:** Gage, Bruce C. (DOC) <bcgage@DOC1.WA.GOV>
**Subject:** RE: Inmate awaiting GD CRC review

Dr. Gage,

I have reviewed the documentation in Ashley's case, including her recent CRC materials, and it appears that she was diagnosed with Gender Dysphoria by Psych Associate Alyea exactly one year ago today. Dr. Furst issued a GD diagnosis in August 2017 and Ashley was notified via kite that she was on the GD CRC list as of 8/23/17. Based on the March 2018 CRC documentation, it appears that the CRC is questioning that GD diagnosis and her need for hormone therapy even though Ashely has been consistently diagnosed with GD by her DOC providers and appears to meet the WPATH standards for hormone treatment. As I recall, at the last DRW/ DOC quarterly meeting you indicated that the standards of care for transgender related medical care are relatively well established. I looked back over DOC's GD Protocol and the DSM-V and Ashley appears to meet the GD criteria for care and I did not see personality testing or family verification mentioned as part of the DOC's diagnostic assessment process. DRW also conducted a review of some of the various standards on this issue, including WPATH Standards, USCF Guidelines, even BOP guidelines, and none of them appear to mention projective or personality testing or verification via family contacts for a GD diagnosis and hormone treatment. If there is other literature or standards that DOC is looking at on this issue, or some kind of revised protocol, can you please forward it so we have the most current information DOC is looking to in these cases?

Thanks,

Rachael Seevers
AVID Program Attorney
Amplifying Voices of Inmates with Disabilities
*Pronouns: she/her/hers*

Disability Rights Washington
315 5th Avenue S, Suite 850 | Seattle, WA 98104

voice: 206.324.1521 or 800.562.2702 | fax: 206.957.0729
www.disabilityrightswa.org | www.rootedinrights.org| www.donatetodrw.org

Disability Rights Washington (DRW) is a private non-profit organization that protects the rights of people with disabilities statewide. Our mission is to advance the dignity, equality, and self-determination of people with disabilities. We work to pursue justice on matters related to human and legal rights.

The contents of this message and any attachment(s) may contain confidential or privileged information. Any disclosure, copying, distribution, or unauthorized use of the contents of this message is prohibited and doing so may destroy the confidential nature of the communication.  If you have received this message by mistake, please do not review, disclose, copy, or distribute the email.  Instead, please notify us immediately by replying to this message or phoning us.

Additionally, people sending email to DRW have a reasonable expectation of privacy. However, DRW does not use encryption, and all email coming to DRW is routed through a third party internet service provider (ISP) before it reaches DRW.   Although it is unlikely that an ISP will intercept and review a message, it is a possibility, especially if a message is incorrectly addressed and "bounced back" to the sender.

**From:** Gage, Bruce C. (DOC) [mailto:bcgage@DOC1.WA.GOV]
**Sent:** Tuesday, April 3, 2018 1:29 PM
**To:** Rachael Seevers <Rachaels@dr-wa.org>
**Subject:** RE: Inmate awaiting GD CRC review

Not sure when the next will be held.


Bruce C. Gage, M.D.
Chief of Psychiatry
Washington State Department of Corrections

Confidentiality Note: This e-mail and its attachments are intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail and its attachments or the information therein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail and its attachments in error, please advise the sender at (360) 725-8693 or by e-mail at bcgage@doc1.wa.gov and destroy the original message and all copies.



**From:** Rachael Seevers [mailto:Rachaels@dr-wa.org]
**Sent:** Tuesday, April 03, 2018 1:20 PM
**To:** Gage, Bruce C. (DOC) <bcgage@DOC1.WA.GOV>
**Subject:** RE: Inmate awaiting GD CRC review

It sounds like our document review in Ashley's case was conducted before the most recent CRC evaluation so it may make sense for us to request those most recent records to get a better understanding of what the CRC's specific concerns are here. I will plan to circle back to you, and perhaps the local provider, if we review those documents and have additional questions.


**From:** Gage, Bruce C. (DOC) [mailto:bcgage@DOC1.WA.GOV]
**Sent:** Tuesday, April 3, 2018 9:31 AM
**To:** Rachael Seevers <Rachaels@dr-wa.org>
**Subject:** RE: Inmate awaiting GD CRC review

It isn't that we don't do outside contacts – it is on a case-by-case basis, of course subject to appropriate ROI. The testing decision will be up to the local mental health team but the committee recommended both standard personality testing and consideration of projective testing.


Bruce C. Gage, M.D.
Chief of Psychiatry
Washington State Department of Corrections

Confidentiality Note: This e-mail and its attachments are intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail and its attachments or the information therein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you

3



have received this e-mail and its attachments in error, please advise the sender at (360) 725-8693 or by e-mail at
bcgage@doc1.wa.gov and destroy the original message and all copies.



**From:** Rachael Seevers [mailto:Rachaels@dr-wa.org]
**Sent:** Tuesday, April 03, 2018 9:13 AM
**To:** Gage, Bruce C. (DOC) <bcgage@DOC1.WA.GOV>
**Subject:** RE: Inmate awaiting GD CRC review

Dr. Gage,

Thank you for your quick response. I am relieved to hear she was presented to the CRC. By outside contacts, do you
mean family references? Based on our meeting last week it was my understanding that was not something staff were
requesting. Additionally, do you have any insight into what personality test is being conducted?

Thanks,

**Rachael Seevers**
*Pronouns: she/her/hers*
Staff Attorney

Disability Rights Washington, AVID Prison Project
315 5th Avenue S, Suite 850 | Seattle, WA 98104

voice: 206.324.1521 or 800.562.2702 | fax: 206.957.0729
www.disabilityrightswa.org | www.disabilityrightsgalaxy.com | donate to DRW

Disability Rights Washington (DRW) is a private non-profit organization that protects the rights of people with disabilities
statewide. Our mission is to advance the dignity, equality, and self-determination of people with disabilities. We work to
pursue justice on matters related to human and legal rights.

The contents of this message and any attachment(s) may contain confidential or privileged information. Any disclosure,
copying, distribution, or unauthorized use of the contents of this message is prohibited and doing so may destroy the
confidential nature of the communication.  If you have received this message by mistake, please do not review, disclose,
copy, or distribute the email.  Instead, please notify us immediately by replying to this message or phoning us.

Additionally, people sending email to DRW have a reasonable expectation of privacy. However, DRW does not use
encryption, and all email coming to DRW is routed through a third party internet service provider (ISP) before it reaches
DRW.  Although it is unlikely that an ISP will intercept and review a message, it is a possibility, especially if a message is
incorrectly addressed and "bounced back" to the sender.

**From:** Gage, Bruce C. (DOC) [mailto:bcgage@DOC1.WA.GOV]
**Sent:** Tuesday, April 3, 2018 9:05 AM

**To:** Rachael Seevers <Rachaels@dr-wa.org>
**Subject:** RE: Inmate awaiting GD CRC review

GD-CRC reviewed Santiago last week.  We are asking for further information, which may well include outside contacts.

Bruce C. Gage, M.D.
Chief of Psychiatry
Washington State Department of Corrections

Confidentiality Note: This e-mail and its attachments are intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail and its attachments or the information therein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail and its attachments in error, please advise the sender at (360) 725-8693 or by e-mail at bcgage@doc1.wa.gov and destroy the original message and all copies.



**From:** Rachael Seevers [mailto:Rachaels@dr-wa.org]
**Sent:** Monday, April 02, 2018 3:43 PM
**To:** Gage, Bruce C. (DOC) <bcgage@DOC1.WA.GOV>
**Subject:** Inmate awaiting GD CRC review

Dr. Gage,

DRW has been working with Ashley Santiago, DOC 896177, an inmate at Stafford Creek who has been waiting for a review by the GD CRC for hormones since August 2017. Based on a review of her records, it appears that she was diagnosed with Gender Dysphoria in January 2017 by her primary mental health provider and that a diagnosis and referral to the GD CRC was made by Dr. Furst in August 2017.  Despite her referral eight months ago, records indicate that her case still has not been presented to the CRC. In that time she has kited mental health and medical repeatedly, explaining the anxiety that this extended delay is causing, and asking about the status of her review. She has been told that she is on the list for CRC review but never seems to actually be presented.

I spoke with her today and she indicated that she was not reviewed by the CRC again, and that her provider mentioned wanting to do a personality test of some kind before presenting her case. It is not clear to me what personality test would be relevant to the CRC's determination on this and I did not see mention of personality testing in any of the current DOC guidance on this process. Do you have any insight into this extended delay in CRC review and what kind of additional testing is being considered here?

Additionally, Ashley reported that her provider has asked her for the names of family members that may serve as references and that she provided a release of information and contact for a family member to staff. At last week's DRW/DOC meeting it was my understanding that people seeking CRC review are not asked to provide such references so I wanted to circle back with you on this as well. I have attached her ROI for your reference.

Thank you,

**Rachael Seevers**
*Pronouns: she/her/hers*

Attorney

Disability Rights Washington, AVID Project
315 5th Avenue S, Suite 850 | Seattle, WA 98104

voice: 206.324.1521 or 800.562.2702 | fax: 206.957.0729
www.disabilityrightswa.org | www.disabilityrightsgalaxy.com | donate to DRW

Disability Rights Washington (DRW) is a private non-profit organization that protects the rights of people with disabilities statewide. Our mission is to advance the dignity, equality, and self-determination of people with disabilities. We work to pursue justice on matters related to human and legal rights.

The contents of this message and any attachment(s) may contain confidential or privileged information. Any disclosure, copying, distribution, or unauthorized use of the contents of this message is prohibited and doing so may destroy the confidential nature of the communication.  If you have received this message by mistake, please do not review, disclose, copy, or distribute the email.  Instead, please notify us immediately by replying to this message or phoning us.

Additionally, people sending email to DRW have a reasonable expectation of privacy. However, DRW does not use encryption, and all email coming to DRW is routed through a third party internet service provider (ISP) before it reaches DRW.   Although it is unlikely that an ISP will intercept and review a message, it is a possibility, especially if a message is incorrectly addressed and "bounced back" to the sender.

The Washington Department of Corrections is increasing the security level for email messages containing confidential or restricted data. A new Secure Email Portal is being implemented. Outbound email messages from DOC staff that contain confidential or restricted data will be routed to the portal. A notification of the secured message will be delivered to the recipient.

Click on the following web link for more information. http://doc.wa.gov/information/secure-email.htm

The Washington Department of Corrections is increasing the security level for email messages containing confidential or restricted data. A new Secure Email Portal is being implemented. Outbound email messages from DOC staff that contain confidential or restricted data will be routed to the portal. A notification of the secured message will be delivered to the recipient.

Click on the following web link for more information. http://doc.wa.gov/information/secure-email.htm

The Washington Department of Corrections is increasing the security level for email messages containing confidential or restricted data. A new Secure Email Portal is being implemented. Outbound email messages from DOC staff that contain confidential or restricted data will be routed to the portal. A notification of the secured message will be delivered to the recipient.

Click on the following web link for more information. http://doc.wa.gov/information/secure-email.htm

The Washington Department of Corrections is increasing the security level for email messages containing confidential or restricted data. A new Secure Email Portal is being implemented. Outbound email messages from DOC staff that contain confidential or restricted data will be routed to the portal. A notification of the secured message will be delivered to the recipient.

Click on the following web link for more information. http://doc.wa.gov/information/secure-email.htm

**Danny Waxwing**

| | |
|---|---|
| From: | Rachael Seevers |
| Sent: | Wednesday, November 21, 2018 11:44 AM |
| To: | Danny Waxwing |
| Subject: | FW: Medical care for transgender prisoners in WADOC |

More email for Ashley

**From:** Rachael Seevers
**Sent:** Thursday, July 5, 2018 3:02 PM
**To:** 'Danny Waxwing' <danny.waxwing@gmail.com>; Heather McKimmie <heatherm@dr-wa.org>
**Subject:** FW: Medical care for transgender prisoners in WADOC

I believe that Ashley is going before the CRC within a couple weeks. I proposed that if she is denied because of the personality testing, or if additional testing is requested again, we ty and retain Karasic to consult on her particular case and get a really short record review and report. If she is approved we could look to him on a more systemic question (and maybe include the SCC in that because they are considering this now too) and we would be able to hold off a bit until Danny is with us.

**From:** Karasic, Dan [mailto:Dan.Karasic@ucsf.edu]
**Sent:** Thursday, July 5, 2018 1:26 PM
**To:** Rachael Seevers <Rachaels@dr-wa.org>
**Subject:** Re: Medical care for transgender prisoners in WADOC

I am extremely busy but I'm interested in this. Please let me know parameters of what you are seeking. I'm doing some consultation with a state forensic hospital in California that is starting to offer surgery.
Best,
Dan

Sent from my iPhone

On Jul 5, 2018, at 1:04 PM, Rachael Seevers <Rachaels@dr-wa.org> wrote:

> Thank you- it's incredibly helpful to have that confirmed. Do you have any interest or availability for a limited consult around this issue?
>
> We are looking at one specific individual right now but that inquiry is part of a larger investigation in the state prisons and we are interested in retaining a consulting expert to assist us as we move forward, either in just the individual issue or on the more systemic case, or both.
>
> Best,
>
> Rachael Seevers
> AVID Program Attorney
> Amplifying Voices of Inmates with Disabilities
> *Pronouns: she/her/hers*
>
> Disability Rights Washington

1

179 ~~188~~ of 238

315 5th Avenue S, Suite 850 | Seattle, WA 98104

voice: 206.324.1521 or 800.562.2702 | fax: 206.957.0729
www.disabilityrightswa.org | www.rootedinrights.org | www.donatetodrw.org

Disability Rights Washington (DRW) is a private non-profit organization that protects the rights of people with disabilities statewide. Our mission is to advance the dignity, equality, and self-determination of people with disabilities. We work to pursue justice on matters related to human and legal rights.

The contents of this message and any attachment(s) may contain confidential or privileged information. Any disclosure, copying, distribution, or unauthorized use of the contents of this message is prohibited and doing so may destroy the confidential nature of the communication. If you have received this message by mistake, please do not review, disclose, copy, or distribute the email. Instead, please notify us immediately by replying to this message or phoning us.

Additionally, people sending email to DRW have a reasonable expectation of privacy. However, DRW does not use encryption, and all email coming to DRW is routed through a third party internet service provider (ISP) before it reaches DRW. Although it is unlikely that an ISP will intercept and review a message, it is a possibility, especially if a message is incorrectly addressed and "bounced back" to the sender.

**From:** Karasic, Dan [mailto:Dan.Karasic@ucsf.edu]
**Sent:** Sunday, June 24, 2018 11:51 PM
**To:** Rachael Seevers <Rachaels@dr-wa.org>
**Subject:** Re: Medical care for transgender prisoners in WADOC

Neither personality testing nor projective testing have any place in the evaluation of people for hormones.

Sent from my iPhone

On Jun 22, 2018, at 1:11 PM, Rachael Seevers <Rachaels@dr-wa.org> wrote:

Dr. Karasic,

I am just following up on the email below to see if this is something that you have any interest in consulting on.

Thanks,

Rachael Seevers
AVID Program Attorney
Amplifying Voices of Inmates with Disabilities
*Pronouns: she/her/hers*

Disability Rights Washington
315 5th Avenue S, Suite 850 | Seattle, WA 98104

voice: 206.324.1521 or 800.562.2702 | fax: 206.957.0729
www.disabilityrightswa.org | www.rootedinrights.org | www.donatetodrw.org

ISM XXXX or 72C

Disability Rights Washington (DRW) is a private non-profit organization that protects the rights of people with disabilities statewide. Our mission is to advance the dignity, equality, and self-determination of people with disabilities. We work to pursue justice on matters related to human and legal rights.

The contents of this message and any attachment(s) may contain confidential or privileged information. Any disclosure, copying, distribution, or unauthorized use of the contents of this message is prohibited and doing so may destroy the confidential nature of the communication. If you have received this message by mistake, please do not review, disclose, copy, or distribute the email. Instead, please notify us immediately by replying to this message or phoning us.

Additionally, people sending email to DRW have a reasonable expectation of privacy. However, DRW does not use encryption, and all email coming to DRW is routed through a third party internet service provider (ISP) before it reaches DRW. Although it is unlikely that an ISP will intercept and review a message, it is a possibility, especially if a message is incorrectly addressed and "bounced back" to the sender.

**From:** Rachael Seevers
**Sent:** Tuesday, June 12, 2018 2:06 PM
**To:** 'Karasic, Dan' <Dan.Karasic@ucsf.edu>
**Subject:** RE: Medical care for transgender prisoners in WADOC

Dr. Karasic,

Thank you for your quick response. It is not clear what the actual concern is in this case. We have reviewed the mental health records for this particular constituent and they have a diagnosis of gender dysphoria dating back to May 2017, which was confirmed by a DOC psychiatrist in August 2017. Their mental health providers have recommended hormone therapy and they have been cleared by medical. However, when the case was submitted to the Care Review Committee (CRC) for approval, the Committee questioned the gender dysphoria diagnosis and requested "standard personality testing and consideration of projective testing." The person has also been asked to provide family members' contact numbers for collateral interviews, though I do not know if those have actually been followed up on by the facility.

When I asked a committee member what standards they were using to guide their requests/ review, they mentioned the WPATH standards but also stated that they "must also look at cases from biological and developmental perspectives as well. The CRC concluded that we did not have a complete enough picture to conclude that treatment was both indicated and likely to do more good than harm…." Based on the records in this case I am an unclear what concerns are driving these requests.

I am happy to speak with you further about this if you are interested.

Again, thank you,

Rachael Seevers
AVID Program Attorney
Amplifying Voices of Inmates with Disabilities
*Pronouns: she/her/hers*

Disability Rights Washington
315 5th Avenue S, Suite 850 | Seattle, WA 98104

voice: 206.324.1521 or 800.562.2702 | fax: 206.957.0729
www.disabilityrightswa.org | www.rootedinrights.org | www.donatetodrw.org

Disability Rights Washington (DRW) is a private non-profit organization that protects the rights of people with disabilities statewide. Our mission is to advance the dignity, equality, and self-determination of people with disabilities. We work to pursue justice on matters related to human and legal rights.

The contents of this message and any attachment(s) may contain confidential or privileged information. Any disclosure, copying, distribution, or unauthorized use of the contents of this message is prohibited and doing so may destroy the confidential nature of the communication.  If you have received this message by mistake, please do not review, disclose, copy, or distribute the email.  Instead, please notify us immediately by replying to this message or phoning us.

Additionally, people sending email to DRW have a reasonable expectation of privacy. However, DRW does not use encryption, and all email coming to DRW is routed through a third party internet service provider (ISP) before it reaches DRW.  Although it is unlikely that an ISP will intercept and review a message, it is a possibility, especially if a message is incorrectly addressed and "bounced back" to the sender.

**From:** Karasic, Dan [mailto:Dan.Karasic@ucsf.edu]
**Sent:** Tuesday, June 12, 2018 1:18 PM
**To:** Rachael Seevers <Rachaels@dr-wa.org>
**Subject:** Re: Medical care for transgender prisoners in WADOC

Why was the person denied hormones?

Dan Karasic, MD
Health Sciences Clinical Professor
Department of Psychiatry, UCSF
1001 Potrero Avenue, Suite 7M
San Francisco, CA 94110
415 206 3809
dan.karasic@ucsf.edu
Pronouns: He, him, his

---

**From:** Rachael Seevers <Rachaels@dr-wa.org>
**Sent:** Tuesday, June 12, 2018 12:05:41 PM

**To:** Karasic, Dan
**Subject:** Medical care for transgender prisoners in WADOC

Dear Dr. Karasic,

I am an attorney with Disability Rights Washington (DRW) and my work focuses on advocating on behalf of people with disabilities in Washington's prisons. Over the last year, DRW has been involved in a coalition of community organizations and legal aid organizations in Washington State working to address the needs of transgender and gender non-conforming people in our state prisons. In collaboration with the coalition, DRW has been investigating the medical care provided to transgender prisoners. We have some serious concerns regarding the DOC's current screening and approval process for various medical interventions, including hormone therapy and surgery. We are interested in discussing these issues with an expert in the field, and, in particular, reviewing the circumstances of an individual we have been working with who has been denied access to hormone therapy. In discussions within the coalition, Danni Askini, of Gender Justice League, and Karter Booher, of Ingersoll Gender Center, have spoken highly of you and your expertise. Are you available for a limited consult around these issues? If so, I would love to discuss this with you in more detail.

Thank you,

Rachael Seevers
AVID Program Attorney
Amplifying Voices of Inmates with Disabilities
*Pronouns: she/her/hers*

Disability Rights Washington
315 5th Avenue S, Suite 850 | Seattle, WA 98104

voice: 206.324.1521 or 800.562.2702 | fax: 206.957.0729
www.disabilityrightswa.org | www.rootedinrights.org| www.donatetodrw.org

Disability Rights Washington (DRW) is a private non-profit organization that protects the rights of people with disabilities statewide. Our mission is to advance the dignity, equality, and self-determination of people with disabilities. We work to pursue justice on matters related to human and legal rights.

The contents of this message and any attachment(s) may contain confidential or privileged information. Any disclosure, copying, distribution, or unauthorized use of the contents of this message is prohibited and doing so may destroy the confidential nature of the communication.  If you have received this message by mistake, please do not review, disclose, copy, or distribute the email.  Instead, please notify us immediately by replying to this message or phoning us.

123 1820 AF 728

Additionally, people sending email to DRW have a reasonable expectation of privacy. However, DRW does not use encryption, and all email coming to DRW is routed through a third party internet service provider (ISP) before it reaches DRW.   Although it is unlikely that an ISP will intercept and review a message, it is a possibility, especially if a message is incorrectly addressed and "bounced back" to the sender.

184 194 of 738

EX. N

| DATE (m/d/yy) | TIME (24-hr) | FACILITY |
|---|---|---|
| 1/30/18 | 0810 | src | CT NRDA |

☐ Risks/benefits of recommended intervention explained; patient consents

Vital Signs: BP 134/84  P 66 RL 16 T 98.4 O2 Sat 97 % Wt. 116 lbs

One Chief Complaint: (L) elbow pain

Referred to Provider today - Yes  No

Deferred to PCP for F/U - Yes  No  Provider Notified - Yes  No

Triage Nurses Name _____ (Stamp)  H. Wilson RN2

X months reports pain when moving arm

① Pt C/O (L) elbow pain x 3 m. Pt is active
and works out 2-5 days/week. Denies
Direct trauma. Denies using OTC
medications for pain, only resting
elbow. Denies distal numbness or weakness
PIC, swelling redness, lesions.

② Vitals: See above; Afebril
Gen: WNWD, NAD, A+O x3
Ext: upper extremities well developed

**PLAN / RX** (Dx required for medication orders. Allergies required for new medication orders)

and muscular. s/m∞
symmetrical. ① swelling/
effusion, lesions, redness
⊕ TTP medial/ventral
elbow - full range of
motion. ⊕ Pain with
supination against resistance
⊕ full 5/5 strength
bilat.

A/P: (L) elbow Pain
most likely d/t over
use. Ice prn, NSAIDs
prn. avoid excessive
upper body exercise
POS Tylenol given

S. Banes PA-C
S. BANES, PA-C

| DATE (m/d/yy) | TIME (24-hr) | FACILITY |
|---|---|---|
| 3/2/18 | | |

☐ Risks/benefits of recommended intervention explained; patient consents

31 yo person ē gender dysphoria here for
eval prior to CRC determination of
treatment

Denies PMH

Meds: Mirtzapine; Lexapro, Tylenol

PSH - Appy

FH - chh

Pt denies hx DVT, stroke, Liver DZ, cancer

HEENT - NC/AT, cerumen, o/p ⊖, eom,

A/P: Gender Dysphoria

CV - RRR ē m/r/g

lung - CTA

abd - soft/NT

A/P Gender Dysphoria - ✓CBC ✓CMP ✓OK ⊖ contraindications to hormone Tx

**PLAN / RX** (Dx required for medication orders. Allergies required for new medication orders)

CMP

CBC

143/81
61
14
98³
100¹.

_____ Harrington, M ___

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

Department of Corrections
Washington State

| DOC 320.255 | DOC 410.430 | DOC 420.250 | DOC 420.255 |
| DOC 420.312 | DOC 490.850 | DOC 610.010 | DOC 610.025 |
| DOC 610.040 | DOC 610.600 | DOC 610.650 | DOC 670.020 |

DOC 13-435 (01/06/2017)

*Harrington*

**Department of Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*     ***SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY***

| LAST NAME Santiago | FIRST NAME Marco (Ashley) | |
|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-112-U | DATE 8-6-18 | TIME 4:30 PM |
| JOB/PROGRAM H3 dayroom porter | JOB/PROGRAM HOURS 1400-2100 | DAYS OFF Th/Fr |

***If you feel you have an actual medical emergency, alert the staff and do not use this form.***

**TYPE OF REQUEST (check only one box per form)**

☑ MEDICAL        ☐ DENTAL        ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY     ☐ OTHER:

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, I was wondering how much longer I am going to be waiting to start my Hormone replacement Therapy as I was approved last month.

Thank you

*Ashlee Sb*
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within ____ days/weeks/months | ☑ Next available sick call | ☐ No visit required |
|---|---|---|

Prolactin level recently ordered was elevated. Looking into to this and any impact may have on your treatment

RESPONDER/signature and stamp (all copies)
R. Herrington. MD

DATE and TIME 8/7/18

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED
AUG 06 2018
SCCC HEALTH SERVICES KITES

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)     DOC 610.040     DOC 610.600     DOC 610.650     DOC 630.500     DOC 630.540



# Department of Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

**PLEASE PRINT**          ***SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY***

| LAST NAME Santiago | | FIRST NAME Marco (Ashley) | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H5-112-U | DATE 8-10-18 | TIME 12:PM |
| JOB/PROGRAM Unit Porter | JOB/PROGRAM HOURS 1400-2100 | | DAYS OFF Th/Fr |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST** (check only one box per form)

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST** (list problem or medications needing refill)

Hello. When we discussed my test results you said
everything was fine and that I had no medical issues
hindering my HRt treatment. also I have ms. bangs
primary encounter report where she also states that
there are no medical complications to hormone
treatment. So why am I not being treated when
I have been approved?

_Ashley S._
OFFENDER/SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within ___ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

You had one more lab test that we
are looking into

**RECEIVED**

AUG 10 REC'D

RESPONDER signature and stamp (all copies)   R. Herrington MD   DATE and TIME 08 13 18   SCCC HEALTH SERVICES

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**
Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (06/12/2018)          DOC 610.600, DOC 610.650    DOC 630.500    DOC 630.540          KITES

EX.O



# HEALTH SERVICES KITE

Department of
**Corrections**
WASHINGTON STATE

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Ashley | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY SCCC | UNIT/CELL H6-56W | DATE 6·13·17 | TIME 4:00 pm |
| JOB/PROGRAM Laundry other | JOB/PROGRAM HOURS M·F 6-8 Am/6-930 pm | DAYS OFF Sat. Sun |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

## TYPE OF REQUEST (check only one box per form)

☒ MEDICAL          ☐ DENTAL          ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

## REASON FOR REQUEST (list problem or medications needing refill)

I have lost alot of weight over the last 2-4 months due to
Stress over trying to recieve hormones. I am under 155 Lbs
and I was 178 Lbs. I have lost my Apetite and have lost
all desire to exercise. If This continues I am going to
need to be transfered to another State where I dont have
to go Through all This stress Just to recieve hormones. I
can't stand The pressure of D.O.C's constant Games.
I Just want help.

OFFENDER SIGNATURE

## HEALTH SERVICES RESPONSE/ENCOUNTER

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues.

| ☐ Schedule within ___ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

I will place you on the call out

| RESPONDER signature and stamp (all copies) Alyea | DATE and TIME 6/15/17 Ø830 |
|---|---|

M. ALYEA, PSYCH ASSOCIATE

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED

JUN 14 2017

SCCC HEALTH SERVICES

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (11/20/2015)          DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540

*Maureen Alyea*
EX.0



## Department of Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Marco (Ashley) | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H6-56 U | DATE 6-16-17 | TIME 4:00 pm |

| JOB/PROGRAM Laundry porter | JOB/PROGRAM HOURS M-F 6-8 Am /. 6-9 pm | DAYS OFF Sun. Mon |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST** (check only one box per form)

☐ MEDICAL    ☐ DENTAL    ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY    ☐ OTHER: _____

**REASON FOR REQUEST** (list problem or medications needing refill)

I had a panic Attack on wednesday due to The crazy amount of stress and depression brought on by The situation with medical trying to recieve hormones. My body can not handle The stress That Medical is putting me Through. They are going to make me snap.

_____ OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ___ days/weeks/months    ☐ Next available sick call    ☐ No visit required

Do you want to be seen?! Please watch the call out.

RESPONDER signature and stamp (all copies) _____ DATE and TIME _____

M. ALYEA, PSYCH ASSOCIATE

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

**RECEIVED**
JUN 16 2017
SCCC HEALTH SERVICES

Distribution: WHITE/YELLOW – Responder PINK – Offender keeps
Distribution upon completion: WHITE – Health Record, YELLOW – Return to Offender with Response

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-423 (11/20/2015)    DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540    KITES

*Maureen Alyea*
*EX J*



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*              *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Marco (Ashley) | |
|---|---|---|---|
| DOC NUMBER 90617 | FACILITY S.C.C | UNIT/CELL H-E-L-U | DATE 8-22-17 | TIME 3:00 PM |
| JOB/PROGRAM Laundry porter | JOB/PROGRAM HOURS 5-9 pm | | DAYS OFF Sat Sun |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☐ MEDICAL          ☐ DENTAL          ☑ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello I am having nightmares every night and I am still losing weight. I am very scared that I will be denied hormones. I am so stressed out. im anxious and nervous all the time. I have nightmares where I am in jail and I am not allowed womens clothing or im housed with men and im too scared to shower or change clothes. or that I cant present as female. Please help

*Ashley* _____
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ___ days/weeks/months     ☑ Next available sick call     ☐ No visit required

Have you made a decision about the medication that Doctor Furst offered? Do you want to be seen? Watch the call out.

| RESPONDER signature and stamp (all copies) M. ALYEA, PSYCH ASSOCIATE *M Alyea* | DATE and TIME 8/23/17     1340 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED

AUG 22 2017

SCCC HEALTH SERVICES
KITES

Distribution: WHITE/YELLOW – Responder, PINK – Offender keeps
Distribution upon completion: WHITE – Health Record, YELLOW – Return to Offender with Response
State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-423 (11/20/2015)          DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540

✗ Shane Evans ✗



**Department of**
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | FIRST NAME Ashley | |
|---|---|---|
| DOC NUMBER 896177 FACILITY S.C.C | UNIT/CELL H6-56-L   DATE 5-22-17 | TIME 11:00 Am |
| JOB/PROGRAM Laundry porter | JOB/PROGRAM HOURS 5-9 PM | DAYS OFF Sat Sun |

**If you feel you have an actual medical emergency, alert the staff and do not use this form.**

**TYPE OF REQUEST (check only one box per form)**

[X] MEDICAL          [ ] DENTAL          [ ] MENTAL HEALTH
[ ] MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below
[ ] OPTOMETRY          [ ] OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello SiR. I have lost a lot of weight and I am having
nightmares every night due to the fact that I am very scared
that I will not be approved for hormones. I am so anxious
and stressed. When I sleep I keep having nightmares. I am
super paranoid that I will be denied hormones. please help me.

Thank you

*Ashley* OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: Simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| [ ] Schedule within _____ days/weeks/months | [ ] Next available sick call | [ ] No visit required |
|---|---|---|

Ms. Santiago, I appreciate your concerns and be sure to
discuss with Ms. Alven. The process will progress and
please continue to work w/ providers so you have the best
opportunity to be approved! Thanks

| RESPONDER signature and institution (copies) SHANE EVANS, HSM   2 | DATE and TIME 8/30/17  1336 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-423 (11/20/2015)          DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540          KITES



**Department of**
# Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*      *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Ashley | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY SCCC | UNIT/CELL 1MO-F-N-A22 | DATE 9-23-17 | TIME 10:00 PM |
| JOB/PROGRAM | JOB/PROGRAM HOURS | | DAYS OFF |

***If you feel you have an actual medical emergency, alert the staff and do not use this form.***

**TYPE OF REQUEST (check only one box per form)**

☐ MEDICAL         ☐ DENTAL         ☑ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY      ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

I am really scared That my cellie stole some of my Things
because I am missing alot of items on the property
matrix I was given after my cell was packed up.
I am also very stressed out because I haunt heard
anything From Olympia yet about hormones. I am
reeeelly scared and Freaking out in here, why is This
happening, what do I do.

OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within _____ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

- I cannot do anything about your property.
You have not heard anything because you
have NOT Been presented to the Board yet.
- "no news is Good news!"
- If I hear anything I will contact you.
Remember to Breath!

| RESPONDER signature and stamp (all copies) M. ALYEA, PSYCH ASSOCIATE   J.Alyea | DATE and TIME 9/26/17   11 AM | (MA) 11 AM |
|---|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

RECEIVED
SEP 25 2017

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

| DOC 13-423 (11/20/2015) | DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540 | KITES |
|---|---|---|

*Shane Evans*

**Department of**
# Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*               *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Ashley | | |
|---|---|---|---|---|
| DOC NUMBER 896177 | FACILITY SCCC | UNIT/CELL MU-F-N-ACC | DATE 9-26-17 | TIME 10:00pm |
| JOB/PROGRAM | JOB/PROGRAM HOURS | | DAYS OFF | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY       ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello Sir. Have you heard anything from olympia about
My case yet about hormones. I am so anxious and
nervous. it seems to be taking a long time. Im really
scared they'll say no.

Thank you

_Ashley SB_
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ___ days/weeks/months    ☐ Next available sick call    ☐ No visit required

MS. SANTIAGO I CLICKED THE REQUEST AND IT IS SUBMITTED
AND PENDING THE COMMITTEE'S DECISION. NO ACTION YET
AND I HAVE NO SENSE OF THEIR SCHEDULE. CONTINUE TO BE
PATIENT AND IT SHOULD OCCUR SHORTLY. THANKS

| RESPONDER signature and stamp (all copies) **Shane L. Evans, HSM2** | DATE and TIME 9/29/17 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

RECEIVED
SEP 27 2017

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (11/20/2015)      DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540                   KITES

**Department of**
**Corrections**
WASHINGTON STATE

# HEALTH SERVICES KITE

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT* — **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | FIRST NAME Ashley | | |
|---|---|---|---|
| DOC NUMBER 890177 | FACILITY SCCC | UNIT/CELL FNA P | DATE 11-8-17 | TIME 6:00 PM |
| JOB/PROGRAM | JOB/PROGRAM HOURS | | DAYS OFF |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☐ MEDICAL  ☐ DENTAL  ☑ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY  ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

I am extremely stressed out and Anxious waiting
for olympias decision. I am getting into more and
more trouble and I dont know what to do. I
hate myself and I want to die. Why wont
Olympia help me.

OFFENDER SIGNATURE

## HEALTH SERVICES RESPONSE/ENCOUNTER

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ____ days/weeks/months   ☐ Next available sick call   ☐ No visit required

I know it is hard waiting. You will be
scheduled to complete an additional piece
of information needed. — Please be assured
you are not being ignored. — the process is
working, it is just slower than you would
like.

| RESPONDER signature and stamp (all copies) M. ALYEA, PSYCH ASSOCIATE | DATE and TIME 11-14-17   1513 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

RECEIVED
NOV 09 2017

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*



**Department of Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Ashley | | |
|---|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C | UNIT/CELL F-N-A-19 | DATE 11-15-17 | TIME 6:00 Am |
| JOB/PROGRAM | JOB/PROGRAM HOURS | | DAYS OFF | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☐ MEDICAL          ☐ DENTAL          ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

I see that I can not trust olympia to do the honest, compassionate thing
by helping me. Therefore as of this day I will not eat anything until
D.O.C agrees to the following:
    1. hormones and T blockers
    2. vaginoplasty / Labiaplasty
    3. electrolosis / laser hair removal (Face, bikini zone)
    I give you my word that I would rather die of starvation than
live with these physical abnormalities any longer.

OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within ___ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

If I die before D.O.C decides to have compassion on me, please call my
uncle Felix at 650-754-9839 and tell him what happened.

Ms. Santiago, Please see attached
note.

| RESPONDER signature and stamp (all copies) | DATE and TIME |
|---|---|
| M. ALYEA, PSYCH ASSOCIATE | 11-16-17      1410 |

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

**RECEIVED**
**NOV 15 2017**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (11/20/2015)          DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540          KITES

*Shane Evans*



### Department of Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*     **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Ashley | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL F-N-A-19 | DATE 11-23-17 | TIME 4:00 PM |
| JOB/PROGRAM | JOB/PROGRAM HOURS | | DAYS OFF |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello Sir. I was wondering about the status of
My case for hormones. It has been over 4 months
and I have still no idea whats been happening.

Why is olympia taking so long to decide my case?

                                        Thank you

                                        Ashley
                                        OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ___ days/weeks/months     ☐ Next available sick call     ☐ No visit required

Ms. Santiago you are in line to be reviewed by
CRCC GID. Scheduling begins w/ Headquarters. The
Referral is current and waiting. I appreciate your
patience. Thanks!

| RESPONDER signature and stamp (all copies) | DATE and TIME 12/7/17   0930 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED
NOV 27 2017

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (11/20/2015)          DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.5          KITES

✗ *Maureen Alyea* ✗



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Ashley | |
| --- | --- | --- | --- |
| DOC NUMBER 396177 | FACILITY | UNIT/CELL H6-56-U | DATE 8-22-17 | TIME 4:00 PM |
| JOB/PROGRAM Laundry porter | JOB/PROGRAM HOURS 5-9-pm | DAYS OFF Sat Sun | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☐ MEDICAL          ☐ DENTAL          ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER:

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, is it true that I must receive a blood test before my care can be presented to the Gender Dysphoria CRC board? If so, does the fact that I have not received a blood test mean that I have been denied hormones? Please help.

*Ashley* ___
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ___ days/weeks/months     ☐ Next available sick call     ☐ No visit required

I do not know the answer to that. This is the first I have heard of any Blood Test. You are on the list to be presented so my advise is to try to be patient.

| RESPONDER signature and stamp (all copies) M. ALYEA, PSYCH ASSOCIATE *M Alyea* | DATE and TIME 8/23/17  13:30 |
| --- | --- |

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

RECEIVED

AUG 22 2017

SCCC HEALTH SERVICES

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-423 (11/20/2015)          DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540

197 200 OF 238

Shane Evans



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*        **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Ashley | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL G1-D-25 | DATE 1-18-18 | TIME 7:00 Am |
| JOB/PROGRAM | | JOB/PROGRAM HOURS | DAYS OFF | |

***If you feel you have an actual medical emergency, alert the staff and do not use this form.***

**TYPE OF REQUEST** (check only one box per form)

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH
☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below
☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST** (list problem or medications needing refill)

Hello, it has been 5 months and I still have not
been presented to the Gender dysphoria CRC yet.
do I have a date to be presented?

OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within ___ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

Ms. SANTIAGO / APOLOGIZE FOR THE DELAYED RESPONSE. I WAS
AWAITING SOME FEEDBACK FROM HEADQUARTERS. THE INFORMATION
IN THE QUE IS YOUR PENDING AND THERE HOPING TO HEAR THE
CASE IN NEXT 30 DAYS. I APPRECIATE YOUR PATIENCE.

| RESPONDER SIGNATURE / stamp (all copies) Shane Evans HSM2 | DATE and TIME 1/31/18 1030 | RECEIVED |
|---|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

JAN 1 8 2018

SCCC HEALTH SERVICES

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (11/20/2015)        DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540        KITES

*Maureen Alyea*



**Department of Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*                    *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Ashley | |
|---|---|---|---|
| DOC NUMBER 846177 | FACILITY S.C.CC | UNIT/CELL G1-D-78 | DATE 1-18-18 | TIME 7:00 AM |
| JOB/PROGRAM | | JOB/PROGRAM HOURS | DAYS OFF |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST** (check only one box per form)

☐ MEDICAL          ☐ DENTAL          ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST** (list problem or medications needing refill)

Hello As of today, do I have a date to be
presented to The Gender dysphoria CRC in
Olympia.

OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ____ days/weeks/months     ☐ Next available sick call     ☐ No visit required

You Are Scheduled for february !
& will be keeping tabs on
the process.

| RESPONDER signature and stamp (all copies) M. ALYEA, PSYCH ASSOCIATE   M Alyea | DATE and TIME 1-19-18   1420 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

JAN 1 8 2018

SCCC HEALTH SERVICES

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

*Dr. Harrington*



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*    *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Ashley | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL G-D-25-L | DATE 3-6-18 | TIME 5:30 pm |
| JOB/PROGRAM | | JOB/PROGRAM HOURS | | DAYS OFF |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL        ☐ DENTAL        ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY        ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, when we spoke on 3-2-18 you said That I
would be having Labs taken on The following monday or
tuesday. it is now wednesday and I have Still not bin
been yet. do you have any idea when he might be
recieving Labs for GID crc.

*Ashley S*
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ___ days/weeks/months        ☐ Next available sick call        ☐ No visit required

Did you get your labs done yet?

RESPONDER signature and stamp (all copies) *Harrington, MP*    DATE and TIME 3/7/18

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

RECEIVED
MAR 09 2018

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

SCCC HEALTH SERVICES
KITES

DOC 13-423 (11/20/2015)        DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540

200 of 238

Alyea



**Department of**
# Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*                    **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | FIRST NAME Ashley |
|---|---|

| DOC NUMBER 880177 | FACILITY S.C.C | UNIT/CELL G-D-25-L | DATE 3-30-18 | TIME 4:40 Pm |
|---|---|---|---|---|

| JOB/PROGRAM Kitchen | JOB/PROGRAM HOURS 7:00 Am / 130 pm | DAYS OFF Thur : Fri |
|---|---|---|

**If you feel you have an actual medical emergency, alert the staff and do not use this form.**

## TYPE OF REQUEST (check only one box per form)

☐ MEDICAL          ☐ DENTAL          ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Why has my presentation to the CRC been
postponed again when you and zeiger told
me it would be This month month.

_____

_____

_____

Ashley SS
OFFENDER SIGNATURE

## HEALTH SERVICES RESPONSE/ENCOUNTER

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☒ Schedule within ___ days/weeks/months    ☐ Next available sick call    ☐ No visit required

Ms. Santiago, You were presented to the committee and they
requested further evaluation. Please watch call out.

_____

_____

_____

| RESPONDER signature and stamp (all copies) E. ZEIGER, PSYCH.4 | DATE and TIME 4/2/2018  1345 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

MAR 3 0 2018

SCCC HEALTH SERVICES
KITES

DOC 13-423 (11/20/2015)          DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540

201. 200 OF Z38

*Shane Evans*



**Department of**
# Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*     SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY

| LAST NAME Santiago | | FIRST NAME Ashley | | |
|---|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL G-D-29-L | DATE 4-25-18 | TIME 11:00 Am |
| JOB/PROGRAM Kitchen | JOB/PROGRAM HOURS 7:00 Am to 1:30 PM | DAYS OFF Thu-Fri | | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL   ☐ DENTAL   ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY   ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, Ms. Alyea told me that olympia wanted further
testing done on me before they could make their
decision about hormones that was last month and
I still have not been put on the callout to have
this testing done.

*Ashley S*
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ____ days/weeks/months   ☐ Next available sick call   ☐ No visit required

You are on the schedule next week. Please watch
call out.

| RESPONDER signature and stamp (all copies) E. ZEIGER, PSYCH.4 | DATE and TIME 4/26/2018   1220 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435/PRIMARY ENCOUNTER REPORT (PER) OR INCIPE.**

Distribution: WHITE/YELLOW – Responder, PINK – Offender keeps
Distribution upon completion: WHITE – Health Record, YELLOW – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

RECEIVED
APR 25 2018
SCCC HEALTH SERVICES
KITES

*Zeiger*



**Department of**
# Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | FIRST NAME Marco (Ashley) |
|---|---|

| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL G-0-25-L | DATE 5-11-18 | TIME 1900 |
|---|---|---|---|---|

| JOB/PROGRAM Kitchen | JOB/PROGRAM HOURS 0700-1330 | DAYS OFF Th/Fr |
|---|---|---|

**If you feel you have an actual medical emergency, alert the staff and do not use this form.**

### TYPE OF REQUEST (check only one box per form)

☐ MEDICAL          ☐ DENTAL          ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

The stress of waiting on Olympia to make a decision is
causing me to have problems focusing. I had to drop a
math class I was doing good at and I am having a
hard time focusing at the kitchen. The stress is affecting
my ability to function in day to day life.

_____

_____

*Ashley* 
OFFENDER SIGNATURE

### HEALTH SERVICES RESPONSE/ENCOUNTER
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues.

| ☐ Schedule within ___ days/weeks/months | ☐ Next available sick call | ☒ No visit required |
|---|---|---|

You have an upcoming appointment with your therapist.
Please work with her on these issues.

_____

_____

_____

| RESPONDER signature and stamp (all copies) **E. ZEIGER, PSYCH.4** | DATE and TIME 5/17/2018 1130 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

MAY ____

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

SCCC HEALTH SERVICES
KITES

DOC 13-423 (11/20/2015)     DOC 610.040   DOC 610.650   DOC 630.500   DOC 630.540

*D. FURST*



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*                    *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | FIRST NAME Marco (Ashley) |
|---|---|

| DOC NUMBER 890175 | FACILITY S.C.C.C. | UNIT/CELL W-D-29-L | DATE 5-11-18 | TIME 1:00 PM |
|---|---|---|---|---|

| JOB/PROGRAM Kitchen | JOB/PROGRAM HOURS 0700-1330 | DAYS OFF Th/Fr |
|---|---|---|

***If you feel you have an actual medical emergency, alert the staff and do not use this form.***

**TYPE OF REQUEST** (check only one box per form)

☐ MEDICAL        ☐ DENTAL        ☑ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY        ☐ OTHER: _____

**REASON FOR REQUEST** (list problem or medications needing refill)

Hello, may you please tell me the date in which
you diagnosed me with Gender Dysphoria.

Thank you

_Ashley SS_
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within _____ days/weeks/months   ☐ Next available sick call   ☐ No visit required

WE COMPLETED YOUR CONSULTATION ON 8.16.2017

| RESPONDER signature and stamp (all copies) **M.L. FURST, M.D.** | DATE and TIME 5.23.18 / 1225 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT AVAILABLE ON CIPS**   RECEIVED

Distribution: **WHITE/YELLOW** -- Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response   1 REC'D

1 REC'D

SCCC HEALTH SERVICES

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)        DOC 610.040   DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540                KITES

204 2023 of 238

X Shane Evans X



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*                    ***SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY***

| LAST NAME Santiago | | FIRST NAME Marco (Ashley) | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-112-U | DATE 7-23-18 TIME 10:00 PM |
| JOB/PROGRAM | JOB/PROGRAM HOURS | | DAYS OFF |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST** (check only one box per form)

[X] MEDICAL          [ ] DENTAL          [ ] MENTAL HEALTH

[ ] MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

[ ] OPTOMETRY        [ ] OTHER: _____

**REASON FOR REQUEST** (list problem or medications needing refill)

Hello. May I please keep MS. Bangs as my
provider as I dealt with her about my OID in
G-unit and I feel comfortable talking to her, especially
as I have been approved for hormones. I would
rather talk to a female doctor about my femanine
issues.

Ashley
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| [ ] Schedule within _____ days/weeks/months | [ ] Next available sick call | [ ] No visit required |
|---|---|---|

MS. Santiago After discussing case w/ Mental Health and
OIP policy, I will deny this request. Providers have
Equitiy in caseload Assignment and there is no current
compelling medical or Mental Health Reason to make an exception.
Thanks!

| RESPONDER signature and stamp (all copies) Shane L. Evans, HSM2 | DATE and TIME 07/26/18 1400 |
|---|---|

RECEIVED
JUL 24 2018
SCCC HEALTH SERVICES

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)   DOC 610.040   DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540          KITES

*Shane evans*



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

PLEASE PRINT | **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | FIRST NAME Marco (Ashley) |
|---|---|

| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-112-U | DATE 8-17-18 | TIME 11:00 Am |
|---|---|---|---|---|

| JOB/PROGRAM Unit Porter | JOB/PROGRAM HOURS 1400 - 2100 | DAYS OFF Th/Fr |
|---|---|---|

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST** (check only one box per form)

☑ MEDICAL   ☐ DENTAL   ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY   ☐ OTHER: _____

**REASON FOR REQUEST** (list problem or medications needing refill)

Hello. It has been a month since I was approved for
Hormones and I have yet to be started on Hormones. can
you please give me a time frame for exactly how long
it is supposed to take before I recieve treatment.
I have not been seen, or recieved additional testing, so if there is
an issue, Why is nothing being done to correct the issue?
please help.

Ashley
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within ___ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

Ms. Santiago, I spoke w/ Provider. She reports additional
Testing was order yesterday to finalize next steps for Hormone
Treatment. I appreciate your patience, but Health Services needs
to be sure All is appropriate Medically prior to commencing
Hormone Therapy. Thanks

| RESPONDER signature and stamp (all copies) Shane L. Evans, HSM2 | DATE and TIME 8/23/18 1000 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED

Distribution: WHITE/YELLOW – Responder, PINK – Offender keeps
Distribution upon completion: WHITE – Health Record, YELLOW – Return to Offender with Response

JUL 1 7 REC'D

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (06/12/2018)      DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540      SCCC HEALTH SERVICES KITES

Ferrington



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

PLEASE PRINT · *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C. | UNIT/CELL H3-112-U | DATE 8-29-18 | TIME 10:00pm |
| JOB/PROGRAM Unit porter | JOB/PROGRAM HOURS 1400 - 2100 | | DAYS OFF Th/Fr |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL ☐ DENTAL ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY ☐ OTHER:

**REASON FOR REQUEST (list problem or medications needing refill)**

I was wondering why my prolactin levels are even being evaluated or monitored when according to WPATH standards of care my prolactin levels should only be tested and monitored IF I exhibit symptoms of prolactinoma such such as headache or blurry vision. also they classify prolactinoma as a Theoretical risk associated with estrogen Therapy and That There is no basis for an increased risk of prolactinomas with physiologic doses of estrogen

→ ☒ I have The documents if you wish to read Them

Ashley S.
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within _____ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

Thank you for your kite & input Ms Santiago.
Please feel free to discuss your concerns with
your provider.

| RESPONDER signature and stamp (all copies) | DATE and TIME 9/1/18 |
|---|---|
| R. Herrington, FMD | |

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

RECEIVED

Distribution: WHITE/YELLOW – Responder, PINK – Offender keeps
Distribution upon completion: WHITE – Health Record, YELLOW – Return to Offender with Response

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-423 (06/12/2018)     DOC 610.600  DOC 610.650   DOC 630.500   DOC 630.540     SCCC HEALTH SERVICES     KITES

*Shane Evans*



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

PLEASE PRINT          **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-112-U | DATE 9-19-18 | TIME 6:00pm |
| JOB/PROGRAM unit worker | JOB/PROGRAM HOURS 1400-2100 | | DAYS OFF Sa/Su |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Why have I still not been seen by a provider
to recieve hormone therapy. I dont even know
who my provider is. Is it light or bangs?
and why have I not been scheduled to even
talk to a provider since I was approved
for hormones? This is my second kite as my
First kite to you was not answered.

                                        Ashley
                                        OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ____ days/weeks/months          ☐ Next available sick call          ☐ No visit required

See Kite you sent on 9-14-18 (your first)
                                               Kite

                                        RECEIVED

                                        SEP 19 2018

| RESPONDER signature and stamp (all copies) | | DATE and TIME |
|---|---|---|
| J Wacata | | 9-10-18 |
|  |  | SCCC HEALTH SERVICES |

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (06/12/2018)          DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540          KITES

208 2000 OF 258

★ Alyea ★



 Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiago | FIRST NAME Marco | | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY SCCC | UNIT/CELL H3-112-U | DATE 9-15-18 | TIME 6:00 pm |
| JOB/PROGRAM Unit worker | JOB/PROGRAM HOURS 1400-7100 | DAYS OFF 6a/5u | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☐ MEDICAL          ☐ DENTAL          ☒ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, despite the fact that olympia has approved
me for medical treatment, I have yet to even
be seen by my provider and dont even
know who my provider is. what is
happening?

*Ashlee* OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within ____ days/weeks/months | ☒ Next available sick call | ☐ No visit required |
|---|---|---|

As far as medical, you will need to
contact your provider. (Mr. Light)
you had an appointment yesterday
(9-19-18) with me but you came
in and cancelled it.

RECEIVED

SEP 19 2018

SCCC HEALTH SERVICES

| RESPONDER signature and stamp (all copies) M. ALYEA, PSYCH ASSOCIATE *Alyea* | DATE and TIME 9/20/18    6:00 SCCC HEALTH SERVICES |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: WHITE/YELLOW – Responder, PINK – Offender keeps
Distribution upon completion: WHITE – Health Record, YELLOW – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (06/12/2018)          DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540          KITES

209 2008 of 738



Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*  SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 390177 | FACILITY S.C.C.C | UNIT/CELL H3-1/2-L | DATE 9-21-18 | TIME 4.30 pm |
| JOB/PROGRAM Unit worker | JOB/PROGRAM HOURS 0500-1100 1600-2100 | DAYS OFF Sa/Su | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL ☐ DENTAL ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello Shane evans, why is a person named J.
Nagala answering my kites that I am directing
to you and my provider Mr. Light? That is really
wierd as Last I checked J. Nagala is not
my provider nor are they the head of medical. If you
or light dont wish to respond to kites I specifically
request direct to you. Simply say so. I'm a big girl,
I can handle It.

Ashlee

OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ____ days/weeks/months   ☐ Next available sick call   ☐ No visit required

Kites are responded by appropriate health services staff that are able
to address the content of the kite. In this case Mr. Evans
is unavailable therefore to provide a timely communication
I am responding to your kite.

RECEIVED

| RESPONDER K. PARRIS HSM (print/stamp) | DATE and TIME 9/25/18 065 | SEP 21 REC'D |
|---|---|---|

SCCC HEALTH CARE

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: WHITE/YELLOW – Responder, **PINK** – Offender keeps
Distribution upon completion: WHITE – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)   DOC 610.040   DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540   KITES





Department of
## Corrections
WASHINGTON STATE

SANTIAGO, MARCO    896177
DOB: 9/2/1986

## PRIMARY ENCOUNTER REPORT

| DATE | TIME | FACILITY | UNIT |
|------|------|----------|------|
| 8/30/2018 | 0930 | SCCC | |

**Allergies:** ☐ Allergies verified with patient (Update Problem List and CIPS if needed)

**Subjective Complaint/Objective Findings/Assessment/Evaluation:**
This is a 31 yo male to female transgender, who is wishing to start hormonal therapy.
Full H&P shows no contraindications, however labs show a slightly elevated prolactin, at 23.72.

Do you feel this to be a major contraindication to hormone therapy?
Also, at this level, is there further work up that should be carried out, beyond periodic monitoring?

Santiago is currently taking
Mirtazapine 15mg, ½ tab qhs
Escitalopram 10mg  1 qhs

I don't not have a base line testosterone, but will order one.

Labs results from 8/23/18 show:
Prolactin of 20.41
Testosterone of 622.0

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

I don't see this as a major contraindication, necessarily. I would like to know a little more about the patient. Does she have a normal (male range) testosterone level prior to treatment? Is Santiago on any meds that raise prolactin levels?

We would want to keep an eye on the prolactin levels in the course of management. We would also want to reassure ourselves that she is not hypogonadal. If the pre-treatment testosterone level is in the normal male range that should be pretty good reassurance.

Per UTD, citalopram rarely is associated with hyperprolactinemia and mirtazapine has not been reported to be associated with hyperprolactinemia, so meds are a possible, though not likely cause of mild elevation of prolactin. If you're getting a testosterone level it would probably be worth checking prolactin again to see how consistent the observed elevation is. As you know, there are some causes of temporary, physiologic prolactin elevation, such as nipple stimulation.

I'd be happy to review the lab results and go from there.

Given the mild and stable prolactin elevation and evidence of normal testicular function, I do not see the mild elevation of prolactin as a strong contraindication to hormonal treatment for MTF transgender transition. As you mention, it would be prudent to monitor prolactin levels during the course of treatment, perhaps 3 months after initiation, 6 months after that, and yearly thereafter if it remains stable. If you saw a substantial rise in prolactin, say above 30 ng/ml or higher, you may want to check an MRI of the pituitary to rule out a macroprolactinoma, which is unlikely in this case.

You should follow the DOC protocol for hormonal treatment of MTF transgender transition; let me know if you are concerned about any other potential contraindications for treatment (although it sounds like you have not discovered any). You also need to have the patient complete and sign the informed consent for transgender hormonal treatment before initiating treatment.

Page 1 of 2

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 410.430   DOC 420.250   DOC 490.850   DOC 610.010   DOC 610.040
DOC 610.025   DOC 610.800   DOC 610.650   DOC 630.520   DOC 670.020

DOC 13-435FP (11/20/2014)

OUTPATIENT/MENTAL HEALTH

8/30/18

SANTIAGO, MARCO 896177
DOB: 9/2/1986

## PRIMARY ENCOUNTER REPORT

| DATE | TIME | FACILITY | UNIT |
|---|---|---|---|
| 8/30/2018 | 0930 | SCCC | |

You should do a pre-treatment, baseline testicular and breast exam for comparison and monitoring during the course of treatment. I am happy to follow the case with you; just let me know what clinical and lab monitoring shows and if you have any questions or concerns during treatment.

**Diagnosis/Plan/Rx:** (Diagnosis required for medication orders)
MTF transgender, initiation of hormonal treatment.

☐ Risks/benefits of recommended intervention explained; patient consents

Name and Title of Staff Performing Encounter:
G. Steven Hammond MD



*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 410.430 DOC 420.250 DOC 490.850 DOC 610.010 DOC 610.040
DOC 610.025 DOC 610.600 DOC 610.650 DOC 630.520 DOC 670.020

DOC 13-435FP (11/20/2014) OUTPATIENT/MENTAL HEALTH



SCOTT LIGHT (not J. Nagala)
EX. Q

## Department of **Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 886177 | FACILITY S.C.C.C | UNIT/CELL Charlie H3-112 | DATE 10-2-18 | TIME 7:00pm |
| JOB/PROGRAM Unit worker | JOB/PROGRAM HOURS 0700-1100  1700-2100 | | DAYS OFF Sa/Su |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

[X] MEDICAL          [ ] DENTAL          [ ] MENTAL HEALTH

[ ] MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

[ ] OPTOMETRY          [ ] OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, May you please tell me in writing, whether my prolacting
levels were normal on my last blood test. Please provide
the answer to this question, in writing on this
kite so I may forward your response to my
lawyer. Thank you.

also, as J. Nagala does not have access to my Medical
information, please stop allowing J. Nagala to answer kites I
am writing to you.                          Ashlee K.
                                        OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| [ ] Schedule within ___ days/weeks/months | [ ] Next available sick call | [ ] No visit required |
|---|---|---|

Please Discuss this at your appointment next week.

**J. Nagala, PSR**

| RESPONDER signature and stamp (all copies) J. Nagala | DATE and TIME 10-4-18 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)     DOC 610.040     DOC 610.600     DOC 610.650     DOC 630.500     DOC 630.540

*(handwritten at top: X (Light) # (not) J. Nagala X in CELL EX. Q (Ses ...)*

# Department of Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY SCCC | UNIT/CELL H3-112-U | DATE 9-21-18 | TIME 5:00 pm |
| JOB/PROGRAM Unit worker | JOB/PROGRAM HOURS 0700-1100 1600-7100 | DAYS OFF Tu/Wed | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

[X] MEDICAL  [ ] DENTAL  [ ] MENTAL HEALTH

[ ] MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

[ ] OPTOMETRY  [ ] OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, were my prolactin levels still elevated on
my most current blood test and if not are
we going to finaly procede with the hormone
therapy olympia approved me for?

Thank you

*Ashley St* OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

[ ] Schedule within ___ days/weeks/months  [ ] Next available sick call  [ ] No visit required

Per Provider

Your next appointment with your
Provider Scott Light P.A. is
on 10-12-18 to follow up
on Labs. J Nagala 10-2-18

*RECEIVED*
*SEP 21 REC'D*
*J. Nagala, PSR*
*SCCC HEALTH SERVICES*

| RESPONDER signature and stamp (all copies) | DATE and TIME |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)   DOC 610.040   DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540   KITES

*LIGHT*
EX. Q



**Department of**
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          ***SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY***

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-112-U | DATE 9-18-18 | TIME 6:00 pm |
| JOB/PROGRAM unit worker | JOB/PROGRAM HOURS 1400 - 2100 | DAYS OFF Sa/Su | |

***If you feel you have an actual medical emergency, alert the staff and do not use this form.***

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, as it is apparent you guys don't want to give me hormones, I need to be presented again to the CRC' for a vaginoplasty or ochiectomy.

Ashlee

OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

☐ Schedule within ____ days/weeks/months          ☐ Next available sick call          ☐ No visit required

Kiting several times after you have been told you have been scheduled won't get you seen any faster.

RECEIVED

SEP 10 2018

HEALTH SERVICES

| RESPONDER signature and stamp (all copies) J. Varella | DATE and TIME 9-20-18 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70:02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (06/12/2018)          DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540          KITES

215 22A of 238

*LIGHT*
HSAX.C

**Department of**
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

PLEASE PRINT                    SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY

| LAST NAME Santiago | FIRST NAME Marco | |
|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-112-U | DATE 9-14-18 | TIME 5:00pm |
| JOB/PROGRAM Unit worker | JOB/PROGRAM HOURS 1400 - 2100 | DAYS OFF Sa/Su |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

[X] MEDICAL          [ ] DENTAL          [ ] MENTAL HEALTH

[ ] MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

[ ] OPTOMETRY          [ ] OTHER:

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello. Are you my provider? an IF So, why have
you made no Attempts to discuss My blood tests
or The hormones I am supposed to be recieving.
The GID CRC approved me for medical treatment
So why are you not providing The medical
treatment I was Authorized to have?

_Ashley_ _SL_
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| [ ] Schedule within ____ days/weeks/months | [ ] Next available sick call | [ ] No visit required |
|---|---|---|

Appt scheduled in approx 3 wks,
discuss this at that time. _J Nagala_ 9-14-18

**J. Nagala, PSR**

RECEIVED
SEP 14 2019
SCC HEALTH SERVICES

| RESPONDER signature and stamp (all copies) | DATE and TIME |
|---|---|
| _JCW_ | 9/3/18 |

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** -- Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)        DOC 610.040    DOC 610.600    DOC 610.650    DOC 630.500    DOC 630.540                    KITES



**Department of Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          *SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY*

| LAST NAME Santiag (& Raelynn) | FIRST NAME Mario (Ashley) |
|---|---|

| DOC NUMBER 896177 | FACILITY 3.C.C.C | UNIT/CELL H13-15-U | DATE 2-12-19 | TIME 7:30 Am |

| JOB/PROGRAM unit porter | JOB/PROGRAM HOURS 0001 - 0400 | DAYS OFF Fi/Sa |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**
- [x] MEDICAL  [ ] DENTAL  [ ] MENTAL HEALTH
- [ ] MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below
- [ ] OPTOMETRY  [ ] OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, you told me to kite you if the sores in my mouth came back. I have gotten one that came back 2 days ago.

Thank you

Ashley ___ Raelynn
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

[ ] Schedule within ___ days/weeks/months  [ ] Next available sick call  [ ] No visit required

**Sick Call Scheduled**

**RECEIVED**
FEB 13 2019
SCCC HEALTH SERVICES

| RESPONDER signature and stamp (all copies) Nagaela, PSR | DATE and TIME 2-13-19 | |

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (06/12/2018)   DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540   KITES

*\*Tight*



**Department of**
# Corrections
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*          ***SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY***

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-78-U | DATE 1-25-19 | TIME 4:30pm |
| JOB/PROGRAM Unit porter | JOB/PROGRAM HOURS 0001-0400 | DAYS OFF Fr/Sa | |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY          ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

I recieved your kite about my prolactine level being
elevated above 30. I would like to clarify for
the record that I am not experiencing any
symptoms of prolactinoma.

_____

_____

_____

*(signature)*
OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**
This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues.

| ☒ Schedule within _____ days/weeks/months | ☐ Next available sick call | ☒ No visit required |
|---|---|---|

Noted

_____

_____

_____

| RESPONDER signature and stamp (all copies) J. Evert, MA | DATE and TIME 1/30/19  12:00 pm |
|---|---|

JAN 2 S REC'D

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (06/12/2018)          DOC 610.600   DOC 610.650   DOC 630.500   DOC 630.540          KITES

218 22217 OF 238

*K. J. Nagata*

Department of
**Corrections**
WASHINGTON STATE

**HEALTH SERVICES KITE**

This form must be used to request non-emergency
health care services, except in facilities where kiosks or sign-up sheets are used.

*PLEASE PRINT*       **SUBMISSION OF HEALTH SERVICES REQUEST MAY RESULT IN A CO-PAY**

| LAST NAME Santiago | | FIRST NAME Marco | |
|---|---|---|---|
| DOC NUMBER 896177 | FACILITY S.C.C.C | UNIT/CELL H3-112-W | DATE 10-2-18 | TIME 7:00 pm |
| JOB/PROGRAM Unit worker | JOB/PROGRAM HOURS 0900-1100   1400-2100 | | DAYS OFF Sa/Su |

*If you feel you have an actual medical emergency, alert the staff and do not use this form.*

**TYPE OF REQUEST (check only one box per form)**

☒ MEDICAL          ☐ DENTAL          ☐ MENTAL HEALTH

☐ MEDICATION REFILL – List medication(s) with prescription number(s) or place sticker below

☐ OPTOMETRY      ☐ OTHER: _____

**REASON FOR REQUEST (list problem or medications needing refill)**

Hello, as you are not my provider or The head of medical or The head provider Mr. Harrington please refrain from answering kites I write to These individuals. I have never been you regarding medical treatment for GID, nor have you ever been my provider, nor have I ever discussed my Gender Dysphoria with you. please allow The person with The information I am requesting to answer my kites.

Ashlee S.

OFFENDER SIGNATURE

**HEALTH SERVICES RESPONSE/ENCOUNTER**

This form must be filed if any information is entered below except for: simple prescription refills, finance, non-medical
work/bunk change, religious diets, shoes, classification, non-health services issues

| ☐ Schedule within ___ days/weeks/months | ☐ Next available sick call | ☐ No visit required |
|---|---|---|

While you may disagree with the response health services staff work diligently to provide them for you. Please watch the callout and attend your upcoming appointment so you can discuss your health care with your unit provider.

| RESPONDER signature and stamp (all copies) **K.PARRIS, HSM1** | DATE and TIME 10/8/18   10:16 |
|---|---|

**PRESCRIPTIONS MUST BE WRITTEN ON DOC 13-435 PRIMARY ENCOUNTER REPORT (PER) OR IN CIPS**

Distribution: **WHITE/YELLOW** – Responder, **PINK** – Offender keeps
Distribution upon completion: **WHITE** – Health Record, **YELLOW** – Return to Offender with Response

*State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written
consent of the person to whom it pertains, or as otherwise permitted by law.*

DOC 13-423 (07/25/2017)       DOC 610.040    DOC 610.600    DOC 610.650    DOC 630.500    DOC 630.540                       KITES





OFFENDER I.D. DATA
NAME:       Santiago, Marco (AKA Ashley)
DOC#:       896177
DOB:        09/02/1986

Department of
**Corrections**
WASHINGTON STATE

## OUTPATIENT PROGRESS NOTE

| DATE | FACILITY/UNIT |
|------|---------------|
| 10/12/2018  Time: 0900 | Stafford Creek Corrections Center |

**Subjective:**

Housing Unit:  H3.

Ms. Santiago is a 32-year-old male to female transgender patient with original male anatomy who presents today for a chronic care visit reference gender dysphoria and being approved for estrogen hormone therapy.  I know Ms. Santiago from a previous episode where she had cut her scrotum out of frustration and in an attempt to perform a self-orchiectomy in January of last year.  Apparently, she did go on to get approved for treatment of gender dysphoria with hormone therapy.

She had been working with her previous primary care provider (she lived in a different housing unit) and the initial workup for hormone treatment includes a prolactin and a testosterone level.  Her prolactin level was mildly elevated.  Endocrine consultation had been obtained and this had been the first opportunity for her to follow up with a primary care provider since that consultation.  We went over the endocrinologist's thoughts and recommendations together today.

In essence, the endocrinologist consultant did not think that the mild elevation in prolactin was an absolute contraindication, and recommended a baseline breast exam as well as more frequent prolactin monitoring after the initiation of treatment.  Of note, the testosterone level was at normal male levels.

We spent quite a bit of time going over potential risks of hormone treatment to include lifetime risk of developing some element of breast cancer, increased thromboembolic risk, and increased cardiovascular risk among other issues surrounding hormone treatment.  We reviewed the policy together as well as the gender dysphoria hormone treatment consent form which she signed in full.

**Objective:**
VITAL SIGNS: BP: 112/59. HR: 63. R: 16. Temperature: 98.2. SPO2: 99%. Weight: 173 pounds.
General: Alert and oriented, no acute distress.
HEENT:  Pupils equal and reactive to light.  Oral mucosa pink and moist.
Neck:  No jugular venous distention.
Lungs:  Clear to auscultation bilaterally.
Cardiovascular:  Regular rate and rhythm.
Chest/Breast exam conducted with RN Wilson standing by and the nipples were normal bilaterally without any discharge, lesions, or other abnormalities.  The remainder of the breast exam did not reveal any lumps or other concerning findings.  Of note, Ms. Santiago is quite physically developed with large pectoral muscles from working out.

Laboratory and Data:
1.  Dr. Hammond 08/30/18 consultation was reviewed to include the recommendation of a testicular (this had been conducted by the PCP previous), and breast exam and the recommendations for ongoing monitoring of prolactin levels at three and six months and then yearly after initiation of treatment.
2.  August 23, 2018, prolactin level of 20.41 with a normal range being 4 to 15.2 and a testosterone level of 622 with a reference range of 249 to 836.
3.  May 11 prolactin level of 23.72.
4.  Normal basic metabolic panel in March 2018.

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-496 (12/02/2014)                    OUTPATIENT/INPATIENT/CONSULTATION/MENTAL HEALTH



**Department of**
**Corrections**
WASHINGTON STATE

OFFENDER I.D. DATA
NAME:     Santiago, Marco (AKA Ashley)
DOC#:     896177
DOB:       09/02/1986

**OUTPATIENT PROGRESS NOTE**

| DATE | FACILITY/UNIT |
|------|---------------|
| 10/12/2018  Time: 0900 | Stafford Creek Corrections Center |

**Assessment and Plan:**

1.  Gender dysphoria in a 32-year-old male to female patient with biologic/original anatomy.  I will go ahead and write for the recommended laboratory surveillance and order estrogen therapy.  Patient signed the consent which we went over in detail today.  I will plan on seeing Ms. Santiago back in about six months or sooner if needed.

_____
Scott M. Light, PA-C
PROVIDER'S PRINTED NAME AND TITLE

_____
SIGNATURE

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

DOC 13-496 (12/02/2014)

OUTPATIENT/INPATIENT/CONSULTATION/MENTAL HEALTH

*EX. 5*

| | LOG I.D. NUMBER/*NUM. DE REGISTRO* |
|---|---|
| | **18655767** |



Department of
**Corrections**
WASHINGTON STATE

**LEVEL I - INITIAL GRIEVANCE**
*NIVEL 1 - QUEJA INICIAL*

| Name: | Last | First | Middle | DOC Number | Facility/Office | Unit/Cell |
|---|---|---|---|---|---|---|
| *NOMBRE:* | *APELLIDO* | *PRIMERO NOMBRE* | *2DO NOMBRE* | *NUMERO DOC* | *FACILIDAD* | *UNIDAD/CELDA* |
| | Santiago | Marco | A | 896177 | SCCC | GD25 |

| PART A - INITIAL GRIEVANCE/*PARTE A - QUEJA INICIAL* | Date Typed | 5/17/18 | Date Due |
|---|---|---|---|

**I WANT TO GRIEVE / *QUIERO QUEJARME DE*:** I am grieving Dr. Bruce Gage and all members of the
Gender Dysphoria Care REview committee for deliberate indiference as defined by the eighth amendment to
the constitution. They did this by: 1.) They acknowledge my diagnoses of Gender Dysphoria, which is
considered a serious medical need to treat. 2.) There have been repeated and wanton delays to my treatment
lasting several months. 3.) There has shown that this deliverate indiference has caused me significant injury.
As I have suffered panic attacks that cuased me to be hospitalized and I tried to perform surgery on my
genitals all due to the extremem stress of delay.

**SUGGESTED REMEDY / *REMEDIO SUGERIDO*:** Give me timely medical care.

| /s/ D. Dahne | 5/17/18 | /s/ Marco Santiago | 5/17/18 |
|---|---|---|---|
| Grievance Coordinator Signature | Date | Grievant Signature | Date |
| *FIRMA DE COORDINADOR DE QUEJAS* | *FECHA* | *FIRMA DE QUEJANTE* | *FECHA* |

| PART B - LEVEL I RESPONSE / *PARTE B RESPUESTA PRIMER NIVEL* |
|---|

You were interviewed by GC Dahne and HSM1 Parris investigated your claim that you are not receiving care
for Gender Dysphoria. The following are facts after reviewing your medical file and OMNI-HS. Your case was
presented to the Gender Dysphoria (GD) Care Review Committee (CRC) that was held on March 26, 2018. As
documented in the Diagnosis/Plan/Rx section:
GD-CRC thinks it is possible that Santiago meets criteria for GD, but it is not possible to confirm this at this
time. Were this confirmed, there remain questions regarding readiness, including marginal participation with
providers, identity concerns generally, and emotional instability. The GD-CRC recommends personality testing
(consider PAI or MMPI and projective testing to help clarify the diagnosis and determine readiness).
I encourage you to watch the callout, attend, participate at appointments, and continue working with health
services staff as they are in the best position to assist you with your needs.

| D Dahne | 5/23/18 |
|---|---|
| Grievance Coordinator Signature | Date |
| *COORDINADOR DE QUEJAS* | *FECHA* |

You may appeal this response by submitting a written appeal to the Coordinator within five (5) working days from date this response was received.
*Ud. puede apelar esta respuesta al someter una apelación por escrito al coordinador dentro de cinco (5) días de trabajo de la fecha en que esta
respuesta fue recibida.*

Distribution:   Grievance Program Manager/*Gerente del Programa de Quejas*, Grievance Coordinator/*Coordinador de Queja*, Grievant/*Quejante*
DOC 05-166 E/S (Rev. 02/23/16)                                                                                                     DOC 550.100

222 ~~223~~ OF 738



Confidential
Grievant Copy
Levant Copy

LOG I.D. NUMBER
18655767

Department of
**Corrections**
WASHINGTON STATE

**OFFENDER COMPLAINT**

CHECK ONE: ☐ Initial  ☐ Emergency  ☒ Appeal  ☐ Rewrite

RESIDENTIAL FACILITIES: Send completed form to the Grievance Coordinator. Explain what happened, when, where, and who was involved or which policy/procedure is being grieved. Be as brief as possible, but include the necessary facts. Use only one complaint form. A formal grievance begins on the date the typed grievance forms are signed by the Coordinator. Contact a Department employee to report an emergency situation or to initiate an emergency complaint. Please attempt to resolve all complaints through the appropriate Department employee(s) before pursuing a grievance.

NOTE: Complaints must be filed within 20 working days of the incident. Appeals must be filed within 5 working days of receiving the response. Include log ID # on rewrite or response being appealed.

| Last Name Santiago | First Marco | Middle Antonio | DOC Number 896177 | Facility/Office S-C-C-C | Unit/Cell Gr-D-25 |
|---|---|---|---|---|---|

COMMUNITY SUPERVISION: Send completed copies of this form directly to: Grievance Program Manager, Offender Grievance Program, Department of Corrections, P.O. Box 41129, Olympia WA 98504-1129.

| MAILING ADDRESS: STREET OR P.O. BOX | CITY, STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|

COMPLAINT: I am appealing The previous decision based on The Following. 1.) Dr. Furst is The person D.O.C recognizes as having The authority to diagnose me with GID, He did This in August of 2017. There fore olympia GID CRC is aware of my serious medical need. Also Maureen Alyea, My assigned mental health provider confirms That She believes I meet all criteria For GID. Also There is documented proof That This condition has and continues to cause me physical and emotional harm.

SUGGESTED REMEDY: Give me timely medical care

Mandatory _Ashley S__ Signature   6-1-18 Date

---

**GRIEVANCE COORDINATOR'S RESPONSE**
Your complaint is being returned because:
☐ It is not a grievable issue.
☐ You requested to withdraw the complaint.
☐ You failed to respond to callout (sheet) on _____
☐ Administratively Withdrawn _____
☒ The formal grievance/appeal paperwork is being prepared.
☐ Not accepted

Facility/Office SCC   Date Received 6/5/18

☐ The complaint was resolved informally.
☐ Additional information and/or rewriting needed. (See below.)
   Return within 5 working days or by: _____
☐ No rewrite received _____
☐ Sent to _____ (facility) on _____ (date).

EXPLANATION: Level II 6/5/18

D. Dahne, CSII
Coordinator's Printed Name (Print)

Coordinator's Signature _____

Date 6/5/18

DOC 05-165 Front (Rev. 07/26/16)                         DOC 310.100, DOC 550.100

223 ~~232~~ OF 238

**Confidential Level 3** III

Department of Corrections
WASHINGTON STATE
**Grievant Copy**

**LOG I.D. NUMBER**
18655767

**OFFENDER COMPLAINT**

CHECK ONE: ☐ Initial   ☐ Emergency   ☑ Appeal   ☐ Rewrite

**RESIDENTIAL FACILITIES:** Send completed form to the Grievance Coordinator. Explain what happened, when, where, and who was involved or which policy/procedure is being grieved. Be as brief as possible, but include the necessary facts. Use only one complaint form. A formal grievance begins on the date the typed grievance forms are signed by the Coordinator. Contact a Department employee to report an emergency situation or to initiate an emergency complaint. Please attempt to resolve all complaints through the appropriate Department employee(s) before pursuing a grievance.

**NOTE:** Complaints must be filed within 20 working days of the incident. Appeals must be filed within 5 working days of receiving the response. Include log ID # on rewrite or response being appealed.

| Last Name | First | Middle | DOC Number | Facility/Office | Unit/Cell |
|-----------|-------|--------|------------|-----------------|-----------|
| Santiago | Marco | Antonio | 896177 | SCCC | H3-112 |

**COMMUNITY SUPERVISION:** Send completed copies of this form directly to: Grievance Program Manager, Offender Grievance Program, Department of Corrections, P.O. Box 41129, Olympia WA 98504-1129.

| MAILING ADDRESS: STREET OR P.O. BOX | CITY, STATE | ZIP CODE | TELEPHONE |
|---|---|---|---|
| | | | |

**COMPLAINT:** I am not grieving The Fact That nothing is being done. per The original grievance issue of deliberate indiference. I am grieving That 1. Bruce gage and The other members are aware of My serious medical need as I was diagnosed with GID by The only one at S.C.C.C authorized to make That diagnoses, Dr. Furst. 2.) That There has been wanton and unessacary delays in my treatment, and 3.) That It is documented That These delays have caused me both physical and mental trauma and suffering. The Fact That The process is ongoing is not The issue. The length of time, and The trauma and pain and suffering These delays have caused me is The issue.

**SUGGESTED REMEDY:** Simply give me The medical care I have been requesting since November of 2016

Mandatory   *Ashley H* (Signature)   7-5-18   (Date)

**GRIEVANCE COORDINATOR'S RESPONSE**
Your complaint is being returned because:
☐ It is not a grievable issue.
☐ You requested to withdraw the complaint.
☐ You failed to respond to callout (sheet) on _____
☐ Administratively Withdrawn
☒ The formal grievance/appeal paperwork is being prepared.
☐ Not accepted

Facility/Office: SCCC   Date Received: 7/6/18
☐ The complaint was resolved informally.
☐ Additional information and/or rewriting needed. (See below.)
   Return within 5 working days or by: _____
☐ No rewrite received _____
☐ Sent to _____ (facility) on _____ (date).

**EXPLANATION:** III 7/6

| Coordinator's Name (PRINT) | Coordinator's Signature | Date |
|---|---|---|
| Kerri S. McTarsney, CSII | *Kerri S. McTarsney* | 7/6/18 |

DOC 05-165 Front (Rev. 07/26/16)   DOC 810.100, DOC 550.100

22-4285 of 238

# Confidential
# Grievant Copy

| LOG I.D. NUMBER/*NUM. DE REGISTRO* |
| --- |
| **18655767** |



**Department of**
**Corrections**
WASHINGTON STATE

**APPEAL TO LEVEL III**
*APELACIÓN AL 3ER NIVEL*

| Name:<br>*Nombre:* | Last<br>*Apellido* | First<br>*Nombre* | Middle<br>*2do Nombre* | DOC Number<br>*Número DOC* | Facility/Office<br>*Institución/Oficina* | Unit/Cell<br>*Unidad/Celda* |
| --- | --- | --- | --- | --- | --- | --- |
| | **Santiago** | **Marco** | **A** | **896177** | **SCCC** | **H3-112** |

| PART A - APPEAL TO LEVEL III<br>*PARTE A - APELACIÓN 3ER NIVEL* | Date Typed / *Fecha escrita a mano*<br>07/06/18 | Due Date / *Fecha de vencimiento*<br>08/03/18 |
| --- | --- | --- |

**I WANT TO GRIEVE /** *QUIERO QUEJARME DE***:** I am not grieving the fact that nothing is being done. Per the orignonal grievance issue of deliberate indiference. I am grieving that 1. Bruce gage and other members are aware of my serious medical need as I was diagnosed with GD by the only one at SCCC authorized to make that diagnoses, Dr. Furst. 2. That there has been wanton and unessacary delays in my treatment, and 3. That it is documented that these delays have caused me both physical and mental trauma and suffering. The fact that the process is ongoing is not the issue. The length of time, and the trauma and pain and suffering these delays have caused me is the issue.

**SUGGESTED REMEDY /** *REMEDIO SUGERIDO***:** Simply give me the medical care I have been requesting since November of 2016.

| /s/ Kerri S. McTarsney | 07/06/18 | /s/ Marco Santiago | 07/06/18 |
| --- | --- | --- | --- |
| Grievance Coordinator Signature<br>*Firma del Coordinador de quejas* | Date<br>*Fecha* | Grievant Signature<br>*Firma del agraviado* | Date<br>*Fecha* |

**PART B - LEVEL III RESPONSE/***PARTE B - RESPUESTA 3ER NIVEL*

I reviewed your initial grievance as well as all appeals and responses.

Chief of Nursing Services M. Cooke also reviewed this grievance and provided this response:

I reviewed your Level I and II grievance, the investigation, and the responses and find them to be adequately investigated. I have read your Level III appeal, consulted with providers, and reviewed evidence-based practices. You grieve deliberate indifference to your health care needs related to Gender Dysphoria.

I am sorry that you are experiencing frustration with your request. As acknowledged in the level II response HSM Evans investigated your complaint.

I would recommend you continue to work with the medical and mental health treatment team and have your case brought forward to the Gender CRC teleconference again as planned.

Since this issue has been addressed by HSM Evans and Dr. Furst please continue to work with the recommendations of the medical and mental health team at SCCC, which includes additional testing and compliance with recommendations made by providers.

The Level I and II responses were accurate per current DOC policy and the level III response is above.

| *Kevin Bovenkamp* (signature) | 8/23/18 |
| --- | --- |
| Assistant Secretary/Deputy Director/designee<br>*Subsecretario/designado*           Kevin Bovenkamp | Date<br>*Fecha* |

225 ~~OVERWRITTEN~~ OF 238

EX. T

# STANDARD TORT CLAIM FORM
General Liability Claim Form #SF 210

Pursuant to Chapter 4.92 RCW, this form is for filing a tort claim
against the state of Washington. Some of the information requested
on this form is required by RCW 4.92.100 and may be subject to public
disclosure. Pursuant to the law, Standard Tort Claim forms cannot be
submitted electronically (via email or fax).

```
┌──────────────────────────┐
│     For Official Use Only │
│                          │
│                          │
│                          │
│                          │
│                          │
└──────────────────────────┘
```

## PLEASE TYPE OR PRINT CLEARLY IN INK

**Mail or deliver**        Department of Enterprise Services
**original claim to**      Risk Management Division
                           1500 Jefferson Street SE
                           MS 41466
                           Olympia, Washington 98504-1466

Business Hours: Monday – Friday 8:00 a.m. – 5:00 p.m.          (A.K.A Ashley moon Roelynn)
Closed on weekends and official state holidays.

1. Claimant's name: Santiago    Marco    Antonio    9/2/86
                  Last name          First      Middle     Date of birth (mm/dd/yyyy)

2. Inmate DOC number (if applicable): 896177

3. Current residential address: 191 constantine way Aberdeen, wa 98520

4. Mailing address (if different): _____

5. Residential address at the time of the incident: _____
   (if different from current address)

6. Claimant's daytime telephone number: N/A _____ N/A
                                    Home                     Business or Cell

7. Claimant's e-mail address: N/A

8. Date of the incident: _____ Time: _____ ☐a.m. ☐p.m. (check one)
                           (mm/dd/yyyy)

9. If the incident occurred over a period of time, date of first and last occurrences:
   from 7/16/18 7/16/17 Time: N/A ☐a.m. ☐p.m.
        (mm/dd/yyyy)                   (mm/dd/yyyy)

   to 10-7-18 _____ Time: N/A ☐a.m. ☐p.m.
       (mm/dd/yyyy)                   (mm/dd/yyyy)

10. Location of incident: WA Graysharbour Aberdeen S.C.C.C
                           State and county       City, if applicable          Place where occurred

11. If the incident occurred on a street or highway:   *N/A*

Name of street or highway          Milepost number          At the intersection with or
                                                            nearest intersecting street

12. State agency or department alleged responsible for damage/injury:

Washington State Dept. of Corrections

13. Names, addresses and telephone numbers of all persons involved in or witness to this incident:

Bruce Gage - head of GD CRC
Ryan Harrington - medical Director at S.C.C.C
Scott light - physicians assistant

14. Names, addresses and telephone numbers of all state employees having knowledge about this incident:

employees of Washington State D.O.C

15. Names, addresses and telephone numbers of all individuals not already identified in #13 and #14 above that have knowledge regarding the liability issues involved in this incident, or knowledge of the Claimant's resulting damages. Please include a brief description as to the nature and extent of each person's knowledge. Attach additional sheets if necessary.

Rachael Seevers of D.R.W
Danny Waxwing of D.R.W

These are both attorneys that are providing me limited representation for This issue.

16. Describe the cause of the injury or damages. Explain the extent of property loss or medical, physical or mental injuries. Attach additional sheets if necessary.

On 8-16-17 I was diagnosed with GD by Mental health staff at S.C.C.C. Since That date I suffered multiple panick attacks, one of which resulted in hospitalization, and on 1-5-18 I attempted to cut open my genitals with a razor blade due to The stress of waiting for D.O.C to make a Decision about my treatment. I have not received any medical care For This condition from 8-16-17 to 10-7-18. I have suffered unneeded mental and emotional stress due to lack of care.

17. Has this incident been reported to law enforcement, safety or security personnel? If so, when and to whom? Please attach a copy of the report or contact information.

Washington D.O.C is fully aware of my situation as found in my medical file as they are responsible for my health and well being.

18. Names, addresses and telephone numbers of treating medical providers. Attach copies of all medical reports and billings.

These names are already provided in #13 of This Document. D.O.C holds all medical records regarding This issue. H.I.P.P.A form already signed.

19. Please attach documents which support the allegations of the claim.

20. I claim damages from the state of Washington in the sum of $ 1,000,000

This Claim form must be signed by the Claimant, a person holding a written power of attorney from the Claimant, by the attorney in fact for the Claimant, by an attorney admitted to practice in Washington State on the Claimant's behalf, or by a court-approved guardian or guardian ad litem on behalf of the Claimant.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

_Ashley M Ruby_                          10-14-18 at S.C.C.C
Signature of Claimant                    191 constantine way
                                         Aberdeen, wa 98520
                                         Date and place (residential address, city and county)

Or

_____                 _____
Signature of Representative              Date and place (residential address, city and county)

_____                 _____
Print Name of Representative             Bar Number (if applicable)

228 of 238

EX. O

| DATE (m/d/yy) | TIME (24-hr) | FACILITY |
|---|---|---|
| 1/12/18 | 12:05 | SCCC |

☐ Risks/benefits of recommended intervention explained; patient consents | PLAN / RX (Dx required for medication orders. Allergies required for new medication orders)

SANTIAGO, MARCO   896177   09-02-88

| | |
|---|---|
| S/p repair of self inflicted scrotal injury @ 7days po. | 144/74 65 16 |
| Doing well — wound well healed | 98⁶ 99% |
| Three prolene sutures sharply removed by me | |
| ∅ complications | |
| RN Wilson present | |
| A/p scrotal lac self inflicted RTC prn | |

---

| DATE (m/d/yy) | TIME (24-hr) | FACILITY |
|---|---|---|
| 1/23/18 | 0830 | SCCC/GT |

☐ Risks/benefits of recommended intervention explained; patient consents | PLAN / RX (Dx required for medication orders. Allergies required for new medication orders)

Vital Signs: BP ___ P ___ R ___ O2-Sat ___ T ___ %Wt 110 lbs

Or. Chief Complaint: Pt requesting tube

Referred to Provider today • Yes ___ No ___

Discussed w/ PCP for F/U • Yes ___ No ___   Provider Notified • Yes ___ No ___

Triage Nurses Name ___ (Stamp) ___ WILSON, RN2

Seen for evaluation of orchiectomy advised apt will be scheduled LWBS

---

State law (RCW 70.02) and/or federal regulations (42 CFR Part 2) prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

**Department of Corrections** WASHINGTON STATE

| | | |
|---|---|---|
| DOC 320.255 | DOC 410.430 | DOC 420.255 |
| DOC 420.312 | DOC 490.850 | DOC 420.250 |
| DOC 610.040 | DOC 610.600 | DOC 610.010 |
| | DOC 610.650 | DOC 610.025 |
| | | DOC 670.020 |

**PRIMARY ENCOUNTER REPORT**

DOC 13-435 (01/06/2017)



**TIP**

Trans in Prison
Justice Project

A Disability Rights Washington Project

March 18, 2019

**LEGAL MAIL - CONFIDENTIAL**

Dear Ashley,

It was nice to hear from you today. To follow-up on our conversation and the letter we received from you on March 11th, I'm sending you the enclosed information:

- Copies of your medical & mental health records that we have on file (please note: we previously filed two records requests in relation to your HRT request, which covered the time period January 1, 2017 to April 5, 2018; we do not have records for the entire time period of 11-1-16 to 3-6-19 as you requested in your letter)

- A copy of the Avila v. Mohave court opinion
- A copy of Federal Rule of Civil Procedure 33
- A copy of the Bradford v. Ogbuehi court opinion
- A copy of the Hartford Underwriters Insurance Company v. Kraus USA court opinion
- Information about the most widely accepted standards of care re: initiating hormone therapy
- DOC Policy 100.500
- DOC Policy 300.010

As we discussed, I'll follow up with you when I have updates about access to religious property. I hope this information is helpful for now. Stay strong and take care!

*It is important for you to understand* that this letter and any accompanying material is legal information, not legal advice. You do not have an attorney-client relationship with me or Disability Rights Washington. Any information you have shared with the TIP Justice Project or Disability Rights Washington will be kept confidential, but we retain the right to advocate or represent someone else related to the issues you have raised. I cannot guarantee that any individual or organization referenced in this material will represent or assist you, nor can I guarantee the quality of their representation if they do. There are certain time limits or deadlines to file complaints, file lawsuits, or to take legal action. If you fail to act within these

315 - 5th Avenue South · Suite 850 · Seattle, WA 98104
t: 206.324.1521 or 800.562.2702 · f: 206.957.0729 · email: info@dr-wa.org · www.disabilityrightswa.org
DRW is a member of the National Disability Rights Network. A substantial portion of the DRW budget is federally funded.

time frames, you may lose your right to do so.  Please check with another lawyer to find out the specific timeframes and requirements for filing these claims.[1]


Sincerely,


**Danny Waxwing**
Attorney
Trans in Prison (TIP) Justice Project
*Equal Justice Works Fellow,*
*Sponsored by Fenwick & West LLP*
Disability Rights Washington

*Pronouns: he/him/his*

---

[1] Please note, there are also administrative requirements regarding the filing of tort claims against government entities that should be considered. For example, a claim against Washington State must be filed with the state of Washington and the relevant state agency at least 60 days prior to a lawsuit against the state for damages. Local governments may have their own timeframes and requirements as well.  The extra time for filing the tort claim must be factored in when considering the statute of limitations.

7.31 22̶2̶9̶ ᴀ F 738



POSITION STATEMENT

# TRANSGENDER HEALTH

## INTRODUCTION
Over the last few decades, there has been a rapid expansion in the understanding of gender identity along with the implications for the care of transgender and gender incongruent individuals. In parallel with the greater societal awareness of transgender individuals, evidence-based and data-driven protocols have increased. While there continue to be gaps in knowledge about the optimal care for transgender individuals, the framework for providing care is increasingly well-established as is the recognition of needed policy changes.

## BACKGROUND
The medical consensus in the late 20th century was that transgender and gender incongruent individuals suffered a mental health disorder termed "gender identity disorder." Gender identity was considered malleable and subject to external influences. Today, however, this attitude is no longer considered valid. Considerable scientific evidence has emerged demonstrating a durable biological element underlying gender identity.[1,2] Individuals may make choices due to other factors in their lives, but there do not seem to be external forces that genuinely cause individuals to change gender identity.

Although the specific mechanisms guiding the biological underpinnings of gender identity are not entirely understood, there is evolving consensus that being transgender is not a mental health disorder. Such evidence stems from scientific studies suggesting that: 1) attempts to change gender identity in intersex patients to match external genitalia or chromosomes are typically unsuccessful[3,4]; 2) identical twins (who share the exact same genetic background) are more likely to both experience transgender identity as compared to fraternal (non-identical) twins[5]; 3) among individuals with female chromosomes (XX), rates of male gender identity are higher for those exposed to higher levels of androgens in utero relative to those without such

exposure, and male (XY)-chromosome individuals with complete androgen insensitivity syndrome typically have female gender identity[6]; and 4) there are associations of certain brain scan or staining patterns with gender identity rather than external genitalia or chromosomes[7,8].

## CONSIDERATIONS
Transgender individuals are often denied insurance coverage for appropriate medical and psychological treatment. Over the last decade, there has been considerable research on and development of evidence-based standards of care that have proven to be both safe and efficacious for the treatment of gender dysphoria/gender incongruence.There is also a growing understanding of the impact that increased access to such treatments can have on the mental health of these individuals.

The Endocrine Society's Clinical Practice Guideline on gender dysphoria/gender incongruence[9] provides the standard of care for treating transgender individuals. The guideline establishes a framework for the appropriate treatment of these individuals and standardizes terminology to be used by healthcare professionals. These recommendations include evidence that treatment of gender dysphoria/incongruence is medically necessary and should be covered by insurance.

Despite increased awareness, many barriers to improving the health and well-being of transgender patients remain. Oftentimes, treatment for gender dysphoria/gender incongruence is considered elective by insurance companies, which fail to provide coverage for physician-prescribed treatment. Access to appropriately trained healthcare professionals can also be challenging as there is a lack of formal education on gender dysphoria/gender incongruence among clinicians trained in the United States. A 2016 survey of endocrinologists, the physicians most likely to care for these patients, found that over 80% have never received training on care of transgender patients[10].

2055 L Street NW
Suite 600
Washington, DC
20036

T. 202.971.3636
F. 202.736.9705

endocrine.org

[1]Saraswat A, et al. Evidence Supporting the Biologic Nature of Gender Identity. Endocr Pract 2015 Feb;21(2): 199-204.
[2]Rosenthal SM. Approach to the Patient: Transgender Youth: Endocrine Considerations. J Clin Endocrinol Metab. 2014 Dec;99(12):4379-89.
[3]Saraswat A, et al. Evidence Supporting the Biologic Nature of Gender Identity. Endocr Pract 2015 Feb;21(2): 199-204.
[4]Rosenthal SM. Approach to the Patient: Transgender Youth: Endocrine Considerations. J Clin Endocrinol Metab. 2014 Dec;99(12):4379-89.
[4]Hoytens C, et al. Gender Identity Disorder in Twins: A Review of the Case Report Literature. J Sex Med. 2012 Mar;9(3):751-7

[5]Dessens AB, et al. Gender Dysphoria and Gender Change in Chromosomal Females with Congenital Adrenal Hyperplasia. Arch Sex Behav 2005 Aug;34(4):389-97.
[6]Saraswat A, et al. Evidence Supporting the Biologic Nature of Gender Identity. Endocr Pract 2015 Feb;21(2): 199-204
[7]Rosenthal SM. Approach to the Patient. Transgender Youth: Endocrine Considerations. J Clin Endocrinol Metab. 2014 Dec;99(12):4379-89.
[8]Endocrine Society Draft Clinical Practice Guideline on Gender Dysphoria/Gender Incongruence (publication expected September 13, 2017).
[9]Davidge-Pitts, C, et al. Transgender Health in Endocrinology: Current Status of Endocrinology Fellowship Program and Practicing Clinicians. J Clin Endocrinol Metab (2017) 102(4):1286-1290.





## POSITION STATEMENT

This can have an adverse impact on patient outcomes, particularly in rural and underserved areas. In fact, studies have indicated that 70% of transgender individuals have experienced maltreatment by medical providers, including harassment and violence.[11] Transgender individuals who have been denied care show an increased likelihood of committing suicide and self-harm.[12] It is critical that transgender individuals have access to the appropriate treatment and care to ensure their health and well-being.

### FUTURE CONSIDERATIONS

While the data are strong for both a biological underpinning to gender identity and the relative safety of hormone treatment (when appropriately monitored medically), the gaps in knowledge to optimize care over a lifetime are profound. Comparative effectiveness research in hormone regimens is needed to determine: the best endocrine and surgical protocols, as it is not yet known if certain regimens are safer or more effective than others; the degree of improvement as a result of the intervention (e.g. decrease in mental health diagnoses); the need for training of health care providers and the most effective training methods; and whether there are cardiovascular, malignancy, or other long-term risks from hormone interventions, particularly as the transgender individual ages. Further, studies are needed to elucidate the biological processes underlying gender identity as well as to determine strategies for fertility preservation and for the optimal approaches to gender non-conforming children. To successfully establish and enact these protocols requires long-term, large-scale studies across countries that employ the same care protocols.

### POSITIONS

- There is a durable biological underpinning to gender identity that should be considered in policy determinations.

- Medical intervention for transgender individuals (including both hormone therapy and medically indicated surgery) is effective, relatively safe (when appropriately monitored), and has been established as the standard of care.[13] Federal and private insurers should cover such interventions as prescribed by a physician as well as the appropriate medical screenings that are recommended for all body tissues that a person may have.

- Increased funding for national research programs is needed to close the gaps in knowledge regarding transgender medical care and should be made a priority.

[11] ibid.
[12] ibid.

[13] Endocrine Society Draft Clinical Practice Guideline on Gender Dysphoria/ Gender Incongruence (publication expected September 13, 2017).

233 of 238

AMERICAN MEDICAL ASSOCIATION HOUSE OF DELEGATES

Resolution: 122
(A-08)

Introduced by:    Resident and Fellow Section, Massachusettes Medical Society, California
                  Medical Association, Medical Society of the State of New York

Subject:          Removing Financial Barriers to Care for Transgender Patients

Referred to:      Reference Committee A

---

1   Whereas, The American Medical Association opposes discrimination on the basis of
2   gender identity[1] and
3
4   Whereas, Gender Identity Disorder (GID) is a serious medical condition recognized as
5   such in both the Diagnostic and Statistical Manual of Mental Disorders (4th Ed., Text
6   Revision) (DSM-IV-TR) and the International Classification of Diseases (10th Revision),[2]
7   and is characterized in the DSM-IV-TR as a persistent discomfort with one's assigned
8   sex and with one's primary and secondary sex characteristics, which causes intense
9   emotional pain and suffering;[3] and
10
11  Whereas, GID, if left untreated, can result in clinically significant psychological distress,
12  dysfunction, debilitating depression and, for some people without access to appropriate
13  medical care and treatment, suicidality and death;[4] and
14
15  Whereas, The World Professional Association For Transgender Health, Inc. ("WPATH")
16  is the leading international, interdisciplinary professional organization devoted to the
17  understanding and treatment of gender identity disorders,[5] and has established
18  internationally accepted Standards of Care [6] for providing medical treatment for people
19  with GID, including mental health care, hormone therapy and sex reassignment surgery,
20  which are designed to promote the health and welfare of persons with GID and are
21  recognized within the medical community to be the standard of care for treating people
22  with GID; and
23
24  Whereas, An established body of medical research demonstrates the effectiveness and
25  medical necessity of mental health care, hormone therapy and sex reassignment
26  surgery as forms of therapeutic treatment for many people diagnosed with GID; [7] and
27
28  Whereas, Health experts in GID, including WPATH, have rejected the myth that such
29  treatments are "cosmetic" or "experimental" and have recognized that these treatments
30  can provide safe and effective treatment for a serious health condition;[7] and
31
32  Whereas, Physicians treating persons with GID must be able to provide the correct
33  treatment necessary for a patient in order to achieve genuine and lasting comfort with
34  his or her gender, based on the person's individual needs and medical history;[8] and
35
36  Whereas, The AMA opposes limitations placed on patient care by third-party payers
37  when such care is based upon sound scientific evidence and sound medical opinion;[9, 10]
38  and



1   Whereas, Many health insurance plans categorically exclude coverage of mental health,
2   medical, and surgical treatments for GID, even though many of these same treatments,
3   such as psychotherapy, hormone therapy, breast augmentation and removal,
4   hysterectomy, oophorectomy, orchiectomy, and salpingectomy, are often covered for
5   other medical conditions; and
6
7   Whereas, The denial of these otherwise covered benefits for patients suffering from GID
8   represents discrimination based solely on a patient's gender identity; and
9
10  Whereas, Delaying treatment for GID can cause and/or aggravate additional serious and
11  expensive health problems, such as stress-related physical illnesses, depression, and
12  substance abuse problems, which further endanger patients' health and strain the health
13  care system; therefore be it
14
15  RESOLVED, That the AMA support public and private health insurance coverage for
16  treatment of gender identity disorder (Directive to Take Action); and be it further
17
18  RESOLVED, That the AMA oppose categorical exclusions of coverage for treatment of
19  gender identity disorder when prescribed by a physician (Directive to Take Action).

Fiscal Note: No significant fiscal impact.


## References

1.  AMA Policy H-65.983, H-65.992, and H-180.980
2.  Diagnostic and Statistical Manual of Mental Disorders (4th ed.. Text revision)
    (2000) ("DSM-IV-TR"), 576-82, American Psychiatric Association; International
    Classification of Diseases (10th Revision) ("ICD-10"), F64, World Health
    Organization.  The ICD further defines transsexualism as "[a] desire to live and be
    accepted as a member of the opposite sex, usually accompanied by a sense of
    discomfort with, or inappropriateness of, one's anatomic sex, and a wish to have
    surgery and hormonal treatment to make one's body as congruent as possible with
    one's preferred sex."  ICD-10, F64.0.
3.  DSM-IV-TR, 575-79
4.  Id. at 578-79.
5.  World Professional Association for Transgender Health: http://www.wpath.org.
    Formerly known as The Harry Benjamin International Gender Dysphoria
    Association.
6.  The Harry Benjamin International Gender Dysphoria Association's Standards of
    Care for Gender Identity Disorders, Sixth Version (February, 2001).  Available at
    http://wpath.org/Documents2/socv6.pdf.
7.  Brown G R: A review of clinical approaches to gender dysphoria. J Clin Psychiatry.
    51(2):57-64, 1990. Newfield E, Hart S, Dibble S, Kohler L. Female-to-male
    transgender quality of life. Qual Life Res. 15(9):1447-57, 2006. Best L, and Stein K.
    (1998) "Surgical gender reassignment for male to female transsexual people."
    Wessex Institute DEC report 88; Blanchard R, et al. "Gender dysphoria, gender
    reorientation, and the clinical management of transsexualism."J Consulting and
    Clinical Psychology. 53(3):295-304. 1985; Cole C, et al. "Treatment of gender

dysphoria (transsexualism)." Texas Medicine. 90(5):68-72. 1994; Gordon E. "Transsexual healing: Medicaid funding of sex reassignment surgery." Archives of Sexual Behavior. 20(1):61-74. 1991; Hunt D, and Hampton J. "Follow-up of 17 biologic male transsexuals after sex-reassignment surgery." Am J Psychiatry. 137(4):432-428. 1980; Kockett G, and Fahrner E. "Transsexuals who have not undergone surgery: A follow-up study." Arch of Sexual Behav. 16(6):511-522. 1987; Pfafflin F and Junge A. "Sex Reassignment. Thirty Years of International Follow-Up Studies after Sex Reassignment Surgery: A Comprehensive Review, 1961-1991." IJT Electronic Books, available at http://www.symposion.com/ijt/pfaefflin/1000.htm; Selvaggi G, et al. "Gender Identity Disorder: General Overview and Surgical Treatment for Vaginoplasty in Male-to-Female Transsexuals." Plast Reconstr Surg. 2005 Nov;116(6):135e-145e; Smith Y, et al. "Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals." Psychol Med. 2005 Jan; 35(1):89-99; Tangpricha V, et al. "Endocrinologic treatment of gender identity disorders. " Endocr Pract. 9(1):12-21. 2003; Tsoi W. "Follow-up study of transsexuals after sex reassignment surgery." Singapore Med J. 34:515-517. 1993; van Kesteren P, et al. "Mortality and morbidity in transsexual subjects treated with cross-sex hormones." Clin Endocrinol (Oxf). 1997 Sep;47(3):337-42; World Professionals Association for Transgender Health Standards of Care for the Treatment of Gender Identity Disorders v.6 (2001).

8.   The Harry Benjamin International Gender Dysphoria Association's Standards of Care for Gender Identity Disorders, at 18.

9.   Id.

10.  AMA Policy H-120.988

**Relevant AMA policy**

**H-65.983 Nondiscrimination Policy**
The AMA opposes the use of the practice of medicine to suppress political dissent wherever it may occur. (Res. 127, A-83; Reaffirmed: CLRPD Rep. 1, I-93; Reaffirmed: CEJA Rep. 2, A-05)

**H-65.992 Continued Support of Human Rights and Freedom**
Our AMA continues (1) to support the dignity of the individual, human rights and the sanctity of human life, and (2) to oppose any discrimination based on an individual's sex, sexual orientation, race, religion, disability, ethnic origin, national origin or age and any other such reprehensible policies. (Sub. Res. 107, A-85; Modified by CLRPD Rep. 2, I-95; Reaffirmation A-00; Reaffirmation A-05)

**H-180.980 Sexual Orientation as Health Insurance Criteria**
The AMA opposes the denial of health insurance on the basis of sexual orientation. (Res. 178, A-88; Reaffirmed: Sub. Res. 101, I-97)

**H-120.988 Patient Access to Treatments Prescribed by Their Physicians**
The AMA confirms its strong support for the autonomous clinical decision-making authority of a physician and that a physician may lawfully use an FDA approved drug product or medical device for an unlabeled indication when such use is based upon

sound scientific evidence and sound medical opinion; and affirms the position that, when the prescription of a drug or use of a device represents safe and effective therapy, third party payers, including Medicare, should consider the intervention as reasonable and necessary medical care, irrespective of labeling, should fulfill their obligation to their beneficiaries by covering such therapy, and be required to cover appropriate "off-label" uses of drugs on their formulary. (Res. 30, A-88; Reaffirmed: BOT Rep. 53, A-94; Reaffirmed and Modified by CSA Rep. 3, A-97; Reaffirmed and Modified by Res. 528, A-99; Reaffirmed: CMS Rep. 8, A-02; Reaffirmed: CMS Rep. 6, A-03; Modified: Res. 517, A-04)

## 5. ASSESSMENT AND MANAGEMENT OF THE TG INDIVIDUAL –
## A MULTIDISCIPLINARY APPROACH

Healthcare for **TG** individuals requires a multidisciplinary approach. The following process is recommended for transgender individuals (especially those newly identifying as **TG**) seeking medical intervention to assist with gender transition needs:

- **FIRST STEP – MENTAL HEALTH ASSESSMENT:** The first step in the process is for the individual to be seen by psychology staff for a comprehensive mental health assessment. Psychology staff will be able to confirm an individual's **TG** identity, diagnose mental health conditions based on DSM criteria, address the inmate's mental health concerns, and provide individualized counseling support and other interventions as appropriate.
    → See *Section 6, Mental Health Assessment.*

- **SECOND STEP – MEDICAL ASSESSMENT:** The second step is for psychology staff to refer the individual for an evaluation by a medical provider if the patient desires medical intervention. If appropriate, the medical provider can initiate hormone therapy after the risks and benefits have been discussed with the individual, and the **BOP TCCT** has been consulted. Pharmacists may also play a role in treatment by counseling individuals on medications and recommending appropriate medication selection and/or lab monitoring to the medical provider. Psychiatrists may be consulted in cases of significant mental health challenges requiring medical intervention.
    → See *Section 7, Medical Assessment.*

- **THIRD STEP – INDIVIDUALIZED TREATMENT:** In many cases, treatment is designed to reduce characteristics of the natal sex and induce those of the identified gender, allowing individuals to project their **GENDER IDENTITY.** The treatment and management of the **TG** individual requires individualized care guided by treatment goals to allow for successful **TRANSITION** through education, counseling, real-life experience, medical evaluation, hormone treatment, and in some cases, sex reassignment surgery.
    → See *Section 8, Stepwise Approach to Medical and Mental Health Treatment of TG Individuals.*

### GENDER DYSPHORIA (GD) CRITERIA

**Individuals identifying as transgender do not necessarily have GD.** Although data are insufficient to know the prevalence rates of **GD** in the transgender population, anecdotally many clinicians report that most transgender individuals experience some degree of dysphoria in the absence of treatment. Because untreated or under-treated **GD** is associated with increased morbidity and mortality, screening for **GD** in **TG** individuals is essential. Without treatment, this population may experience higher rates of depression, anxiety, and suicidality. Treatment modalities may include psychotherapy, supportive changes in gender expression and role, hormone therapy, and surgical therapy. Where indicated, hormonal interventions may improve **GD**, mental health comorbidities, and overall quality of life.

6

*Federal Prisons' policy re: HORMONE THERAPY*

238 of 238