1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10

MARCO SANTIAGO,

11

Plaintiff,

12

v.

13

BRUCE C. GAGE, *et al.*,

14

Defendants.

CASE NO. 3:18-cv-05825-RBL-JRC

REPORT AND
RECOMMENDATION
RE: CROSS MOTIONS FOR
SUMMARY JUDGMENT

**Noted for:** September 27, 2019

15
16

The District Court has referred this 42 U.S.C. § 1983 civil rights matter to United States

17

Magistrate Judge J. Richard Creatura under 28 U.S.C. §§ 636(b)(1)(A) and (1)(B) and Local

18

Magistrate Judge Rules MJR 1, 3, and 4.  *See* Dkt. 2.  The matter is before the Court on the

19

parties' cross motions for summary judgment.  *See* Dkts. 33, 38.

20

Plaintiff, a male-to-female transgender prisoner, alleges claims of deliberate indifference

21

in violation of the Eighth Amendment against Bruce Gage, the Department of Corrections'

22
23
24

REPORT AND RECOMMENDATION - 1

1 ("DOC") chief of psychiatry; Ryan Herrington, her[1] facility's medical director; and Scott Light,

2 one of her primary care providers.  Her claims derive from defendants' various roles in an

3 alleged 13-month delay between when she requested hormone therapy and when it was

4 provided—a period during which plaintiff attempted self-castration and reported suffering

5 emotional anguish because of the delay.

6       Although the Court is conscious that treatment for Gender Dysphoria ("GD") is relatively

7 new and appropriately treating prisoners with this condition may inevitably involve some delay,

8 here, plaintiff has provided facts that could support a jury finding that for at least two defendants,

9 the delay was due to purposeful interference, not prudent medical judgment.  Thus, there are

10 material issues of fact regarding whether at least some portion of that delay was the result of

11 deliberate indifference toward a serious medical need.  Therefore, the undersigned recommends

12 that the District Court deny plaintiff's motion for summary judgment and grant in part and deny

13 in part defendants' cross-motion for summary judgment.

14

15                       **FACTUAL BACKGROUND**

16       Many of the facts giving rise to this lawsuit are undisputed, including the following.

17 Plaintiff identifies herself as a male to female transgender prisoner at Stafford Creek Corrections

18 Center.  *See* Dkt. 20, at 1.  She suffers from GD, which is a "persistent discomfort with one's

19 assigned sex and with one's primary and secondary sex characteristics, which causes intense

20 emotional pain and suffering."  Dkt. 33-1, at 234; *see* Dkt. 38, at 3.  The parties agree that GD is

21 a "serious medical condition."  Dkt. 38, at 14; Dkt. 43, at 5.

22

23 ---

[1] The Court refers to plaintiff using feminine pronouns, as this is plaintiff's preferred
24 pronoun usage.

REPORT AND RECOMMENDATION - 2

One of the methods of treating this condition is a form of hormone therapy.  *See* Dkt. 33-1, at 28; Dkt. 39, at 3.  But, according to DOC policy, before such therapy could be administered, the treatment had to be authorized by a care review committee specifically addressing persons with GD (a committee that is hereinafter referred to as the "GD-CRC") on a case-by-case basis. *See* Dkt. 33, at 6; Dkt. 39-1, at 13, 25, 27, 55.  The GD-CRC is comprised of three voting members—the DOC chief medical officer, mental health director, and chief of psychiatry.  *See* Dkt. 33-1, at 163; Dkt. 39-1, at 56.  Defendant Gage, the DOC chief of psychiatry, is one voting member of that committee.  *See* Dkt. 33, at 7; Dkt. 39, at 2; Dkt. 39-1, at 56, 63, 65.

The following dates are important to the resolution of these motions:

August 16, 2017 – Plaintiff is diagnosed with GD.  *See* Dkt. 33, at 3.

September 21, 2017 – Defendant Gage becomes personally aware of plaintiff's case.  *See* Dkt. 43, at 4.

November 20, 2017 – Clinical assessments are completed for presentation of plaintiff's hormone treatment request to the GD-CRC.  Dkt. 38, at 4; Dkt. 43, at 4–5.

January 5, 2018 – Plaintiff attempts auto-castration and is treated by defendant Light. Dkt. 33-1, at 15, 165; Dkt. 41-1, at 2.

February 8, 2018 – According to defendant Gage, the GD-CRC meets, but plaintiff's case is not discussed because of agenda issues.  *See* Dkt. 39, at 4.

March 26, 2018 – The GD-CRC meets to discuss plaintiff's case, decides that it is unable to confirm plaintiff's GD diagnosis, and orders psychological testing, all of which is documented in an April 3 report authored by defendant Gage.  *See* Dkt. 33-1, at 165; Dkt. 39, at 4; Dkt. 39-1, at 63.

1    May 9, 2019 – A "blood work up" reveals that plaintiff has slightly elevated prolactin

2  levels.  *See* Dkt. 43, at 9.

3    July 12, 2018 – The GD-CRC meets, considers psychological testing results, and

4  authorizes plaintiff's hormone therapy.  Dkt. 39-1, at 66; *see* Dkt. 43, at 9.

5    July 16, 2018 – Defendant Gage writes a primary encounter report documenting the GD-

6  CRC's decision and authorizing hormone therapy.  *See* Dkt. 39-1, at 66; *see* Dkt. 43, at 9.

7    August 30, 2018 – An additional endocrinology consultation is completed at the request

8  of defendant Herrington.  Dkt. 33-1, at 211; Dkt. 40, at 2.

9    October 12, 2018 – Defendant Light, now plaintiff's primary care provider, approves

10  plaintiff's hormone treatment.  *See* Dkt. 33, at 11; Dkt. 41, at 4.

11    November 3, 2018 – Plaintiff receives the first hormone injection.  Dkt. 40, at 2; *see* Dkt.

12  43, at 8.

13    **PROCEDURAL BACKGROUND**

14    Plaintiff, who proceeds *pro se* and *in forma pauperis*, initiated this matter in October

15  2018.  *See* Dkt. 1.  In her amended complaint, she asserts that the actions of defendants Gage,

16  Herrington, and Light violated the Eighth Amendment.  *See* Dkt. 20, at 2.  Plaintiff requests

17  $250,000 in damages, payment of costs associated with her lawsuit, and injunctive relief.  *See*

18  Dkt. 20, at 6.  The parties have engaged in extensive discovery.  *See* Dkt. 34.

19    Plaintiff and defendants have now filed cross motions for summary judgment.  *See* Dkts.

20  33, 38.  Defendants included a notice of dispositive motion with their cross motion for summary

21  judgment.  *See* Dkt. 42.  Plaintiff concedes that defendants' motion should be granted inasmuch

22  as it requests dismissing her claims for injunctive relief.  *See* Dkt. 43, at 13.

23    Defendants have also filed supplemental evidence in support of their motion.  *See* Dkt.

24

47.  Plaintiff filed a response to the supplemental evidence that includes arguments in support of her summary judgment motion.  *See* Dkt. 48.

## DISCUSSION

### I.  Motions To Strike and Supplemental Evidence

As a preliminary matter, the undersigned addresses defendants' requests to strike certain evidence that plaintiff relies upon.  An affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

First, defendants request that the Court strike plaintiff's briefing to the extent that it relies on a statement in plaintiff's declaration that an April 2017 report established that plaintiff "meet[s] the standards to be treated with Hormone therapy."  Dkt. 38, at 2; *see* Dkt. 33-1, at 11. Plaintiff provided the report.  *See* Dkt. 33-1, at 1.  Contrary to plaintiff's characterization, the report does not state that plaintiff meets the criteria for hormone therapy; rather, it states that she meets the criteria for GD and refers her to a psychiatrist so that her case can be presented to the GD-CRC.  Dkt. 33-1, at 6–7.  The Court will therefore consider the report to the extent that it establishes that the provider who drafted the report assessed GD and directed further referral so that plaintiff's case could be considered by the GD-CRC.

Second, defendants request that the Court strike plaintiff's briefing to the extent that it relies on plaintiff's statement that World Professional Association for Transgender Health ("WPATH") guidelines outline appropriate treatment protocols for individuals with GD.  Dkt.

38, at 2.  The Court will consider the guidelines as having some persuasive value, although they are not binding.  The Court takes judicial notice that other courts have looked to the WPATH standards as authoritative in this area.  *See, e.g.*, *Edmo v. Corizon*, __ F.3d __, 2019 WL 3978329, at *4 (9th Cir. Aug. 23, 2019); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1171, 1188 (N.D. Cal. 2015).  There is no reason to strike plaintiff's briefing on this issue.

Third, defendants object to plaintiff's reliance on emails between Rachael Seevers (an attorney with Disability Rights Washington who appears to have assisted plaintiff before plaintiff filed this case) and Dan Karasic, M.D. (a professor of psychiatry).  *See* Dkt. 38, at 2; Dkt. 33-1, at 179.  In these emails, which plaintiff offers as expert opinion testimony regarding whether the personality testing ordered by the GD-CRC was medically appropriate, Dr. Karasic stated that "[n]either personality testing nor projective testing have any place in the evaluation of people for hormones."  Dkt. 38, at 2; *see* Dkt. 33-1, at 180.

Defendants are correct that this statement is hearsay, offered without an exception—and therefore is inadmissible.  Moreover, even if plaintiff offered a hearsay exception or the evidence could be presented in an admissible form, this statement is offered as an expert opinion regarding the standard of care for GD patients.  Rule 702 of the Federal Rules of Evidence requires that, among other things, the proffered expert opinion be based on sufficient facts or data and the product of reliable principles and methods and that the expert must have "reliably applied the principles and method to the facts of the case."  Here, Dr. Karasic does not explain the basis for his conclusory statement about projective and personal testing, nor does he explain whether this statement applies to plaintiff's particular case or is a general, abstract principle.  Without more explanation about the basis for this opinion, it does not meet the requirements of Rule 702.  The motion to strike Dr. Karasic's opinion about personality or projective testing is granted.

1    Finally, defendants submitted supplemental evidence in support of their cross-motion

2    after the noting date for summary judgment, when this Court granted their motion to compel.

3    *See* Dkts. 46, 47.  This evidence consists primarily of plaintiff's responses to interrogatories, in

4    which she identifies "no physical harm" that resulted from a particular "act" by defendant Light,

5    Gage, or Herrington, since her claim is premised on a "failure to act."  *E.g.*, Dkt. 47, at 8.  The

6    Court has considered this supplemental evidence in making a recommendation on the parties'

7    motions for summary judgment, although the Court does not find that any of this evidence is

8    material to the analysis below.  The Court has also considered plaintiff's arguments in her

9    response to the supplemental evidence, to the extent that they are offered in support of her

10   summary judgment motion and in opposition to defendants' cross motion for summary

11   judgment.  *See* Dkt. 48.

12   **II.  Legal Principles**

13   **A.  Summary Judgment**

14   Summary judgment is appropriate "if the movant shows that there is no genuine dispute

15   as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

16   56(a).  "In ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be

17   believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor.'"  *Moldex-*

18   *Metric, Inc. v. McKeon Prods., Inc.*, 891 F.3d 878, 881 (9th Cir. 2018) (quoting *Anderson v.*

19   *Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Further, "'courts should construe liberally

20   motion papers and pleadings filed by *pro se* inmates and should avoid applying summary

21   judgment rules strictly.'"  *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018) (quoting *Thomas*

22   *v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010); *see also Blaisdell v. Frappiea*, 729 F.3d 1237,

23

24

1241 (9th Cir. 2013) (a court must not hold "missing or inaccurate legal terminology or muddled draftsmanship against" a *pro se* inmate).

   Because plaintiff is *pro se*, all of her contentions in motions and pleadings that are made under penalty of perjury, based on personal knowledge, and set forth facts that would be admissible in evidence will be considered in ruling on the cross motions for summary judgment. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

### B.  Section 1983 and the Eighth Amendment

   To prevail in a § 1983 action, a plaintiff must show "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused (3) by conduct of a "person" (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

   A § 1983 claim for damages against a person in his individual capacity requires a showing that the person's conduct proximately caused the constitutional violation. *See Crumpton*, 947 F.2d at 1420. "A person deprives another 'of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains].'" *Leer v. Murphy*, 84 F.2d 628, 633 (9th Cir. 1988) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

   As for claims of deliberate indifference under the Eighth Amendment, a two-part test applies—"[f]irst, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Second, the plaintiff must show the defendant[s]' response to the need was deliberately indifferent."  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).  ""A

1    prison official is deliberately indifferent under the subjective element of the test only if the

2    official 'knows of and disregards an excessive risk to inmate health and safety.'" *Colwell v.*

3    *Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1057

4    (9th Cir. 2004)). "[T]he official must both be aware of facts from which the inference could be

5    drawn that a substantial risk of serious harm exists, and he must also draw the inference."

6    *Farmer v. Brennan*, 511 U.S. 825, 827 (1994).

7        Inadvertent or negligent failures to provide adequate medical care are insufficient to

8    make out a claim under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). Rather, a

9    plaintiff must show at least subjective recklessness. *See Snow v. McDaniel*, 681 F.3d 978, 985

10   (9th Cir. 2012), *overruled in part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83

11   (9th Cir. 2014).

12       Deliberate indifference includes both intentionally delaying access to medical care and

13   intentionally interfering with medical care once prescribed. *Estelle*, 429 U.S. at 104. However,

14   a prisoner must demonstrate that the delay led to further injury. *See McGuckin v. Smith*, 974

15   F.2d 1050, 1060 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104

16   F.3d 1133, 1136 (9th Cir. 1997).

17   **III.  Cross Motions for Summary Judgment Regarding Defendant Gage**

18       Defendant Gage states that he is a board certified psychiatrist and the DOC's Chief of

19   Psychiatry. Dkt. 39, at 1–2. As the Chief of Psychiatry, he is one of three voting members of the

20   GD-CRC, which determines by majority vote whether a GD diagnosis is "clinically indicated"

21   and whether to authorize hormone treatment. Dkt. 33-1, at 163; *see* Dkt. 39, at 2.

22       On September 21, 2017, defendant Gage first became aware of plaintiff's interest in

23   hormone therapy, and he states that plaintiff's request for hormone treatment was ready for GD-

24

1    CRC review on November 20, 2017. *See* Dkt. 39, at 3–4, 9; Dkt. 43, at 4–5; Dkt. 45, at 9. The

2    GD-CRC did not consider plaintiff's request for treatment until March 26, 2018. *See* Dkt. 33, at

3    7; Dkt. 38, at 5; Dkt. 39, at 4. At that meeting, the GD-CRC found no medical contraindications

4    to hormone therapy but concluded,

> GD-CRC thinks it is possible that [plaintiff] meets criteria for GD, but it is not possible to confirm at this time. Were this confirmed, there remain questions regarding readiness, including marginal participation with providers, identity concerns generally, and emotional instability. The GD-CRC recommends personality testing (consider PAI or MMPI and projective testing to help clarify the diagnosis and determine readiness).

Dkt. 33-1, at 165.

9        On July 12, 2018, the GD-CRC reconvened, stating that it had received psychological

10   testing results. *See* Dkt. 39-1, at 65. This time, the GD-CRC "confirm[ed]" plaintiff's GD

11   diagnosis, found that "psychological testing gives some assurance that [plaintiff] is capable of

12   some degree of stability and does not have serious identity issues that substantially impact either

13   the diagnosis or readiness," and authorized hormone therapy. *See* Dkt. 39-1, at 66. The GD-

14   CRC explicitly found "no medical conditions that represent a contraindication to hormone

15   therapy." Dkt. 39-1, at 65. At that point, defendant Gage claims that he was no longer directly

16   responsible for plaintiff's care and that her care was directed by her primary care providers. *See*

17   Dkt. 39, at 5.

18       Plaintiff requests summary judgment on her claims against defendant Gage on the basis

19   of his role in the GD-CRC's provisional, April 2018 report postponing treatment. Defendant

20   Gage argues that he did not personally participate in the delay in treatment and was not otherwise

21   deliberately indifferent to plaintiff. *See* Dkt. 38, at 19. He also seeks summary judgment in his

22   favor, claiming that plaintiff has presented evidence of, at most, a difference in opinion regarding

her treatment, and has not presented any evidence from which a jury could conclude that he was deliberately indifferent to her medical needs. *See* Dkt. 38, at 15.

### A. Personal Participation

The parties agree that defendant Gage did not became aware of plaintiff's case until September 21, 2017. *See* Dkt. 38, at 20.   *See* Dkt. 43, at 4.  Plaintiff alleges that defendant Gage "postponed" her treatment when the GD-CRC ordered further testing in its provisional, April 2018 report. *See* Dkt. 33, at 7; Dkt. 43, at 6.  Defendant Gage's membership on the committee is evidence that, viewed in the light most favorable to plaintiff, defendant Gage at least participated in the decision to postpone a decision on plaintiff's treatment at that time.

Although plaintiff asserts that defendant Gage is liable for the period from July 2018 (when treatment was authorized) through November 2018 (when plaintiff ultimately received treatment (*see* Dkt. 43, at 8)), plaintiff provides no facts to controvert defendant Gage's claims that he did not personally participate in the alleged deprivations after July 2018.  *See* Dkt. 39, at 5.  Therefore, summary judgment should be granted in favor of defendant Gage for any alleged deprivations after July 2018.

Thus, the Court will now consider whether there is evidence that defendant Gage was deliberately indifferent to plaintiff between September 21, 2017 and July 12, 2018.

### B. Deliberate Indifference—September 2017 to March 2018

For the period between September 21, 2017 and the GD-CRC's March 2018 meeting, when the GD-CRC decided to postpone making a decision regarding plaintiff's treatment, the parties dispute the extent of defendant Gage's awareness of plaintiff's serious medical needs.

For her part, plaintiff provides various medical records as evidence.  In August 2017, a psychiatrist diagnosed plaintiff with gender dysphoria.  Dkt. 33-1, at 10.  In November 2017,

1   plaintiff's case was approved for presentation to the GD-CRC.  The GD-CRC did not hear her

2   case until March 2018.  *See* Dkt. 39, at 4, 8; Dkt. 43, at 4–5; Dkt. 45, at 9.  Plaintiff further

3   supports her summary judgment motion with evidence that she suffered significant ongoing

4   anxiety during the period between when her case was ready for review and when the GD-CRC

5   actually heard her case.  *See* Dkt. 33-1, at 12.  She claims that her anxiety and emotional distress

6   culminated in her attempted auto-castration on January 4, 2018.  *See* Dkt. 33-1, at 12, 15.

7         In response, defendant Gage asserts that even after he became aware of plaintiff's GD

8   diagnosis in September 2017, he was not aware of her attempted auto-castration or the other

9   details of her medical file during the period leading up to the March 2018 meeting.  *See* Dkt. 39,

10  at 4, 6–7.  In addition, he argues that because he was attempting to schedule plaintiff's GD-CRC

11  review, he did not disregard any risk of harm.

12        Even if a reasonable jury could conclude that defendant Gage was aware that delaying the

13  decision to authorize hormone therapy posed an excessive risk of harm to plaintiff, there is no

14  evidence that defendant Gage intentionally disregarded that risk leading up to March 2018, when

15  the GD-CRC first considered plaintiff's request.  *See Snow*, 681 F.3d at 985.  Defendant Gage

16  explains in his declaration that the delay between when plaintiff's case was ready for

17  presentation to the GD-CRC and when they met in March 2018 "was the result of scheduling

18  problems, not indifference."  Dkt. 39, at 7.  Specifically, defendant Gage explains,

> There were challenges scheduling the GD-CRC for [plaintiff], including problems
> scheduling [plaintiff's] clinical providers.  This also came at a time when referrals
> for GD-CRC were increasing.  In response, the [DOC] added CRC meeting dates
> at the beginning of 2018. . . .  [Plaintiff] was scheduled for February 8, 2018 along
> with other patients.  The GD-CRC ran out of time before completing [plaintiff's]
> review and GD-CRC was rescheduled for March 26, 2018.

23  Dkt. 39, at 4.

24

1    Plaintiff provides no facts to rebut defendant Gage's claim that he was attempting to

2    schedule her GD-CRC review earlier during this interval.  Instead, plaintiff simply re-states that

3    defendant Gage "re-scheduled" her, showing deliberate indifference.  *See* Dkt. 43, at 6.  But this

4    kind of sweeping, conclusory allegation is insufficient to defeat summary judgment.  *See Leer*,

5    84 F.2d at 633.

6    As it stands, therefore, the undisputed facts regarding plaintiff's claim against defendant

7    Gage for the period between September 2017 and March 2018 establish at most, that defendant

8    Gage attempted to take action, but that his attempts were ineffective.  This is insufficient for a

9    claim of deliberate indifference, even if defendant Gage knew of an excessive risk of harm.

10   *Accord Lefall v. Dallas Independent Sch. Dist.*, 28 F.3d 521, 532 (5th Cir. 1994) (good faith but

11   ineffective responses are inadequate to show deliberate indifference).  Therefore, the Court

12   recommends that plaintiff's motion be denied and defendant Gage's motion be granted for any

13   alleged claims against defendant Gage arising before March 2018.

### C.  Deliberate Indifference—March 2018 to July 2018

15   The remainder of plaintiff's claim against defendant Gage concerns defendant Gage's

16   actions beginning in March 2018, when the GD-CRC met and determined that additional testing

17   was necessary before treatment could be authorized.  Plaintiff also submits evidence that

18   pursuant to the GD-CRC's provisional request for further psychological testing, her providers

19   requested the names of family members to DOC staff to "serve as references[.]"  Dkt. 33-1, at

20   177.

21   There is evidence in the record to contradict defendant Gage's statements that he was

22   unaware of any serious risk of harm to plaintiff from the delay.  *See* Dkt. 39, at 6.  For example,

23

24

1  the GD-CRC's April 2018 report, signed by Gage, includes a description of plaintiff's self-

2  castration attempt in January 2018.  Dkt. 33-1, at 165.

3      Defendant Gage argues that plaintiff has established at most, a mere disagreement with

4  her physicians over the course of her treatment, which is insufficient as a matter of law to

5  establish an Eighth Amendment violation.  Dkt. 38, at 15.  But a choice between medical

6  opinions is actionable if plaintiff shows that "the chosen course of treatment 'was medically

7  unacceptable under the circumstances' and was chosen 'in conscious disregard of an excessive

8  risk to [the prisoner's] health.'"  *Toguchi*, 391 F.3d at 1058 (quoting *Jackson*, 90 F.3d at 332)).

9  Thus, the crux of the matter is whether plaintiff has raised a genuine issue of material fact that

10  the decision to postpone her treatment for further testing was medically unacceptable under the

11  circumstances.

12      Plaintiff relies on various protocol for GD treatment to argue that the information

13  required by the GD-CRC in its provisional report is irrelevant to "a positive [GD] diagnosis" or

14  "the approval process of medical care for [GD]" under the DOC's GD protocol.  Dkt. 33, at 7.

15  Essentially plaintiff argues that because various treatment guidelines and protocol are silent

16  regarding the need for personality and projective testing and family contacts, it is medically

17  unacceptable to require such information before approving hormone treatment.  *See* Dkt. 33, at

18  7–8.  Having carefully reviewed plaintiff's proffered evidence, the undersigned disagrees.

19      The WPATH standards that plaintiff submits are silent about whether it is appropriate to

20  request personality or projective testing or family contacts as a precondition to hormone therapy

21  or confirmation of a GD diagnosis.  However, the WPATH standards—which provide "clinical

22  guidance for health professionals to assist transsexual, transgender, and gender-nonconforming

23  people with safe and effective pathways to achieving lasting personal comfort with their

24

REPORT AND RECOMMENDATION - 14

1    gendered selves" (Dkt. 33-1, at 21)—emphasize the importance of obtaining a complete picture

2    of a patient's mental health before referring the patient for hormone treatment.  The WPATH

3    guidelines require "mental health screening and/or assessment" before a referral for hormone

4    treatment (Dkt. 33-1, at 48); a diagnosis of "[p]ersistent, well-documented" GD (Dkt. 33-1, at

5    54); and reasonably well-controlled other mental health concerns.  Dkt. 33-1, at 54.  Plaintiff

6    argues that the absence of these requirements does not preclude hormone therapy under WPATH

7    guidelines.  Dkt. 43, at 5.  But this appears to be the case only in "selected" circumstances—such

8    as patients who will otherwise recourse to illicit hormone use.  Dkt. 43, at 54.

9        Moreover, the WPATH guidelines are meant to be "flexible"—"individual health

10    professionals and programs may modify them" based on "a patient's unique anatomic, social or

11    psychological situation; an experienced health professional's evolving method of handling a

12    common situation" and other factors.  Dkt. 33-1, at 22.  In short, not only is there nothing in the

13    WPATH guidelines disfavoring psychological testing or family contacts, but the WPATH

14    guidelines appear to counsel in favor of a flexible, individualized approach and gathering

15    additional information about factors such as the persistence of a GD diagnosis and the

16    significance of any other mental health concerns as necessary to support a diagnosis and referral

17    for hormone treatment.

18        Plaintiff also provides Department of Justice standards—which are not binding on the

19    Washington State DOC.  *See* Dkt. 33-1, at 141.  These standards, too, are silent regarding

20    psychological or projective testing as a precondition to a confirmed GD diagnosis and hormone

21    therapy.  Instead, they emphasize the importance of "individualized assessment," including

22    psychological consultation, before ordering hormone treatment.  *See* Dkt. 33-1, at 143.

23

24

1    Finally, like the other sources that plaintiff provides, the DOC's GD protocol is silent as

2    to personality and projective testing as well as family contacts.  However, the GD-CRC

3    determines whether hormonal therapy is clinically indicated. A majority of GD-CRC members

4    must agree that treatment is clinically indicated, that there are no contraindications to treatment,

5    and that the patient is ready for and understands the likely effects of treatment.  Dkt. 33-1, at 162.

6    This is entirely consistent with the GD-CRC's request for additional information to confirm the

7    GD diagnosis and to ensure that plaintiff is ready for treatment.  In fact, the GD protocol

8    authorizes the GD-CRC to review a GD diagnosis to determine whether it is warranted.  *See* Dkt.

9    33-1, at 163.  Moreover, it directs that "[t]reatment interventions other than gender confirmation

10   surgery shall . . . [a]ddress medical, mental health, and *personal adjustment needs*."  Dkt. 33-1, at

11   164 (emphasis added).  In short, a review of the GD protocol demonstrates that the GD-CRC

12   acted within the GD-CRC protocol when they requested additional information to confirm

13   plaintiff's GD diagnosis and hormone therapy readiness.

14   Plaintiff also appears to argue that because there were no "medical" contraindications to

15   care found in April 2018, that means that the GD-CRC necessarily also found that there were no

16   "mental health" contraindications.  *See* Dkt. 48, at 3.  This is not a plausible reading of the April

17   2018 report—which clearly sets forth that although there were no medical contraindications to

18   hormone therapy, the GD-CRC had questions regarding plaintiff's GD diagnosis and her

19   readiness for care.  *See* Dkt. 33-1, at 165.

20   Therefore, there is nothing in the proffered evidence to suggest that delaying her hormone

21   treatment for further testing was medically unacceptable under the circumstances.  And, no

22   material evidence to suggest that defendant Gage was deliberately indifferent because he chose

23   to delay a decision regarding treatment in order to obtain psychological testing.  Treatment for

24

GD is an emerging area and defendants must be allowed deference in their medical decisions regarding appropriate treatment in individual cases. This Court finds that there is no evidence to support a conclusion that defendant Gage's conduct constituted deliberate indifference.

For these reasons, plaintiff's motion for summary judgment against defendant Gage should be denied and defendants' motion for summary judgment in favor of defendant Gage should be granted. Plaintiff's claim against defendant Gage should be dismissed with prejudice.

**IV. Cross Motions for Summary Judgment Regarding Defendant Herrington**

Defendant Herrington states that he is a medical doctor and the Facility Medical Director for Stafford Creek Corrections Center. Dkt. 40, at 1. He participated in plaintiff's medical care and had access to her medical records. Dkt. 40, at 32; *see* Dkt. 43, at 9.

Defendant Herrington was aware of the fact that the GD-CRC had approved plaintiff's hormone treatment on July 16, 2018. *See* Dkt. 40, at 2. However, defendant Herrington claims that based on the elevated prolactin levels noted in May 2018, he had requested a consultation with an endocrinologist, which was not completed until August 30, 2018. Dkt. 40, at 2. Defendant Herrington says that he considered this consultation "prudent practice" because of plaintiff's "mildly elevated prolactin level." Dkt. 40, at 2.

Plaintiff argues in support of her summary judgment motion that defendant Herrington should be held liable as a matter of law because he ignored the GD-CRC's authorization to begin treatment, instead postponing treatment on the basis of elevated prolactin levels that the GD-CRC did not find to be a contraindication to treatment. Dkt. 33, at 11.

Defendant Herrington argues that he did not personally participate by interfering or delaying plaintiff's treatment and that he was not deliberately indifferent to plaintiff's medical needs. Dkt. 38, at 18, 20. He requests summary judgment in his favor, as well. Dkt. 38, at 16.

1

### A.  Causation

2     Plaintiff does not appear to allege that defendant Herrington could have directed

3 treatment before the GD-CRC authorized care.  *See* Dkt. 33, at 11; Dkt. 43, at 10.  Because the

4 parties do not dispute that defendant Herrington could only direct hormone therapy once the GD-

5 CRC authorized care, plaintiff fails to allege facts that would amount to a showing that defendant

6 Herrington deprived her of a constitutionally protected right before July 16, 2018.  *See*

7 *Preschooler II v. Clark Cty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007).

8     However, plaintiff has raised triable issues regarding defendant Herrington's personal

9 participation in the alleged violation of her Eighth Amendment rights by interfering with the

10 treatment that the GD-CRC had authorized in July 2018.  Specifically, plaintiff points to

11 defendant Herrington's declaration, in which he states that he postponed her treatment until the

12 endocrinologist's opinion was received.  *See* Dkt. 40, at 2.

13

### B.  Deliberate Indifference (July 2018 to November 2018)

14     The parties dispute the facts regarding whether defendant Herrington was deliberately

15 indifferent after July 16, 2018.  Defendant Herrington asserts that a physician's assistant's May

16 9, 2018 workup revealed "a mildly elevated prolactin level that warranted additional expertise[.]"

17 Dkt. 40, at 2; *see* Dkt. 33-1, at 220.  Therefore, defendant Herrington requested a consultation

18 from an endocrinologist, which took place in August 2018 and which "was reassuring."  Dkt. 40,

19 at 2.  Thereafter, defendant Light directed treatment on October 30, 2018, and treatment began in

20 November.  *See* Dkt. 40, at 2.  Defendant Herrington states that his decision to delay treatment

21 pending an endocrinologist's consultation was "prudent practice"—not deliberate indifference.

22 *See* Dkt. 40, at 2.

23

24

1    For her part, plaintiff claims that she spoke to defendant Herrington and told him of her

2    "unremitting emotional pain . . . while awaiting treatment." Dkt. 33-1, at 12. She also points to

3    the GD-CRC's July 2018 approval of treatment, which includes that the GD-CRC found "no

4    medical conditions that represent a contraindication to hormone therapy." Dkt. 39-1, at 65. She

5    asserts that if the GD-CRC did not believe that plaintiff's elevated prolactin levels were a

6    contraindication to treatment, then defendant Herrington's decision to request an outside

7    consultation on the basis of elevated prolactin levels anyway shows that he "took it upon himself

8    to deny [her] the needed treatment" and raises an inference that he purposefully delayed her

9    treatment for no valid medical reason. Dkt. 33, at 9.

10    The record is unclear regarding whether the GD-CRC was aware of plaintiff's elevated

11    prolactin levels. The GD-CRC's July 2018 report contains no reference to any workups that

12    occurred between March and July 2018. *See* Dkt. 39-1, at 65–66. Plaintiff asserts that she

13    knows from conversations with defendant "Light and other medical staff that the GD-CRC at all

14    times were aware of [her] prolactin levels, and that those levels were never a factor to the GD-

15    CRC to deny [her] care." Dkt. 33-1, at 14. She also points to the GD-CRC protocol, which

16    directs the GD-CRC to authorize treatment based on providers' presentations regarding, among

17    other things, a "[c]omplete medical evaluation . . . to include evaluation of any absolute or

18    relative contraindications to proposed hormonal or other pharmacological treatment" and the

19    GD-CRC's own "[r]eview of relevant mental health and medical diagnostic or treatment

20    records." Dkt. 39-1, at 57. There is at least a reasonable inference from this evidence that when

21    the GD-CRC rendered its decision in July of 2018, it was aware of plaintiff's entire medical file,

22    including her elevated prolactin levels. However, given the conspicuous lack of reference to the

23

24

1  elevated levels of prolactin in the GD-CRC's July 2018 report, the undersigned finds that the

2  record is unclear on this point.

3      Considering the evidence submitted, a rational jury could conclude that defendant

4  Herrington's decision to delay treatment while waiting for the endocrinologist's consultation was

5  medically unacceptable and deliberately indifferent to plaintiff's medical needs.  On the other

6  hand, there is also material evidence for a rational jury to conclude that defendant Harrington

7  was simply following prudent practice when he requested the endocrinologist's consultation.

8  Therefore, the Court recommends that summary judgment be denied to plaintiff and defendant

9  on the issue of whether defendant Herrington's conduct after July 16, 2018 violated the Eighth

10 Amendment.  The Court must also decide whether he is entitled to qualified immunity, which

11 will be discussed *infra*, part VI.

12     **V.  Cross Motions for Summary Judgment Regarding Defendant Light**

13     Defendant Light states that he is a Certified Physician's Assistant at the Stafford Creek

14 Corrections Center and that he participated in plaintiff's treatment and care.  Dkt. 41, at 1–2.  On

15 January 5, 2018, defendant Light treated plaintiff for a self-inflicted cut to her scrotum.  *See* Dkt.

16 33-1, at 15; Dkt. 41, at 2.  Defendant Light's report documents that plaintiff "was frustrated and

17 wanted to perform an orch[i]ectomy by herself."  Dkt. 33-1, at 15.  The GD-CRC's April 2018

18 report references the January 2018 incident, describing that "[plaintiff] did make a superficial cut

19 to the scrotum, reportedly considering autocastration and requiring three sutures, in January of

20 this year."  Dkt. 33-1, at 165.

21     In June 2018, defendant Light became plaintiff's primary care provider.  *See* Dkt. 41, at

22 2.  Defendant Light met with plaintiff on October 12, 2018, she signed a consent form, and

23 defendant Light ordered hormone treatment to begin.  *See* Dkt. 41, at 4.

24

1    Plaintiff argues that defendant Light is liable as a matter of law on the basis that he

2  ignored her medical kites pleading for hormone treatment, instead of acting to ensure that she

3  received the hormone treatment that the GD-CRC had authorized in July 2018.  Dkt. 33, at 11.

4  Defendant Light responds that summary judgment in his favor is appropriate because he did not

5  personally participate in plaintiff's care and was not deliberately indifferent to her condition.  *See*

6  Dkt. 41, at 1; Dkt. 38, at 15, 18, 20.

7    **A.  Personal Participation**

8    The parties provide conflicting evidence about the extent of defendant Light's knowledge

9  of the delay and failure to act.  Plaintiff provides evidence that defendant Light treated her for

10  her self-castration attempt in January 2018 and for a June 2017 panic attack related to her GD.

11  *See* Dkt. 33-1, at 15, 17.  Plaintiff does not appear to dispute that defendant Light was not her

12  primary care practitioner until June 2018, nor does she provide any facts to support a conclusion

13  that defendant Light was responsible for her hormone therapy treatment prior to that time or

14  could act before the GD-CRC had authorized treatment.  Further, there is no evidence that he

15  participated in, or was part of, the GD-CRC authorization process.  Thus, the undersigned finds

16  no genuine dispute of material fact regarding whether defendant Light personally participated in

17  the alleged violations before July 16, 2018, when the GD-CRC authorized care.

18    However, after the GD-CRC authorized treatment in July 2018, plaintiff claims to have

19  sent four kites directed to defendant Light about the delay in her treatment, all of which were

20  responded to by other providers.  Dkt. 33-1, at 213–16.  She also claims that she spoke to

21  defendant Light—apparently during that time—about her unremitting emotional pain and anxiety

22  while awaiting treatment.  Dkt. 33-1, at 12.

23

24

For his part, defendant Light states that he was not involved with "[plaintiff's] diagnosis and treatment for Gender Dysphoria before October 12, 2018," when he met with plaintiff and directed her treatment. Dkt. 41, at 2. He claims that he did not receive her kites, and that he was unaware of her concerns. Dkt. 41, at 4.

Although defendant Light claims that he was unaware of plaintiff's concerns before October 12, this appears to be in conflict with plaintiff's statement that she spoke to defendant Light about her concerns, in addition to submitting kites directed to him. *See* Dkt. 33-1, at 12.

Moreover, the record is unclear regarding whether defendant Light could have acted despite defendant Herrington's decision to delay treatment pending an endocrinologist's opinion. Although defendant Light states—somewhat obliquely—that "[i]nitiation of hormone treatment would not have been possible prior to receiving" the endocrinologist's opinion (Dkt. 41, at 3), plaintiff claims that defendant Light could have overridden defendant Herrington's decision to delay treatment. *See* Dkt. 43, at 11.

Therefore, there is sufficient evidence for a reasonable jury to concluded that defendant kite personally participated in delaying or denying plaintiff's treatment after July 2018, but that evidence is disputed.

### B.  Deliberate Indifference

Again, regarding the period after July 2018, defendant Light asserts that he was not deliberately indifferent to plaintiff's case because he was unaware of her concerns, never having received her medical kites; because he could not have initiated hormone treatment before receiving the endocrinologist's opinion; and because he could not have sooner scheduled her appointment due to his schedule. Dkt. 41. As set forth above, the undersigned finds that plaintiff's declaration creates a triable issue of fact regarding whether defendant Light did, in

1    fact, know of and disregard a substantial risk of harm as a result of delaying her hormone

2    treatment.  Not only does plaintiff allege that she communicated her concerns to defendant Light,

3    but it is undisputed that he was the one who treated her for her auto-castration attempt in January

4    2018.  *See* Dkt. 41, at 2.  Thus, by the time he became her primary medical care provider in June

5    2018, defendant Light should have been aware of a significant risk of harm associated with

6    delaying treatment.

7          As for defendant Light's claim that he could not initiate hormone treatment before

8    receiving the endocrinologist's opinion, the GD-CRC's authorization does not require further

9    evaluation before implementing treatment.  The DOC GD protocol required facility clinical staff

10   to "develop a treatment plan that is in accordance with the treatment interventions authorized by

11   GD[-]CRC."  Dkt. 33-1, at 164.  A rational trier of fact could find from the evidence presented

12   that by acting contrary to the GD-CRC's authorization to implement hormone treatment—with

13   no noted medical contraindications to care—defendant Light postponed treatment without a valid

14   medical reason.

15         Moreover, although defendant Light claims that delay after August 30, 2018 was

16   unavoidable due to scheduling issues (*see* Dkt. 41, at 3), it is a reasonable inference that had

17   defendant Light acted earlier, attempts to schedule an appointment with defendant Light could

18   have begun earlier.  Although delaying some forms of treatment due to scheduling problems is

19   sometimes inevitable, at some point failing to provide treatment for necessary medical needs

20   constitutes deliberate indifference.  *See, e.g.*, *Battista v. Clarke*, 645 F.3d 449, 455 (1st Cir.

21   2011) ("[E]ven though it does not rest on any established sinister motive or 'purpose' to do harm

22   . . . the Department's action is undercut by a composite of delays, poor explanations, missteps,

23

24

1   changes in position and rigidities[.]").  This is a jury question and cannot be decided as a matter

2   of law in favor of either party based on the evidence presented.

3          **VI.  Qualified Immunity Regarding Defendant Herrington and Defendant Light**

4         Defendants assert that they are entitled to qualified immunity against damages on

5   plaintiff's § 1983 claims.  Dkt. 38, at 20.  The undersigned addresses qualified immunity as it

6   pertains to the two defendants for whom a rational trier of fact could find in plaintiff's favor:  the

7   claims against defendants Herrington and Light for interfering with and/or delaying treatment

8   after the GD-CDC approved of plaintiff's hormone treatment in July 2018 and until she finally

9   began receiving treatment on November 3, 2018—a period of approximately 3 1/2 months.

10        The inquiry into qualified immunity has two components, either of which may be

11   addressed first: "whether the plaintiff has suffered a deprivation of a constitutional or statutory

12   right" and "whether that right was clearly established at the time of the alleged misconduct."

13   *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (internal quotation omitted) (per curiam).  "'To

14   be clearly established, a right must be sufficiently clear that every reasonable official would have

15   understood that what he is doing violates that right.'"  *Id.* (quoting *Reichle v. Howards*, 132 S.

16   Ct. 2088, 2093 (2012)).

17         Plaintiff argues that "[p]rison officials have been on notice for years that leaving serious

18   medical conditions, including gender dysphoria, untreated can amount to unconstitutional

19   deliberate indifference."  Dkt. 43, at 12–13.  However, framing the inquiry as whether

20   defendants Harrington and Light were on notice that they may not leave serious medical

21   conditions untreated is "too high a level of generality" for qualified immunity purposes.  *See, e.g*,

22   *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir. 2016).  Rather, the inquiry must be

23   undertaken in light of the specific context of the case and not as a broad general proposition.  *Id.*

24

1    For their part, defendants argue that the qualified immunity inquiry comes down to

2    whether it is "clearly established" that a delay of, at most, 13 months in providing hormone

3    therapy for a person suffering from GD violates the Eighth Amendment.  *See* Dkt. 38, at 22–23

4    (discussing *Mitchell v. Kallas*, 895 F.3d 500 (7th Cir. 2018)).  But this frames the inquiry at too

5    high a level of specificity.  *See Scott v. Cty. of San Bernardino*, 903 F.3d 943, 951 (9th Cir.

6    2018) ("Though the constitutional right must be clearly established such that 'a reasonable

7    official would understand that what he is doing violates that right,' . . . '[t]here need not be a case

8    dealing with these particular facts to find [the officer's] conduct unreasonable.'"  (quoting *Hope*

9    *v. Pelzer*, 536 U.S. 730, 739 (2002); *Doe ex rel. Doe v. Hawaii Dep't of Educ.*, 334 F.3d 906,

10    910 (9th Cir. 2003)).

11    Rather, the proper inquiry in this case is whether, when the evidence is viewed in the

12    light most favorable to the prisoner, a reasonable person in defendants' position should have

13    known that purposely postponing gender dysphoria hormone treatment that had already been

14    authorized by the GD-CRC violated plaintiff's clearly established Eighth Amendment right.

15    As pointed out in *Saucier v. Katz*, 533 U.S. 194 (2001), this is a different inquiry from

16    whether plaintiff has presented evidence that is sufficient to prove that defendant violated her

17    constitutional rights.  "The concern of the immunity inquiry is to acknowledge that reasonable

18    mistakes can be made as to the legal constraints. . . ."  *Saucier*, 533 U.S. at 205, *overruled on*

19    *other grounds, Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Qualified immunity goes further

20    and protects public officials unless defendant's actions violate plaintiff's "clearly established"

21    rights.  *Id.* at 202.

22

23

24

1       It is beyond debate in the Ninth Circuit that denying or interfering with directed medical

2  treatment violates the Eighth Amendment. *See, e.g.*, *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th

3  Cir. 2000); *see also Portillo v. Johnson*, 94 Fed. App'x 457, 459 (9th Cir. 2004).

4       It is also undisputed the GD-CDC authorized plaintiff's hormone treatment on July 16,

5  2018. *See* Dkt. 39-1, at 66. The Washington State Department of Corrections' Health Services

6  Division Offender Health Plan sets forth when medical treatment for offenders is medically

7  necessary. Dkt. 39-1, at 6–53. The Offender Health Plan makes clear that in GD cases, the GD-

8  CRC "is the method DOC uses to assure the appropriateness of the purchased health care

9  services given to offenders." Dkt. 39-1, at 14. Violating the DOC's own standards about GD

10  treatment supports the conclusion that a delay in treatment was deliberate interference with

11  authorized treatment and therefore conduct that a reasonable official should have known violated

12  clearly established rights.

13       The GD-CDC initially considered plaintiff's request for GD treatment with hormone

14  therapy at "level 2." *See* Dkt. 39, at 3. Level 2 medically necessary care will be provided if it is

15  authorized by a care review committee—such as the GD-CRC. *See* Dkt. 39-1, at 13. A care

16  review committee is charged with determining what treatment is "medically appropriate." Dkt.

17  39-1, at 13. Once authorized, then the care is considered Level 1, "[m]edically necessary care."

18  *See* Dkt. 39-1, at 13.

19       Regarding when a primary care practitioner can interfere with a committee determination,

20  the Offender Health plan allows for the practitioner to intervene in two circumstances. First, a

21  primary care practitioner may re-present a case to the committee for reconsideration in light of

22  additional information. Dkt. 39-1, at 17. Second,

23      [i]f, at any time after a proposed intervention has been authorized by CRC, the
         clinical circumstances of the case change significantly and there is a question that

24

the authorized intervention is the most appropriate intervention, the primary care practitioner should take the case to CRC for further review.

Dkt. 39-1, at 17. Because the Offender Health Plan defines two instances in which a primary care practitioner can act to delay care authorized by a committee, therefore, it would appear that otherwise, a practitioner must provide authorized care.

Here, neither of the two exceptions to providing authorized care apply because—taken in the light most favorable to plaintiff—elevated prolactin levels were known to the GD-CRC when it found no medical contraindication to treatment. Under plaintiff's version of the facts, therefore, the mildly elevated prolactin levels amounted to neither additional information nor changed circumstances.

Moreover, it is undisputed that neither defendant Harrington nor defendant Light resubmitted anything to the GD-CRC regarding plaintiff's hormone treatment during the 3 1/2 months between when the GD-CRC authorized care and when plaintiff received her first injection. Defendant Harrington acknowledges that he "participated in [plaintiff's] medical care" during this period. Dkt. 40, 2. Defendant Light acknowledges that he was plaintiff's primary care provider beginning in June of 2018. It is also undisputed that neither of them provided hormone treatment to plaintiff during this 3 1/2 month period.

Viewing the case in the light most favorable to plaintiff, both of these defendants violated a clearly established right when they postponed treatment that the GD-CDC had authorized, in contravention of DOC's own protocol regarding level 2 care.

Both of these defendants claim that they did not violate such a right. Defendant Harrington claims that plaintiff's mildly elevated prolactin levels warranted additional endocrinology consultation. Dkt. 40, at 2. However, as previously discussed, there is evidence that the GD-CDC had already considered plaintiff's prolactin levels before finding no medical contraindications and

authorizing the treatment. *See supra*, part IV(B). Therefore, there is evidence to support that this was not a changed circumstance or "additional" information—nor did defendant Herrington seek reconsideration by the GD-CDC. Defendant Light claims that he never received the numerous kites that plaintiff claims to have filed between July and November 2018 and that he did not see her for her primary care provider visit until October 12, 2018. He claims that the reason for the delay was difficulties in scheduling and because the medical evaluation was complicated by the abnormal lab finding of elevated prolactin levels. *See* Dkt. 41, at 5. Finally, he concludes that this hormone treatment was not a medical emergency or urgency. *Id.*

Although a jury may concur with one or more of these explanations, viewing the evidence in the light most favorable to plaintiff, defendants Harrington and Light violated plaintiff's clearly established Eighth Amendment rights when they deliberately delayed medically necessary treatment that had been authorized by the GD-CD. The undersigned recommends that the District Court find that qualified immunity does not apply.

**VIII.  Conclusion**

Genuine issues of material fact prevent judgment for either party on plaintiff's claims for damages against defendant Herrington and defendant Light after the GD-CRC authorized plaintiff's hormone treatment on July 16, 2018, and until plaintiff began receiving hormone treatment on November 3, 2018.

Therefore, defendants' motion for summary judgment should be **denied in part and granted in part**, and plaintiff's motion for summary judgment should be **denied in full.** Specifically, claims for injunctive relief, claims against defendant Gage, and claims against defendants Herrington and Light other than for the period between July 16, 2018 and November 3, 2018, should be dismissed with prejudice. Because there are genuine issues of material fact

1    precluding summary judgment in any party's favor, the claims against defendants Herrington and

2    Light for the period between July 16, 2018 and November 3, 2018 should survive.

3         Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

4    fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

5    6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

6    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

7    of those objections for purposes of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

8    *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted).  Accommodating the time limit

9    imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

10   September 27, 2019 as noted in the caption.

11        Dated this 12th day of September, 2019.

12

13

14                                            J. Richard Creatura
                                             United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

REPORT AND RECOMMENDATION - 29